# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| BEACH TV PROPERTIES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 15-1823 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 24, 25, 27, 28 |
| | : | | |
| HENRY A. SOLOMON, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting Haley Bader & Potts, P.L.C.'s Motion to Dismiss; Granting Garvey, Schubert & Barer's Motion to Dismiss; and Granting in Part and Denying in Part Henry A. Solomon's Motion to Dismiss

Two days before the world bid farewell to the twentieth century, attorney Henry Solomon filed seemingly-routine paperwork with the Federal Communications Commission. Little did he know that omissions on a one-page form would have his client claiming that he lost it hundreds of millions of dollars almost seventeen years later. Plaintiffs allege that Mr. Solomon was negligent both in his filing of the FCC form and in how he handled the administrative appeals. They also seek to hold his employers—Haley Bader & Potts at the time he filed the form and Garvey, Schubert & Barer when he appealed—liable for his malpractice.

Defendants' motions to dismiss present several disparate issues ranging from the purely procedural to the purely substantive. The now-defunct Haley Bader & Potts asks the Court to identify to what extent it is possible for an attorney to practice before a federal agency, yet remain beyond the reach of District of Columbia courts. Garvey, Schubert & Barer asks the Court to resist widening the scope of successor liability *vis a vis* legal malpractice claims. The

same defendant also asks the Court to wade through a web of "what-ifs" hidden in Plaintiffs'

theories of causation.  Piggy-backing off of his co-defendants' motions, Henry Solomon asks the

Court to determine which plaintiff may maintain this action, in light of one plaintiff's attempted

assignment of these claims to the other plaintiff.  Although these are only four of the many issues

that Defendants ask the Court to address, they are sufficient for the Court to resolve the motions

before it.  The Court will dismiss Plaintiffs' claims against Haley Bader & Potts, P.L.C. for lack

of personal jurisdiction, and against Garvey, Schubert & Barer for failure to state cognizable

claims.  The court will dismiss Plaintiffs' claims pertaining to negligent appeals in Count Two

against Henry A. Solomon, and further dismiss all claims made by Beach TV Properties for lack

of standing.  The sole remaining plaintiff following this order is The Atlanta Channel, and its

sole remaining claim is in Count One against Henry Solomon, for filing a defective Statement of

Eligibility.

## I.  BACKGROUND

### A.  The WTHC-LD License Application

Plaintiffs in this case, Beach TV Properties, Inc. ("Beach TV"), and The Atlanta Channel,

Inc. (ACI), allege that defendant Henry Solomon and his former law firms, defendants Haley

Bader & Potts, P.L.C. ("Haley Bader") and Garvey, Schubert & Barer ("Garvey"), committed

legal malpractice in connection with Plaintiffs' application for an FCC Low-Power Television

("LPTV")[1] class A license.  *See* Am. Compl. ¶¶ 122–137, ECF No. 21.  Specifically, Plaintiffs

allege that, in 1999, Mr. Solomon failed to adequately complete the required Statement of

---

[1] Low Power Television Service is designed "to provide opportunities for locally-oriented television service in small communities."  *Low Power Television (LPTV) Service*, Federal Communications Commission, https://www.fcc.gov/consumers/guides/low-power-television-lptv-service (last updated November 7, 2015).

Eligibility, which would have entitled ACI to a class A license.  *Id.* ¶¶ 24–27.  They also allege that Mr. Solomon committed malpractice throughout the administrative appeal process for failing to raise procedural errors committed by the FCC.  *Id.* ¶ 125.  Plaintiffs seek to hold Haley Bader and Garvey jointly and severally liable for the allegedly deficient application and appeals through theories of respondeat superior, and, in the case of Garvey, successor liability.  *See id.* ¶¶ 126–137.

In 1999, Congress enacted the Community Broadcasters Protection Act ("CBPA"), codified at 47 U.S.C. § 336(f), to preserve LPTV community broadcasting.  The CBPA required the FCC to promulgate regulations to establish a class A license for LPTV qualifying stations.  *See* 47 U.S.C. § 336(f)(1)(A).  It also required the FCC to, "[w]ithin 30 days after November 29, 1999 . . . send a notice to the licensees of all [LPTV] licenses that describes the requirements for class A designation."  *See* 47 U.S.C. § 336(f)(1)(B).  Then, "[w]ithin 60 days after November 29, 1999,[2] licensees intending to seek class A designation shall submit to the Commission a certification of eligibility based on the qualification requirements," and, "[a]bsent a material deficiency, the Commission shall grant certification of eligibility to apply for class A status."  *Id.*

On December 27, 1999, Beach TV signed six Statements of Eligibility and sent them to Mr. Solomon for review and filing with the FCC.  Am. Compl. ¶ 22.  That same day, ACI also sent a Statement of Eligibility for its WTHC-LD license to Mr. Solomon for review and filing.  *Id.* ¶ 23.  Two days later, Mr. Solomon, employed by Haley Bader, filed the Statements of Eligibility with the FCC, but failed to complete Parts 3 or 4—the only portions pertaining to the

---

[2] In other words, by January 28, 2000.

applicant's substantive eligibility—of the five-part, one-page form[3] for ACI's WTHC-LD

license.  *See id.* ¶ 24–25; Pls.' Am. Compl. Ex. A, ECF No. 21-1.  In early June, 2000, the Mass

Media Bureau of the FCC issued class A licenses to Beach TV's six LPTV stations.  Am. Compl.

¶ 29.  A week later on June 9, despite ACI meeting all eligibility requirements, the Mass Media

Bureau dismissed ACI's Statement of Eligibility for WTHC-LD on the grounds that it contained

a "material deficiency" because Part 3 of the form was not filled out.  *Id.* ¶¶ 30–32.

Shortly after the dismissal, Mr. Solomon filed a petition for reconsideration with the

Mass Media Bureau, submitting an "amended" ACI statement with all parts complete.  *Id.* ¶ 50.

In November, 2000, the Bureau denied ACI's petition because the original Statement of

Eligibility was "patently defective."  *Id.* ¶ 52.  The Bureau reasoned that "the January 28th[,

2000] certification deadline was statutory [so] the Commission [did] not have general authority

to waive or extend the deadline, absent extraordinary circumstances."  *Id.* ¶ 53.  Mr. Solomon

applied for review by the full FCC.  *Id.* ¶ 65.  Nearly ten years later in November, 2012, finding

that the Mass Media Bureau was reasonable in interpreting "material deficiency" to include "the

complete omission of the required certifications, regardless of whether the licensee actually met

the statutory qualifications at the time of filing," the FCC rejected ACI's application for review.

*Id.* ¶ 67.  Garvey then unsuccessfully petitioned for reconsideration, which the FCC denied on

October 7, 2014.  *Id.* ¶¶ 70–72.

Later that year, Beach TV, represented by new counsel, appealed to the United States

Court of Appeals for the District of Columbia Circuit.  *See id.* ¶ 73; Mot. of Def. Garvey

---

[3] The only completed Parts of the form asked for the company's general information (name, mailing address, etc.), contact representative, and signature.  *See* Pls.' Am. Compl. Ex. A, ECF No. 21-1.  The remaining two Parts asked for information relating to the statute's LPTV eligibility requirements and whether the applicant was in violation of the Anti-Drug Abuse Act of 1988, which would jeopardize eligibility.  *See id.*

Schubert Barer to Dismiss Am. Compl. Under Rule 12(b)(6) ("Garvey Mot. to Dismiss") Ex. 13, ECF No. 24-14.  Beach TV argued that the FCC's interpretation of "material deficiency" and assertion that it could not extend the deadline absent "extraordinary circumstances" constituted legislative rulemaking under the Administrative Procedure Act ("APA"), and that the FCC had not followed APA requirements.  *See* Garvey Mot. to Dismiss Ex. 12, ECF No. 24-13; Am. Compl. ¶¶ 53–55.   The D.C. Circuit, per curiam, ruled that it did not have jurisdiction to address Beach TV's new legislative-rulemaking claims.  *See* Garvey Mot. to Dismiss Ex. 13., at 3; *Beach TV Properties, Inc. v. FCC*, 617 F. App'x 10, 11 (D.C. Cir. 2015).  The court further held that the FCC was not arbitrary or capricious in concluding that ACI's failure to complete Parts 3 and 4 of the Statement of Eligibility constituted a material deficiency, and that the statutory deadline of 60 days "is unequivocal."  *See Beach TV Properties, Inc.*, 617 F. App'x at 11.

