# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BEACH TV PROPERTIES, INC., *et al.*,          :
                                              :
     Plaintiffs,     :          Civil Action No.:          15-1823 (RC)
                                              :
     v.              :          Re Document No.:          71, 74
                                              :
HENRY R. SOLOMON, *et al.*,                   :
                                              :
     Defendants.     :

## MEMORANDUM OPINION

### Denying Plaintiff's Motion for Partial Summary Judgment; Denying Defendant's Motion for Summary Judgment

## I. INTRODUCTION

With the inclusion of a few check marks on a form submitted in 1999, this litigation might have been avoided. In December of 1999, Defendant Henry Solomon, an attorney for Plaintiff Atlanta Channel, Inc. ("ACI"), submitted a form on ACI's behalf to the Federal Communications Commission ("FCC") without realizing that several key questions on the form remained unanswered. Because the form was incomplete, the FCC dismissed it, thereby blocking ACI's ability to obtain a special license that would have given it preference on the airwaves. Mr. Solomon filed a motion with the FCC asking it to reverse its dismissal of the form, but for twelve years the FCC sat on that motion. In the intervening years, Mr. Solomon retired from the practice of law. After several failed appeals of the FCC's dismissal, ACI filed suit in this Court alleging that Mr. Solomon was negligent when he filed the incomplete form, and now moves for summary judgment as to Mr. Solomon's liability. In his cross-motion for summary judgment, Mr. Solomon argues that ACI cannot recover because its malpractice claim is barred by the statute of limitations, because ACI was contributorily negligent by failing to complete the form

itself, and because the far-reaching damage ACI now alleges it suffered was not proximately caused by the submission of the incomplete form. For the reasons set forth below, the Court finds that neither party has met its burden for a finding of summary judgment in its favor, and therefore denies both motions.

## II. FACTUAL AND PROCEDURAL BACKGROUND

ACI is a broadcast television business that owns and operates a low power television ("LPTV") station with the call sign WTHC-LD in Atlanta, Georgia. Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMF") ¶ 18, Pl.'s Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 71-1; Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") ¶ 1, Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 76-1. Through this license granted by the FCC, ACI broadcasts "visitor information to hotels in the Atlanta area." Pl.'s SMF ¶¶ 19–20; Def.'s Brief Supp. Mot. Summ. J. ("Def.'s Brief") at 4, ECF No. 76. From 1993 to 2009 and from 2016 to present, ACI has held the FCC license for this channel; from 2009 to 2016, the license was assigned to Beach TV Properties, Inc. ("Beach TV"). Pl.'s SMF ¶¶ 20–21. Both ACI and Beach TV are owned and operated by Jud Colley and Toni Davis. *Id.* ¶¶ 2–3.

In 1999, Congress enacted the Community Broadcasters Protection Act ("CBPA"), 47 U.S.C. § 336(f), which directed the FCC to award qualified LPTV licensees Class A licenses granting them the same protection and status as full power broadcast television stations in the event of displacement from their assigned broadcast frequency. Pl.'s SMF ¶¶ 23–24; Def.'s SMF ¶ 4. ACI claims that its LPTV station met the qualification criteria for a Class A license, as provided by 47 U.S.C. § 336(f)(2)(A). Pl.'s SMF ¶¶ 25–26. Therefore, in December 1999, Mr. Colley worked with his attorney Henry Solomon, who at the time was employed by the Virginia

law firm Haley Bader & Potts, to obtain a Class A license for WTHC-LD, along with several LPTV stations owned by Beach TV. *Id.* ¶¶ 7–8, 29–44.

In order to obtain a Class A license for an LPTV station, applicants must have completed and filed Statements of Eligibility with the FCC by January 28, 2000. *See* 47 U.S.C. §336(f)(1)(B). The CBPA provided that "[a]bsent a material deficiency, the [FCC would] grant certification of eligibility to apply for class A status." *Id.* Therefore, in December 1999, Mr. Colley "partially filled out and signed Statements of Eligibility for five (5) LPTV licenses owned by Beach TV and sent them to Mr. Solomon for review and filing with the FCC." Pl.'s SMF ¶ 31. Questions 3(a), 3(b), 3(c), and 4 remained incomplete on each form. *Id.* ¶ 32; Solomon Dep. 20:12–21:7, 21:16–21:20, Pl.'s Mot., ECF No. 72-4. Mr. Colley claims that he sent the forms to Mr. Solomon partially filled out because he "did not know how to provide the appropriate answers to the Qualification Questions on any of the Beach TV Statements." Pl.'s SMF ¶ 32; *see also* Colley Dep. 99:13–103:3, 106:21–107:5, Pl.'s Mot., ECF No. 72-2. Therefore, he "relied on Mr. Solomon to provide the appropriate answers" to the questions he left blank. Pl.'s SMF ¶ 32. A paralegal at the Haley firm filled in the relevant parts of the forms, at which point Mr. Solomon reviewed the forms and submitted them to the FCC on December 28, 1999. Pl.'s SMF ¶¶ 33–34. Around that time, Mr. Colley sent Mr. Solomon a similarly partially filled out and signed form for ACI's LPTV channel, and similarly relied on Mr. Solomon to complete the form. *Id.* ¶¶ 35–36. However, Mr. Solomon submitted this form to the FCC with the boxes for Questions 3(a), 3(b), 3(c), and 4 left blank. *Id.* ¶¶ 37–39; *see also* Ex. A, Pl.'s SMF, ECF No. 71-3. The form also contained the incorrect call sign for the LPTV station. Solomon Dep. 24:18–25:17, ECF No. 72-4. On March 6, 2000, Mr. Solomon switched employers from the Haley firm to the D.C. firm Garvey, Schubert & Barer. *See* Def.'s SMF ¶ 8.

On June 2, 2000, the FCC's Mass Media Bureau ("MMB") accepted Beach TV's Statements of Eligibility, and soon after granted Beach TV's stations Class A licenses. Pl.'s SMF ¶ 42. However, on June 9, 2000, the MMB dismissed ACI's Statement because it was incomplete. *Id.* ¶ 43. Mr. Solomon informed Mr. Colley of the dismissal soon thereafter. *See* Colley Dep. 93:14–97:14, Def.'s Mot., ECF No. 76-3. Mr. Colley told Mr. Solomon that they would "need to do everything possible to get [the] Class A status" for the ACI station. Pl.'s SMF ¶ 45. Therefore, on June 22, 2000, Mr. Solomon filed a Petition for Reconsideration of the Dismissal with the Bureau, which included a correctly filled out, amended Statement of Eligibility. *Id.* ¶ 47. However, on November 20, 2000, the MMB denied the Petition for Reconsideration because ACI's original Statement of Eligibility had been "patently defective." *Id.* ¶ 49.

A few weeks later, on December 13, 2000, Mr. Solomon emailed Mr. Colley about seeking further review of the dismissal with the FCC, and explained that in the meantime, "it d[id] not appear that the station [wa]s likely to suffer any harm as a result of" the dismissal. *Id.* ¶¶ 50–51. Mr. Colley agreed that for the time being, the station was not at risk of displacement, but worried that at some point in the future it could be. *Id.* ¶ 53. Therefore, on December 20, 2000, Mr. Solomon filed an Application for Review by the full FCC of the MMB's denial of ACI's Petition for Reconsideration. *Id.* ¶ 56. The Application languished for twelve long years. It was ultimately denied on November 8, 2012. *Id.* ¶ 57.

During the first few years following the submission of the Application, Mr. Solomon communicated with ACI regarding its status, and in 2004 drafted a letter in support of the Application from U.S. Representative John Lewis of Georgia to be submitted to the FCC. *Id.* ¶¶

58–60. The last time Mr. Solomon communicated directly with Mr. Colley regarding the Application was in 2008. *Id.* ¶ 60.

Also in 2008, Mr. Solomon began the process of winding down his practice at the Garvey firm due to his advanced age. *See* Ex. 25, Solomon Dep., Pl.'s Mot., ECF No. 72-5. The details regarding how he characterized this change to Mr. Colley remain murky. Mr. Colley summarizes Mr. Solomon's 2009 communications with him regarding this "transition" as follows: that Mr. Solomon told Mr. Colley that he would turn over responsibility for ACI and Beach TV matters to Melodie Virtue, another partner at the firm; that she would become the "front person" for ACI and Beach TV's dealings with the FCC; that Mr. Solomon would act "in the background" as a "consultant"; that Mr. Solomon would remain in Washington, D.C. and would maintain an office at the Garvey firm; that he would continue to perform a limited amount of work for the firm; and that he would continue to work on pro bono matters. Pl.'s SMF ¶ 64. In his deposition, Mr. Solomon said that he could not recall speaking with Mr. Colley or Ms. Davis about his retirement, *see* Solomon Dep. 108:2–17, 140:8–22, ECF No. 72-4, but now claims that he never told Mr. Colley that he "would be the back person regarding legal representation of ACI or any of the other businesses owned by Colley." 2d Solomon Decl. ¶ 8, Def.'s Opp'n, ECF No. 78-6.

