# Expert Witness Statement of Jack N. Goodman

## I. Qualifications

1. I am Jack N. Goodman. I am an attorney practicing before the Federal Communications Commission ("FCC"). I am the owner and sole attorney at the Law Offices of Jack N Goodman in Washington, D.C. I am admitted to practice law in the District of Columbia. I have practiced communications law since 1976, and have operated my own firm since 2011. I represent radio and television stations in transactions and assist them in complying with the regulations of the Federal Communications Commission ("FCC").

2. I received a Bachelor of Arts degree from The Johns Hopkins University in 1972. I received a J.D. with Honors from the University of North Carolina at Chapel Hill in 1975, where I was Articles Editor of the *North Carolina Law Review*. I clerked for Judge John D. Butzner, Jr. of the United States Court of Appeals for the Fourth Circuit.

3. After my clerkship, I joined the Washington, D.C. law firm of Pierson, Ball & Dowd. My practice there focused on representation of communications clients before the FCC. I also represented communications and other clients in state and federal appellate courts, including the Supreme Court. I was an associate and then a partner at Pierson, Ball & Dowd.

4. I joined the staff of the Legal Department of the National Association of Broadcasters ("NAB") in 1990. At NAB, I was the Association's chief legislative counsel in connection with both the Cable Act of 1992 and the Telecommunications Act of 1996. At NAB, I was responsible for FCC and court proceedings involving, among other things, the ownership rules applicable to broadcasters, license renewal and transfer procedures, FCC spectrum policies, the First Amendment rights of broadcasters, development of the use of auctions to allocate spectrum, the transition to digital television, political broadcasting rules and regulations, carriage

of television stations' signals on cable television, and security interests in communications licenses. From 1998 until 2004, I was the General Counsel of NAB.

5. In 2005, I became counsel to Wilmer Cutler Pickering Hale and Dorr LLP. I represented broadcasters and other telecommunications companies before the FCC and the courts. I represented parties in numerous acquisitions of television and radio stations, as well as parties in connection with FCC investigations of licensee compliance with FCC rules.

6. In March 2011, I formed the Law Offices of Jack N Goodman. I have represented broadcasters in transactions and regulatory proceedings, including numerous applications for consent to the assignment or transfer of control of a broadcast license. I counseled clients during the development of what became the Spectrum Act of 2012, which authorized the FCC to conduct the Broadcast Incentive Auction. I filed comments on behalf of several clients in the FCC proceedings to develop rules for the Broadcast Incentive Auction, and I have advised clients in connection with their decisions about participation in the Broadcast Incentive Auction, and subsequent proceedings involving the required "repack" of the television spectrum.

7. I have been a speaker at numerous industry conventions. I have several times chaired the Mass Media Practice and Judicial Practice committees of the Federal Communications Bar Association. I have spoken to numerous industry and bar groups about issues in communications law. I am listed and have been so for several years as a leading practitioner in Communications Law in *Best Lawyers*, *Chambers USA*, and *Super Lawyers*.

8. In the last ten years, I was the co-author of Ilene Gotts, Nathaniel Asker & Jack Goodman, *US Antitrust and FCC Treatment of Acquisitions of Distressed Communications Businesses*, Competition Law International (April 2010).

9. I have been retained as an expert witness in four previous court cases, one in the U.S. Bankruptcy Court for the Eastern District of Missouri,[1] one in the U.S. District Court for the Northern District of California[2], one in the Delaware Court of Chancery,[3] and one in California state court.[4] I testified by deposition in the latter two cases. In 2009, I submitted a written expert opinion on behalf of Shaw Communications, Inc. to the Canadian Radio-Television and Telecommunications Commission in *Policy Proceeding on a Group-Based Approach to the Licensing of Television Services and on Certain Issues Relating to Conventional Television*, Broadcasting Notice of Consultation CRTC 2009-411 (2009), and *Call for Comments Following a Request by the Governor in Council to Prepare a Report on the Implications and Advisability of Implementing a Compensation Regime for the Value of Local Television Signals*, Broadcasting Notice of Consultation CRTC 2009-614 (2009).

10. I am being compensated for my work on this case at a rate of $1000 per hour. My compensation is unrelated to the outcome of this matter.

## II. Summary of Opinions

11. I have been asked to provide testimony and a written expert opinion of whether Mr. Henry Solomon could reasonably have anticipated in 1999 and 2000 that the lack of Class A status for Low-Power Television Station WTHC-LD ("WTHC") could have resulted more than ten years later in a loss of the opportunity to sell the spectrum used by WTHC either in the

---

[1] *In re Roberts Broadcasting Company, et al.*, Case No. 11-50744 *et seq.* (Bankr. E.D. Mo.).

