## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ATLANTA CHANNEL, INC.,      :
                                 :

      Plaintiff,              :      Civil Action No.:     15-1823 (RC)
                                 :

      v.                      :      Re Document Nos.:  143, 159
                                 :

HENRY A. SOLOMON, *et al.*,    :
                                 :

      Defendants.          :

## MEMORANDUM OPINION

### DENYING DEFENDANT HENRY SOLOMON'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS

## I. INTRODUCTION

Over 20 years ago, Defendant Henry Solomon submitted a form to the Federal Communications Commission ("FCC" or "Commission") on behalf of his client, the Atlanta Channel, Inc. ("ACI"). Timely submission of this material was required to establish ACI's eligibility to apply for a special license that would have given the broadcaster preference on the airwaves. But the form was incomplete: none of the boxes indicating eligibility were checked. As a result, the FCC deemed ACI ineligible to apply for a Low-Power-Television ("LPTV") Class A license pursuant to the Consumer Broadcasters Protection Act ("CBPA"), 47 U.S.C. § 336(f), and associated FCC regulations, 47 C.F.R. Part 73. Plaintiff thereafter brought malpractice claims against Mr. Solomon, alleging, as relevant here, that his actions are to blame for ACI's loss of this valuable licensing opportunity.[1] Second Am. Compl. ¶¶ 26–35, ECF No.

---

[1] This Court previously permitted Plaintiff to amend its complaint to include two new claims against Mr. Solomon's colleague, Melodie Virtue, and their law firm, Garvey Schubert Barer. *See Beach TV Properties Inc. v. Solomon* (*Beach TV II*), 254 F. Supp. 3d 118 (2017). Because the pending motions involve only Defendant Solomon, the Court does not discuss these claims or Defendants here.

69 ("The FCC would have granted a Class A License . . . but for the 'material deficiency' in the ACI Statement prepared, reviewed[,] and filed by Mr. Solomon." *Id.* ¶ 35.); *id.* ¶ 74 ("Mr. Solomon committed legal malpractice in the representation of ACI by failing to exercise due and proper care in the preparation and filing of the ACI statement.").

Defendant Solomon now seeks summary judgment on the grounds that, as a matter of law, ACI was never actually eligible for a Class A license. Def. Solomon's Motion for Summ. J. Based on the Lack of Eligibility of WTHC-LD for Class A Status ("Def.'s Mot.") 1–2, ECF No. 143.[2] According to Defendant, because ACI did not in 1999, and has not ever, satisfied the statutory and regulatory requirements for Class A status, Plaintiff cannot establish that Mr. Solomon's omission of material on the eligibility form led ACI to sustain a legally cognizable injury. Def. Solomon's Brief in Support of Motion for Summ. J. Based on the Lack of Eligibility of WTHC-LD for Class A Status ("Def.'s Br.") 4, ECF No. 143.[3] Mr. Solomon thus moves for summary judgment to dismiss the claim against him. Plaintiff, unsurprisingly, characterizes the underlying law and its application to ACI quite differently—so differently that ACI not only opposes Defendant's motion for summary judgment, ECF No. 153, but also moves for Rule 11 sanctions against Solomon's counsel for making what it characterizes as a frivolous legal argument, ECF No. 159. For the reasons set forth below, the Court agrees with Plaintiff that summary judgment is inappropriate but does not find Rule 11 sanctions to be in order here. Accordingly, the Court denies both motions.

---

[2] WTHC-LD (formerly WTHC-LP) is ACI's call sign. Second Am. Comp. ¶ 15.

[3] This document and Defendant's motion were filed together, *see* ECF 143, but are separately paginated. The Court cites to each document using the original pagination.

## II.  BACKGROUND

Because the parties dispute the manner in which the underlying statutory and regulatory structure applies to the facts presented, the Court will begin with an overview of applicable controlling law and then briefly recount the procedural and factual history of this case.

### A.  Statutory and Regulatory Background

#### 1.  The Consumer Broadcasters Protection Act of 1999

Congress enacted the CBPA, 47 U.S.C. § 336(f), on November 29, 1999, to ensure community access to locally-originated programming.  *See* 145 Cong. Rec. S29977 (Nov. 17, 1999) (stating that Act aims to "ensure that many communities across the nation will continue to have access to free, over-the-air low-power television (LPTV) stations, even as full-service television stations" convert to digital format).  In furtherance of this objective, the CBPA directed the FCC to create a new category of "[C]lass A television license."  47 U.S.C. § 336(f)(1)(A).  The CBPA provides that the FCC should award a Class A license "subject to the same license terms and renewal standards as the licenses for full-power television stations," unless otherwise provided, *id*. at § 336(f)(1)(A)(i), and should accord "each such [C]lass A licensee . . . primary status as a television broadcaster" so long as the licensee satisfies "the requirements for a qualifying low-power station," *id*. at § 336(f)(1)(A)(ii).  The statute specifies the relevant qualifying requirements:

> [A] station is a qualifying low-power television station if—
>> (A)(i) during the 90 days preceding November 29, 1999—
>>> (I) such station broadcast a minimum of 18 hours per day;
>>> (II) such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and
>>> (III) such station was in compliance with the Commission's requirements applicable to low-power television stations; and

(ii) from and after the date of its application for a [C]lass A license, the station is in compliance with the Commission's operating rules for full-power television stations[.]

47 U.S.C. § 336(f)(2).

In addition, the CBPA established a time-limited, two-step process for local broadcasters to use to apply for a Class A license. First, "within 60 days after November 29, 1999, licensees intending to seek [C]lass A designation" were to submit to the FCC a "certification of eligibility based on [the subsection's] qualification requirements." *Id*. § 336(f)(1)(B). Unless the statement of eligibility had a "material deficiency," the CBPA directed the FCC to "grant certification of eligibility to apply for [C]lass A status."[4] *Id*. Second, eligible applicants were permitted to "submit an application for [C]lass A designation." *Id*. § 336(f)(1)(C). The CBPA required the FCC to "prescribe regulations to establish a [C]lass A television license" for eligible licensees within 120 days of November 29, 1999. *Id*. § 336(f)(1)(A). Summing up, then, the CBPA established qualifying requirements and the process that licensees needed to follow to establish eligibility for a Class A license and delegated to the FCC the authority to, within the specified time frame, promulgate regulations concerning the details of the Class A license application process. The Court next describes the relevant FCC regulations.

