## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| THE ATLANTA CHANNEL, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-1823 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 195, 196, 201, 208 |
| | : | | 211, 212 |
| HENRY A. SOLOMON, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANT SOLOMON'S MOTION TO STRIKE; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTIONS TO STRIKE

## I. INTRODUCTION

Before the Court are several motions to strike expert testimony.  In this legal malpractice case, Plaintiff Atlanta Channel, Inc. ("ACI") alleges that Defendant Henry A. Solomon failed to completely fill out an application for a special license that he filed with the Federal Communications Commission ("FCC") in December of 1999.  ACI alleges that failure to secure the license resulted in millions of dollars in damages.  The claim against Mr. Solomon hinges on application of the statute of limitations.  Two years after filing suit against Mr. Solomon, ACI added a legal malpractice claim against Defendant Melodie Virtue and her law firm Garvey, Schubert & Barer (together the "Garvey Defendants"), a firm Mr. Solomon moved to in the early 2000s.  Broadly, ACI alleges that the Garvey Defendants failed to properly alert ACI about its potential malpractice claim against Mr. Solomon—the claim against the Garvey Defendants is contingent on the jury finding that ACI's claim against Mr. Solomon is time-barred.  The parties have proffered expert testimony on a variety of topics, including ACI's eligibility for the special license, the appropriate standard of care applicable for the legal malpractice claims, and

damages.  The motions to strike before the Court aim to limit the expert testimony ultimately presented to the jury.  For the reasons set forth below, the Court denies Mr. Solomon's motion to strike and grants in part and denies in part ACI's motions to strike.

## II.  BACKGROUND[1]

ACI filed this suit to recover damages stemming from the erroneous filing of an incomplete form with the FCC on December 29, 1999.  *See* 2d Am. Compl. ¶¶ 26–27, ECF No. 69.  ACI alleges that Mr. Solomon was responsible for filing the Statement of Eligibility form for a Class A License for its Low Power Television ("LPTV") Station that used call sign WTHC-LD ("WTHC").  *Id.* ¶¶ 16, 26–27.  When Mr. Solomon submitted the form, he left several questions blank, and on June 9, 2000, the FCC's Mass Media Bureau rejected the statement.  *Id.* ¶¶ 28–29, 32.  ACI alleges that it would have been granted the Class A License if the form had been completely filled out.  *Id.* ¶ 35.

After the dismissal of the initial statement, Mr. Solomon pursued an administrative appeal within the FCC.  *Id.* ¶ 37.  The appeal remained pending until November 9, 2012—more than a decade after it had been submitted.  *Id.*  While the matter lied dormant at the FCC, Mr. Solomon started working at Garvey, Schubert & Barer.  *See id.* ¶ 11.  Eventually, in 2010, he retired from the practice of law altogether.  *See id.*  Mr. Solomon's employment status during this time, and what ACI reasonably believed about it, will determine whether the claims against him are time barred under the continuous representation doctrine.  *See Beach TV Props., Inc. v.*

---

[1] The Court assumes familiarity with its prior opinions and limits its discussion to the factual and procedural history most relevant to the pending motions.  *See, e.g.*, *Beach TV Props., Inc. v. Solomon*, 324 F. Supp. 3d 115, 118 (D.D.C. 2018); *Beach TV Props., Inc. v. Solomon*, No. 15-cv-1823, 2016 WL 6068806, at *1–4 (D.D.C. Oct. 14, 2016).

*Solomon*, 306 F. Supp. 3d 70, 89 (D.D.C. 2018) (explaining factual issues under continuous representation doctrine that must be resolved by fact finder).

Ms. Virtue took over responsibilities for ACI's representation after Mr. Solomon ceased working full time.  2d Am. Compl. ¶¶ 51–54.  ACI alleges that Ms. Virtue failed to tell ACI about the potential malpractice claim against Mr. Solomon, the statute of limitations issue with that claim, and her potential conflict of interest.  *See id.* ¶ 59.  The claims against the Garvey Defendants are contingent on the jury finding that the claim against Mr. Solomon is barred by the statute of limitations.  *See id.* ¶¶ 80–87.  The Garvey Defendants have filed an expert report prepared by Lucian T. Pera to support their contention that Ms. Virtue's representation of ACI adhered to the applicable standard of care.  *See* Pera Rep., ECF No. 171-1.