Plaintiffs allege that they would have received a class A license had Defendants made any of the following four arguments during the WTHC-LD administrative appeals, *see* Am. Compl. ¶¶ 68, 76:  first, that Plaintiffs were entitled to formal adjudication under the APA, 5 U.S.C. § 558(c), because they were applying for a license, *see id.* ¶¶ 36–37; second, that the FCC's interpretations of "material deficiency" and statutory deadline constituted rulemaking under the APA, *id.* ¶ 51; third, assuming that such interpretations constituted rules, that they must have first been published prior to taking effect, *id.* ¶ 64; fourth, that the "rules" were unlawfully retroactively applied, *id.*

### B.  The Relationship Between Mr. Solomon, Haley Bader, and Garvey

In March, 2000, before filing ACI's first petition for reconsideration, Mr. Solomon moved from Haley Bader to Garvey.  Am. Compl. ¶ 83–89.  He did so along with "all of the attorneys and support staff of the Haley firm," and continued providing legal advice to Plaintiffs

throughout his transition.  *Id.* ¶ 88(c).  Shortly thereafter, Haley Bader stopped functioning as a

law firm and continued solely to wind up its affairs.  *See id.* ¶ 89; Am. Compl. Ex. B, ECF No.

21-2.  Garvey expressly disclaimed responsibility for Haley Bader's accounts receivable,

accounts payable, and all liabilities other than certain library subscriptions.  Am. Compl. Ex. B,

at ¶¶ 6–8.  Although Haley Bader received no consideration for its dissolution, Am. Compl. ¶ 87,

Garvey did hire all seven of Haley Bader's members as "of counsel."  Am. Compl. Ex. B, ¶ 2.

These seven members would each become eligible for an ownership interest in the firm "at a

future date that is not less than two years" after being employed at Garvey.  *Id.* ¶ 4.  Until that

time, they would not be entitled to a vote in Garvey management or attend firm-wide ownership

meetings.  *See id.*; Am. Compl. Ex. C, at ¶ 1.  Garvey conditioned the offers of employment on

Haley Bader showing evidence of tail insurance, *id.* ¶ 7, and all seven members of Haley Bader

accepting, *id.* ¶ 12.  At the end of 2005, Haley Bader was cancelled by operation of law due to

failure to pay its annual registration fee.  *See* Def. Haley Bader & Potts P.L.C.'s Br. in Supp. of

Rule 12(b) Mot. to Dismiss Am. Compl. ("Haley Mot. to Dismiss") Ex. A, ECF No. 27-2.

     Mr. Solomon is a citizen of the District of Columbia.  Am. Compl. ¶ 5.  Haley Bader was

a Virginia Professional Limited Liability Company, and was served process in Virginia pursuant

to Virginia law.  *Id.* ¶ 8; Aff. of Service by Haley Bader & Potts P.L.C., ECF No. 8.  Garvey is a

Washington state law partnership of corporations, none of which are citizens of Florida or

Georgia.  Am. Compl. ¶ 10.  Mr. Solomon is licensed to practice law in the District of Columbia,

and "has held himself out . . . as a specialist in FCC law . . . ."  *Id.* ¶ 7.  Haley Bader and Garvey

have also allegedly held themselves out as specialists in FCC law.  *Id.* ¶¶ 9, 11.  According to

Mr. Solomon, he sent the Statement of Eligibility from Haley Bader's office in Virginia, and

Haley Bader performed all work on the Statement in Virginia.  *See* Haley Mot. to Dismiss Ex. B

¶¶ 5–6, ECF No. 27-3.  Neither Mr. Solomon nor any attorney from Haley Bader appeared before the FCC in the District of Columbia in connection with the WTHC-LD Statement.  *Id.* ¶¶ 7–9.

Plaintiffs allege that Haley Bader does not have sufficient assets to pay the full amount of damages alleged in the Complaint.  Am. Compl. ¶ 91.

### C.  The Relationship Between ACI and Beach TV

On Mr. Solomon's advice, ACI assigned the WTHC-LD license to Beach TV in 2009.  Am. Compl. ¶¶ 92–94.  Mr. Solomon had not advised either party that ACI had potential malpractice claims, nor that assigning the license could harm ACI's malpractice lawsuit.  *Id.* ¶ 97.  However, Plaintiffs do not seek recovery on this basis.  *See id.* ¶¶ 122–37.  In 2015, ACI assigned its malpractice claims to Beach TV "as of the date of the assignment of the WTHC-LD License."  *Id.* ¶ 100.  The Amended Complaint does not specify where the assignment was negotiated or executed, but does allege that Mr. Solomon—a D.C. resident then employed by Garvey in Virginia—advised on the assignment.  *See id.* ¶¶ 92–101.

Beach TV is a Florida corporation with its principal place of business in Florida.  *Id.* ¶ 1.  ACI is a Florida corporation with its principal place of business in Georgia.  *Id.* ¶ 2.  WTHC-LD broadcasts in Atlanta, Georgia.  *Id.* ¶ 111.

## II.  ANALYSIS

The Court will first consider Haley Bader's motion to dismiss for lack of personal jurisdiction.  Because Haley Bader has neither "continuous and systematic contacts" with the District of Columbia nor sufficient contacts arising from their allegedly negligent representation of ACI, the Court will grant the motion and dismiss all counts against Haley Bader.  The Court

will then turn its attention to Garvey's motion to dismiss for failure to state a claim.  Because Garvey's employment agreements with Haley Bader's former partners did not rise to the level of a de facto merger or a mere continuation of the entity Haley Bader, the Court will dismiss Count Six.  The Court will also dismiss Counts Two, Four and Five against both Garvey and Mr. Solomon, because Plaintiffs' theories of malpractice during the administrative appeal are not legally plausible.  Finally, with only Count One remaining against Mr. Solomon, the Court will address whether ACI's attempted transfer of these claims to Beach TV was effective.  Because Virginia law applies, it was not, and only ACI has standing to maintain this action.

This is a diversity action brought under 28 U.S.C. § 1332.  *See* Am. Compl. ¶ 12.  The parties are diverse and the amount in controversy exceeds $75,000.  *See id.* ¶¶ 1–12, 122–137.

## A.  Personal Jurisdiction over Haley Bader

The plaintiff bears the burden of establishing personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  And, although the court must resolve any factual discrepancies in favor of the plaintiff, *Crane*, 894 F.2d at 456, "[b]are allegations and conclusory statements are insufficient."  *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 95 (D.D.C. 2012); *see also Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).  A court may consider evidence outside of the pleadings to resolve questions of personal jurisdiction. *See Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).

"A personal jurisdiction analysis requires that a court determine whether jurisdiction over a party is proper under the applicable long-arm statute and whether it accords with the demands of due process."  *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995); *accord GTE New*

*Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  There are two distinct types of personal jurisdiction: general jurisdiction, whereby a court can entertain claims against the defendant regardless of the claim's relationship to the forum, and specific jurisdiction, where jurisdiction is based on acts by the defendant that touch and concern the forum.  *D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008).  General jurisdiction "sets a high bar," requiring that the defendant have "continuous and systematic" contacts with the forum state.  *Id.*  Specific jurisdiction, in comparison, requires only sufficient "'minimum contacts' with [the forum]," but requires that the plaintiffs' claims arise from those contacts.  *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  For claims brought pursuant to courts' specific jurisdiction, the relationship between the defendant, the forum, and the litigation "is the essential foundation of [personal] jurisdiction."  *Id.*

In a diversity-jurisdiction case, "the federal district court's personal jurisdiction over the defendant is coextensive with that of a District of Columbia court."  *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).  Accordingly, an assertion of personal jurisdiction here must comply with Due Process and District of Columbia law.  Under D.C. law, "personal jurisdiction is determined as of the commencement of an action."  *Roz Trading Ltd v. Zeromax Grp., Inc.*, 517 F. Supp. 2d 377, 384 (D.D.C. 2007).