On December 11, 2009, Mr. Solomon forwarded an email to Mr. Colley that contained an image of a "biker bar in Florida." *See* Ex. C, Pl.'s Mot., ECF No. 71-5. The image depicted three motorized scooters parked outside of a convenience store. In the email, Mr. Solomon told Mr. Colley, while referring to the photo: "Not me. Staying in DC forever. Transition will be smooth and I will be around to consult, etc." *Id.* In response, Mr. Colley joked, "Don't look close, they may have our names on them." *Id.* The parties have provided no other documentation regarding how Mr. Solomon informed Mr. Colley of his impending retirement. Mr. Colley claims that the

email "was the only written communication by Mr. Solomon to Mr. Colley regarding his 'transition' at the Garvey Firm." Pl.'s SMF ¶ 69.

Between 2008 and 2011, Mr. Solomon took several steps to wind down his practice. On July 1, 2010, his employment at the Garvey firm was officially terminated. *See* Ex. 25, Solomon Dep. Mr. Solomon relinquished his Virginia bar license in 2009 and his D.C. license in 2011. Def.'s SMF ¶ 19. However, Mr. Solomon did not completely sever his relationship with the Garvey firm upon his termination and the relinquishment of his bar licenses. He continued to work from his office at the firm several days a week, and maintained a pro bono practice. Pl.'s SMF ¶¶ 70, 73. Additionally, at least in ACI's case, he continued to advise his former partners on their work before the FCC. *See, e.g.*, Ex. 41, Virtue Dep., Pl.'s Mot., ECF No. 72-7.

In February 2012, Congress passed the Spectrum Act, which Mr. Colley worried might affect ACI's LPTV spectrum usage rights. As such, he contacted Ms. Virtue, whom he believed he had been told would be the "front person" for all of ACI's dealings with the FCC, inquiring as to the status of ACI's December 2000 Application for Review. Pl.'s SMF ¶¶ 85–87. Up until Mr. Colley's email, Ms. Virtue had been unaware that ACI had an Application for Review pending before the FCC. *Id.* ¶¶ 88–89. The next morning Ms. Virtue emailed Mr. Solomon asking if he knew whether the FCC had ever issued a decision regarding the Application for Review (which she referred to as a petition for reconsideration), and after he answered that it had not issued a decision, she confirmed that it was still a "live" Application. *See* Ex. E, Pl.'s SMF., ECF No. 71-7.

Upon further inquiry, Ms. Virtue learned that the Garvey firm did not have a complete record of the Application, and the FCC had "no records in its Public File regarding the Application for Review." Pl.'s SMF ¶¶ 90–91. Therefore, Ms. Virtue reconstructed the record for

the Application for Review using documents provided by Mr. Colley and forwarded the reconstructed record to the FCC. She informed Mr. Colley that she was "in communication with Mr. Solomon about the Application for Review." *Id.* ¶ 94.

While Ms. Virtue had "notified the FCC in writing [that] she would be the contact person for other matters handled by Mr. Solomon for Beach TV," which at that point was the licensee for the relevant LPTV station, she did not notify the FCC in writing that she would be the contact person for the Application for Review, nor did she substitute as counsel of record. *Id.* ¶¶ 95–100. However, she immediately began strategizing, with the help of Mr. Solomon, on how to obtain a favorable decision on the Application for Review for Beach TV. On March 23, 2012, Mr. Solomon emailed Ms. Virtue from his personal email account to brainstorm, writing "Do you think that a Supplement to the Application for Review might be worthwhile-including Cong. Letter and more facts? One reason is that now that the staff has the file, it might act quickly. Also, arrange meeting with Barbara and bring Jud?" Ex. F, Pl.'s Mot., ECF No. 71-8. Ms. Virtue responded that "Jud's already trying to get another congressional letter and I've recommended Jud come back up for FCC meetings with the Commissioners. A supplement might be a good idea." *Id.* In response, Mr. Solomon explained, "I'm just trying to head off a quick decision before we exhaust all other options. Based on my experience with Honig, I think meetings with commissioner[]s as a first resort isn't advisable. I'd set something up with Barbara and Joyce first—with Jud." *Id.* Ms. Virtue believes that after that exchange she likely communicated to Mr. Colley that "Henry [Solomon] was giving [her] some ideas on how to get the FCC to act on that pending application for review, and to bring it full circle with the staff, based on the fact that it had been pending for 12 years." Virtue Dep. 94:14–95:12, Pl.'s Mot., ECF No. 72-6.

Mr. Colley went on to lobby the FCC for an adjudication in his favor, using lobbyists not employed by the Garvey firm. Pl.'s SMF ¶ 108–09. One of those lobbyists was Benjamin Perez, an engineer who is also a licensed attorney. Colley Dep. 147:8–15, ECF No. 76-3; *see also* Ex. 10, Def.'s Mot., ECF No. 76-12. During that time, the FCC contacted Mr. Solomon requesting a copy of ACI's Statement of Eligibility. Pl.'s SMF ¶ 112. Mr. Solomon forwarded the request to Ms. Virtue, who supplied the FCC with a copy of the statement. *Id.*

On November 8, 2012, the FCC denied the Application for Review, explaining that ACI's Statement of Eligibility had a "material deficiency" because it did not include answers to key questions. *See* Ex. G, Pl.'s SMF, ECF No. 71-9. The next day, Ms. Virtue sent a copy of the denial to Mr. Solomon for his review, and told him that she planned to file a Petition for Reconsideration with the FCC. Pl.'s SMF ¶¶ 118–19. Mr. Solomon offered to provide her with "input" and "wisdom" as she drafted the petition. *Id.* ¶ 120. On November 16, 2012, Mr. Solomon emailed Ms. Virtue with his "preliminary thoughts" on the denial and the types of arguments that could be made in the Petition for Reconsideration. In his email, he included a phrase ("the law favors repose") that Ms. Virtue liked so much that she included it in the final petition. *Id.* ¶¶ 121–123, 126. In his email, he also used the phrase "we" when describing strategy for the case. *See* Ex. H, Pl.'s SMF, ECF No. 71-10.

On November 21, 2012, Ms. Virtue emailed Mr. Colley and Ms. Davis discussing her recommendations for the Petition for Reconsideration. *See* Ex. 43, Virtue Dep., Pl.'s Mot., ECF No. 72-7. In the email, she also responded to a previous email from Ms. Davis in which Ms. Davis expressed her belief that this whole situation had arisen because of a clerical error by the Haley firm. *Id.* Ms. Virtue explained that it would behoove Beach TV to consider engaging independent counsel to consider whether Beach TV and the Garvey firm had a conflict of interest

regarding the Petition for Reconsideration. *Id.* She explained that Beach TV had several options as it assessed whether a conflict existed. *Id.* It "could decide to have Garvey Schubert Barer file the Petition for Reconsideration, [it] could transfer this matter to independent counsel, or [it] could engage another firm with expertise in administrative litigation to serve as co-counsel with Garvey Schubert Barer and complement [Ms. Virtue's] background in communications regulation." *Id.* Beach TV and ACI retained the law firm Balch & Bingham to determine whether there was a conflict, but ultimately chose to proceed with the Garvey firm as counsel for the Petition. *See* Ex. 54, Virtue Dep., Pl.'s Mot., ECF No. 72-7.

Upon finishing a draft of the Petition, Ms. Virtue sent a copy to Mr. Colley and Ms. Davis, and also left a copy on Mr. Solomon's chair in his Garvey firm office for him to review. *See* Ex. J, Pl.'s SMF, ECF No. 71-12; Ex. K, Pl.'s SMF, ECF No. 71-13. It appears that Mr. Solomon was in the office that day, because an hour and a half later, he responded to Ms. Virtue with comments. In those comments, he suggested

> Maybe a short para. saying that what the FCC did to us vs. its flexibility vis-a-vis other filers, borders on disparate treatment. See Melody Music, Inc. v. FCC (a couple of cases followed and relied on MM doctrine. Similarly-situated parties can't be treated differently. Granted network stations though anti-trust violations/deception, but denied AM renewal where also deceptive practices.) Melody Music v. FCC, 345 F.2d 730 (DC Cir. 1965). I haven't re-read the McElroy Electronics case, but I think MM was cited. 990 F.2d 1351 (DC Cir. 1993). In any event, MM has been cited in a number of subsequent cases that you can easily find. Jud's Declaration excellent.