[2] *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14 Civ. 1278 (N.D. Cal.).

[3] *Tinicum Capital Partners II, LP v. Liberman Broadcasting, Inc.*, C.A. No. 11902-VCL (Del. Chan.).

[4] *San Mateo County Community College District v. LocusPoint Networks, LLC*, 17CIV01534 (Cal. Sup. Ct.).

Broadcast Incentive Auction (the "Auction") held by the Federal Communications Commission ("FCC") or to sell an option for WTHC to a speculator intending to participate in the Auction.

12. As set forth in more detail below, it is my opinion that neither Mr. Solomon nor any other FCC practitioner could or would reasonably have anticipated the Auction or that there would have been an opportunity to monetize the WTHC license in connection with the Auction. In forming this opinion, I consulted the Spectrum Act of 2012, relevant provisions of the Community Broadcasters Protection Act of 1999, FCC decisions implementing the Spectrum Act, the complaint and other documents, as relevant, in this matter, and the expert reports of Stephan C. Sloan and Tom W. Davidson.

## III. The Pre-1999 Status of Low Power Television and the Purpose of the CBPA

13. The FCC originally established the Low Power Television Service as a "secondary" service. Stations with that status were not permitted to interfere with the signals of other stations, and on the other hand had to accept interference from any station with a "primary" license (such as traditional, full power television stations). Stations in secondary services could also be displaced from their licenses if the FCC awarded a license to a primary service in the area in which the low power station operated, without any guarantee that alternative frequencies would be available to them.

14. Congress in 1996 authorized the FCC to begin a transition to digital television service in the United States (the original television service used analog signals). To provide for a transition that would minimize disruption to viewers, Congress authorized the FCC to grant each full power television station a second, temporary license to be used to transmit digital television signals. After a transition period, the FCC was supposed to reclaim one of the two licenses held

by each station. Congress also in 1997 directed the FCC, when the transition was completed, to reduce the amount of spectrum (and thus the number of channels) allocated to television service.

15. The FCC's goal when it proposed its initial allocation of channels for digital television service was to replicate the area served by each full power station's analog signal. This was complicated by the fact that analog and digital signals have differing propagation characteristics. The result of the FCC's calculations was that some traditional, powerful stations on VHF channels (channels 2-13) would have received licenses allowing for transmitters of up to five megawatts of power, while some traditional UHF stations (channels 14-69) might have only been allowed to transmit 25 kilowatts of power, a level which those stations believed would not allow them to be received in many locations. Full power stations with UHF analog licenses complained about this enormous power discrepancy and lobbied both the FCC and Congress for an opportunity to "maximize" their digital signals, so long as they did not interfere with another full power station.

16. Each of these actions had the potential for disrupting low power television stations. Many channels which low power stations occupied might be reallocated for full power stations' interim digital channels and interference from new digital signals – even on nearby channels – might make low power stations impossible to receive. And Congress was concerned that some low power stations which provided valuable local service could be displaced.

17. A compromise was reached under which the FCC would reduce the maximum power of a new digital signal to one megawatt and would allow stations which had been allocated lower levels of power to maximize their signals. As part of that compromise, Congress adopted the CBPA which allowed low power stations which were providing similar levels of service as traditional full power stations to apply for Class A status. Class A stations

were given primary status and protected from interference or disruption (except where necessary to ensure replication of a full power station's service area or to accommodate a full power station's right to maximize its signal).

18. Thus, the specific purpose of the CBPA and its creation of Class A stations was to preserve low power stations providing specified levels of public service from disruption due to the transition to digital television. That transition for full power stations ended in June 2009 when all full power stations were required to turn in one license and transmit only digital signals.

19. Although WTHC's Eligibility Statement was not accepted by the FCC and it was not awarded a Class A license, the FCC did not grant any full power station a license to use WTHC's channel or to operate in a way that materially interfered with WTHC's operations during and after the transition to digital television service. Moreover, as part of the transition to digital television service, the FCC removed from its Table of Allocations for television channels any channels for which it had not granted a license, and the FCC since then has not opened a filing "window" to permit applications for new full power television licenses. Thus, while the lack of Class A status may have placed WTHC at risk for displacement during the digital transition – the specific harm to which the CBPA was addressed – in fact it was not displaced.

## IV. The Broadcast Incentive Auction Could Not Have Been Foreseen in 1999 and 2000

20. My understanding is that the harm WTHC alleges it has suffered from the absence of Class A status (since it was not displaced or otherwise affected by the digital transition), is that it was unable to place its spectrum into the Broadcast Incentive Auction. In my opinion, that

harm – to the extent it might have occurred[5] – was not something that could have been foreseen in 1999 or 2000.