## 2. FCC Implementation of the CBPA

As required by the CBPA, the FCC promulgated implementing regulations to establish a Class A television license. *See* FCC, *Report and Order*, In the Matter of Establishment of a Class A Television Service, MM Docket No. 00-10, FCC 00-115, 15 FCC Rcd. 6355 (Apr. 4, 2000) ("2000 Report and Order"). The FCC stated that the implementing regulations in its 2000 Report and Order were the "final regulations" described in the CBPA, such that licensees were

---

[4] The statute refers to a "certification of eligibility," whereas the parties refer to a "statement of eligibility." The Court considers the two terms to be synonymous.

permitted to file Class A applications within 30 days of the date that the regulations took effect. *Id.* at 6360. The regulations articulated in the 2000 Report and Order took effect on June 9, 2000. *Id.* at 8985.

In the 2000 Report and Order, the Commission both set forth implementing regulations and discussed the interaction between the regulations and the CBPA. The FCC first reiterated the "several steps" required for an LPTV station to be eligible for a Class A license: (1) "it must have filed a certification of eligibility within 60 days of the enactment of the CBPA" (*i.e.* by January 28, 2000); (2) the FCC must approve the certification of eligibility; (3) "it must file an application for a Class A license . . . within 6 months from the effective date of the Class A rules" (*i.e.* within 6 months of June 9, 2000); and (4) the FCC must grant that license. *Id.* at 6361. The Commission also established that it would apply to applicants and licensees "all" of the controlling Part 73 regulations that applied to full-service stations "except for those that cannot apply for technical or other reasons." *Id.* at 6365.

The FCC next addressed certain terms not defined by the CBPA itself. As relevant here, the FCC discussed what "market area" it would consider in determining whether a station had complied with the local production requirements to qualify for a Class A license. *See* 47 U.S.C. § 336(f)(2)(A)(i)(II) (indicating that qualifying for a Class A license requires a low-power television station to broadcast a minimum amount of "programming that was produced" in that station's market area). The Commission defined market area "to encompass the area within the predicted Grade B contour," or, for "a group of commonly controlled stations," as "the area within the predicted Grade B contours" of any of those stations. 2000 Report and Order at 6364.

The FCC further provided that it would "require Class A applicants and licensees to maintain a main studio . . . within the station's Grade B contour," consistent with the local access

objectives of the statute.[5]  *Id.* at 6366 (discussing "main studio rule").  However, the

Commission created a limited exception by "grandfather[ing] all main studios now in existence

and operated by LPTV stations . . . for purposes of [the] Class A main studio rule."  *Id.*  The FCC

also made clear that it would "consider programming produced at the main studio of such

grandfathered Class A stations to be locally produced programming" for purposes of compliance

with all applicable statutes and regulations.  *Id.* at 6365.  These provisions ensured that there was

no conflict between the locally produced programming requirement, discussed above, and the

main studio rule.  *Id.*  The final main studio rule itself thus provided, "[e]ach Class A television

station shall maintain a main studio at the site used by the station as of November 29, 1999, or a

location within the station's Grade B contour."  47 C.F.R. § 73.1125 (2000).  In addition, the

FCC stated that, "[i]n order to qualify as a 'main studio,' the location must be [1] equipped with

appropriate equipment capable of originating programming at any time" and [2] "staffed by at

least one staff-level employee at all times during regular business hours."  2000 Report and

Order at 6444, App'x D, ¶ F (emphasis removed).

     In 2001, the FCC reconsidered certain of these rules, including, as relevant here, the

definition of "market area" and its relationship to the main studio rule.  FCC, Memorandum

Opinion and Order on Reconsideration, *In the Matter of Establishment of a Class A Television

Service*, MM Docket No. 00-10, FCC 01-123, 16 FCC Rcd. 8244, 8252–53 (Apr. 13, 2001)

("2001 Reconsideration").  Discussing the "local programming" requirement, the Commission

clarified that "programming must be produced within the same 'market area' in which it is

broadcast" in order to "qualify as 'local programming' under the CBPA."  *Id.* at 8253.  The

---

[5] Separate FCC regulations define the Grade B contour, which depends on the signal strength of the LPTV station.  *See* 2000 Report & Order at 6366 n.52 (discussing definition of Grade B field strength values in 47 C.F.R. § 73.683(a)).

amended regulation thus defined "locally produced programming" as "programming: (1) produced within the predicted Grade B contour of the station broadcasting the program or within the contiguous predicted Grade B contours of any of the stations in a commonly owned group; or (2) programming produced at the station's main studio."  47 C.F.R § 73.6000 (2001).

In the 2001 Reconsideration, the FCC retained its previous regulatory provisions concerning main studios.  First, it reaffirmed the "grandfather" provision with respect to the location of a main studio.  2001 Reconsideration at 8252 n.34 ("If a Class A station used its main studio on or before the date of enactment of the CBPA (November 29, 1999), that studio is 'grandfathered.'  The location requirements for main studios that were established in the [2000] *Report and Order* and modified in this Order do not apply to these grandfathered studios."). Accordingly, under the updated regulations, a "grandfathered" main studio was again not required to be "located within a [Class A station's] predicted Grade B contour" to comply with the main studio rule.  *Id*. at 8256.  The FCC also reiterated the managerial and staffing requirements that would apply at main studios, stating that, in keeping with "CBPA's intent that Class A stations comply with all of the requirements of full-power TV stations," a station's main studio "must maintain, at a minimum, full-time managerial and full-time staff personnel."  *Id*. at 8255.  Satisfying this requirement demanded the full-time or equivalent part-time presence of two individuals during normal business hours.  *Id*.