With respect to damages, ACI argues that failing to secure a Class A License led to diminished value for the station and led to WTHC going off the air.  *See* 2d Am. Compl. ¶¶ 63–68.  Part of ACI's damages argument relates to Title VI of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, 125 Stat. 156 (2012), commonly known as the Spectrum Act.  *See id.*  The Spectrum Act allows for radio spectrum currently in use by broadcast television stations to be relicensed to wireless communications companies.  *See id.*  Under the Spectrum Act, the government uses a reverse auction to acquire licenses of full power and Class A broadcast television stations, resells the acquired licenses to wireless carriers, and "repacks" or moves the Class A licensees to a different frequency.  *Id.* ¶ 64.  Without a Class A License, LPTV stations cannot participate in the reverse auction or repacking and risk going off the air if the available spectrum is taken by wireless carriers or broadcast stations with priority.  *Id.* ¶¶ 65–66.  ACI alleges that the failure to obtain the Class A License has led to damages of at least $25,000,000.  *Id.* ¶ 70.  ACI has filed an expert report prepared by Michael J. Garibaldi to

support a portion of its damages claim.  *See* Garibaldi Rep., ECF No. 185.  Mr. Solomon has

filed an expert report, and a supplemental report, prepared by Jack N. Goodman to support his

claim that the reverse auction procedures outlined in the Spectrum Act were not foreseeable, *see*

Goodman Rep., ECF No. 115-1, and that WTHC was actually never eligible for the Class A

License, *see* Suppl. Goodman Rep., ECF No. 141.

Portions of the expert reports noted above have all been challenged through motions to

strike.  *See* Solomon's Mot. to Strike Garibaldi ("Soloman's Mot. to Strike"), ECF No. 195;

ACI's Mot. to Strike Pera, ECF No. 208; ACI's Mot. to Strike Goodman Auction, ECF No. 211;

ACI's Mot. to Strike Goodman Class A Qualification, ECF No. 212.  Also pending is a motion

for leave to file a surreply filed by ACI, *see* ACI's Mot. for Leave to File, ECF No. 201, and a

motion by the Garvey Defendants to join Mr. Solomon's motion to strike, *see* Garvey Defs.'

Mot. for Joinder, ECF No. 196.  All these pending motions are ripe for decision.

## III.  LEGAL STANDARD

The pending motions to strike expert testimony are all governed by the same standard

defined by Federal Rule of Evidence 702.  Expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "In general, Rule 702 has been interpreted to favor admissibility."

*Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 587 (1993)).  The Rule requires that the Court act as a gatekeeper to

ensure "that the methodology underlying an expert's testimony is valid and the expert's

conclusions are based on 'good grounds.'"  *Chesapeake Climate Action Network v. Export-*

*Import Bank of the U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (quoting *Daubert*, 509 U.S. at 590–97).  In other words, the Court's obligation under Rule 702 is to "'ensure that any and all scientific testimony . . . is not only relevant, but [also] reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).  The gatekeeping obligation applies to all expert testimony, even if it is not "scientific" testimony.  *Id.*

Generally, "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either "'understand[ing] the evidence' or . . . 'determin[ing] a fact in issue.'"  *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting Fed. R. Evid. 702).  This is because "[l]egal conclusions . . . 'intrude upon the duties of, and effectively substitute for the judgment of, the trier of fact and the responsibility of the Court to instruct the trier of fact on the law.'"  *Convertino v. U.S. Dep't of Justice*, 772 F. Supp. 2d 10, 12 (D.D.C. 2010) (quoting *United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002)).  "[T]he line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence . . . is not always bright."  *Burkhart*, 112 F.3d at 1212.  Generally, though, "an expert may offer [an] opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but [the expert] may not testify as to whether the legal standard has been satisfied."  *Id.* at 1212–13.  Additionally, the Court is not required to admit opinion evidence when "there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  When the expert relies primarily on experience, the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 414 (D.D.C. 2017) (quoting Fed. R. Evid 702 advisory committee's note to 2000

amendment).  "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  *Id.* (quoting Fed. R. Evid 702 advisory committee's note to 2000 amendment).

These general rules become more complex in the context of legal malpractice suits. "When an expert witness is required, the expert must 'clearly articulate and reference a standard of care by which the defendant's actions can be measured.'"  *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 39 (D.C. Cir. 2014) (quoting *Varner v. District of Columbia*, 891 A.2d 260, 269 (D.C. 2006)).  When that defendant is a lawyer, that standard of care necessarily implicates legal issues that would not arise in a typical negligence case*.  See, e.g.*, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100–01 (1st Cir. 1997) ("[T]here may be particular areas of law, such as legal malpractice, where expert testimony on legal matters is admissible where it would normally be excluded.").