Defendant Haley Bader argues that this Court lacks personal jurisdiction, because Plaintiffs have shown neither "continuous and systematic" contacts between Haley Bader and the District of Columbia, nor any specific set of contacts with an adequate nexus to Plaintiffs' claims.  The Court will address these contentions in order.

1.  General Jurisdiction

District of Columbia courts may exercise general jurisdiction "over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in" the District of Columbia.  D.C. Code § 13-422.  D.C. Code § 13-334(a) also authorizes the exercise of general jurisdiction over "a foreign corporation doing business in the District."  *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 n.1 (D.C. Cir. 2002).  However, jurisdiction under § 13-334(a) requires "that personal service be made within the District of Columbia."  *See Everett v. Nissan Motor Corp. in U.S.A.*, 628 A.2d 106, 108 (D.C. 1993).  Here, Plaintiffs allege that Haley Bader was a Virginia Professional Limited Liability Company.[4]  Am. Compl. ¶ 8. They do not dispute that Haley Bader dissolved in 2005.  *See* Pls.' Mem. of Law in Opp'n to Mot. of Def. Haley Bader & Potts, PLC to Dismiss the Am. Compl. ("Pls.' Opp'n to Haley Mot.") at 7, ECF No. 36.  Nor do they deny that Haley Bader was served in Virginia pursuant to Virginia law.  *See id.* at 6 n.5.

Plaintiffs nonetheless contend that Haley Bader is subject to the court's personal jurisdiction because the firm "had continuous and systematic contacts with the District of Columbia by practicing law before the FCC up until 2000," and waived any defects related to

---

[4] Plaintiffs do allege that Haley Bader had members who were citizens of the District of Columbia when it existed.  Haley Bader notes in its Brief in Support of its Motion to Dismiss that the citizenship of LLCs and PLLCs cannot be used to establish personal jurisdiction, citing, among other cases, *Carruth v. Michot*, 2015 WL 6506550 (W.D. Tex. Oct. 26, 2015).  Plaintiffs appear to agree, arguing only that Haley Bader was "doing business" in the District of Columbia.  *See* Pls.' Mem. of Law in Opp'n to Mot. of Def. Haley Bader & Potts, PLC to Dismiss the Am. Compl. ("Pls.' Opp'n to Haley Mot.") at 4–7, ECF No. 36.  Although neither party cites to an authoritative source on the issue, the Court need not resolve it to dispose of Defendant's motion, because Haley Bader was dissolved at the time of filing.

service of process in this case.[5]  *See id.* at 6 n.5, 7.  They further contend that "'continuous and systematic contacts' cannot be determined . . . solely on the basis of a snapshot at one particular point in time, such as the filing of the complaint."  *See id.* at 7.

Plaintiffs' syllogism is flawed in three critical respects.  First, Haley Bader's waiver of service of process defects does not estop it from asserting a defense based on a statutory prerequisite for personal jurisdiction.  In *Everett*, the plaintiffs served the out-of-state defendants pursuant to a District of Columbia Superior Court rule authorizing service of process by certified mail.  628 A.2d at 108.  The District of Columbia Court of Appeals concluded that by serving the defendant outside of the District of Columbia, the plaintiffs "failed to comply with [§ 334]'s mandate, and . . . thus [were] foreclosed from benefitting from its jurisdictional protection."  *See id.*  The court highlighted the difference between general provisions for service of process and the specific jurisdictional requirements prescribed by statute.  *See id.*  Here, it does not matter that Haley Bader waived defects to service of process, because they need not assert that there was a procedural defect with it.  Instead, the sole inquiry is whether the plaintiffs, by virtue of meeting the service requirements of D.C. Code § 13-334, became entitled to assert it as a basis for jurisdiction.  Because they did not, D.C. law precludes the Court from asserting general personal jurisdiction over Haley Bader.

---

[5] Plaintiffs also assert that Haley Bader "filed hundreds of pleadings and applications with the FCC for dozens of clients," employed six attorneys licensed in the District of Columbia, and otherwise held itself out as a "Washington, D.C. firm" in 1992.  *See* Pls.' Opp'n to Haley Mot. at 5–7.  Although these facts are not relevant to the Court's analysis, it is worth noting that Plaintiffs do not cite to their Complaint or any other part of the record. Although the Court may look past the complaint in determining personal jurisdiction, a party must do more than assert jurisdictional facts in a legal memorandum.  *See Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (noting that plaintiffs may "rest their argument on their pleadings, bolstered by *such affidavits and other written materials as they can otherwise obtain*") (emphasis added)).

Second, Haley Bader's 2005 dissolution precludes the Court from finding general jurisdiction. In *Roz Trading Ltd. v. Zeromax Grp., Inc.*, the plaintiffs alleged that the defendant U.S. Zeromax—a group of companies subject to personal jurisdiction in the District of Columbia—was an "alter ego" of the foreign Zeromax GmbH, making the latter subject to general jurisdiction under § 334. 517 F. Supp. 2d at 383–84. The court dismissed without reaching the alter ego issue because U.S. Zeromax was dissolved prior to the date of the complaint, and "personal jurisdiction is determined as of the commencement of an action." *See id.* at 384. The facts here are analogous. Haley Bader has been dissolved for over a decade, leaving the Court without power to confer general jurisdiction, regardless of Plaintiffs' claim that it merged with Garvey. In an attempt to distinguish these facts from *Roz Trading*, Plaintiffs boldly assert that the court there found a lack of personal jurisdiction "because the plaintiffs failed to allege that the defendants acted within the District of Columbia at any time." *See* Pls.' Opp'n to Haley Mot. at 6–7. Plaintiffs' argument conflates general jurisdiction with specific jurisdiction. *See id.* at 6 (citing to page 387 of *Roz Trading*); *Roz Trading*, 517 F. Supp. 2d at 387 (addressing specific jurisdiction). It is true that the *Roz Trading* court found that the plaintiffs failed to meet their burden of showing personal jurisdiction because the complaint merely "parrot[ed] the relevant statutory language, proffering no factual allegations whatsoever," *see* 517 F. Supp. 2d at 387, but it did so with respect to *specific* jurisdiction.

Third, Plaintiffs are incorrect in their assertion that the filing of the complaint is merely one possible data point that could show that the court has general jurisdiction. To be sure, analyzing general jurisdiction often requires retrospective analysis of events connecting the party with the forum. *See, e.g.*, *In re Orshansky*, 804 A.2d 1077, 1091 (D.C. 2002). But the past connections between a party and a forum matter only insofar as they shed light on whether, at the

time of filing, the contacts are sufficiently "continuous and systematic" to justify the assertion of

jurisdiction over *any* claim—whether related to those contacts or not—against the party.  *See Roz*

*Trading*, 517 F. Supp. 2d at 384–85; *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509–

10 (D.C. Cir. 2002).

Haley Bader was not domiciled in the District of Columbia or organized under District of

Columbia law, and did not maintain its personal place of business here.  It was not served in the

District Columbia, and did not exist as an entity when the Complaint was filed.  Accordingly, the

Court does not have general jurisdiction over Haley Bader.

## 2.  Specific Jurisdiction

Because the Court can still assert specific personal jurisdiction over parties whose

contacts with the forum relate to particular claims before it, the analysis continues.  Under the

District of Columbia's long-arm statute:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's —
>
> > (1) transacting any business in the District of Columbia; . . .
> >
> > (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> >
> > (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . .
>
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

D.C. Code § 13-423.  District of Columbia courts have interpreted paragraph (a)(1) to permit

jurisdiction over defendants "transacting business" as far as the Due Process Clause allows.  *See*

*Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 810 (D.C. 1976).