Ex. K, Pl.'s SMF. Seven minutes later, he sent another email, which read: "Also see fn. 13 White Mtn. Beg. Co, Inc. v. FCC 598 F.2d 274 (1998). Did not follow MM, but distinguished. I think maybe we're closer to MM than was appellant in WMtn. I will be re-reading Pet. For Recon." *Id.* Ms. Virtue incorporated an analysis of the *Melody Music* case into the final Petition for Review.

Pl.'s SMF ¶ 130. Mr. Colley recalls Ms. Virtue informing him at the time that she was consulting with Mr. Solomon as she prepared the Petition for Review. Colley Dep. 177:21–178:8, ECF No. 72-2. Ms. Virtue does not recall telling Mr. Colley that Mr. Solomon was involved, but she "assumes" that she did. Virtue Dep. 166:18–167:2, ECF No. 72-6. Ms. Virtue submitted the Petition on December 7, 2012. Pl.'s SMF ¶ 133.

On October 7, 2014, the MMB denied the Petition for Reconsideration because "[t]he Atlanta Channel's initial Statement of Eligibility lacked any information supporting eligibility, and its corrected statement was untimely." Ex. 53, Virtue Dep., ECF No. 72-7. In response to this denial, Ms. Virtue emailed Mr. Colley and Ms. Davis explaining the process for filing an appeal of the decision to the D.C. Circuit. *See* Ex. 54, Virtue Dep., ECF No. 72-7. She also explained that it would be wise at that juncture to again consult with outside counsel regarding whether Beach TV and the Garvey firm had a conflict of interest that could affect the appeal. *Id.*

Beach TV ultimately decided to file an appeal with the D.C. Circuit using a different law firm, but continued to retain the Garvey firm for other matters. The D.C. Circuit affirmed the FCC denial of the Petition for Review on September 23, 2015. *See Beach TV Props., Inc. v. FCC*, 617 Fed. App'x 10 (D.C. Cir. 2015). One month later, on October 26, 2015, Beach TV and ACI filed this suit against Mr. Solomon, the Haley firm, and the Garvey firm. *See generally* Compl., ECF No. 1. At that point, Ms. Virtue advised Mr. Colley that the Garvey firm could no longer represent ACI and Beach TV due to the conflict of interest posed by the lawsuit. Pl.'s SMF ¶ 151.

All three defendants moved to dismiss ACI and Beach TV's First Amended Complaint. *See* ECF Nos. 24, 25, 27. The Court granted the Garvey and Haley firms' motions, and granted in part and denied in part Mr. Solomon's. *See Beach TV Props., Inc. v. Solomon*, No. 15-cv-

1823, 2016 WL 6068806 (D.D.C. Oct. 14, 2016). It also dismissed claims by Beach TV for lack

of standing. *Id.* With only one active claim remaining (ACI's claim against Mr. Solomon for his

submission of the defective form) ACI filed a motion to amend its complaint a second time,

which the Court granted in part and denied in part. *See Beach TV Props., Inc. v. Solomon*, 254 F.

Supp. 3d 118 (D.D.C. 2017). Following the Court's order, the case now contains two surviving

claims of legal malpractice: one against Mr. Solomon for preparing and filing the incomplete

Statement of Eligibility, and one against Ms. Virtue for failing to advise ACI about, among other

things, potential conflicts and claims arising from Mr. Solomon's alleged malpractice. *See* 2d

Am. Compl., ECF No. 69. ACI and Mr. Solomon subsequently filed cross-motions for summary

judgment on Mr. Solomon's liability to ACI for malpractice. Their motions are now ripe for

review.

## III.  LEGAL STANDARD

A court may grant a motion for summary judgment when there is "no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Material" facts are those capable of affecting the substantive outcome of the litigation,

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute regarding those facts is

"genuine" if there is enough evidence on the record for a reasonable jury to find for the non-

movant, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

On summary judgment, the movant bears the initial burden of identifying portions of the

record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P.

56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-movant must

point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed.

R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The purported dispute may not be based on mere

allegations—rather, the non-movant must present affirmative evidence demonstrating that there is indeed a genuine dispute. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). However, all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Liberty Lobby*, 477 U.S. at 255. When the statute of limitations is at issue, "[t]he burden of proof rests with the defendants because the statute of limitations is an affirmative defense." *Seed Company Limited v. Westerman*, 832 F.3d 325 (D.C. Cir. 2016) (citing *Brin v. S.E.W. Inv'rs*, 902 A.2d 784, 800–01 (D.C. 2006)).

## IV.  ANALYSIS

ACI and Mr. Solomon have each moved for a ruling in their favor regarding Mr. Solomon's liability for the submission of the incomplete Statement of Eligibility. *See* Pl.'s Mot.; Def.'s Mot. ACI argues that the Court should grant it summary judgment because it has demonstrated that Mr. Solomon committed malpractice when he submitted the incomplete form and because it filed suit within the statute of limitations period. Mr. Solomon argues that the Court should rule in his favor because he has demonstrated that ACI's suit is barred by the statute of limitations. In the alternative, Mr. Solomon argues that ACI was contributorily negligent when it forwarded the incomplete Statement of Eligibility to him for his review, and that ACI cannot show, as a matter of law, that it was Mr. Solomon's actions that led to the full extent of the loss ACI alleges it suffered in its Second Amended Complaint. For the reasons set forth below, the Court finds that questions of fact remain as to whether Mr. Solomon committed legal malpractice when he submitted the incomplete form, whether ACI's claim against Mr. Solomon is time-barred, and whether Mr. Solomon's actions proximately caused the full extent of ACI's injuries, and therefore denies both parties' motions for summary judgment.

## A. Statute of Limitations[1]

The parties dispute whether ACI's claim of legal malpractice against Mr. Solomon is time-barred. Legal malpractice claims in the District of Columbia "may not be brought" more than three years "from the time the right to maintain the action accrues." D.C. Code § 12-301(8). Despite bringing this suit almost sixteen years after Mr. Solomon's error, ACI promotes several arguments as to why its suit is not time-barred. First, ACI argues that its claim did not accrue at the time of Mr. Solomon's error, or upon its discovery of that error, because ACI did not suffer an actual injury as a result of Mr. Solomon's alleged malpractice until November 10, 2014, when it began to pay its new lawyers for its appeal of the FCC's decision to the D.C. Circuit. *See* Pl.'s Mem. Law Supp. Mot. Summ. J. ("Pl.'s Mem.") at 13–14, ECF No. 73. Second, it claims that even if it did suffer an injury earlier, its suit is not time-barred because its claim was tolled during the lengthy time period during which Mr. Solomon continued to represent the company in its attempt to obtain a Class A license for its LPTV station and because it brought suit within three years of the end of the tolling period. *See id.* at 16–17. Third, ACI argues that even if Mr. Solomon did not in fact represent it after October 26, 2012 (three years before this suit was filed), his actions surrounding his retirement were so unclear that he lulled ACI into inaction. *See*

---

[1] "A federal court sitting in diversity must apply the choice-of-law rules of the forum state—here, the District of Columbia." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Looking to the D.C. choice-of-law rules, we see that they treat statutes of limitations as procedural, and therefore almost always mandate application of the District's own statute of limitations." *A.I. Trade Fin., Inc. v. Petra Intern. Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) (citing *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966)). Therefore, the Court will apply D.C. law in its analysis of the statute of limitations. However, "[u]nder proper conflict of laws principles, the Court is to conduct the choice of law analysis for each distinct issue being adjudicated." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citing *In re Air Crash Disaster at Washington, D.C.*, 559 F. Supp. 333, 341 (D.D.C. 1983)); *see also Logan v. Providence Hosp., Inc.*, 778 A.2d 275, 280 (D.C. 2001) ("[D]ifferent law may apply to different issues in a lawsuit.") Therefore, this choice of law decision does not apply to any other issues in this case.

*id.* at 19. Fourth, ACI accuses Mr. Solomon of fraudulently concealing his retirement from ACI, thereby tolling the statute of limitations until it discovered his fraud. *See id.* at 21–22.

In response, Mr. Solomon claims that his representation of ACI ended upon his retirement in 2010. *See* Def.'s Opp'n at 13, ECF No. 78. In addition, he argues that the lulling doctrine is inapplicable, and his actions did not amount to fraudulent concealment. *See id.* at 18, 21. For the reasons set forth below, the Court concludes that ACI's injury as a result of Mr. Solomon's alleged negligence occurred when its Statement of Eligibility was dismissed in June 2000, that Mr. Solomon did not lull ACI into inaction, and that Mr. Solomon did not fraudulently conceal from ACI its cause of action against him. However, the Court also finds that questions of fact remain as to whether ACI's claim against Mr. Solomon was tolled past October 26, 2012 due to the continuing representation doctrine. As such, the Court cannot find at this time that the statute of limitations has run on ACI's malpractice claim against Mr. Solomon.