21. The purpose of the Auction was to reallocate spectrum that had been allocated to television service for use by providers of wireless telephone and broadband service. In the Auction, the FCC offered to buy channels used by television stations, which then had the option of either giving up their channels entirely or moving to a lower channel that was less useful for wireless telephone and broadband service. The remaining stations that chose not to participate in the Auction or whose channels were not acquired could then be "repacked" into fewer channels, leaving spectrum at the top of the television "band" to be reallocated to wireless service. The FCC was obliged, to the extent feasible, to preserve the service areas of the stations it was required to repack.

22. An incentive auction to repurpose broadcast spectrum was first proposed in the National Broadband Plan in 2010.[6] Indeed, the FCC has stressed that this is the first auction of its kind anywhere.[7] After considerable public discussion, Congress authorized a single broadcast incentive auction in the Spectrum Act in 2012.[8]

---

[5] The results of the Auction were, in many cases, far different than experts expected. In part, that was because the demand for spectrum by wireless licensees was far less than anticipated and the FCC, therefore, acquired much less spectrum than it originally expected. But in addition, perhaps as a result of the willingness of television stations outside of large urban areas to sell their channels at a lower price, in many large markets like Atlanta the FCC found that it was cheaper to clear spectrum by buying channels in nearby small markets than to purchase spectrum from licensees in large markets. In Atlanta, my understanding is that no licenses were purchased in the Auction.

[6] FCC, *Connecting America: The National Broadband Plan* (available at https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

[7] *E.g.*, *Expanding the Economic and Innovation Opportunities of Spectrum Rights Through Incentive Auctions,* Report and Order, 29 FCC Rcd. 6567 ¶ 13 (2014)("the auction will be the first of its kind").

[8] Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, § 6403.

23. Prior to that, although broadcasters could sell their stations, with extremely limited exceptions they had no rights to sell their channels for non-broadcast uses. While the FCC permitted the use of parts of a digital television channel's bitstream for non-broadcast transmissions, a condition of that right was that the station continue to broadcast at least one free, over-the-air standard definition video signal.[9] Thus, it would have been impossible for a television station to sell its channel for wireless communications purposes. And even if there had been a legal right to sell spectrum for such a purpose, it would have been a practical impossibility to operate a two-way wireless service, which is inherently lower-powered, on one channel in the middle of the television band structured for one-way transmissions of very powerful signals.

24. Further, although Congress in the Spectrum Act did direct the FCC to both allow Class A stations to participate in the Auction and to be protected from displacement in the subsequent repacking of the television "band," it was not required to do so and could have – if it so wished – protected only full power television stations.[10]

25. In my opinion, in 1999 and 2000, the possibility of an auction where the FCC would acquire spectrum from television stations could not have been anticipated. If anything, at that time and for years later, if the FCC determined that spectrum should be allocated to a new service, it either moved an existing service to new frequencies or it shrank or eliminated the

[9] 47 C.F.R. § 73.624 (b), (c).

[10] As the Supreme Court has said, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *FHA v. The Darlington*, 358 U.S. 84, 91 (1958). Moreover, the FCC – even without a specific statutory mandate – may reallocate spectrum among various services even if doing so might result in a licensee's complete loss of the ability to broadcast. *See, e.g., National Association of Broadcasters v. FCC*, 740 F.2d 1190, 1211 (D.C. Cir. 1984); *see also Teledesic LLC v. FCC*, 275 F.3d 75, 84 (D.C. Cir. 2001)(FCC has the authority to strike a balance "between protecting valuable existing uses and making room for these sweeping new technologies").

allocation for the existing service. Not until 2010 was the possibility of the FCC conducting a reverse auction to pay television broadcasters (or for that matter, any other license holders) to give up their channels voluntarily seriously discussed.

26. Even if it would have been possible to foresee something like the Auction, it was not in my opinion foreseeable in 1999 and 2000 that, if stations were repurchased by the FCC, Class A stations would have been protected by either the FCC or by Congress. If only full power stations had been permitted to participate in the Auction and to be protected in repacking – a choice which would have increased the potential amount of spectrum available to be reallocated to wireless service – WTHC's license would not have had any auction value to the FCC or to spectrum speculators even if it had a Class A license. My opinion is that no reasonable FCC practitioner in 1999 or 2000 could have anticipated the harm WTHC alleges.

I currently hold the opinions expressed in this Expert Report. I reserve the right to supplement or amend my Report to the extent that new information becomes available to me.

Executed on April 1, 2019

Jack N. Goodman