These provisions remained substantively unchanged until 2017, when the FCC repealed its "main studio rule."  FCC, *Elimination of Main Studio Rule*, MC Docket No. 17-106, FCC 17-137, 82 FR 57876-01 (Dec. 8, 2017) ("2017 Order").  Finding that technological innovations had "eliminated the need for a local main studio," the FCC determined that the "costs of complying with the main studio rule substantially outweigh any benefits."  *Id*. at 57877.  Thus, the

Commission amended 47 C.F.R Parts 1 and 73 to delete § 73.6000(3), which had previously—as the Court just discussed—permitted a station to consider "[p]rogramming produced at the station's main studio" to be "locally produced programming."[6]  *Id*. at 57881.  Thus, all content would need to be produced at stations located within the specified Grade B contour to qualify. *See id*.  An exception remained, though: as it had in 2001, the FCC retained the grandfathering provision, stating, "[f]or those Class A stations currently operating at grandfathered main studios that are outside of the locations described in § 73.600(1)–(2) of our rules, we will continue to consider programming produced at that previously grandfathered main studio to be locally produced."  *Id*. at 57881 n.33.  Accordingly, a station that operated a main studio at a location outside of the applicable Grade B contour as of the November 29, 1999, date of enactment of the CBPA retained its grandfathered status with regard to locally produced content.

## B.  Factual Background and Procedural History

Because this Court has addressed this suit in six prior opinions, it assumes familiarity with its previous rulings and limits is discussion of the factual and procedural history to the points that are most relevant to the pending motions. [7]

---

[6] With the deletion of this provision, the FCC also eliminated the previous requirement that the main studio be capable of program origination.  2017 Order at 57878.  The Commission retained, however, rules requiring each Class A station to "maintain a local telephone number in its community of license or a toll-free number."  *Id*. (quoting 47 C.F.R. § 73.1125).  The FCC also added certain provisions to ensure ongoing public access to a broadcast station's public file, even after elimination of the main studio requirement.  *See id*. at 57879–80.

[7] On a motion for summary judgment, the Court accepts the non-movant's evidence— here, Plaintiff—as true.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158–59 (1970)).  Unless otherwise indicated, the reporting of the facts here and throughout the Court's opinion draws from the material facts that Plaintiff has indicated are not in dispute.  *See generally, e.g.*, Second Am. Compl.; Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s SMF"), ECF No. 153-2.

This suit centers on ACI's LPTV station in Atlanta, Georgia, which operates with call sign WTHC-LD. Second Am. Compl. ¶ 15. This station is one of seven LPTV stations owned by Jud Colley and his wife, Toni Davis, through three entities (ACI, Beach TV Properties, Inc. ("Beach TV"), and Beach TV of South Carolina, Inc.). Pl.'s SMF ¶ 2 (citing Sept. 27, 2019 Declaration of Byron "Jud" Colley ("2019 Colley Decl.") ¶ 2, ECF No. 153-3); *see also* Pl.'s Mem. Opp'n to Def. Solomon's Mot. Summ. J. ("Pl.'s Opp'n") 2–3, ECF No. 153. All of these LPTV stations are part of "The Destination Network." Pl.'s SMF ¶ 6, which "creates programming targeted to tourists who stay at hotels in each of the communities served by the [LPTV stations]," *id*. ¶ 7.

On December 29, 1999, attorney Harry Solomon submitted forms to the FCC seeking to establish that his client's seven LPTV stations were eligible to apply for a Class A license pursuant to the CBPA.[8] *See Beach TV Props., Inc. v. Solomon* (*Beach TV I*), No. 15-cv-1823, 2016 WL 6068806 at *2 (D.D.C. Oct. 14, 2016). But the form that Mr. Solomon submitted on behalf of ACI for WTHC-LD was missing information concerning the station's substantive eligibility. *Id.* On June 9, 2000, the Mass Media Bureau of the FCC dismissed ACI's statement of eligibility for WTHC-LD because it contained a "material deficiency." *Id.*

ACI, unwilling to concede defeat, pursued further administrative review. First, Mr. Solomon, continuing to act as ACI's legal counsel, filed a petition for reconsideration with the FCC. This petition was unavailing; in November 2000, the Mass Media Bureau denied the

---

[8] Mr. Solomon submitted forms on behalf of both ACI and Beach TV Properties, Inc. *See Beach TV Props., Inc. v. Solomon* (*Beach TV I*), No. 15-cv-1823, 2016 WL 6068806 at *2 (D.D.C. Oct. 14, 2016). Plaintiff's pleadings indicate that Beach TV and ACI "are and were at all times relevant to this action affiliates with 100% common ownership." Second Am. Compl. ¶ 41. Beach TV initially pursued claims against Mr. Solomon alongside ACI, but this Court dismissed all claims made by Beach TV for lack of standing. *See generally Beach TV I*, 2016 WL 6068806.

petition on the grounds that the original statement of eligibility was "patently defective." *Id.* (internal quotation omitted). ACI then sought review by the full FCC. Over a decade later, the FCC upheld the Mass Media Bureau's determination as reasonable and rejected ACI's application for review. *Id.*; *see also Beach TV Props., Inc. v. Solomon* (*Beach TV III*), 306 F. Supp. 3d 70, 81 (D.D.C. 2018). After the D.C. Circuit affirmed this denial of the petition for review in September 2015, Plaintiff filed suit against Mr. Solomon in this Court on October 26, 2015. *Beach TV III*, 306 F. Supp. 3d at 81.

ACI's malpractice suit against Mr. Solomon requires linking his action in 1999 to WTHC-LD's failure to acquire Class A status. More specifically, ACI's claim turns on the premise that, but for Mr. Solomon's submission of an incomplete form, WTHC-LD would have received a Class A license. Second Am. Compl. ¶ 35 ("The FCC would have granted a Class A license for the WTHC-LD License pursuant to the CBPA but for the 'material deficiency' in the ACI Statement [of Eligibility] prepared, reviewed[,] and filed by Mr. Solomon."); *see Beach TV III*, 306 F. Supp. 3d at 84 ("ACI suffered actual injury as a result of Mr. Solomon's alleged negligence on June 9, 2000, when the FCC dismissed ACI's Statement of Eligibility, thereby precluding it from applying for a Class A license."). In the pending motion for summary judgment, Mr. Solomon challenges this premise and contends that ACI was never eligible for a Class A license because ACI cannot satisfy the controlling locally-produced content requirements pursuant to the CBPA and associated FCC regulations.[9] Def.'s Mot. 1–2. ACI has moved for Rule 11 sanctions concerning the legal arguments presented in Defendant's motion. For the forthcoming reasons, the Court finds Defendant's arguments unpersuasive; however,

---

[9] As Defendant notes, his answer to Plaintiff's second amended complaint challenged this conclusion and "demand[ed] strict proof" that ACI "met the Qualifications Criteria and that the WTHC-LD License qualified for a Class A license." Answer of Def. Solomon to Second Am. Compl. ("Answer") ¶ 22, ECF No. 70; *see* Def.'s Br. 1 (citing Answer ¶¶ 21–22, 27).

because the Court does not find them frivolous in a manner that warrants the Rule 11 sanctions that Plaintiff pursues, both parties' motions are denied.