Courts in this circuit consider ethical rules applicable to D.C. attorneys to be relevant to determining the appropriate standard of care in a legal malpractice case.  *See Waldman v. Levine*, 544 A.2d 683, 691 (D.C. 1988) (noting that "[i]t is an obvious proposition that the [D.C.] Code of Professional Conduct provides a gauge by which to determine the competency of the Bar" and finding appropriate an expert's "use of the Code in determining the standard of care required in a legal malpractice case"); *see also Williams v. Mordkofsky*, 901 F.2d 158, 163 (D.C. Cir. 1990) ("While the Model Code [of Professional Responsibility] does not provide for a direct private malpractice action, violations of the Code certainly constitute evidence in an action at common law" (citing *Waldman*, 544 A.2d at 690–91)).  Additionally, courts both in this circuit and in others have allowed experts to testify as to violations of, or compliance with, ethical rules and the resulting standard of care in legal malpractice cases.  *See, e.g.*, *Hendry v. Pelland*, 73 F.3d

397, 401 (D.C. Cir. 1996) (discussing expert testimony that defendant had violated D.C. disciplinary rule in breach of fiduciary duty case); *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1461 (7th Cir. 1996) (discussing expert testimony that defendant's actions did not breach standard of care in legal malpractice case); *Miami Int'l Realty Co. v. Paynter*, 841 F.2d 348, 353 (10th Cir. 1988) (rejecting argument that lower court erroneously admitted expert testimony as to lawyer's failure to comply with Colorado Code of Professional Responsibility in legal malpractice case). However, while a lawyer's ethical duties, and breach thereof, can be used as evidence in a legal malpractice action, an expert is not entitled to make the inferential leap to conclude that the attorney's actions constitute or fail to constitute *de facto* negligence. *See, e.g.*, *Paynter*, 841 F.2d at 353.

## IV.  ANALYSIS

Before the Court are four motions to strike related to three separate experts. In each subsection below, the Court will briefly summarize the content of the challenged expert report, the reasons underlying the challenge, and then provide an analysis and ruling on the motion.

### A.  Garibaldi

Michael J. Garibaldi, a certified public accountant, was "retained to provide accounting and consulting services" for ACI. Garibaldi Rep. at 4,[2] ECF No. 185. Mr. Garibaldi explains in his short report that he was "asked to compute the net present value of a stream of costs and expenses that the plaintiffs will incur." *Id.* Mr. Garibaldi summarized his conclusions in an initial report filed on March 4, 2019, but then submitted an updated report based on new assumptions on April 16, 2020. *See id.* Mr. Garibaldi and his team reviewed materials provided

---

[2] Because this filing included multiple documents, the Court cites the page numbers generated by the electronic case filing system.

by ACI to determine the net present value of "streaming video technology" used as a replacement for ACI's traditional broadcasting methods. *See id.* Mr. Garibaldi concluded, based on the information provided to him by ACI that the "net present value of the costs and expenses to The Atlanta Channel are estimated to be approximately $1,361,000 based upon a 33 year period." *Id.* at 5.

Mr. Solomon argues that Mr. Garibaldi's testimony should be stricken because his calculations are not reliable and are irrelevant. Solomon Mot. to Strike at 8–12.[3] According to Mr. Solomon, Mr. Garibaldi should have conducted an analysis of the company's finances as a whole, rather than just calculate the net present value of the costs associated with streaming. *See id.* at 8–9. Mr. Solomon also states that Mr. Garibaldi's use of a thirty-three-year period in his calculation is arbitrary, *id.* at 8, and that Mr. Garibaldi should have requested more information from ACI prior to reaching his conclusion, *id.* at 9. Mr. Solomon points to Mr. Garibaldi's deposition testimony, and ACI's counsel's instruction not to answer questions that explored how the conclusion fit into ACI's theory of damages, as evidence suggesting that Mr. Garibaldi's methodology is flawed. *Id.* at 9–10. Mr. Solomon claims that Mr. Garibaldi's calculation, standing alone, "fails to address the applicable measure of damages" and is therefore irrelevant. *Id.* at 10–11. Mr. Solomon suggests that the present value of future costs cannot be relevant to damages in this case because the appropriate measure of damages is loss of business value or the value of lost profits. *See id.* at 11. According to Mr. Solomon, these deficiencies render Mr. Garibaldi's testimony both unreliable and irrelevant under *Daubert*. *See id.* at 8, 10.

---

[3] As noted above, the Garvey Defendants filed a motion to join in Mr. Solomon's motion to strike. *See* Garvey Defendants' Mot. for Joinder. Given that no party objects, the Court grants the Garvey Defendants' motion.