Because paragraph (a)(1) extends as far as the Due Process Clause, "the statutory and []
jurisdictional questions, which are usually distinct, merge into a single inquiry . . . ." *See United
States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995), *amended* (July 28, 1995). "In this single
inquiry, courts must examine whether the defendant has purposefully availed itself of the
benefits and protections of the District in engaging in a business activity in the forum
jurisdiction, and whether it is fair and reasonable to expect it to anticipate being sued in that
jurisdiction." *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 154 (D.D.C.
2010) (internal quotations omitted). In contrast, paragraphs (a)(3) and (a)(4) "stop[] short of the
outer limits of due process," requiring careful analysis of where the "act" and "injury" occurred.
*See Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986) (internal
quotations omitted). Paragraph (b) of the statute acts as a limit on paragraph (a), "bar[ring] . . .
claims unrelated to the acts forming the basis for personal jurisdiction." *Willis v. Willis*, 655
F.2d 1333, 1336 (D.C. Cir. 1981).

Plaintiffs argue that Haley Bader is subject to personal jurisdiction, asserting that it
transacted business in the District of Columbia and caused tortious injury in the District of
Columbia. The Court will address these contentions in turn.

### *a.  "Transacting Business" Under § 13-423(a)(1)*

In the Amended Complaint, Plaintiffs assert that Haley Bader "practiced law before the
FCC and held itself out" as an FCC specialist firm. *See* Am. Compl. ¶ 9. They further assert
that Mr. Solomon—then employed by Haley Bader—reviewed and filed a defective statement
with the FCC as a member of the District of Columbia bar, and that his act of filing had
"significant legal consequences." *See id.* ¶ 6–7; Pls.' Opp'n to Haley Mot. at 8. They argue that
Mr. Solomon "practiced law" as defined by District of Columbia Court of Appeals rules. *See*

Pls.' Opp'n to Haley Mot. at 8 (citing D.C. Ct. App. R. 49(b)(2)(D)).  They never contend, however, that Mr. Solomon entered the District of Columbia in connection with the allegedly defective statement.[6]

Taken together, Plaintiffs' allegations are insufficient to meet their burden of showing specific personal jurisdiction.  The mere act of filing with a federal agency does not allow the Court to assert jurisdiction on the basis that Haley Bader was "transacting . . . business" in the District of Columbia.[7]  In *Touchcom, Inc. v. Bereskin & Parr*, the plaintiffs made virtually identical arguments, asserting that under Virginia law—which also extended as far as the Due Process Clause allowed—the court had jurisdiction over foreign defendants who filed a patent application with the United States Patent and Trademark Office in Virginia.  574 F.3d 1403, 1412 (Fed. Cir. 2009).  There, the defendants engaged in subsequent communications and filings with the USPTO, but "never traveled to Virginia in connection with th[e] patent."  *See id.* at 1412.  The United States Court of Appeals for the Federal Circuit held that, even though the defendants did establish their contacts with Virginia purposefully, they did not avail themselves to the "'privilege of conducting business within' Virginia."  *See id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  Stated differently, although the defendants had contacts with "a

---

[6] In a footnote of their argument pertaining to general jurisdiction, Plaintiffs ask for jurisdictional discovery "if and to the extent the Court deems the physical presence of Haley Firm attorneys in the District of Columbia to meet with FCC officials" in connection with the "hundreds of pleadings and applications" Haley Bader filed between 1992 and 2000.  *See* Pls.' Opp'n to Haley Mot. at 5, 5 n.4.  Because such meetings would not affect the Court's general jurisdictional analysis and Plaintiffs do not suggest that any Haley Bader attorney might have met with FCC officials in connection with the ACI Statement, Plaintiffs' request is denied.

[7] In support of the Court asserting general jurisdiction, Plaintiffs argue that when the attorney–client relationship was formed, Haley Bader was "doing business" in the District of Columbia, and the existence of such a relationship is a common element of their malpractice claims.  *See* Pls.' Opp'n to Haley Mot. at 7.  Just as the argument would not show the existence of general jurisdiction, it does not show specific jurisdiction here.  The requirement that the claim "aris[e] from" the "transacti[on] [of] business," *see* D.C. Code § 13-423, precludes finding specific jurisdiction on the basis of the formation of the attorney–client relationship.  The tortious "acts" of Haley Bader that Plaintiffs allege caused them injury are negligently filing the WTHC-LD Statement of Eligibility, not establishing a relationship.

federal agency that happen[ed] to be located" in Virginia, they did not "benefit[] from Virginia's restaurants, hotels, airports, or other commercial establishments in its prosecution of the patent," nor did they "direct[] any of their activities at issue in [the] case towards residents of Virginia, nor [did] they engage[] in business negotiations with any Virginia residents." *See id.*

Attempting to distinguish *Touchcom* from the facts here, Plaintiffs place considerable emphasis on Mr. Solomon's license to practice in the District of Columbia, and the District's corresponding interest in regulating its attorneys' conduct. *See* Pls.' Opp'n to Haley Mot. at 9. They reason that the actions of a person practicing with a District of Columbia license "directly affect[] the interests of the District of Columbia in regulating practice of law . . . ." *See id.* However, Haley Bader correctly notes that "membership in a state Bar does not have any impact on the jurisdictional analysis." *See Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 284 n.29 (D.D.C. 2011). "[I]t is the actual practice of a profession . . . and not the possession of the right to practice that brings a person within the jurisdiction of a . . . court." *Ghanem v. Kay*, 624 F. Supp. 23, 25 (D.D.C. 1984) (internal quotations omitted). So, Plaintiffs' argument only holds water if Mr. Solomon was actually practicing with his District of Columbia license. In *Ghanem*, the plaintiff sued a Maryland doctor who was licensed in Maryland and the District of Columbia. *See id.* at 24. Even though the doctor did *practice medicine* when he performed surgery on the plaintiff, he was not subject to personal jurisdiction in the District of Columbia, because he did not "carr[y] on significant activities within" the District. *See id.* at 25. Similarly, here, Mr. Solomon possessed licenses to practice law in Virginia and the District of Columbia. *See* Am. Compl. Ex. 1. His membership in the Virginia Bar was required for him to practice at Haley Bader, *see* Def. Mot. to Dismiss Am. Compl. Corrected Ex. D, ECF No. 28,

and it alone entitled him to practice before the FCC.  *See* 47 C.F.R. § 1.23(a).  Thus, Mr.

Solomon's District of Columbia law license is irrelevant to the Court's jurisdictional analysis.

Because Haley Bader did not transact business in the District of Columbia in connection

with filing the Statement of Eligibility, the Court cannot assert jurisdiction based on D.C. Code

13-423(a)(1).

### b.  *"Causing Tortious Injury" Under § 13-423(a)(4)*

Plaintiffs argue that their injury—loss of a class A license—though felt in Georgia,

occurred in the District.  *See* Pls.' Opp'n to Haley Mot. at 10–11.  They concede that the class A

license is "tied to the geographic area for which the license is granted," but assert that "it comes

into existence, or ceases to exist, pursuant to an action by the FCC in the District of Columbia."

*See id.* at 10.  The FCC's denial of the license, they argue, "was 'tortious injury' which occurred

in the District of Columbia."  *See id.* at 10–11.

Plaintiffs' argument runs counter to District of Columbia law.  "A corporation that suffers

financial losses suffers such losses at its business location."  *Geier v. Conway, Homer & Chin-

Caplan, P.C.*, 983 F. Supp. 2d 22, 36 (D.D.C. 2013) (referencing § 13-423(a)(3), citing to

*Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 10–11 (D.D.C.

2009), which analyzed paragraph (a)(4)).  Although an injury "does not necessarily occur where

the plaintiff is domiciled," "the alternate injury site" of the "original events that caused the

alleged injury" is generally where the defendant resides at the time of the injury, or where the

plaintiff has its business or consumer relationships tortuously interfered with.  *Exponential

Biotherapies*, 638 F. Supp. 2d at 10.  Although Plaintiffs may be able to argue that its "business

location" that suffered loss is either in Florida or Georgia, either alternative makes this case beyond the purview of District of Columbia courts.