### 1. Date of Injury

When determining whether the statute of limitations on a claim has run, a court must first determine when the relevant cause of action accrued. *See Williams v. Mordofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990) (citing *Byers v. Burleson*, 713 F.2d 856, 859–60 (D.C. Cir. 1983)). One method of determining when a legal malpractice claim accrues in the District of Columbia is the so-called "injury" rule. "Under this rule, a claim for legal malpractice accrues when the plaintiff-client suffers actual injury, not when the act causing the injury occurs." *Byers*, 713 F.2d at 859–60.

ACI claims that it did not suffer an injury as a result of Mr. Solomon's alleged negligence until November 10, 2014, when it suffered the "actual injury" of incurring legal fees and expenses by taking an appeal of the FCC's decision to the D.C. Circuit. *See* Pl.'s Mem. at 14.

ACI claims that this was the first injury it suffered because even though its application for a Class A license was denied on June 9, 2000, it has not yet suffered displacement from Channel 42. It explains that "ACI therefore did not lo[]se any existing right, remedy or interest when Mr. Solomon filed the incomplete ACI Statement in 1999. ACI had and retained the right to use Channel 42 of the broadcast spectrum in Atlanta because ACI held a low power television license. Mr. Solomon's mistake did not affect that right." *Id.* Even after the passage of the Spectrum Act in 2012, ACI's LPTV station was not displaced, and it remains unclear whether the Act makes the station more likely to be displaced. *Id.* As such, ACI claims that the only actual injury it has suffered are the legal fees it incurred for its appeal to the D.C. Circuit. ACI makes no attempt to reconcile this argument with its allegation in its Second Amended Complaint that it is owed over $25,000,000 in damages due to the diminished value of its LPTV station. *See* 2d Am. Compl. ¶¶ 70–72.

"At the earliest, [a cause of] action accrues 'when the plaintiff has sustained some injury, even if the injury occurs prior to the time at which the precise amount of damages can be ascertained.'" *Bleck v. Power*, 955 A.2d 712, 715 (D.C. 2008) (quoting *Ideal Elec. Sec. Co., Inc. v. Brown*, 817 A.2d 806, 811 (D.C. 2003)). "The term 'injury' encompasses any 'loss or impairment of a right, remedy or interest, or the imposition of a liability.'" *Id.* (quoting 3 Mallen & Smith, Legal Malpractice, § 23:11 (2008 ed.)). "It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989) (citing *United States v. Gutterman*, 701 F.2d 104, 106 (9th Cir. 1983)).

Despite its arguments to the contrary, ACI suffered actual injury as a result of Mr. Solomon's alleged negligence on June 9, 2000, when the FCC dismissed ACI's Statement of Eligibility, thereby precluding it from applying for a Class A license. ACI explains, "[t]he sole

reason for filing the ACI Statement in 1999 was to get Class A status for the WTHC-LD License and thus protect it from the possibility of displacement due to the FCC's promotion of new technology." Pl.'s Opp'n at 19, ECF No. 79. Therefore, the dismissal of the Statement of Eligibility, which precluded ACI from obtaining a Class A license for its LPTV station, was the first actual harm ACI suffered as a result of Mr. Solomon's alleged negligence. At that point, its station lost its chance to obtain the same protection from displacement as a full power television station has, and also possibly its opportunity to increase in value as a result of obtaining that license. *See* 2d Colley Decl. ¶ 23, ECF No. 79-3. Even though the full extent of the damages caused by the dismissal of the Statement of Eligibility may not have been apparent in 2000, the dismissal of the Statement was a real, concrete injury, and would have provided a basis for a malpractice suit in 2000 if ACI had chosen to sue Mr. Solomon then. *See* Pl.'s Opp'n at 22 ("ACI's damages are measured by the difference between ACI having a Class A license and not having a Class A license.")

Because ACI suffered an actual injury as the result of Mr. Solomon's alleged malpractice in 2000 but did not bring this suit until 2015—well beyond the three years required by the applicable statute of limitations—the Court must evaluate whether there are any applicable common law doctrines that excuse ACI's otherwise late filing. ACI claims that there are three: the continuous representation doctrine, lulling, and fraudulent concealment. The Court addresses each in turn.

### 1. Continuous Representation

ACI has invoked the continuous representation doctrine to argue that the statute of limitations has not run on its malpractice claim against Mr. Solomon. ACI claims that, because Mr. Solomon continued to represent the company in its attempt to secure a Class A license

through at least October 26, 2012, the continuous representation doctrine tolled the statute of limitations during that time period, thereby making the suit that it brought only three years later timely. Pl.'s Mem. at 16. Mr. Solomon counters that the continuous representation doctrine does not make ACI's claim timely, because his representation of ACI ended upon his retirement in 2010 and ACI did not bring suit within three years of that date. The parties dispute whether Mr. Solomon ever clearly told ACI that he was retiring from the practice of law in 2010. The Court finds that because a material question of fact remains as to whether Mr. Colley and Ms. Davis reasonably believed that Mr. Solomon was still representing them in their pursuit of a Class A license, it is precluded from granting summary judgment on this issue to either party.

The continuous representation doctrine "tolls the statute of limitations for a legal malpractice claim during the time the attorney continues to represent the client in the relevant matter. The rule aims to avoid putting a client in the position of having to choose between (i) disrupting an ongoing lawyer-client relationship to enable bringing a malpractice claim and (ii) continuing the relationship but relinquishing the claim." *Seed Company Ltd. v. Westerman*, 832 F.3d 325, 332 (D.C. Cir. 2016) (citing *See Bradley v. Nat'l Ass'n of Sec. Dealers Dispute Resolution*, 433 F.3d 846, 850 (D.C. Cir. 2005)). Under the doctrine, "when the injury to the client may have occurred during the period the attorney was retained, the malpractice cause of action does not accrue until the attorney's representation concerning the particular matter in issue is terminated." *Id.* (quoting *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 768 (D.C. 1997))." "Although the rule will not always toll the statute of limitations during an appeal, it is not categorically inapplicable either. At the least, the rule applies when the same attorneys continue to represent a client in connection with the same matter." *Id.* (citing *De May v. Moore & Bruce, LLP*, 584 F. Supp. 2d 170, 183 (D.D.C. 2008)). This doctrine applies even when the

client is aware that a malpractice claim may exist. *Bleck v. Power*, 955 A.2d 712, 715 (D.C. 2008). When the attorney-client relationship ends, and therefore when the statute of limitation begins to run, is a question of fact, *Winston*, 700 A.2d at 768, and there are "no bright-line rule[s]" for that determination. Mallen, Legal Malpractice § 23:47. "On summary judgment, if the defendant has raised a statute of limitations defense, the plaintiff must show that a genuine issue of fact exists as to whether the discovery rule or equitable tolling applies." *Abate v. District of Columbia*, 659 F. Supp. 2d 156, 160 (D.D.C. 2009).

District of Columbia courts provide scant guidance of how a Court should determine when an attorney-client relationship ended when the client believes that an attorney continued to represent him after the attorney believes that the representation has ended. D.C. courts have, however, determined that formal withdrawal of an appearance before a tribunal is not required to end the representation; rather, the representation ends when the parties agree that it has ended. *See Rocha v. Brown & Gould*, LLP, 101 F. Supp. 3d 52, 73–74 (D.D.C. 2015) (citing *Casas-Cordero v. Salz*, No. 11-CV-1713, 2012 WL 2190879, at *4 (S.D. Cal. June 14, 2012) and *Aaron v. Roemer, Wallens & Mineaux, LLP*, 707 N.Y.S.2d 711, 714 (N.Y. Sup. Ct. 2000)). As such, the fact that Mr. Solomon never withdrew his appearance before the FCC is of little import. Additionally, D.C. courts have explained that when the attorney and client do not have an understanding regarding the nature of their relationship, "a client's perception of an attorney as his counsel is a consideration [for the court] in determining whether a[n attorney-client] relationship exists," *Matter of Lieber*, 442 A.2d 153, 156 (D.C. 1982).

"Where, as here, 'the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity.'" *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 255

(D.D.C. 2013) (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)); *see also Hull v. Eaton Corp.*, 825 F.2d 448, 453 (D.C. Cir. 1987) ("Our task is thus to choose the rule we believe the District of Columbia is likely to adopt in the future.") (citing 19 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4507, 103 (1982)). The two jurisdictions to have produced the most continuous representation jurisprudence are New York (at the state supreme court level) and California (at the intermediate appellate level). Both states trend in the direction of examining the client's perception of the attorney-client relationship, and allowing the trier of fact to determine if that perception was reasonable.