### III.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

The Court will first address Defendant's motion for summary judgment before considering Plaintiff's motion for Rule 11 sanctions.  For the forthcoming reasons, the Court denies both motions.

### A.  Defendant Solomon's Motion for Summary Judgment

Defendant Solomon urges summary judgment on the grounds that ACI's station, WTHC-LD, was not and has not ever been eligible for Class A status under the terms established by the CBPA and associated FCC regulations.  Def.'s Br. 6.  Defendant's opening brief emphasizes WTHC-LD's alleged failure to comply with the CBPA's locally-produced programming requirement as well as with the FCC's main studio rule.  *Id.* at 7–8.  Mr. Solomon argues that, because ACI was not eligible for Class A status at the time he filed the defective form in 1999, it "sustained no legally cognizable injury due to the FCC's denial of [ACI's] Statement of Eligibility," leaving Plaintiff without a cause of action for legal malpractice against him.  *Id.* at 11.

In support of this contention, Defendant first challenges the station's compliance with the locally produced programming requirement articulated in the CBPA and reiterated by the FCC. Mr. Solomon points to the Rule 30(b)(6) declaration by Plaintiff's designated witness, Byron "Jud" Colley, Jr., wherein Mr. Colley stated that ACI does not and has not ever created its own programming, but instead relies on the Beach TV Cable Company to produce its programming content.[10]  *Id.* at 3 (citing Def.'s Statement of Material Facts Not in Genuine Dispute ("Def's

---

[10] This entity is distinct from Beach TV Properties, Inc., the former co-plaintiff in this suit.  *See* 30(b)(6) Deposition of Byron Judson Colley, Jr. ("Colley Depo.") 19–20, ECF No. 143-1 (stating that Beach TV holds the license for certain stations, whereas Beach TV Cable Company, Inc. "runs TV stations in Panama City, Destin, and Key West" and serves as the "production company" for ACI's TV stations).  Mr. Colley and his wife are the sole shareholders

SMF") ¶ 3, ECF No. 143 (citing Def.'s Mot. Ex. 1, Colley Tr., ECF No. 143-1)).  According to

Defendant, because Beach TV Cable Company produces its content in Panama City, Florida, and

WTHC-LD is a station in Atlanta, Georgia, *id.*, WTHC-LD did not carry "local programming

produced within the market area served" by the station in the manner required to establish

eligibility for Class A status, *id.* at 6–7 (quoting 47 U.S.C. § 336(f)(2)(A)(i)(II)).  In other words,

because ACI's LPTV station WTHC-LD "generally speaking served the Atlanta market" and did

not operate as "part of a group of stations serving the same market area," and because it relied on

an entity in another state, outside of its Grade B contour, to produce all programming, Mr.

Solomon maintains that ACI could not possibly have met the statutory requirements for Class A

eligibility.  *Id.* at 7; *see id.* at 11–12.

Next, Defendant argues that WTHC-LD cannot establish that it would have been eligible

for a Class A license because it did not satisfy the FCC's main studio rule.  *Id.* at 8.  Mr.

Solomon notes that FCC regulations mandate main studios to (1) retain "at least two

employees . . . on a full-time basis: one management-level employee and one staff member" and

(2) maintain "production and transmission facilities that would allow stations to originate

programming" from that location.  *Id.* (first quoting, then citing, 2017 Order at 8128).  Defendant

asserts that ACI fails to meet this requirement because ACI identified only a single contract

employee and indicated that it does not employ camera crews or operators, and, accordingly,

cannot satisfy the FCC's staffing requirements under the main studio rule.  *Id.* at 8–9.

Plaintiff contends that Mr. Solomon's motion for summary judgment fails to account for

all of the relevant facts concerning ACI's programming production and main studio location.[11]

_____

for Beach TV Cable.  *Id.* at 114:4–10.

    [11] Plaintiff also argues that the expert witness statement that Defendant provides in
support of his motion for summary judgment contains only inadmissible legal conclusions and

ACI explains that Mr. Solomon overlooks a critical point: applying the FCC's grandfathering provisions, the Panama City studio is grandfathered as ACI's main studio. Pl.'s Opp'n 5. According to Plaintiff, because ACI's Panama City studio provided locally produced programming to WTHC-LD in Atlanta as of November 29, 1999, ACI has established that WTHC-LD did in fact satisfy what the CBPA and associated regulations demand to establish Class A eligibility. *See id.* at 5–9. In addition, Plaintiff emphasizes that this Panama City studio "had the equipment capable of originating programming and was staffed by the requisite two people," such that it met the regulatory requirements for a "main studio." *Id.* at 5.

In response, Defendant strongly contests the characterization of the Panama City studio as WTHC-LD's main studio. He raises several arguments, but just one suffices to resolve the instant motion: Panama City cannot be WTHC's main studio because Plaintiff has, "in legal pleadings before the FCC in the review of the FCC's dismissal of WTHC's Statement of Eligibility, clearly and unmistakably identified WTHC's main studio address as 236 Peachtree Street NE" in Atlanta, Georgia. Def. Henry A. Solomon's Reply in Further Supp. of Mot. Summ. J. ("Def.'s Reply") 1, ECF No. 162. Mr. Solomon contends that, because WTHC "has never moved from that location," and because Mr. Colley attested that the Peachtree location was WTHC's main studio address in a sworn statement provided on December 7, 2012, and acknowledged under oath in 2017, ACI cannot now claim that Panama City is WTHC's main studio to "bootstrap" its way into CBPA compliance. *Id.* at 3–4, 16–17. Defendant further argues that, in light of ACI's 2012 statement, the sham affidavit rule bars the Court from

should be disregarded or, alternatively, if it is considered, that the Court should also consider Plaintiff's supplemental expert witness statements. Pl.'s Opp'n 1–2. Because, as set forth below, the Court concludes that there are genuine questions of material fact that render summary judgment inapposite without considering these materials, it reserves judgment concerning the admissibility of these statements.

considering Plaintiff's 2019 attestation that "ACI's main studio was, at all relevant times, properly located in Panama City, FL," *id.* at 9 (quoting September 29, 2019 Declaration of Jud Colley ("Sept. 2019 Colley Decl.") ¶ 1, ECF No. 153-3); *see id.* at 9–11. Plaintiff rebuts these contentions, emphasizing that the 2012 and 2019 statements were in distinct contexts and that, when Panama City is construed as WTHC's main station, WTHC satisfies the Class A eligibility requirements.[12] *See* Pl.'s Sur-Response in Opp'n to Mot. of Def. Henry A. Solomon for Summ. J. ("Pl.'s Sur-Response") 1–3, ECF No. 167. For the following reasons, ACI has the better argument.