ACI argues in response that Mr. Garibaldi was hired for a specific and limited purpose: to calculate the "net present value of ACI's recurring monthly costs to deliver its programming" via streaming technology. ACI's Opp'n Solomon's Mot. to Strike at 1, ECF No. 197. ACI states that calculating net present value is something that Mr. Garibaldi is qualified to do, and that it is appropriate to establish through expert testimony. *See id.* 1–2. From ACI's perspective, Mr. Solomon's motion does nothing to undermine the reliability of Mr. Garibaldi's calculation of net present value of future costs. *See id.* at 2–3. ACI argues that "Mr. Solomon is certainly free to cross-examine ACI" on the alleged deficiencies noted in the motion, but that the alleged deficiencies do not render the opinion unreliable. *Id.* at 3. Finally, ACI claims that Mr. Garibaldi's testimony is relevant to ACI's "obligation to mitigate its losses and the cost of the mitigation." *Id.* at 5.[4]

The parties also use the briefing on this motion to strike to debate the applicable theory of damages. *See id.* at 5; Solomon's Reply Mot. to Strike Garibaldi at 2–6, ECF No. 200 (discussing consequential and direct damages). After discussing the differences between direct and consequential damages and the appropriate measure of each, Mr. Solomon states that "consequential damages based on the expenses of mitigation require consideration of the reasonableness of the efforts and expenses, and showing that the expenses bear a reasonable relation to the damages to be avoided or mitigated." *Id.* at 6. Because Mr. Garibaldi's report does not discuss the reasonableness of the expenses, Mr. Solomon argues that the jury should not hear his conclusions. *See id.* ACI responds that "Mr. Garibaldi is opining only on the

---

[4] ACI also has filed a motion for leave to file a surreply with Mr. Solomon's consent. *See* ACI's Mot. for Leave to File Surreply, ECF No. 201; ACI's Proposed Surreply, ECF No. 201-1. Given that no party objects and the proposed surreply addresses matters raised for the first time in reply, the Court will grant ACI's motion for leave to file.

appropriate discount rate to be applied to the recurring future expenses of video streaming to determine their net present value – nothing more." ACI's Proposed Surreply at 2. ACI says that the reasonableness of the mitigation of damages expenses can be explored through cross examination of other witnesses. *Id.*[5]

The Court agrees with ACI. The Court understands Mr. Garibaldi's testimony to be aimed at a discrete and limited topic. While Mr. Solomon argues that Mr. Garibaldi's methodology was flawed because he did not conduct a full analysis of ACI's financials, Mr. Solomon does not suggest that the methodology used to calculate the net present value of costs associated with streaming video is flawed. That discrete opinion appears to be based on Mr. Garibaldi's expertise and his reliable application of recognized methods. *See* Fed. R. Evid. 702. Mr. Solomon can challenge Mr. Garibaldi's underlying assumptions and attempt to demonstrate the limited value of his conclusions through cross examination of the fact witnesses that provide the basis for those assumptions (or of Mr. Garibaldi if the predicate evidence for those assumptions is never admitted or has been discredited). Furthermore, the Court agrees that the testimony is relevant with respect to ACI's obligation to mitigate damages. Mr. Solomon does not seriously challenge this contention, and instead argues that Mr. Garibaldi's report should include an analysis of the reasonableness of the future expenses. The Court does not agree that his report needs such an analysis to be relevant. The Court finds that Mr. Garibaldi's proffered testimony is sufficiently reliable and relevant to be presented to the jury. Accordingly, Mr. Solomon's motion to strike is denied.

---

[5] This argument raises the possibility that ACI's lay witnesses may attempt to proffer testimony that may be more appropriately characterized as expert testimony. But that is an objection for another day.

**B. Pera**

Lucian T. Pera is an attorney and the Garvey Defendants' expert on liability.  *See* Pera Rep., ECF No. 171-1.  His report states that he is "familiar with [the] standard of care, as well as the law and rules, governing the conduct of a District of Columbia lawyer concerning her conduct when faced with the assertion by a client that the lawyer . . . has made a mistake."  *Id.* at 3.  He states that the "opinions stated in [his] expert report reflect th[e] applicable standard of care."  *Id.* at 3–4.  In addition to offering some of his own commentary, Mr. Pera adopts the opinions and conclusions of Professor Myles Lynk.  *Id.* at 5; *see also* Lynk Rep., ECF No. 119-1.  Professor Lynk was originally slated to testify for the Garvey Defendants, but due to a conflict had to withdraw.  *See* Mem. Op. at 20, ECF No. 205 (granting the Garvey Defendants' motion to substitute expert).  Broadly speaking, Mr. Pera, and Professor Lynk, testify that pursuant to the applicable rules of professional conduct, Ms. Virtue's conduct adhered to the standard of care. *See id.* at 6; Lynk Rep. at 5–12.