Because the Court cannot assert either general or specific personal jurisdiction over Haley Bader, all counts against it must be dismissed.

## B.  Garvey's 12(b)(6) Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, would state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In evaluating a Rule 12(b)(6) motion to dismiss, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties." *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (internal citations and quotations omitted).

### 1.  Successor Liability of Garvey for the 1999 Statement

The Court begins with Plaintiffs' theory that Garvey is liable for Mr. Solomon's negligence at Haley Bader because it "joined the Garvey Firm by merging [its] legal practice" with Garvey's on March 6, 2000.[8]  *See* Am. Compl. ¶ 86.  Generally, "a business entity which

---

[8] In their Amended Complaint and memoranda, Plaintiffs refer to a "merger" of Haley Bader with Garvey, *see, e.g.*, Am. Compl. at ¶¶ 86, 88, and assert "[u]pon information and belief . . . the Haley Firm joined the Garvey firm by merging . . . ." Am. Compl. at ¶ 86.  Because, "'the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's

acquires the assets of another business is not liable for its predecessor's liabilities and debts."
*Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89 (D.C. 1994).[9]  There are
exceptions to this rule, however, when (1) "the transaction amounts to a de facto merger," and
(2) "the buying corporation is a 'mere continuation' of the selling corporation."[10]  *Id.* at 89–90.
Plaintiffs contend that both of these doctrines apply.  *See* Pls.' Mem. of Law in Opp'n to Mot. of
Def. Garvey, Schubert & Barer to Dismiss the Successor Liability Claim in Count Six ("Pls.'
Opp'n to Garvey Mot. to Dismiss Count Six") at 1, ECF No. 35.  The Court will address them in
turn.

### a. De Facto Merger

"A de facto merger occurs when a transaction, although not in form a merger, is in
substance a consolidation or merger of seller and purchaser."  *Feld Entm't Inc. v. Am. Soc'y for
the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 324 (D.D.C. 2012) (internal citation
and quotations omitted).  It would be extremely difficult for a plaintiff to show a de facto merger
without showing that the previous entity was a party to a transaction of assets.  *See LeSane v.
Hillenbrand Indus., Inc.*, 791 F. Supp. 871, 875 (D.D.C. 1992) ("This alone may be enough to
support a conclusion that no merger or consolidation occurred.").  "The hallmarks of a de facto
merger are (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the

---

legal conclusions,'" the Court looks to specific factual allegations rather than the legal conclusion that a merger took place.  *See Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. Aug. 29, 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. Nov. 15, 2006)).

[9] "Without specifically briefing the issue, all parties assume that District of Columbia law applies. Accordingly, the Court applies the law of the District of Columbia."  *LeSane v. Hillenbrand Indus., Inc.*, 791 F. Supp. 871, 872 n.2 (D.D.C. 1992) (using District of Columbia law to evaluate successor liability claims, noting that "'[u]nlike jurisdictional issues, courts need not address choice of law questions *sua sponte*'" (quoting *In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C.Cir.) (Mikva, J., dissenting)).

[10] Garvey contends that these doctrines do not extend to legal malpractice cases at all.  *See* Mot. of Def. Garvey Schubert Barer to Dismiss Am. Compl. Under Rule 12(b)(6) ("Garvey Mot. to Dismiss") at 33–35, ECF No. 24-14.  Because the Court need not decide the issue to resolve this motion, the Court assumes without deciding that the doctrine could apply to the relationship between Haley Bader and Garvey.

acquired corporation as soon as possible; (3) assumption of the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Feld*, 873 F. Supp. 2d at 324 (internal citation and quotations omitted) (applying New York law); *accord LeSane*, 791 F. Supp. at 875 (applying District of Columbia law, using the same factors).

Even before the four-factor calculus articulated in *Feld*, a threshold issue stands in the way of Plaintiffs' de facto merger contention. The Complaint does not allege that any transfer of assets—at least within the meaning of the term as it applies to de facto mergers—occurred at all. The purpose of the de facto merger exception, according to the case Plaintiffs cite to support their assertion that the doctrine applies to intangible assets, is "to ensure that a source remains to pay for the victim's injuries." *See Feld*, 873 F. Supp. 2d at 324 (internal quotations omitted). It stands to reason, then, that only assets that could be attached could be considered "assets" within the context of the de facto merger doctrine. The Haley–Garvey Agreement that Plaintiffs reference expressly left Haley Bader "solely responsible for its accounts receivable," and required evidence that the entity Haley Bader had tail insurance. *See* Am. Compl. Ex. B ¶ 7. Nowhere in the Complaint do Plaintiffs contend that any tangible assets transferred from Haley Bader to Garvey. In fact, although Garvey did state that it would make an effort to purchase Haley Bader equipment for use in its offices, it expressly required Haley Bader attorneys to bring their own office furniture, and provided that "[Haley Bader] may . . . dispose of [its] equipment or furniture as it determine[d]." *See id.* ¶ 9. And, the Complaint explicitly asserts that it was the responsibility of Haley Bader to "distribute net proceeds [from winding up] to its partners." *See* Am. Compl. ¶ 89. An injured plaintiff could not attach attorneys, support staff, or business

relationships, which are the only "assets" Plaintiffs contend transferred from Haley Bader to

Garvey.  Because no meaningful transaction of assets occurred, the de facto merger exception

does not apply.

Even assuming that Haley Bader did transfer assets to Garvey, the most important *Feld*

factors weigh against application of the exception—continuity of ownership, and continuity of

management.  *See Crawford Harbor Assocs. v. Blake Const. Co.*, 661 F. Supp. 880, 884 (E.D.

Va. 1987) ("The most critical element . . . is continuity of ownership . . . [and] [t]he absence of

continuity of either ownership or management in the case at bar precludes the finding that any de

facto corporate reorganization occurred."); *accord Rivas v. Dist. Int'l Trucks*, 1989 WL 117871,

at *4 (D.D.C. 1989) (citing *Crawford*, reasoning that "to impute liability . . . under . . . de facto

merger [exception], there must have been continuity of ownership").  The importance of these

factors comports with the purpose of the de facto merger doctrine of ensuring that entities cannot

shield their assets through moving them to another legal entity.  There was no continuity of

either ownership or management here.  The so-called Haley–Garvey agreement that Plaintiffs

assert demonstrates the "merger" of the two entities was actually an employment agreement sent

to individual partners.  *See* Am. Compl. Ex. B.  The Haley Bader partners were individually

offered employment as "of counsel," *id.* ¶ 2, paid salaries rather than given equity stakes, *id.*, and

expressly disqualified from ownership of the firm for two years, *id.* ¶ 4.  Though Plaintiffs assert

that "one or more attorneys" became equity partners in Garvey, they do not identify how many,

what ownership stake those lawyers eventually held, or whether they came to own portions of

Garvey based on their ownership of Haley Bader or through the normal process of promotion.

*See* Am. Compl. ¶ 88(e).  At any rate, Plaintiffs' allegations are a far cry from showing

"continuity of ownership" from Haley Bader to Garvey.  Plaintiffs also contend that "[t]here was

a continuity of . . . management between the Haley Firm and the Garvey Firm because the Haley

Firm attorneys continued to service and *manage* the former . . . clients . . . ." *See* Pls.' Opp'n to

Garvey Mot. to Dismiss Count Six at 3 (emphasis added).  Their interpretation of the word

"manage" as it is used in this context is erroneous.  The cases contemplate "management" to

mean directorial or supervisory roles in the entity, not mere interactions with clients.  *See, e.g.*,

*LeSane*, 791 F. Supp. at 875 (using the word "management" in the context of directors and

shareholders).

Given that no meaningful transfer of assets occurred and that the most powerful *Feld*

factors weigh against the exception, Plaintiffs cannot assert liability against Garvey on the basis

that a de facto merger occurred.