The New York Court of Appeals has held that the statute of limitations stops tolling when the client discovers or should have discovered that the attorney had abandoned his representation of the client. *See Shumsky v. Eisenstein*, 96 N.Y.2d 164, 170–71 (2001). In *Shumsky*, the court found that the plaintiffs were on notice that the defendant had ceased representing them when he failed to return their many calls, three years after they had retained him to file a breach of contract action, and three years after they had last heard from him. *Id.* at 171. This case was an implicit overruling of what other jurisdictions had called the "New York rule," which required, in order to be granted tolling, a demonstration of ongoing communication between the attorney and the client, *i.e.* "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney, . . . marked with trust and confidence." *Muller v. Sturman* 437 N.Y.S.2d 205, 208 (N.Y. App. Div. 1981). New York courts have since transitioned to the *Shumsky* rule, such as in *Cordero v. Koval Retjig & Dean PLLC*, when a New York court found that when an attorney who had worked on a matter left the firm that was representing the plaintiff, and provided "no evidence that plaintiff was ever informed of, or had objective notice of, [his] departure," a triable issue of fact remained as to whether the statute of

limitations was tolled under the continuous representation doctrine. 57 N.Y.S.3d 145 (N.Y. App. Div. 2017).

California courts originally varied in their approach as well. *See Gonzalez v. Kalu*, 43 Cal. Rptr. 3d 866, 871 (Cal. Ct. App. 2006) (rejecting, as other California courts had, the New York rule, but observing that "[s]ome California courts have endorsed the purported 'New York rule' [] for purposes of the continuing representation rule"). In *Kalu*, a case in which a client had hired an attorney to represent her in a sexual harassment action, but then did not discover for three years that he had never actually filed the lawsuit, the court held that, "in the event of an attorney's unilateral withdrawal or abandonment of the client, the representation ends when the client actually has or reasonably should have no expectation that the attorney will provide further legal services. That may occur upon the attorney's express notification to the client that the attorney will perform no further services, or, if the attorney remains silent, may be inferred from the circumstances." *Id.* at 872 (internal citations omitted). This is because "[a]fter a client has no reasonable expectation that the attorney will provide further legal services, [] the client is no longer hindered by a potential disruption of the attorney-client relationship and no longer relies on the attorney's continuing representation, so the tolling should end." *Id.* The court explained that "[w]hether the client actually and reasonably believed that the attorney would provide further legal services regarding a specific subject matter is predominantly a question of fact for the trier of fact, but can be decided as a question of law if the undisputed facts can support only one conclusion." *Id.* at 873. A Washington State appellate court has also adopted the *Gonzalez* approach. *See Hipple v. McFadden*, 255 P.3d 730, 734 (Wash. App. Div. 2011), *review denied*, 259 P.3d 1108 (Wash. 2011) ("We adopt the *Gonzalez* approach. Running the statute of limitations from the first break in continuity of the relationship does not protect an injured client

where the attorney abandons representation. The *Gonzalez* rule, which accounts for the client's reasonable expectations, is an appropriate standard to apply because it furthers the stated objective of preventing an attorney from being able to wait out an alleged malpractice claim.")

Given this trend among state appellate courts, and the D.C. Court of Appeals's prior holding that "a client's perception of an attorney as his counsel is a consideration [for the court] in determining whether a[n attorney-client] relationship exists," *Matter of Lieber*, 442 A.2d 153, 156 (D.C. 1982), it is likely that the D.C. Court of Appeals would also adopt this reasonable perception rule. As such, the Court will analyze the facts relevant to this case under this rule.

Based on the parties' declarations and depositions, there was clearly no meeting of the minds as to when Mr. Solomon's representation of ACI ended. Therefore, the Court must determine whether ACI's assumption that Mr. Solomon continued to represent it past October 26, 2012 was reasonable. Mr. Solomon highlights the following events as demonstrating that Mr. Colley and Ms. Davis understood, or at the very least should have understood, that Mr. Solomon was retiring from the practice of law, and therefore could no longer represent them. First, in late 2009, Mr. Solomon informed Mr. Colley that there would be a "transition" due to Mr. Solomon's age which would include Mr. Solomon turning over to his partner Ms. Virtue responsibility for all ACI and Beach TV matters. *See* Colley Decl. ¶ 16, ECF No. 72-1. Second, Mr. Solomon believes that Mr. Colley demonstrated that he understood Mr. Solomon to be retiring from the practice of law when he responded to Mr. Solomon's "Biker Bar" email by joking that the motorized scooters may have had Mr. Solomon and Mr. Colley's names on them. *See* Def.'s Opp'n at 15–16. And third, following Mr. Solomon's retirement in July 2010, Ms. Virtue began acting as ACI's replacement counsel by traveling to Florida to meet with Mr. Colley and Ms. Davis, and began serving as ACI's email point of contact, as demonstrated when Mr. Colley

inquired in March 2012 as to the status of the Application for Review. *Id.* at 14. Indeed,

following the biker bar email, Mr. Colley never emailed or spoke with Mr. Solomon again,

Solomon Decl. ¶¶ 3–4, ECF No. 76-29, though perhaps that was because he did not believe he

had any means of reaching him. *See* Ex. 8, Colley Dep., ECF No. 72-3 (email from Mr. Colley to

Ms. Virtue on August 13, 2010 asking for Mr. Solomon's "email address and other contact

info").

ACI argues that although Mr. Colley had been informed of the transition at some point in

2009, he was under the impression that Mr. Solomon had not terminated his representation of

ACI and Beach TV, but rather was taking a step back from the work because of his age. *See* Pl.'s

Mem. at 19. It explains that Mr. Colley and Ms. Davis were within reason in believing that Mr.

Solomon was not disassociating himself from ACI's case entirely because Mr. Solomon had,

when describing the transition, referred to Ms. Virtue as the future "front person" for ACI's

dealings with the FCC and to himself as a consultant acting "in the background"[2]; had stated that

he would be remaining in Washington, D.C.; and had mentioned that he would maintain an

_____

[2] Counsel for ACI asked Mr. Solomon twice if he recalled speaking with Mr. Colley or
Ms. Davis about his retirement and both times Mr. Solomon answered that he could not recall
any such conversation. *See* Solomon Dep. 108:2–17, 140:8–22, ECF No. 72-4. Mr. Solomon
now claims that he remembers that he "never told Colley in 2009 or any time thereafter, that
after [he] retired Melodie Virtue would be the front person and that [he] would be the back
person regarding legal representation of ACI or any of the other businesses owned by Colley[,
n]or did [he] ever suggest that after [he] retired [he] would maintain an attorney-client
relationship with ACI or any of the Colley interests." 2d Solomon Decl. ¶ 8. Technically, these
statements do not contradict each other, and are therefore, not subject to the sham affidavit rule,
as ACI argues. Mr. Solomon did not say that he does not recall *whether* he had any conversations
with Mr. Colley about his retirement; he said that he did not recall any such conversation taking
place. Assuming he never told Mr. Colley that he would continue to work as ACI and Beach
TV's attorney, it makes sense that Mr. Solomon does not recall ever telling Mr. Colley that he
would. Therefore, there remains a question of fact as to whether Mr. Solomon and Mr. Colley
ever discussed Mr. Solomon's retirement, and if such a conversation occurred, what was said
during it. However, there is no dispute that Mr. Solomon wrote to Mr. Colley in 2009 that he
would "be around to consult, etc." following his transition. Ex. C, Pl.'s Mot., ECF No. 71-5.

office at the Garvey Firm, from which he would be doing pro bono work.[3] Colley Dep. at 17:4–14; 45:14–46:17; 54:17–55:21, ECF No. 72-2. ACI also argues that Mr. Solomon never informed Mr. Colley that he was relinquishing his bar licenses, and indeed, there is no evidence in the record that Mr. Colley was aware that Mr. Solomon had relinquished both of his bar licenses by 2011. Pl.'s Mem. at 5. Last, ACI points to the assistance Mr. Solomon gave Ms. Virtue, which included strategy pointers and case citations, as she attempted to encourage the FCC to rule on the long-pending Application for Review and as she drafted a Petition for Consideration on ACI's behalf following the denial of its Application for Review, contributions which were conveyed, to some extent, to Mr. Colley, and that appear consistent with the "background" role ACI claims Mr. Solomon told the company he would perform. Pl.'s Mem. at 8–9; Pl.'s SMF ¶¶ 131–32.