Because it determines what materials the Court may consider in resolving Mr. Solomon's motion for summary judgment, the Court begins with Defendant's contention that Plaintiff's 2019 representations concerning WTHC's main studio location are inadmissible. *See* Def.'s Reply 7–8. The "sham affidavit" rule, as Defendant notes, "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate." *Id.* (quoting *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007)). "If the supplemental affidavit does not contradict but instead clarifies the prior sworn statement, then it is usually considered

---

[12] In passing, Plaintiff also seems to argue more directly that content was actually "produced" in Atlanta. *See* Pl.'s Sur-Response 3 & n.5 (asserting "the indisputable truth that ACI's programming was about Atlanta subject matter, filmed in Atlanta, edited at the Panama City studio," *id.* at 3, and suggesting that Wikipedia definition of "production" establishes that "all of the programming broadcast by ACI was 'produced' in Atlanta" because it was filmed there, *id.* at 3 n.5). The Court will not rest its decision on a Wikipedia definition of production included in a footnote of Plaintiff's Sur-Response. Nor need it opine on this issue: because, as set forth below, the Court finds a material dispute of genuine fact concerning whether the Panama City studio qualifies as a main studio, and because Plaintiff does not appear to argue that the Peachtree location alone would suffice as a main studio for CBPA compliance purposes, the Court resolves the pending motion on these other grounds.

admissible." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 104 n.16 (D.D.C. 2015) (quoting *Galvin*, 488 F.3d at 1030).

Here, Defendant maintains that Mr. Colley's 2019 statement that WTHC's main studio is located in Panama City is inadmissible because it not only conflicts with the material in the 2012 legal proceedings with the FCC, but also conflicts with his 2017 testimony as ACI's Rule 30(b)(6) designee. *See* Def.'s Reply 8–9. On Mr. Solomon's account, the 2019 statement is in direct conflict with the sworn 2012 testimony, rendering it a sham affidavit. But Defendant's read of the two sets of statements glosses over the distinct settings in which the two statements were made. As Plaintiff points out, the two statements were made in different contexts. *See* Pl.'s Sur-Response 12. ACI emphasizes that Mr. Colley made his 2012 statement to the FCC in the context of ACI's petition for reconsideration of the FCC's denial of WTHC's statement of eligibility. *See* Pet. for Reconsideration 28–29, Dec. 7, 2012 Colley Decl., ECF No. 162-2.[13] Therein, ACI identified the Peachtree location "as a place where ACI conducted its operations like a full power television station." Pl.'s Sur-Response 3. In contrast, the 2019 declaration by Mr. Colley "identified the Panama City Studio as the place where ACI edited its 'locally produced programming' and otherwise complied with the requirements for a Class A License." *Id*. Accordingly, "[t]he two statements are not inconsistent because a full power television 'main studio' at the Peach Tree Studio is not the same thing as a Class A station 'main studio' at the Panama City Studio." *Id*.

A close read of the materials reveals that Plaintiff has the better argument. At a bare minimum, ACI's submissions concerning the two statements create a genuine dispute of material fact regarding the different contexts in which the statements were submitted. The 2012 petition

_____

[13] The Court cites to this document, which Defendant attached to his reply brief, using the ECF page numbers.

to the FCC urged the Commission to "reverse its prior ruling and allow WTHC to file a Class A license application." Pet. for Reconsideration 26. This petition specifically sought to address the FCC's finding that "ACI did not state it had met the continuing eligibility requirements for Class A stations," including "compliance with the Commission's operating rules for *full-power* stations." *Id*. at 12–13 (emphasis in original) (quoting FCC, Memorandum Opinion and Order, FCC 12-135 at 2 n.8 (Nov. 9, 2012) ("2012 FCC Mem. Op."), ECF No. 162-6). Therein, ACI argued that the FCC had misconstrued its own regulations by conflating step one of the CBPA's process (submission of the statement of eligibility) with step two of the process (application for a Class A license). *See id*. Thus, the main studio address offered in this context was meant to advance a particular legal argument and respond to the FCC's prior finding that ACI had not indicated a "main studio of record," *id*. at 12, for purposes of establishing initial Class A license eligibility under the CBPA. As Plaintiff explains, the 2012 Colley Declaration "was drafted by Defendant Melodie Virtue ('Virtue') and communicated to the FCC that ACI had been 'operating . . . like a full power television station.'"[14] Pl.'s Sur-Response 4 (citing 2012 Colley Decl. ¶¶ 6–8). ACI further notes that the requirements for a full-power television station are different from the requirements for a Class A license because "a full power television station does not have an obligation to broadcast 'locally produced programming,'" whereas a Class A licensee does. *Id*. at 4 & n.7 (distinguishing between § 336(f)(2)(A)(ii) requirement that Class A licensee must comply with rules for full power TV stations and § 336(f)(2)(A)(i)(II)'s separate,

---

[14] Plaintiff alleges that Mr. Solomon also participated in drafting the 2012 petition for reconsideration. Pl.'s Sur-Response 4 n.6. The Court previously addressed this issue in *Beach TV III* and found that conflicting "accounts of who knew what and when raise sufficient questions of fact to preclude the Court from granting ACI or Mr. Solomon summary judgment" with respect to when Mr. Solomon's representation ended, which determined the statute of limitations question. 306 F. Supp. 3d at 80–81, 89. Though it notes Plaintiff's allegation, the Court does not reopen the question of Mr. Solomon's involvement in resolving the instant motion.