ACI claims that several portions of Mr. Pera's report should be stricken.  ACI argues that a number of Mr. Pera's conclusions, or Professor Lynk's conclusions adopted by Mr. Pera, are impermissible legal conclusions that should be excluded by the Court.  ACI's Mot. to Strike Pera at 1–2, ECF No. 208-1.  According to ACI, the opinions of Mr. Pera have been foreclosed by this Court's prior ruling on the Garvey Defendants' motion for summary judgment.  *See id.* at 2–8. ACI states that "[t]he Court has held, as a matter of law, there are no limitations, on Ms. Virtue's duties to ACI arising out of facts that support the" arguments, previously made by the Garvey Defendants, that Ms. Virtue's duties did not extend to the so-called "Virtue Obligations."[6]  *Id.* at

---

[6] The "Virtue Obligations" constitute a list of duties that ACI asserts Ms. Virtue should have fulfilled.  *See* 2d Am. Compl. ¶ 59.  In using this label, the Court takes no position on whether the listed obligations are in fact required by the appropriate standard of care.

2–6.  ACI also claims that several statements in Mr. Pera's report amount to *ipse dixit* opinions without any support or constitute speculation.  *See id.* at 10–12.

The Garvey Defendants respond that Mr. Pera's opinions are about the applicable standard of care, which is appropriate in a legal malpractice case.  Garvey Defs.' Opp'n ACI's Mot. to Strike Pera at 2–5, ECF No. 225.  They claim that ACI misreads the Court's prior opinions stating that "while the Court indeed denied the request of the Garvey Defendants to decide as a matter of law that such duties did *not* exist, the Court did not hold as a matter of law that they *did*."  *Id.* at 9.  Because Mr. Pera's opinions are aimed at what the applicable standard of care required of Ms. Virtue, the Garvey Defendants assert that his opinions fall directly into the space left by the Court for expert testimony on the issue of liability.  *See id.*  (quoting Mem. Op. at 12).  The Garvey Defendants also argue that ACI should be judicially estopped from making the arguments in its motion because they are inconsistent with ACI's prior positions.  *See id.* at 10–12.  Furthermore, the Garvey Defendants claim that none of Mr. Pera's opinions amount to *ipse dixit* because they should be considered in the context of the entire report, including Professor Lynk's report that Mr. Pera adopts as his own.  *See id.* at 13.  Finally, the Garvey Defendants put forth an argument that the motion to strike should be treated as untimely because it is essentially a *de facto* motion to strike Mr. Pera as an expert, which would render the motion untimely under the Court's prior orders.  *See id.* at 14–15.

The Court concludes that the vast majority of Mr. Pera's opinions are appropriate in the context of a legal malpractice case.  The Court has repeatedly stated that the parties will need to rely on expert testimony to establish the appropriate standard of care and what specific conduct is required, or not required, by that standard.  *See Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 134 (D.D.C. 2017) ("Whether a reasonable attorney would have been aware of the

doctrine of continuing representation and what specific conduct was required by the standard of care . . . are questions of fact that may be resolved with the aid of expert testimony.") (internal citations omitted); *Atlanta Channel, Inc. v. Solomon*, 2020 WL 4219757, at *8 (D.D.C. July 23, 2020) ("At trial, the parties will present expert testimony for the trier of fact on the proper standard of care, what that standard required of Ms. Virtue, when it required action, and whether Ms. Virtue's actions met that standard."). The majority of the opinions ACI seeks to strike speak directly to the appropriate standard of care, what that standard required of Ms. Virtue, and whether her actions conformed with that standard. The Court reaches this conclusion by evaluating Mr. Pera's report and Professor Lynk's report together and as a whole. *See* Lynk Rep. at 5–12.

The Court does not agree that its prior opinions foreclose many of the opinions offered by Mr. Pera. ACI misinterprets the Court's prior rulings. The Court stated that it would "not declare as a matter of law that Ms. Virtue's duty as a lawyer did not extend to disclosing a potential malpractice claim and conflict of interest regarding the matter on which she was employed to work." *Atlanta Channel*, 2020 WL 4219757, at *6. The Court did not rule as a matter of law that the appropriate standard of care is exactly what ACI says it is. The Court finds that Mr. Pera's testimony will aid the jury in determining the appropriate standard of care, what the standard of care required in this case, and whether Ms. Virtue's actions conformed with the standard. ACI will have an opportunity to present expert testimony on the exact same matters.