### b.  Mere Continuation

Plaintiffs' arguments pertaining to the mere continuation exception are essentially the

same as those for the de facto merger exception, likely because the two exceptions are quite

similar.  "To decide whether a consolidation or merger has rendered a corporation a 'mere

continuation' of its predecessor, the court considers whether the two have common officers and

stockholders; whether the two are in the same line of business; and whether sufficient

consideration was paid for the predecessor's assets."  *Material Supply Int'l, Inc. v. Sunmatch

Indus. Co ., Ltd.*, 62 F. Supp. 2d 13, 23–24 (D.D.C. 1999).  Importantly, the District of Columbia

does *not* recognize the "continuity of enterprise" exception to the general rule of nonliability.

*LeSane*, 791 F. Supp. at 875.  The continuity of enterprise exception takes a more expansive

view of the continuity exception, focusing on the "continuation of the business operation or

enterprise where there is no continuation of ownership."  *See Nissan Corp. v. Miller*, 594 A.2d

564, 567 (Md. 1991); *accord LeSane*, 791 F. Supp. at 875.

Taken together, for the same reasons that there was no de facto merger, Haley Bader attorneys joining Garvey was not the "mere continuation" of Haley Bader.  There was no meaningful transfer of assets between the two entities.  There was not continued ownership, nor continued management of a law practice: the partners at Haley Bader became "of counsel" at Garvey, and did not participate in the ownership or leadership of the firm.  Nor did Garvey merely continue Haley's business in such a way that it could be said that the "entity" of Haley Bader continued.[11]  Accordingly, the mere continuation exception does not apply, and Garvey cannot be held responsible for Haley's previous liabilities.

### 2.   Negligent Appeals for Failing to Raise Procedural Issues

Plaintiffs allege that Mr. Solomon—then employed by Garvey—negligently appealed their case through the FCC after denial of their application.  *See* Am. Compl. ¶¶ 128–130.  To establish causation in the context of a legal malpractice claim for negligent appeals, a plaintiff must show that "it is more likely than not she would have prevailed in her appeal . . . in the absence of" the defendant's negligence.  *Steele v. Salb*, 93 A.3d 1277, 1282 (D.C. 2014).  Both parties agree that when causation depends on a legal ruling, the court may resolve such an issue as a matter of law.  *See* Garvey Mot. to Dismiss at 18; Pls.' Mem. of Law in Opp'n to Joint Mot. by Def. Henry A. Solomon and Def. Garvey, Schubert & Barer to Dismiss the Malpractice Claims in Counts Two, Four, and Five ("Pls.' Opp'n to Garvey Mot. to Dismiss Count Two") at 1, ECF No. 34; *see also Iacangelo v. Georgetown Univ.*, 560 F. Supp. 2d 53, 60 (D.D.C. 2008) (reasoning that it is the judge's "province alone to instruct the jury on the relevant legal standards" in cases involving the alleged violation of a statute as negligence per se).

---

[11] "An acquiring entity is a mere continuation of its predecessor when 'there is a continuation of the corporate entity of the seller'—it's not enough that 'there is a continuation of the seller's business operation.'" *Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*, 878 F. Supp. 2d 13, 21 (D.D.C. 2012) (quoting *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 92 (D.C. 1994)).

Accordingly, if the Court finds, based on the Complaint and documents incorporated by reference or attachment, that a legal ruling would have precluded recovery regardless of Defendants' actions, Plaintiffs have not established a plausible theory of causation.

Plaintiffs' claims are predicated upon their assertions that the FCC's interpretation of "material deficiency" constituted rulemaking, and that the FCC had discretion to extend the January 28 deadline.  If the FCC's action was merely an interpretive rule or informal adjudication and the deadline was statutory, then Plaintiffs do not have a plausible claim for recovery, because Garvey could not have obtained a reversal from the FCC.[12]  The Court will address these assumptions in turn and conclude that they do not state a plausible theory of causation, requiring dismissal of Counts Two, Four, and Five of the Amended Complaint.  Even though Plaintiffs do not explain why they would have recovered had they been afforded formal adjudication, the Court will first address their assertion that the FCC erred in using informal adjudication.

### a.  The FCC's Use of Informal Adjudication

Plaintiffs assert that, under 5 U.S.C. § 558(c), ACI was entitled to formal adjudication under 5 U.S.C. §§ 556–57 because the FCC denied its application for a license.  *See* Am. Compl.

---

[12] In its Opposition to Garvey's Motion to Dismiss, Plaintiffs assert that "[t]he CBPA provided two separate and independent paths to a Class A License for LPTV licensees," consisting first of stations who met the statutory qualification criteria, and second of those stations the FCC recognized with its "very broad discretion." *See* Pls.' Opp'n to Garvey Mot. to Dismiss Count Two at 3.  Garvey is correct that this new theory was not included in the Amended Complaint, and that the purported discretion is unrelated to the application process.  47 U.S.C. § 336(f)(1)(B) outlines the application process for prospective licensees.  The provision that Plaintiffs cite, § 336(f)(2)(B), defines which stations *qualify* as LPTV stations.  The FCC never found that ACI failed to meet the qualifications to obtain a license, but rather that it did not apply in accordance with § 336(f)(1)(B).  Likewise, when it comes to the FCC's discretion, the definition of "material deficiency" in the context of *application* is unaffected by qualification.  Accordingly, it has no relevance to the January 28 deadline or the FCC's interpretation of "material deficiency."

¶¶ 33, 36.  Even if they had stated a related theory of causation, their argument is legally

foreclosed by the language of the Administrative Procedure Act and relevant case law.

> Under the APA,
>
> [w]hen application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title *or other proceedings required by law* and shall make its decision. . . . [T]he withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c) (emphasis added).  By its language, § 558(c) does not require that licensing

proceedings be governed by the rules of formal adjudication; rather, it requires that *whatever*

*procedures apply* ("in accordance with sections 556 and 557 *or other proceedings*") be

implemented within a reasonable time and in a reasonable manner.  Courts have widely given the

statute this reading.  *See, e.g.*, *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1261 n.25 (9th Cir.

1977) (citing precedent and the APA's legislative history, concluding that "Section 558(c) does

not independently provide that full adjudicatory hearings must be held"); *City of W. Chicago, Ill.*

*v. Nuclear Regulatory Comm'n*, 701 F.2d 632, 644 (7th Cir. 1983) ("We now agree with the

First, Fifth and Ninth Circuits that Section 558(c) does not independently provide that formal

adjudicatory hearings must be held.  It merely requires any adjudicatory hearings mandated

under other provision of law to be set and completed in an expeditious and judicious manner."

(internal quotations omitted)); *accord Nat'l Whistleblower Ctr. v. Nuclear Regulatory Comm'n*,

208 F.3d 256, 262 (D.C. Cir. 2000) ("We are in complete accord with the Seventh Circuit's

position that the NRC possesses the authority 'to change its [licensing] procedures on a case-by-

case basis with timely notice to the parties involved.'" (quoting *City of W. Chicago, Ill.*, 701 F.2d at 632)).

Plaintiffs do not allege that the FCC did not act expeditiously or judiciously. Nor do they contend that they were deprived of notice or an opportunity to demonstrate compliance. Accordingly, § 558(c) is inapplicable.

### b.  The FCC's Interpretation of "Material Deficiency"

The Court now turns to Plaintiffs' contention that the FCC engaged in legislative rulemaking when it determined that not answering Parts 3 and 4 of a Statement of Eligibility constituted a material deficiency.  Plaintiffs allege that on June 9, in denying ACI's Statement, the FCC "promulgated, published[,] and applied a rule that a 'material deficiency' . . . include[s] a Statement of Eligibility with no answer to Question 3."  *See* Am. Compl. ¶¶ 30, 39. Accordingly, they argue, Plaintiffs were shielded from retroactive application and entitled to publication and public notice and comment.  *See id.* ¶¶ 64, 76.  They do not allege that this June 9 dismissal—which is not attached to the Complaint as an exhibit and not apparently available anywhere else in the record[13]—further defined "material deficiency" beyond including a Statement of Eligibility lacking answers to eligibility questions.