These accounts of who knew what and when raise sufficient questions of fact to preclude the Court from granting ACI or Mr. Solomon summary judgment on the statute of limitations question. First, there is a dispute among the parties as to what Mr. Solomon said to Mr. Colley when he retired. Second, there is a dispute as to whether Mr. Colley understood Mr. Solomon to be scaling back his practice, as opposed to retiring. Third, there is a dispute as to whether Mr. Colley truly believed that Mr. Solomon was his lawyer on the Class A license matter. And

---

[3] The parties dispute whether Mr. Solomon told Mr. Colley that he would be maintaining an office at the Garvey firm and would work on pro bono projects there. Mr. Solomon explains that he "did not tell Colley . . . at any time, that [he] was going to remain at the Garvey law firm doing pro bono work, representing Garvey's clients, or starting a law practice of [his] own. In mid-June 2010, as [he] was preparing to vacate [his] office by the July 1, 2010 termination date set by the firm, [he] received an offer to affiliate, pro bono, with a nonprofit organization. The offer was unsolicited and welcomed. As noted, the pro bono opportunity arose after 2009—[his] final communication with Colley–and after [he] had any contact with Colley or anyone else in his organization. Nor did [he] ever tell Colley about the Garvey firm's offer to allow [him] to share office space after [he] retired." 2d Solomon Decl. ¶ 9.

fourth, there is a dispute as to whether, if Mr. Colley did believe that Mr. Solomon continued to represent ACI, that belief was reasonable under the circumstances. As such, the Court cannot grant summary judgment on the continuous representation doctrine question, and must leave the determination of when Mr. Colley should have reasonably understood that Mr. Solomon was no longer his lawyer to the trier of fact.

ACI has invoked two other common law doctrines to argue that the statute of limitations was tolled past October 26, 2012: lulling and fraudulent concealment. The Court will next determine whether it can determine on a motion for summary judgment that either of these doctrines render ACI's suit timely.

### 2. Lulling and Fraudulent Concealment

ACI argues that even if Mr. Solomon had ceased to represent it in its attempt to obtain a Class A license for its LPTV station before October 26, 2012, its claim is not time barred because Mr. Solomon lulled ACI into thinking that he still represented it, and fraudulently concealed that he was no longer representing it. *See* Pl.'s Mem. at 19–23. Mr. Solomon responds that neither doctrine applies to this case because he did not take any affirmative steps to trick ACI into believing that he still represented it after his retirement. *See* Def.'s Opp'n at 18–26. Mr. Solomon is correct.

Tolling "is frequently applied where the conduct of a fiduciary is alleged to have lulled the plaintiff into failure to protect his interests within the statutory limitations period." *Ray v. Queen*, 747 A.2d 1137 (D.C. 2000). "District of Columbia courts recognize a restricted equitable tolling doctrine," which "allows a plaintiff to initiate an action beyond the statute of limitations . . . [if the] defendant's fraudulent concealment or misconduct lulled the plaintiff into allowing the filing deadline to pass (often called the 'lulling doctrine')." *Doe v. Exxon Mobil Corp.*, 573 F.

Supp. 2d 16, 34 (D.D.C. 2008) (internal quotation marks omitted). The lulling doctrine applies when the defendant "ha[s] done something that amounted to an affirmative inducement to plaintiffs to delay bringing action." *Kiwanuka v. Kailana*, 844 F. Supp. 2d 107, 119 (D.D.C. 2012) (citing *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C.1986)).

"[F]raudulent concealment of the existence of a cause of action" also "tolls the running of a conventional statute of limitations . . . [a]nd in the legal malpractice field, there is widespread agreement that the statute will not run where the existence of a cause of action for legal malpractice has been fraudulently concealed by affirmative misrepresentations." *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. 1978) "Concealment will exist if the attorney has knowingly made false representations; it is only then that his conduct, by way of estoppel or otherwise, will toll the running of the statute." *Id.* at 996. Fraudulent concealment need not be pleaded in the complaint, because the "statute of limitations is an affirmative defense that defendant must prove: A plaintiff's obligation to plead fraudulent concealment therefore arises only when defendant raises the statute of limitations as a defense." *Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996) (citing *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 343 n. 12 (D.C. Cir.1991)).

In order for the doctrine to apply, the "party injured by another's fraudulent conduct" must "remain[] in ignorance . . . without any fault or want of diligence or care on his part until the fraud is discovered." *Craig v. Lew*, 109 F. Supp. 3d 268, 282 (D.D.C. 2015) (internal citations and quotation marks omitted). "The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination*

*Unit*, 507 U.S. 163 (1993). In *Hobson*, the D.C. Circuit listed two factors for courts to consider: first, "the plaintiff must know facts giving notice of the particular cause of action at issue, not just any cause of action"; and second, the "plaintiff's knowledge of the grounds for a suit must generally extend to an awareness of the persons responsible for plaintiff's injury." *Id.* at 35–36.

As a preliminary matter, ACI has pointed to no cases in which a court has found that fraudulent concealment applied when a defendant concealed not a cause of action or underlying injury, of which the plaintiff was well aware, but rather an ancillary fact such as when the statute of limitations began to run. Rather, courts in this district have found that so long as plaintiff was on notice of the alleged malpractice, fraudulent concealment cannot apply. *See e.g.*, *Gallucci v. Schaffer*, 507 F. Supp. 2d 85, 90–91 (D.D.C. 2007) (holding that fraudulent concealment did not apply to a case in which the defendant law firm had told plaintiff that there was nothing more it could do for him in his workers' compensation case because he was already aware of his allegedly insufficient payments for over a year). Here, ACI had been aware that Mr. Solomon had submitted the incomplete Statement of Eligibility to the FCC since June 2000. Therefore, the fact that it believes that Mr. Solomon misrepresented the nature of his retirement to it cannot toll the statute of limitations on fraudulent concealment grounds.

Even assuming that fraudulent concealment could apply to ancillary matters such as when the statute of limitations on a claim began to run (or, in this context, stopped being tolled), as opposed to the existence of the actual cause of action, ACI has not alleged sufficient affirmative actions on Mr. Solomon's part to demonstrate that he fraudulently concealed that the statute of limitations on their claim had begun to run, or lulled them into inaction. There is indeed a definitive dispute as to whether Mr. Solomon clearly indicated to ACI that he was retiring from the practice of law in 2009 and 2010, and whether ACI understood that he was retiring, rather

than simply taking a step back from his practice. *See supra*, Section IV.A.1. However, Mr. Solomon's alleged lack of clarity does not amount to an "affirmative inducement to plaintiff[] to delay bringing action." *Bailey*, 516 A.2d at 937 (citing *Hornblower v. George Washington University*, 31 App. D.C. 64 (1908)). Even if Mr. Solomon was purposefully unclear when he told ACI about his "transition" and the transfer of his work for ACI and Beach TV to Ms. Virtue, following his biker bar email to Mr. Colley in December 2009, Mr. Solomon took no further steps to lead Mr. Colley or Ms. Davis to believe that he was still ACI's lawyer. The record reflects that Mr. Colley began to email Ms. Virtue, whom he believed to be the "front person" for all Beach TV and ACI business before the FCC, after Mr. Solomon retired, and never emailed Mr. Solomon again after December 11, 2009. Although Ms. Virtue began communicating with Mr. Solomon about how to encourage the FCC to finally review ACI's Application for Review, and informed Mr. Colley of that fact, there is no indication in the record that Mr. Solomon asked Ms. Virtue to inform Mr. Colley that he was giving her advice. Similarly, when Mr. Solomon assisted Ms. Virtue as she drafted the Petition for Reconsideration, there is no evidence that Mr. Solomon asked Ms. Virtue to inform ACI that he was involved. Because the record is devoid of evidence that Mr. Solomon took affirmative steps after late 2009 to maintain the appearance that he was still representing ACI, his actions do not amount to lulling or fraudulent concealment, and the statute of limitations cannot be tolled on these bases.

### B. Liability

Next the Court must determine whether there is a question of material fact, apart from timing, as to Mr. Solomon's liability to ACI for legal malpractice. ACI argues that it has presented sufficient undisputed evidence for the Court to determine that Mr. Solomon is liable to ACI for malpractice due to the submission of the incomplete Statement of Eligibility, and

therefore should be granted summary judgment on liability. Mr. Solomon has in turn moved for a finding that he is not liable for any damages to ACI caused by the passage of the Spectrum Act of 2012. For the reasons set forth below, the Court finds that neither party has met its burden for a grant of summary judgment on these questions.