additional requirement that such a licensee must broadcast a minimum amount of qualifying local programming (mistakenly referring to § 338 of CBPA)).  Therefore, according to a further declaration provided by Mr. Colley in October 2019, because ACI's 2012 statements were meant to address the full-power TV station requirements, the main studio address provided in 2012 was never intended to establish compliance with the "locally produced programming" requirement for a Class A license pursuant to the CBPA and associated FCC regulations.[15]  Oct. 28, 2019 Decl. of Jud Colley ¶¶ 3–7 ("Oct. 2019 Colley Decl."), ECF No. 167-1.  Defendant provides no reason to ignore this testimony, apart from claiming it is inconsistent with prior sworn statements.  But the Court cannot outright discount Mr. Colley's sworn testimony without assessing the witness's credibility.  And this task is not the province of the Court, but rather a matter for the trier of fact.  *Czekalski*, 475 F.3d at 363 (holding that a court must "eschew making credibility determinations or weighing the evidence" in resolving a motion for summary judgment).  Accordingly, Plaintiff's 2019 statements concerning its main studio location for purposes of CBPA compliance are not barred from consideration.[16]

---

[15] The Court does not mean to call into question any of the FCC or Circuit dispositions concerning ACI's application process, which rejected ACI's petitions for reconsiderations.  The point here is a narrower one: putting to the side all questions of law concerning whether the Panama City Studio can qualify as a main studio to establish WTCH's compliance with the locally-produced programming requirement pursuant to the CBPA and associated regulations, there is, at a minimum, a genuine dispute of material fact concerning the meaning of "main studio" in the 2012 submissions as compared to the 2019 submissions, which means that the Court cannot say the 2019 material is a sham affidavit.

[16] Defendant also argues that, because the 2012 Colley Declaration was included in the legal proceedings before the FCC and the D.C. Circuit, the doctrine of judicial estoppel bars consideration of the 2019 statements.  Def.'s Reply 8–11.  As this Court previously noted, "[a]lthough 'the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle,' three factors generally guide courts' analyses.  First, the party's later position usually must be 'clearly inconsistent' with its earlier position.  Second, a party generally must have succeeded in its earlier position to be estopped from advancing its later position.  Third, courts consider whether the party seeking to assert an inconsistent position would derive an unfair advantage if it is not estopped."  *Beach TV*

Taking into account the possibility that Panama City qualifies as WTHC's main studio for purposes of CBPA compliance, Mr. Solomon's argument is unavailing as a matter of law. As a threshold point, Defendant's contentions concerning retroactive application of regulations and statutes is mistaken. *See* Def.'s Reply 14–15. This argument is not a paragon of clarity, but Mr. Solomon appears to assert that, because "the events that gave rise to the legal malpractice claim against [him]" occurred before promulgation of "[t]he FCC's rules concerning the meaning of locally-produced programming with respect to a group of commonly owned stations," the Court would give improper retroactive effect to the FCC's interpretive rules if it were to apply them to his conduct. *Id.* There are two problems with this argument, however. First, the malpractice claim itself arises from submission of the statement of eligibility in December 1999. This conduct occurred *after* the CBPA, which indicates what is required for a station to qualify for a Class A license in the first instance, 47 U.S.C. § 336(f)(1)(B), took effect on November 29, 1999. As such, there does not seem to be a retroactivity issue with the specific conduct (submission of the eligibility form) at issue in the malpractice suit. Furthermore, Defendant does

---

*II*, 254 F. Supp. 3d at 126 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2007) (citations omitted)). Here, Mr. Solomon maintains not only that the 2019 statement is inconsistent and would give Plaintiff an unfair advantage, but also that ACI "achieved at least partial success" in its prior use of the 2012 declaration in the proceeding before the FCC because "the FCC disclaimed footnote 8 of its original opinion" and instead denied the petition on procedural grounds. Def.'s Reply 10. However, as the Court just explained, it cannot conclude as a matter of law that the two statements are so utterly at odds in the way that Defendant urges. Moreover, the bare fact that the FCC disposition ultimately rested on separate, procedural grounds does not indicate that it (1) provided any binding holding concerning the location of the main studio where ACI created content for purposes of complying with the CBPA's locally produced content requirement or (2) addressed the location of ACI's main studio in a way that indicates ACI succeeded in its earlier position. The Court thus finds Defendant's argument unpersuasive. *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) ("Contradictory pleadings do not usually create a judicial estoppel unless the party prevailed on the repudiated pleading." (citing *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547–48 (7th Cir. 1990)). Accordingly, the Court rejects Defendant's appeal to the doctrine of judicial estoppel.

not explain why it would be improper to apply the interpretive rules that the CBPA explicitly

directed the FCC to establish within 120 days of November 29, 1999, *id*. § 336(f)(1)(A),

particularly when, as Plaintiff points out, "the FCC's interpretive rules were in effect on June 9,

2000[,] when the FCC ruled ACI was ineligible for a Class A license," Pl.'s Sur-Response 9; *see*

2000 Report and Order 8985.[17]

Second, this retroactivity argument fails even under Defendant's own theory. Citing

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994), Mr. Solomon suggests that, because there

is no retroactive effect for the statute, "the court 'is to apply the law in effect at the time it

renders its decision.'" Def.'s Reply 15 (quoting *Landgraf*, 511 U.S. at 277). He then asserts that

ACI cannot establish eligibility under the current version of the regulation because the FCC

eliminated the main studio rule in 2017, and "ACI has not met its burden of showing that its

programming during the 90 days preceding the enactment of the CBPA on November 29, 1999"

satisfied the CBPA's requirements for "locally produced programming" under the two current

regulatory definitions. *Id*. (quoting 47 C.F.R. § 73.6000 (2019)). As Plaintiff underscores,

though, and as the Court previously described, the 2017 regulatory changes maintained the

grandfathering provisions that permitted a main studio in operation on November 29, 1999, to

count as a site for local production of programming for purposes of CBPA compliance. Pl.'s

Opp'n 9–10; *see also* Pl.'s Sur-Response 9 n.10 (citing Pl.'s Opp'n 9). Accordingly, even under

---

[17] That said, the Court does not endorse Plaintiff's reasoning in its entirety. ACI
maintains that the Court's prior finding concerning the date of the injury for purposes of statute
of limitation analysis, *see Beach TV III*, 306 F. Supp. 3d at 83, is the same date that matters for
retroactivity analysis, Pl.'s Sur-Response 9–10 (discussing *Beach TV III*). The question of when
the cause of action for malpractice accrued is a discrete one from when the relevant conduct
occurred. Here, as discussed above, the post-CBPA, December 1999 submission of the
statement of eligibility is the relevant action, and it is the operative date of the final, statutorily-
required regulation on June 9, 2000, that matters—not, as Plaintiff seems to argue, the FCC's
ruling per se on that same date.

the current version of the regulations, the operative question remains whether a reasonable finder of fact could conclude that the Panama City studio qualifies as WTHC's main studio in a manner that establishes Class A eligibility.