The Court does not find that Mr. Pera's opinions are *ipse dixit*. The Supreme Court has held that "noting in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 553 U.S. at 146. When Mr. Pera's opinions and conclusions are considered in

the proper context, alongside the report of Professor Lynk, the Court finds that they do not amount to *ipse dixit*. The Court finds that the opinions are based on citations to appropriate sources of ethical rules, such as the D.C. Rules of Professional Responsibility. *See* Lynk Rep. at 5, 7–8, 11 (discussing D.C. Rules of Professional Responsibility); *see id.* (citing Restatement (Third) of the Law Governing Lawyers); *id.* at 6 (discussing American Bar Association Ethics opinion); *id.* at 11 (discussing legal ethics treatise); Pera Rep. at 4–5 (describing materials reviewed). That said, given that Mr. Pera adopts in full the report of Professor Lynk, Mr. Pera should ensure that any testimony offered at trial is rooted in applicable ethical rules or other specific sources.[7]

Two statements in Professor Lynk's report go a step too far and will be stricken. First, Professor Lynk states that "in [his] professional opinion ACI's allegations against Ms. Virtue in Court III are unfounded." *Id.* at 5. Second, Professor Lynk states that "in [his] opinion the claims against Ms. Virtue as set forth in Count III of the Second Amended Complaint are without merit." *Id.* at 12. These statements are not limited to the appropriate standard of care or Ms. Virtue's actions measured against that standard. Instead, they are opinions that amount to legal conclusions about the claims against Ms. Virtue as a whole. Such testimony does not assist the trier of fact because it merely supplies an answer for the ultimate legal question the jury must answer. *See Burkhart*, 112 F.3d at 1212 ("Expert testimony that consists of legal conclusions

---

[7] In two short paragraphs with no citations to legal authority, ACI suggests that two other portions of the report should be stricken. *See* ACI's Mot. to Strike Pera at 12–13. First, ACI argues that Professor Lynk's report inappropriately opines on Ms. Virtue's intent given her word choice in an email. *Id.* at 12. Second, ACI complains that Mr. Pera simultaneously adopts Professor Lynk's report as his own and describes it as thorough, complete, and correct. *Id.* at 12–13. The Court does not find the discussion of Mr. Virtue's email to be inappropriate in the context of a discussion about the standard of care. The Court also is not troubled by the Mr. Pera's word choice in adopting Professor Lynk's report as his own.

cannot properly assist the trier of fact" in either "'understand[ing] the evidence' or . . . 'determin[ing] a fact in issue.'" (quoting Fed. R. Evid. 702)).  Accordingly, the Court grants ACI's motion with respect to these two statements and denies the motion in all other respects. [8]

### C. Goodman

Jack N. Goodman is an attorney who was hired by Mr. Solomon.  Mr. Goodman specializes in communications law and practices before the FCC.  *See* Goodman Rep. ¶ 1.  Mr. Solomon hired Mr. Goodman to offer opinions with respect to two distinct topics.  First, Mr. Goodman offers his opinion about whether Mr. Solomon could have reasonably anticipated in 1999 and 2000 that the failure to secure a Class A License could have resulted in a "loss of the opportunity to sell the spectrum used by WTHC either in the Broadcast Incentive Auction (the "Auction") held by the [FCC] or to sell an option for WTHC to a speculator intending to participate in the Auction."  *Id.* ¶ 11.  Second, Mr. Goodman offers his opinion about whether WTHC "would have met the qualifications for a Class A station."  Suppl. Goodman Rep. ¶ 1.  ACI filed motions to strike each opinion separately.

### 1. Auction Opinion

Mr. Goodman's initial report states that it is his opinion "that neither Mr. Solomon nor any other FCC practitioner could or would reasonably have anticipated the Auction or that there would have been an opportunity to monetize the WTHC license in connection with the Auction." Goodman Rep. ¶ 12.  Much of his report gives background information about the FCC, broadcast television spectrum, and the Spectrum Act.  *See id.* ¶¶ 13–19, 21–24.  He ultimately concludes

---

[8] Because the Court largely denies ACI's motion to strike, the Court declines to rule on judicial estoppel or on timeliness grounds.

that the changes made by the Spectrum Act could not have been reasonably anticipated.  *See id.* at ¶¶ 25–26.