"In interpreting and administering its statutory obligations under the [APA], the [FCC] has very broad discretion to decide whether to proceed by adjudication or rulemaking." *Conference Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013).  However, after the fact, courts must decide whether agency action constituted rulemaking or adjudication.  *See, e.g., Milk*

---

[13] Defendants reference and attach a June 9 Dismissal letter, but it does not reference ACI or failure to answer Part 3 of the Statement.  *See* Garvey Mot. to Dismiss Ex. 2, ECF No. 24-3.  Because the Amended Complaint does not further describe the document, the Court will not strain to determine whether this is some portion of the dismissal to which Plaintiffs refer.

*Indus. Found. v. Glickman*, 949 F. Supp. 882, 893–94 (D.D.C. 1996).  "Two principal characteristics distinguish rulemaking from adjudication."  *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994); *accord Milk Indus. Found.*, 949 F. Supp. at 893–94. First, adjudications concern "individuals in specific cases," in comparison to rulemaking, which "affects the rights of broad classes of unspecified individuals."  *See Yesler Terrace Cmty. Council*, 37 F.3d at 448.  Second, adjudications "have an immediate effect on specific individuals" instead of prospective effect on individuals "only after the rule subsequently is applied."  *Id.*  Legislative rulemaking often "amend[s] a prior legislative rule or explicitly invoke[es] the [agency]'s general legislative authority."  *See Conference Grp.*, 720 F.3d at 965.

The June 9 dismissal—based on what the Court knows of it from the Amended Complaint—bears little resemblance to administrative rulemaking.  The Amended Complaint alleges that the Mass Media Bureau "dismissed the ACI Statement on the grounds it did not answer [Q]uestion 3," and does not allege that its dismissal affected the rights of other individuals.  *See* Am. Compl. ¶ 30.  The dismissal had an immediate effect on ACI, but no apparent effect on anyone else.  *See id.* ¶¶ 30, 41 (arguing that the dismissal "had the force and effect of law because it denied ACI its right").  Furthermore, Plaintiffs do not allege that the Mass Media Bureau invoked its legislative authority, nor that it tried to amend another rule. Instead, "the statutory interpretation by the [FCC] . . . was simply an interpretation given in the course of informal adjudication."  *See Conference Grp.*, 720 F.3d at 965.

Plaintiffs cite to *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014), for the proposition that "an agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *See* Am. Compl. ¶ 42.

However, the inference that they ask the Court to draw is inconsistent with the holding in that case.  In *McCarthy*, the D.C. Circuit analyzed the differences between legislative rulemaking, interpretive rulemaking, and general statements of policy.  758 F.3d at 251–52.  Following the quote that Plaintiffs cite, the court in *McCarthy* noted that interpretive rules "merely interpret[] a prior statute or regulation, and do[] not [themselves] purport to impose new obligations or prohibitions or requirements on regulated parties . . . ."  *See id.* at 252.[14]  *McCarthy*'s applicability is contingent on the agency action at issue being an act of rulemaking.  Because it is not, Plaintiff's argument does not apply.  But even if it did, the agency's dismissal would constitute an interpretive rule.  The FCC did not purport to impose any new obligations upon even ACI; rather, it noted its interpretation that omitting answers to the substantive portions of the Statement of Eligibility constituted a material deficiency.

Because the FCC's Mass Media Bureau merely interpreted "material deficiency" in the context of an informal adjudication, it was not negligent for Mr. Solomon to fail to argue that it constituted rulemaking during the course of ACI's administrative appeals.

### c. The FCC's Construction of the January 28 Deadline

Plaintiffs similarly argue that the FCC's conclusion that the January 28 certification deadline was statutory rather than discretionary constituted legislative rulemaking, and that Mr. Solomon did not raise the issues associated with rulemaking on appeal.  *See* Am. Compl. ¶¶ 53–62.  If the FCC was correct that they did not have discretion, of course, Plaintiffs' argument fails

---

[14] The *McCarthy* court further noted that "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy."  *Nat'l Min. Ass'n*, 758 F.3d at 252.

because Mr. Solomon would have been powerless to change the eventual outcome of the case.

When Beach TV appealed this case to the D.C. Circuit, the court stated the following:

> "The [FCC]'s decision to enforce the deadline was not arbitrary or capricious.  Indeed, this Court has affirmed the enforcement of similar deadlines. For example, this Court has discouraged the Commission from accepting untimely petitions for reconsideration absent 'extremely unusual circumstances.'  *Virgin Islands Telephone Corp. v. FCC*, 989 F.2d 1231, 1237 (D.C. Cir. 1993).  The statutory deadline at issue in this case is unequivocal: 47 U.S.C. § 336(f)(1)(B) specifies that 'within 60 days ..., licensees ... *shall* submit to the Commission a certification of eligibility' (emphasis added)."

*Beach TV Properties, Inc. v. FCC*, 617 F. App'x 10, 11 (D.C. Cir. 2015).

The D.C. Circuit's opinion requires this Court to conclude that the FCC was correct in its

assertion that the deadline was not discretionary.  The court found that the statutory deadline of

January 28 was "unequivocal."  That is, the FCC was powerless to accept ACI's amended

certification absent "extremely unusual circumstances."  Plaintiffs argue that the FCC could have

chosen to treat January 28 as a mere "directory" deadline—where the agency is encouraged to

act by a certain time, but its power extends beyond the statutory date.  Their argument fails for

three reasons.  First, the so-called "directory deadline" to which they refer pertains to deadlines

for administrative action, as shown by the case that they quote in their opposition.  *See* Pls.'

Opp'n to Garvey Mot. to Dismiss Count Two at 20 (quoting *Barnhart v. Peabody Coal Co.*, 537

U.S. 149, 161 (2003) as saying "a statute *directing official action* . . . can sensibly be read to

expire *when the job is supposed to be done*" (emphasis added)).  In comparison, the statute at

issue here does not require the exercise of authority by a certain date; rather, it defines the

contours of that grant of authority based on whether a regulated entity has timely acted.  *See* 47

U.S.C. § 336(f)(1)(B).

Second, interpreting the word "unequivocal" as Plaintiffs assert would produce absurd results. Plaintiffs argue that the D.C. Circuit did not address the nature of the January 28 *deadline* and simply "observed" that the *date* was "unequivocal." *See* Pls.' Opp'n to Garvey Mot. to Dismiss Count Two at 20 n.28. This argument would require the Court to assume that the United States Court of Appeals for the District of Columbia Circuit found it notable that a specific date was "unequivocal" without passing on whether it constituted an unequivocal deadline. According to Plaintiffs, the sentence could be rephrased to where the italicized word "shall" merely stated that January 28 was a clear date in the statute. The fact that January 28 was clearly identified in the statute—by virtue of the language "60 days after November 29, 1999"—goes without saying. The Circuit instead intended to identify the January 28 deadline as statutory, and thus not subject to discretionary exceptions by the FCC.

Third, the D.C. Circuit directly compared the deadline at issue here with a jurisdictional deadline. In *Virgin Islands Telephone Corp.*, which the Circuit quoted for its "extremely unusual circumstances" language, the plaintiff missed a filing deadline for a petition of reconsideration by one day. *See* 989 F.2d at 1237. That statute provided that "[a] petition for reconsideration must be filed within thirty days." *See* 47 U.S.C. § 405. The court found a mandatory thirty-day deadline, with only certain "discouraged" exceptions outlined in the statutory text. *See Virgin Islands Telephone Corp.*, 989 F.2d at 1237. In *Beach TV Properties*, the D.C. Circuit referred to the deadline in § 336(f)(1)(B) as "similar" to the one in *Virgin Islands Telephone Corp.*

For all three reasons, the statutory deadline of January 28 was not discretionary for the FCC. It was not subject to rulemaking, and accordingly did not require notice and comment, publication, or notice prior to application. Mr. Solomon could not have successfully appealed on the grounds that the FCC should have extended the deadline. The deadline, coupled with the

FCC's informal adjudication applying the phrase "material deficiency,"[15] shows that Plaintiffs do not have a plausible theory of recovery from Garvey on the basis of negligent appeals. Accordingly, Count Two must be dismissed against Mr. Solomon.  Counts Four and Count Five must be dismissed against Garvey.