## 1. Choice of Law

"Because jurisdiction over [ACI's] legal malpractice claims is founded on diversity of citizenship, the Court must first determine which state law to apply." *Marbury Law Group, PLLC v. Carl*, No. 9-1402, 2013 WL 4583558, at *5 (D.D.C. July 21, 2013). Neither party briefed which state's laws the Court should use when evaluating this legal malpractice claim. ACI uses D.C. law to demonstrate that the Court has enough evidence before it to rule on Mr. Solomon's liability, but also explains that "District of Columbia law is the same as Virginia law on the elements of legal malpractice." Pl.'s Mem. at 12 n.7 (citing *Desetti v. Chester*, 290 Va. 50, 56, 772 S.E.2d 907, 909 (2015)). In his opposition to ACI's motion for summary judgment, Mr. Solomon applies D.C. law in responding to all of ACI's arguments, *see* Def.'s Opp'n at 10, but in his own motion for summary judgment, uses Virginia law in support of his proximate causation arguments, assuming that the Court's October 14, 2016 analysis deciding that Virginia law applied to ACI's attempt to assign its legal malpractice claim to Beach TV applies to determining which state's laws should be used to decide the merits of ACI's malpractice claim as well. *See* Def.'s Brief at 28 n.25. ACI has chosen to respond to these arguments with Virginia law. Neither party suggests that the laws of Florida or Georgia, where ACI is incorporated and has its principle place of business, respectively, applies to any portion of this case. Because the parties disagree as to whether District of Columbia or Virginia law applies to the substantive

legal issues governing ACI's malpractice claim against Mr. Solomon, the Court must determine which law applies.

"A federal court sitting in diversity must apply the choice-of-law rules of the forum state—here, the District of Columbia." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The District of Columbia "employ[s] 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.'" *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (quoting *Moore v. Ronald Hsu Constr. Co.*, 576 A.2d 734, 737 (D.C. 1990)). Under this approach, a court must first "determine whether a true conflict exists between the laws of the two jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." *In re APA Assessment Fee Litig.*, 766 F.3d at 51–52 (internal quotation marks omitted) (quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992)). A "false conflict" exists, on the other hand, "when either (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its law and the policies of the states whose laws are claimed to be in conflict would not be advanced by application of their law." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citing *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)). If "there is no 'true conflict'" among the purportedly interested jurisdictions, and where one of those jurisdictions is the District of Columbia, D.C. courts will "apply the law of the District of Columbia by default." *GEICO*, 958 F.2d at 1141 (citing *Fowler*, 262 A.2d at 348; Restatement (Second) of Conflict of Laws § 186 cmt. c (Am. Law Inst. 1971)).

As the parties have suggested through their disagreement, both states have a potential interest in this case. Virginia has a potential interest because the events leading to ACI's injuries occurred at a law firm in Virginia. D.C. has an interest because this case involves an attorney barred in D.C. (as well as Virginia), domiciled in D.C., who was representing plaintiff-client before an agency located in D.C that issues decisions appealable to the D.C. Circuit.

Because more than one state has an interest in its laws being applied to this case, next the Court must determine whether there is a true conflict or a false conflict between the states' laws. Virginia and D.C. maintain very similar standards for proving a claim of legal malpractice. In Virginia

> a cause of action for legal malpractice requires the existence of an attorney-client relationship which gave rise to a duty, breach of that duty by the defendant attorney, and that the damages claimed by the plaintiff client must have been proximately caused by the defendant attorney's breach . . . . To establish an attorney's breach of duty, a client must show that the attorney failed to exercise a reasonable degree of care, skill, and dispatch in rendering the services for which the attorney was employed . . . . This generally is a question of fact to be decided by a fact finder, after considering testimony of expert witnesses, but must be reserved for determination by a court and cannot be the subject of expert testimony if the issue of a breach is a matter of law.

*Smith v. McLaughlin*, 769 S.E.2d 7, 13 (Va. 2015) (internal quotation marks and citations omitted). In D.C., "to succeed on a legal malpractice claim, the plaintiff must show that (1) the defendant was employed as the plaintiff's attorney, (2) the defendant breached a reasonable duty, and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages." *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010) (citing *Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949)). "[I]n a legal malpractice action, the plaintiff must present expert testimony establishing the standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge," *Flax v. Schertler*, 935 A.2d 1091, 1106

(D.C. 2007) (quoting *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982)), or as a matter of law,

*Hamilton v. Needham*, 519 A.2d 172, 175 n.6.

D.C. and Virginia law contain the same rules for when expert testimony is or is not required. As explained in *Smith*, Virginia allows for the finding of liability on a breach of the standard of care as a matter of law in some circumstances, negating the need for expert testimony. *Smith*, 769 S.E.2d at 13; *see also Heyward & Lee Const. Co., Inc. v. Sands, Anderson, Marks & Miller*, 453 S.E.2d 270, 272 (Va. 1995). Additionally, in Virginia "it is well-established that '[u]nless a malpractice case turns upon matters within the common knowledge of laymen, expert testimony is required to establish the appropriate professional standard, to establish a deviation from that standard, and to establish that such a deviation was the proximate cause of the claimed damages.'" *Sloan v. Urban Title Servs.*, 770 F. Supp. 2d 227, 234 (D.D.C. 2011) (quoting *Seaward Int'l, Inc. v. Price Waterhouse*, 239 Va. 585, 391 S.E.2d 283, 287 (1990)). The matter of law and common knowledge exceptions to the expert testimony requirement also exist for clear cases in D.C. *Hamilton v. Needham*, 519 A.2d 172, 175 n.6 (D.C. 1986) (affirming summary judgment, granted without expert testimony, for plaintiff whose attorney omitted from his will a residuary clause the plaintiff had requested, thereby causing his residual estate to pass intestate); *O'Neil*, 452 A.2d at 342 n.6 (observing in dictum that "[e]xpert testimony has been held unnecessary in cases involving other failures to act," and that "[s]ome courts, moreover, have stated that, in cases of obvious negligence, the court may rule, without benefit of expert testimony, that the attorney committed a breach of the duty of care as a matter of law); *but see Liu v. Allen*, 894 A.2d 453, 459 (D.C. 2006) (finding while the "existence of the INS regulation governing motions for reconsideration certainly was relevant to 'the specific standard of conduct' applicable in determining whether [the attorney] was negligent," there remained a

question of fact as to whether the attorney would have needed to file such a motion at all in order to achieve the desired outcome, thereby precluding a finding of negligence as a matter of law). Because both D.C. and Virginia allow for this sort of departure, in certain limited circumstances, D.C. and Virginia malpractice law are in false conflict in this case. *Long*, 877 F. Supp. at 11. Because there is no "true conflict" between the substantive law governing legal malpractice claims in the District of Columbia and Virginia, the Court will apply District of Columbia law to ACI's claim going forward.[4] *GEICO*, 958 F.2d at 1141.

### 2. ACI's Motion

ACI has moved for summary judgment on Mr. Solomon's liability for legal malpractice. *See* Pl.'s Mem. at 12. To support its motion, it has provided a short expert report by George W. Conk, Esq., which concludes that Mr. Solomon's failure to complete ACI's Statement of Eligibility before submitting it "was a breach of Solomon's duty to his client of competence and diligence." Ex. D at 2, Pl.'s Mot., ECF No. 71-6. The majority of this report, however, focuses on the duties of care and rules of professional responsibility that Mr. Solomon breached upon his retirement. Mr. Solomon strikes back by pointing out that Mr. Conk's "report does not address the standard of care of an attorney in the District of Columbia or Virginia and Mr. Conk is not qualified to do so," because "Mr. Conk is not licensed to practice in Virginia or in the District of Columbia and does not profess to know the standard of care of attorneys practicing in Virginia, the District of Columbia, or before the FCC." Def.'s Response to Pl.'s SMF ¶ 41, ECF No. 78-1. In his rebuttal report, Mr. Solomon's expert, Thomas B. Mason, Esq., offers three opinions: that

---

[4] The Court also observes that contributory negligence is available as an affirmative defense in both D.C. and Virginia, creating another "false conflict." *See e.g.*, *Lyle, Siegel, Croshaw & Beale, P.C. v. Tidewater Capital Corp.*, 457 S.E.2d 28, 32 (V.A. 1995); *Pair v. Queen*, 2 A.3d 1063 (D.C. 2010) (defense recognized but not applicable).

no conflict of interest existed between Mr. Solomon and ACI from December 29, 1999 to June 9, 2000; that no conflict of interest existed between Mr. Solomon and ACI from June 9, 2000 to June 30, 2010; and that Mr. Solomon's retirement from the Garvey firm on June 30, 2010 terminated his attorney-client relationship with ACI. *See generally* Mason Report, ECF No. 76-26. However, Mr. Mason does not address whether Mr. Solomon's conduct in submitting the partially incomplete Statement of Eligibility amounted to a breach of his duty of care to ACI.