The short answer to this question is yes: Plaintiff has established genuine disputes of material fact concerning whether WTHC can rely on Panama City as its main studio and thereby establish that it would have qualified for a Class A license. For one, the issues previously discussed regarding the context of the 2019 statement and the credibility of Mr. Colley as a witness themselves require examination by the trier of fact to resolve. Furthermore, Plaintiff points to other evidence to counter Mr. Solomon's arguments that WTHC has not complied with other aspects of the main studio rule. For instance, in addition to his contentions that WTHC did not locally produce its programming, Defendant maintains that WTHC was not properly staffed. But if the Panama City location and not the Peachtree, Atlanta location is WTHC's "main studio" for purposes of compliance with controlling law, which ultimately turns on the same questions of witness credibility previously discussed, then Plaintiff has provided evidence of compliance with these elements of the main studio rule. *See* Pl.'s Opp'n 5 (stating that ACI "used the Panama City location for the creation of virtually all of its programming" as of November 28, 1999, and that this location "had the equipment capable of originating programming and was staffed by the requisite two people"); Sept. 2019 Colley Decl. ¶¶ 5, 10, 16; Declaration of W. James Mac Naughton ("Naughton Decl.") 19–36 (Ex. B), ECF No. 153-4 (providing wage and tax statements for employees at Panama City location). In addition, Plaintiff suggests that Mr. Solomon himself was aware of the manner in which ACI relied on the Panama City studio to establish its CBPA compliance. Pl.'s Opp'n 10. In support of this point, Plaintiff provides an email between the parties that indicates that Mr. Solomon was aware of the

FCC's grandfather provisions.  Oct. 2019 Colley Decl. 11, Ex. B, Nov. 10, 2004 Email Between Henry Solomon and Jud Colley, ECF No. 167-1 at 11 (including statement by Mr. Solomon that "Class A stations must have a main studio[;] . . . [h]owever, studios used prior to attaining Class A status, may continue to be used even if not within Grade B").  Although this point is not dispositive, and noting that Mr. Solomon strongly contests his awareness of ACI's reliance on Panama City as its main studio, *see* Def.'s Reply 6; Declaration of Henry Solomon ("Solomon Decl.") ¶ 9, ECF 162-10, the disagreement about which party's testimony to credit with respect to the main studio location lends further support to the Court's conclusion that there are genuine disputes that remain the province of the factfinder.  Accordingly, the Court denies Defendant's motion for summary judgment.

### B.  Plaintiff's Motion for Rule 11 Sanctions

Additionally, Plaintiff moves for sanctions pursuant to Federal Rule of Civil Procedure 11(b)(1) and 11(b)(2).  Pl.'s Mem. L. in Supp. of a Mot. for Rule 11 Sanctions Against Counsel for Def. Henry Solomon ("Pl.'s Rule 11 Mem."), ECF No. 159-1.  More specifically, Plaintiff maintains that Defendant's motion, which initially maintained that "ACI did not and could not qualify for a Class A license for WTHC-LD on the grounds" that (1) its programming "is not 'locally produced programming' within the meaning of 47 C.F.R. § 73.6000 as amended," and (2) it lacked a "main studio," represents a frivolous legal argument in contravention of Rule 11(b)(2).[18]  Because Mr. Solomon "relied solely on the Supplemental Expert Witness Statement of Jack N. Goodman" to make his argument, and this argument "failed to consider that ACI's

---

[18] Although Plaintiff moves under Rules 11(b)(1) and (b)(2), *see* Pl.'s Rule 11 Mem. 1, as Defendant notes, Plaintiff's memorandum never again invokes or cites to Rule 11(b)(1), *see* Def.'s Opp'n to Pl.'s Mot. for Rule 11 Sanctions 3, ECF No. 164.  Because Plaintiff presents no argument developing this point and because the Court did in fact authorize Defendant to pursue a "viable theory" via motion during the parties June 5, 2019, status conference, *see* Def.'s Opp'n to Pl.'s Rule 11 Mot. 4, the Court does not consider Rule 11(b)(1) in the following analysis.

'locally produced programming' was edited at ACI's grandfathered 'main studio' in Panama City, [Florida]," Plaintiff maintains that Defendant's argument lacks "any merit whatsoever" and warrants sanctions.  Pl.'s Reply to Opp'n of Def. Henry A. Solomon to Mot. for Sanctions ("Pl.'s Reply in Supp. of Rule 11 Mot.") 1–2, ECF No. 168.  For the following reasons, the Court disagrees with the manner in which Plaintiff attempts to paint Defendant's argument and declines to enter Rule 11 sanctions.

"Rule 11 of the Federal Rules of Civil Procedure provides that in submitting motions and other pleadings, or defending them before the district court, attorneys vouch that 'the claims, defenses, and other legal contentions therein are warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.'"  *SEC v. Loving Spirit Found. Inc.*, 392 F.3d 486, 494 (D.C. Cir. 2004) (quoting Fed. R. Civ. P. 11(b)(2)); *see also Holmes v. FEC*, 823 F.3d 69, 74 (D.C. Cir. 2016).  To resolve a Rule 11 motion, a court is to apply "an objective standard of reasonable inquiry on represented parties who sign papers or pleadings."  *Bus. Guides, Inc. v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 554 (1991).  "A party's representations are 'frivolous and thus worthy of sanctions when they are utterly lacking in legal merit and evidentiary support.'"  *Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643, at *3 (D.D.C. Oct. 15, 2014) (quoting *ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245, 271 (D.D.C. 2013) (internal quotation marks and citation omitted)).  The court "has the discretion to determine both 'whether a Rule 11 violation has occurred and what sanctions should be imposed if there has been a violation.'"  *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002) (quoting *Long v. U.S. Dep't of Justice,* 207 F.R.D. 4 (D.D.C. 2002)).