ACI argues that Mr. Goodman's opinion about the foreseeability of the changes made by the Spectrum Act should be stricken because it is an impermissible legal conclusion.  ACI's Mot. to Strike Goodman Auction at 3.  ACI states that Mr. Goodman's opinion boils down to an opinion that "the auction was a superseding or intervening cause between Mr. Solomon's failure to file a completed Statement of Eligibility and ACI's damages."  *Id.*  ACI suggests that the Court already determined that the Spectrum Act is not a superseding cause of ACI's damages. *See id.* at 5.  ACI argues that damages should be measured as the amount ACI would have recovered but for Mr. Solomon's negligence.  *Id.* at 6 (citing *Lockhart v. Cade*, 728 A.2d 65, 69 (D.C. 1999).  For this reason, ACI contends that Mr. Solomon, not ACI, should bear the risk of an uncertain future.  *See id.*  The Court understands this argument to suggest that Mr. Goodman's opinion on the foreseeability of the Spectrum Act is irrelevant.  ACI also argues that Mr. Goodman's opinion will be confusing for the jury because "Mr. Goodman does not make any connection between his opinion on foreseeability" and the other damages experts' testimony.  *Id.* at 8.  ACI claims that Mr. Goodman's failure to make this connection would make his testimony unfairly confusing and that the testimony would be prejudicial because he would carry a certain degree of "gravitas" before the jury.  *Id.* at 8.

Mr. Solomon argues in response that Mr. Goodman's opinion does not amount to an impermissible legal opinion.  Solomon Opp'n ACI's Mot. to Strike Goodman Auction at 3, ECF No. 228.  Mr. Solomon states that Mr. Goodman's opinion does not "merely reference a legal standard" but instead "addresses factual components that would be helpful to the finder of fact in following the Court's instructions."  *Id.*  Mr. Goodman's opinion about the foreseeability of

developments in communications law, Mr. Solomon says, "is one that laymen could not draw for themselves." *Id.* at 3.  Mr. Solomon claims that Mr. Goodman's opinion is relevant because it speaks to the causal relationship between Mr. Solomon's actions and the harm alleged to have occurred.  *Id.*  Mr. Solomon also argues that the Court's prior ruling denying Mr. Solomon's motion for summary judgment "is not equivalent to a finding by the Court as a matter of law that the Spectrum Act was foreseeable." *Id.* at 4.  Finally, Mr. Solomon contends that Mr. Goodman's testimony would not be unfairly prejudicial just because of his high billing rates.  *Id.* at 5.

The Court finds that portions of Mr. Goodman's opinion should be stricken.  As noted above, "[a]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart*, 112 F.3d at 1212–13.  When Mr. Goodman opines that "neither Mr. Solomon nor any other FCC practitioner could or would reasonably have anticipated the Auction," Goodman Rep. ¶ 12, he crosses the line between expert testimony that helps the trier of fact and impermissible legal opinion that does not.  What is "reasonably foreseeable" is for the jury to decide.  That being said, the Court finds that much of Mr. Goodman's report would assist the trier of fact in understanding a complicated field and aid the jury in reaching its own conclusion with respect to what was foreseeable.  *Cf. S.E.C. v. Johnson*, 525 F. Supp. 2d 70, 77 (D.D.C. 2007) ("[I]n securities cases, expert testimony commonly is admitted to assist the trier of fact in understanding trading patterns, securities industry practice, securities industry regulations, and complicated terms and concepts.").  The Court does not find that ACI has demonstrated that Mr. Goodman's testimony would be unfairly confusing or prejudicial.  ACI can use cross examination to attempt to undermine Mr. Goodman's credibility.

As such, the Court will only strike those portions of Mr. Goodman's report that encroach on the province of the jury.[9]  Accordingly, ACI's motion is granted in part.

### 2.  Class A License Opinion

Mr. Goodman's supplemental expert report contains his opinion that "WTHC-LD did not in 1999, did not in 2016, and does not now meet the requirements for Class A Television status." Suppl. Goodman Rep. ¶ 11.  Similar to Mr. Goodman's initial report, the supplemental report includes background discussion about Class A Licenses, technical terms such as "DTV noise-limited contour," and the FCC's regulations.  *See id.* ¶¶ 3–5.  He goes on to quote at length from a deposition taken for this case.  *See id.* ¶¶ 6–8.  Mr. Goodman concludes that WTHC would not be eligible for a Class A License because it does not meet the locally produced programming requirement, *id.* ¶ 11, and because it does not meet the "main studio with two full-time employees and production capability" requirement, *id.* ¶ 15.  He also suggests that even if WTHC had originally been granted a Class A License, the FCC would have revoked the license prior to the auction.  *Id.* ¶ 16.