## C.  The Assignment of ACI's Claims

Mr. Solomon argues that, because ACI attempted to transfer these malpractice claims to Beach TV, only one party may maintain this action.  To maintain a claim in federal court, a party must have standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The plaintiff carries the burden of establishing standing through sufficiently specific factual allegations.  *See id.* at 561.  When a party has completely assigned away a right to sue, that party loses standing to maintain an action on the basis of that right.  *See Gilson v. Republic of Ireland*, 606 F. Supp. 38, 41 (D.D.C. 1984), *aff'd*, 787 F.2d 655 (D.C. Cir. 1986) (noting that following "a complete assignment of title to a patent only the assignee . . . has standing"); Moore's Federal Practice – Civil § 17.11 (2015) ("Under a valid assignment, the assignee of a claim becomes the real party in interest . . . [and] the assignor retains no interest on which to base an action.").

In 2015, ACI attempted to assign its malpractice claim to Beach TV.  *See* Am. Compl. ¶ 100.  Defendant Mr. Solomon—through wholesale adoption of Haley Bader's arguments—and Plaintiffs are in accord that if Virginia law applies, the 2015 attempted assignment of Plaintiffs' legal malpractice claims was invalid, and only ACI has standing to sue.  *See* Haley Mot. to Dismiss at 4–5; Pls.' Opp'n to Haley Mot. to Dismiss at 20.  If, however, District of Columbia

---

[15] Plaintiffs' quasi-claim—which does not appear in the Complaint—that the FCC promulgated and retroactively applied a "letter perfect rule" also fails, because it was merely a combination of the purported "material deficiency" and deadline rules.  *See* Pls.' Opp'n to Garvey Mot. to Dismiss Count Two at 15–16.

law applies, both parties agree that only Beach TV Properties has standing to sue. *See* Haley

Mot. to Dismiss at 4; Pls.' Opp'n to Haley Mot. to Dismiss at 19 (arguing that "Beach TV is . . .

the proper party to sue"). The law underlying these stances is well settled in each of the

jurisdictions. *See MNC Credit Corp. v. Sickels*, 497 S.E.2d 331, 333 (Va. 1998) ("In view of the

highly confidential and fiduciary relationship between an attorney and client, we hold that

[Virginia law] does not abrogate the common law rule which prohibits the assignment of legal

malpractice claims . . . ."); *Richter v. Analex Corp.*, 940 F. Supp. 353, 358 (D.D.C. 1996)

(concluding that, in cases where the claim passes from an assignee with a close connection to the

underlying lawsuit and is not "bartered or sold to an unrelated third party, . . . public policy does

not prohibit the assignment of a legal malpractice claim and District of Columbia law does not

prevent it").

The remaining question, then, is which jurisdiction's law applies. "A federal court

sitting in diversity must apply the choice-of-law rules of the forum state—here, the District of

Columbia." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014); *Klaxon Co. v.

Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The District of Columbia "employ[s] 'a

modified governmental interests analysis which seeks to identify the jurisdiction with the most

significant relationship to the dispute.'" *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168,

180 (D.C. 2006). Under this approach, a court must first "determine whether a 'true conflict'

exists—that is, whether more than one jurisdiction has a potential interest in having its law

applied and, if so, whether the law of the competing jurisdictions is different." *GEICO v.

Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (citing *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d

876, 882 (D.C. Cir. 1985); *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970)). If "there is no

'true conflict'" among the purportedly interested jurisdictions, and where one of those

jurisdictions is the District of Columbia, a court will "apply the law of the District of Columbia by default." *Id.* (citing *Fowler*, 262 A.2d at 348; Restatement (Second) of Conflict of Laws § 186 cmt. c (Am. Law Inst. 1971)).  But if a "true conflict" does exist, "the court must go on to determine which of the relevant jurisdictions has the 'more substantial interest' in having its law applied to the case under review." *Id.*  To make that determination in the context of the assignment of claims, a court must determine "which has the most significant relationship to the contract and the parties with respect to the issue of assignability."  Restatement (Second) of Conflict of Laws § 208 (Am. Law Inst. 1971); *accord Fox-Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346, 1354–55, 1354 n.45 (D.C. Cir. 1971).  In evaluating which jurisdiction has the "most significant relationship" with an assignment, courts generally look to the choice of law provisions governing contract law.  *See* Restatement (Second) of Conflict of Laws § 208 cmt. b (Am. Law Inst. 1971).  For contracts without choice-of-law clauses, courts look to where the contract was negotiated and executed, the location of the subject matter of the contract, the location of performance, and the domiciles, places of incorporation, and places of business of the parties.  *See* Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst. 1971).

Plaintiffs argue that the District of Columbia "has an interest in the assignability of legal malpractice claims against attorneys who are admitted to practice law in the District of Columbia, who actually practice law in the District of Columbia[,] and who cause injury in the District of Columbia."  *See* Pls.' Opp'n to Haley Mot. to Dismiss at 20.  Mr. Solomon and Haley Bader argue that "Virginia has a compelling interest in regulating the conduct of attorneys within its borders," and in preserving its conception of what protects the attorney–client relationship. *See* Haley Mot. to Dismiss at 9.  The interests of the jurisdictions with respect to legal

malpractice assignment laws concern the attorney–client relationship.  Virginia certainly has an interest in ensuring that individuals from Virginia do not engage in transactions that might undermine such relationships, that such assignments are not negotiated or formed in Virginia, and that Virginia attorney–client relationships are not undermined.  *See Eli Lilly & Co.*, 764 F.2d at 882 (outlining similar interests with respect to the formation of a contract).  The District of Columbia, in comparison, does not have an interest in such an assignment, because the parties to the assignment were not citizens of the District of Columbia, the assignment was not negotiated or made within the District of Columbia, and, as noted above, the underlying tort claim did not arise from conduct that occurred in the District of Columbia.  Plaintiffs' arguments concerning Mr. Solomon's bar admission are simply inapplicable.  As noted above, Mr. Solomon is not alleged to have been practicing in Washington D.C. either in connection with the ACI Statement or the assignment of the malpractice claim.  Bare licensure of a nonparty to a transaction does not create an interest with respect to the assignment transaction itself.  Otherwise, any member of the Virginia bar could use his membership as a talisman to defeat an assignment of a malpractice claim against him, regardless of where the underlying events took place.

But even if the District of Columbia did have an interest, Virginia has the most significant relationship to the assignment.  The Amended Complaint suggests that the assignment was negotiated and created in Garvey's Virginia office.  *See* Am. Compl. ¶¶ 92–101.  It was also executed in Virginia.  *See id.*  The parties were not domiciled in the District of Columbia, nor residing or transacting business in the District of Columbia.  Moreover, it concerned subject

matter with no real connection to the District of Columbia.  Accordingly, the state with the "most significant relationship" to the assignment was Virginia.[16]

Because the attempted assignment of ACI's legal malpractice claims against Mr. Solomon was invalid under Virginia law, Beach TV does not have standing to maintain this action.  The claims by Beach TV must be dismissed.

## III.  CONCLUSION

For the foregoing reasons, Defendant Haley Bader & Potts, P.L.C.'s Motion to Dismiss Amended Complaint (ECF No. 27) is **GRANTED** and Defendant Garvey, Schubert & Barer's Motion to Dismiss Amended Complaint (ECF No. 24) is **GRANTED**.  Defendant Henry A. Solomon's Motion to Dismiss Amended Complaint (ECF No. 25) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 14, 2016                                      RUDOLPH CONTRERAS
                                                             United States District Judge

---

[16] Plaintiffs may have been able to make a colorable argument that Georgia or Florida law should have applied, because the parties to the assignment have close connections to those states.  The result would likely be the same regardless, because both states seem to prohibit the assignment of legal malpractice claims.  *See* Ga. Code Ann. § 44-12-24; *Law Office of David J. Stern, P.A. v. Sec. Nat. Servicing Corp.*, 969 So. 2d 962, 966–67 (Fla. 2007).