In D.C., the standard of care of attorneys is "that which a reasonably prudent person would have exercised under the same or similar circumstances." *Waldman v. Levine*, 544 A.2d 683, 688 (D.C. 1988) (citing *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979)). An attorney's "conduct must comport with that degree of care reasonably expected of other medical [or legal] professionals with similar skills acting under the same or similar circumstances." *Morrison*, 407 A.2d at 561. "While the general standard of conduct is an invariable legal rule—it requires an attorney to exercise that degree of reasonable care and skill expected of members of the legal profession under the same or similar circumstances, . . . the specific standard of conduct required under a given set of factual circumstances is a question to be answered by the trier of fact on a case-by-case basis with the assistance of expert testimony, in most instances, adduced at trial." *Waldman*, 544 A.2d at 689 (citations omitted).

ACI has presented no argumentation that Mr. Solomon's actions amounted to negligence as a matter of law, though perhaps it could have. *See O'Neil*, 452 A.2d at 342 n.6 (observing in dictum that "[e]xpert testimony has been held unnecessary in cases involving [] failures to act," and that "[s]ome courts, moreover, have stated that, in cases of obvious negligence, the court may rule, without benefit of expert testimony, that the attorney committed a breach of the duty of care as a matter of law). Instead, it presents an expert report, the reliability of which Mr.

Solomon challenges due to its sparseness and Mr. Conk's lack of licensure in D.C. or Virginia. While Mr. Solomon was correct to point out that Mr. Conk's expert report should have contained more than three sentences regarding the requisite standard of care Mr. Solomon owed to ACI when he submitted its Statement of Eligibility, and how he breached that standard of care, it is not the case that an expert witness is unqualified as a matter of law to present his expert opinion in a legal malpractice case in a state in which he is not licensed to practice law. *See e.g.*, *Sloan*, 770 F. Supp. 2d at 237 (holding that the court could not say, at the summary judgment stage, that an expert in a malpractice case was "so patently unqualified to opine on the subject of real estate settlement practice in Virginia that his proffered testimony must be excluded in its entirety" simply because he was not barred in Virginia). As such, the Court will not at this time exclude Mr. Conk's report. However, because questions regarding the report's reliability have been raised, the Court will not rule on the standard of care that Mr. Solomon owed ACI at this time either. Rather, it will be the trier of fact's responsibility to weigh the worth of Mr. Conk's expert opinion in determining what duty of care Mr. Solomon owed ACI when he submitted its Statement of Eligibility, and whether he breached it. With these questions remaining, the Court cannot at this time grant ACI summary judgment on the merits of its malpractice claim against Mr. Solomon. While putting off this issue may simply be delaying the inevitable, the lack of argumentation on this point leaves the Court with no alternative.

### 3. The Spectrum Act and Proximate Causation[5]

Mr. Solomon has moved for summary judgment as to damages stemming from the passage of the Spectrum Act of 2012 for lack of proximate causation, claiming that the Court

---

[5] Mr. Solomon chose to use Virginia law in his proximate causation analysis, and ACI has responded to his arguments using Virginia law as well. However, as explained above, Mr. Solomon's adoption of Virginia law, on the assumption that the Court's analysis regarding ACI's

should find as a matter of law that he did not proximately cause any damage to ACI relating to the passage of the Spectrum Act because "[t]he Spectrum Act of 2012 was unprecedented and a complete surprise to the communications industry and to ACI." Def.'s Brief at 26–27. He also claims that the damages ACI alleges in its first and second amended complaints "rest[] on sheer conjecture and speculation," because first, ACI's LPTV station has not yet been displaced, and second, because comparable stations have not yet been auctioned on the market, and therefore, ACI's value on the reverse auction market, had it been eligible, is speculative. *Id.* at 28–29. ACI responds that "Mr. Solomon's argument is irrelevant and premature at this stage of the case" because "[t]he full economic consequences for ACI's displacement are not yet determined." Pl.'s Opp'n at 18. ACI is correct.

In *Dalo v. Kivitz*, the D.C. Court of Appeals provided the proximate causation standard for legal malpractice claims:

> As with any tort action, legal malpractice liability is predicated on a finding that the injury was proximately caused by the breach of duty. Proximate cause exists when there is a "substantial and direct causal link" between the attorney's breach and the injury sustained by the client. A defendant "will be held responsible for the damages which result despite the entry of another act in the chain of causation" if that subsequent act reasonably could have "been anticipated and protected against." By contrast, an intervening act not reasonably foreseeable (sometimes referred to as a "superseding cause") breaks the chain of causation and relieves the wrongdoer of liability.

596 A.2d 35, 41–42 (D.C. 1991) (internal citations omitted).

ACI and Mr. Solomon dispute the foreseeability of the harm ACI now alleges it suffered, harm in part precipitated by the passage of the Spectrum Act. Mr. Solomon claims that "[t]he

---

assignment of its malpractice claim to Beach TV, was erroneous, since under D.C. choice of law rules, D.C. law applies to ACI's malpractice claim. *See* Section IV.B.1, *supra*. As such, the Court will apply D.C. law to Mr. Solomon's proximate causation arguments.

Spectrum Act of 2012 was unprecedented and a complete surprise to the communications industry and to ACI." Def.'s Brief at 27. He points to the fact that during Mr. Colley's Rule 30(b)(6) deposition on ACI's behalf, Mr. Colley admitted that he was surprised to learn of the Spectrum Act and the "potential for huge dollars to be paid for TV licenses." *Id.* at 30 (citing Colley Dep. 186:10–15, ECF No. 76-3). ACI responds that the type of harm it allegedly suffered as a result of not obtaining a Class A license (possible displacement due to the FCC's adoption of new technology and loss in the license's value) in precisely the kind of harm he anticipated when he directed Mr. Solomon to submit the Statement of Eligibility for the Class A license. *See* Pl.'s Opp'n at 19; 2d Colley Decl. ¶¶ 11–23, ECF No. 79-3.

"[P]roximate causation is ordinarily a question of fact for the jury . . . [and] it is only the exceptional case in which questions of proximate cause pass from the realm of fact to one of law." *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, 70 (D.D.C. 2012). Triers of fact determine not only whether a defendant's negligence proximately caused damage to the plaintiff, but also the extent of the plaintiff's damage that the defendant proximately caused. *See e.g.*, *Jefferson v. Ourisman Chevrolet Co., Inc.*, 615 A.2d 582, 584–585 (D.C. 1992) (upholding verdict resulting from the following jury instruction: "If you find that the defendant was negligent, but that his negligence was not the proximate cause of the damages to the extent claimed by the plaintiff, then the plaintiff may recover only the portion of the damages which resulted proximately from the defendant's negligence."). In general, courts should not grant summary judgment on damages when a plaintiff has not presented evidence of the full extent of his or her damages, so long as the fact that some damage has occurred has been established. *See e.g.*, *Cormier v. District of Columbia Water & Sewer Auth.*, 959 A.2d 658, 668 (D.C. 2008) ("However, a plaintiff who . . . has made a sufficient showing with respect to the

critical issue, i.e., the fact of damages, to foreclose the entry of summary judgment . . . will still have the opportunity, at trial, to present evidence as to the amount of damages." (citing *Rafferty v. NYNEX Corp.*, 744 F. Supp. 324, 331 n.26 (D.D.C. 1990))).

The Court cannot find as a matter of law that the damage ACI alleges it suffered (failure to procure a Class A license, leading to a risk of displacement and a decrease in the LPTV license's value) were not foreseeable when Mr. Solomon submitted the incomplete Statement of Eligibility. Additionally, while the Court has a general idea of the damages ACI will seek should liability be established, *see* 2d Am. Compl. ¶¶ 70–72, the Court has very little indication at this point of the monetary effects of Mr. Solomon's alleged negligence for one very simple reason: damages discovery has not occurred yet. *See* Pl.'s Opp'n at 3 n.6; *see also* Scheduling Order, ECF No. 58 (setting schedule for discovery on liability, but not damages). As such, ACI has not been given an opportunity to procure and present expert evidence regarding the extent of damages it has suffered, as well as the ascertainability of those damages, in order to rebut Mr. Solomon's assertion that any damage it suffered as a result of the passage of the Spectrum Act was unforeseen in 1999 and also incalculable. But as is required under *Comier*, ACI has established that it has suffered *some* damage: the loss of the opportunity to receive a Class A license. Therefore, the Court will allow the question of the extent of the damage Mr. Solomon's alleged negligence proximately caused to proceed to the trier of fact, and denies his motion for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 71) is **DENIED**, and Defendant's Motion for Summary Judgment (ECF No. 74) is **DENIED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2018

RUDOLPH CONTRERAS
United States District Judge