Here, the Court does not find Defendant's motion to be frivolous in a manner that warrants sanctions. Much of Plaintiff's motion amounts to a little more than restatement of the same substantive arguments that ACI has already presented. Plaintiff's contentions rest, at bottom, on Defendant's failure to consider the grandfathering provision of the "main studio" rule and the manner in which it might interact with ACI's Class A license eligibility. As ACI puts the point: "Solomon's reliance on the Goodman opinion overlooked the salient and dispositive detail that the FCC grandfathered the Panama City Studio so it qualifies as a 'main studio' for all Class A purposes . . . . The diligence required by Rule 11 calls for Solomon to at least bring that detail to the Court's attention . . . ." Pl.'s Reply in Supp. of Rule 11 Mot. 3. The problem with this argument, though, is that characterizing the motion as legally frivolous in this manner requires assuming that Mr. Solomon was aware of how ACI relied on the Panama City studio for compliance purposes at the time that he filed the motion for summary judgment. And as the Court just discussed, what Mr. Solomon knew, at what point, is disputed. In his opposition to Plaintiff's motion for Rule 11 sanctions, moreover, Defendant states that it was not until September 13, 2019, "more than two months after the filing of the summary judgment motion," that Mr. Solomon first became aware of "the allegations that [he] knew of the facts regarding the production and distribution" for ACI and that ACI "relied on those facts" in making representations to the FCC concerning ACI's Class A license eligibility. Def.'s Opp'n to Rule 11 Mot. 5 (discussing Sept. 2019 Colley Decl.).

For Rule 11 purposes, the question for the Court is whether, if Defendant in fact only learned of this information after filing the summary judgment motion, Defendant's counsel, "under the circumstances," "conduct[ed] a reasonable inquiry into the facts and the law before filing." *Bus. Guides*, 498 U.S. at 551; *see also Sweigert v. Podesta*, No. 17-cv-2330, 2019 WL

1243679, at *3 (D.D.C. Mar. 18, 2019) (quoting *Bus. Guides* and discussing standard).  In this

instance, because Plaintiff so strongly rests its case on the legal frivolousness of Defendant's

failure to even consider the grandfather aspects of the main studio rule, the Court's task is made

more difficult.[19]  Plaintiff is not explicit about why, if at all, the Court should find that

Defendant's counsel did not reasonably discover the relevant facts until later in litigation than

ACI might prefer.  Instead, ACI moves for sanctions because it sees the legal argument presented

as fatally flawed, to the point that it is frivolous for Defendant to even make it.  Again, however,

this Court would need to assess witness credibility to determine whether Mr. Solomon in fact

legitimately relied on Mr. Colley's representations, such that his late realizations concerning

ACI's reliance on the Panama City main studio could be timely (and his counsel's initial failure

to raise this point could be understandable), or whether he is now concealing his own

involvement with respect to ACI (and his initial failure to raise this point could amount to

making an argument without any legal or evidentiary basis).  This category of dispute, as

discussed above, is for the finder of fact—not the Court.[20]  Accordingly, the Court is left only

---

[19] Plaintiff presents further contentions concerning the sham affidavit rule and the retroactivity argument, but not until ACI's reply brief.  *See* Pl.'s Reply in Supp. of Rule 11 Mot. 3–4.  Courts in this Circuit have "generally held that issues not raised until the reply brief are waived."  *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000) (quoting *Board of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996)); see also *Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006) (citing *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006)).  "This principle holds when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief." *Bloche v. DOD*, 414 F. Supp. 3d 6, 23 n.5 (D.D.C. 2019) (citing *Sitka Sound Seafoods*, 206 F.3d at 1181).  Here, by failing to develop these points until its reply brief, ACI has waived other bases from which the Court might conclude that Defendant's arguments are frivolous.

[20] That said, the Court is skeptical that an attorney who holds himself out as an expert in FCC law would rely so wholly on his client's assessments of compliance, without ever at least engaging in a conversation that would bring to light the kind of information that Mr. Solomon expressly disclaims knowing.  And the emails upon which Plaintiff relies seem to confirm that Mr. Solomon indeed advised Plaintiff on substantive aspects of the main studio rule and the requirements of local programming.

with Plaintiff's assertions that, as a matter of law, Defendant's arguments fail. But this leads the Court in a circle once more: it is not possible to make this call without putting a thumb on the scale of many of the very same factors that, because they are matters for the finder of fact, favor Plaintiff in the Court's denial of Defendant's motion. Thus, the Court declines to enter Rule 11 sanctions.[21]

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED** and Plaintiff's motion for Rule 11 sanctions is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 30, 2020                                          RUDOLPH CONTRERAS
                                                               United States District Judge

---

[21] Although the Court does not credit ACI's further arguments because they were not raised until Plaintiff's reply brief, *see Sitka Sound Seafoods*, 206 F.3d at 1181, it is worth noting that they similarly retread terrain already covered. First, Plaintiff contends that Defendant's invocation of the sham affidavit doctrine is frivolous. Pl.'s Reply in Supp. of Rule 11 Mot. 3. As discussed previously, the two statements are not plainly inconsistent because a finder of fact could determine, reading the statements in context, that the 2012 and 2019 statements refer to different understandings of a "main studio" in the manner that ACI urges. But the Court's conclusion that the 2019 declaration is not plainly barred as a sham affidavit is not tantamount to a holding concerning the operative effect of Mr. Colley's 2019 statements. Particularly in light of the complex interplay of regulatory and statutory law across over 20 years of administrative and legal proceedings, the Court hesitates to say that it rises to the level of frivolity for Defendant to have attacked the change in "main studio" location between the 2012 and 2019 declarations. In addition, Plaintiff maintains that Defendant's arguments about ACI's reliance on the grandfather provision are frivolous. *Id*. at 4. This contention amounts to little more than a reiteration of ACI's argument that it has established Class A eligibility as a matter of law because "[t]he Panama City Studio met" the "main studio" "definition for ACI." *Id*. Standing alone, ACI's allegations here do not provide adequate grounds for Rule 11 sanctions.