---

[9] The Court strikes the following:

(1) "[I]t is my opinion that neither Mr. Solomon nor any other FCC practitioner could or would reasonably have anticipated the Auction of that there would have been an opportunity to monetize the WTHC license in connection with the Auction." Goodman Rep. ¶ 12;

(2) "In my opinion, that harm – to the extent it might have occurred – was not something that could have been foreseen in 1999 or 2000." *Id.* ¶ 20;

(3) "In my opinion, in 1999 and 2000, the possibility of an auction where the FCC would acquire spectrum from television stations could not have been anticipated." *Id.* ¶ 25;

(4) "Even if it would have been possible to foresee something like the Auction, it was not in my opinion foreseeable in 1999 and 2000 that, if stations were repurchased by the FCC, Class A stations would have been protected by either the FCC or Congress." *Id.* ¶ 26;

(5) "My opinion is that no reasonable FCC practitioner in 1999 or 2000 could have anticipated the harm WTHC alleges." *Id.* ¶ 26.

ACI again argues that Mr. Goodman's opinions amount to impermissible legal conclusions. *See* ACI's Mot. Strike Goodman Class A Qualification at 1–2, ECF No. 212-1. ACI also suggests that because the Court previously ruled that "ACI could meet the 'main studio' requirement by its use of the 'grandfathered' studio in Panama City, FL," Mr. Goodman's opinion should be stricken because it makes no mention of "grandfathered" studios. *Id.* at 2 (citing Mem. Op. at 21, ECF No. 184). Mr. Solomon argues in response that because this is a legal malpractice case, expert testimony that embraces legal conclusions is often required. *See* Solomon's Opp'n ACI's Mot. to Strike Goodman Class A Qualification at 3, ECF No. 227. Furthermore, Mr. Solomon claims that Mr. Goodman does not merely state what legal conclusion should be reached, but instead "identifies facts which if found would support the conclusion that the legal standard" was not satisfied. *Id.* at 5.

As the Court found with Mr. Goodman's initial report, some portions of his supplemental report must be stricken as impermissible legal conclusions.[10] The Court agrees with Mr. Solomon that "discussion of the laws and FCC regulations concerning a highly specialized industry will help the jury understand unfamiliar terms and concepts." *Id.* at 4. But Mr. Goodman goes too far when he opines on legal issues that the Court has determined must be resolved by the fact finder. The Court ruled that disputed issues of fact prevented summary judgment on the Class A eligibility issue. *See Atlanta Channel, Inc. v. Solomon*, 2020 WL 1508587, at *9 (D.D.C. Mar. 30, 2020). The jury will be responsible for resolving the factual disputes and determining the appropriate legal conclusion based on instructions provided by the Court. Mr. Goodman's opinion that WTHC did not satisfy the legal requirements to secure a

---

[10] The Court takes no position on whether the legal conclusions offered by Mr. Goodman are correct.

Class A License does not assist the jury in understanding the facts or determining a factual dispute. *See Burkhart*, 112 F.3d at 1212. Although the Court will strike Mr. Goodman's legal conclusion, the Court will allow Mr. Goodman to testify to the legal framework at issue and how given facts might fit into that framework. Therefore, the Court grants in part ACI's motion to strike the portions of Mr. Goodman's supplemental report.[11]

## V.  CONCLUSION

For the foregoing reasons, Mr. Solomon's motion to strike (ECF No. 195) is **DENIED**; ACI's motion to strike (ECF No. 208) is **GRANTED IN PART AND DENIED IN PART**; ACI's motion to strike (ECF No. 211) is **GRANTED IN PART AND DENIED IN PART**; and ACI's motion to strike (ECF No. 212) is **GRANTED IN PART AND DENIED IN PART**. The Garvey Defendants' motion for joinder (ECF No. 196) and ACI's motion for leave to file (ECF No. 201) are **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

---

[11] The Court strikes the following from Mr. Goodman's supplemental report:

(1) "In my opinion, therefore, WTHC-LD did not in 1999, did not in 2016, and does not now meet the requirements for Class A Television status." Suppl. Goodman Rep. ¶ 11.

(2) "It would, therefore, not be deemed to be locally produced programming for purposes of Class A eligibility." *Id.*

(3) "It appears, therefore, that WTHC-LD was not complying with the FCC's condition that stations qualifying for Class A status have at least two full-time employees working at the station's main studio and that the main studio include facilities that would enable local program production." *Id.* ¶ 14.

(4) "Mr. Colley's indication that the manner in which WTHC-LD operated was unchanged from the 1990's suggests that WTHC-LD never possessed a qualifying main studio." *Id.*

(5) The entirety of paragraph fifteen.

(6) "In my opinion, the FCC's staff would have proposed that the station be downgraded to a low power television station and not permitted to participate in the auction." *Id.* ¶ 16.

Dated:  November 24, 2020                    RUDOLPH CONTRERAS
                                             United States District Judge