**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| THE ATLANTA CHANNEL, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-1823 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 257, 261 |
| | : | | |
| HENRY A. SOLOMON, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### Granting in Part and Denying in Part Plaintiff's Motion *in Limine* and Granting Plaintiff's Motion for Partial Summary Judgment

### I.  INTRODUCTION

The parties in this long-running legal malpractice case have filed a series of motions in anticipation of trial.  Two are before the Court today.  In one, Plaintiff Atlanta Channel, Inc. ("ACI") seeks to introduce lay opinion from a television industry businessperson.  Defendant Henry Solomon asserts that the opinion is inadmissible expert testimony.  In the other motion, ACI argues that it is entitled to partial summary judgment regarding the fees it paid an attorney to appeal the unfavorable agency decision that resulted from Solomon's malpractice.  Solomon opposes that motion too.  Ultimately, the Court grants in part and denies in part ACI's motion to introduce the lay opinion and grants ACI's motion for partial summary judgment.

### II.  BACKGROUND

ACI brought this malpractice lawsuit after its attorney, Solomon, filed an incomplete license application on its behalf with the Federal Communications Commission ("FCC").  *See* Second Am. Compl. ¶¶ 26–29, 73–79, ECF No. 69.  Solomon's mistake led to the FCC dismissing ACI's application, costing the company a Class A license for its low-power television

("LPTV") station. Settlement Agreement, ECF No. 263-2. A Class A license protects an LPTV station against displacement from its assigned broadcast frequency by full-power television stations. *See* Second Am. Compl. ¶¶ 19–20.

Solomon helped ACI administratively appeal the dismissal. *See* 1st Mac Naughton Decl., Exs. A–B, ECF No. 261-3. But after waiting over a decade to decide the appeal, the FCC eventually denied it. *Id.* Ex. E, at 13–18. In the meantime, ACI had transferred its existing LPTV license to Beach TV Properties. Second Am. Compl. ¶ 40. ACI and Beach TV are both owned and operated by Jud Colley and Toni Davis. *See* 2d Colley Decl. ¶ 2, ECF No. 261-4. Beach TV, describing itself as ACI's "successor," asked the FCC to reconsider the appeal denial. *See* 1st Mac Naughton Decl., Ex. C. The FCC denied that request too. *See id.* Ex. E, at 21–29.

In a last-ditch effort to obtain the Class A license, Beach TV (noting that it was "formerly known as" ACI) filed suit in the D.C. Circuit. *See id.* Ex. D. ACI's lawyer in these proceedings, W. James Mac Naughton, prosecuted the appeal. *See* 1st Mac Naughton Decl. ¶ 4. The D.C. Circuit affirmed the FCC's decisions in a short opinion. *See Beach TV Props., Inc. v. FCC*, 617 F. App'x 10 (D.C. Cir. 2015) (per curiam). It explained that it lacked jurisdiction to hear three of Beach TV's claims because Beach TV did not raise them "at any stage of the administrative adjudication." *Id.* at 10. Two other claims were untimely because Beach TV first raised them in a motion for reconsideration. *Id.* And two claims were "not barred on appeal but lack[ed] merit" because the FCC did not abuse its discretion by rejecting ACI's license application based on a "material deficiency" or by refusing to extend the deadline to submit the application. *Id.* at 11.

It is unnecessary to review the long and complicated procedural history of this case from there. As things currently stand, the parties agree that Solomon is liable for malpractice. *See* Settlement Agreement. The question remaining for trial is what damages Solomon owes ACI,

*see* Settlement Agreement—which once again holds the existing LPTV license, *see* 2d Mac Naughton Decl., Ex. C, at 93:22–95:19, ECF No. 267-2.  Before going to trial, however, ACI makes two requests.  First, it asks the Court to admit deposition testimony from Vince Castelli, a businessperson in the television industry who approached ACI about buying an interest in a permit for an LPTV station in Atlanta.  *See* Pl.'s Mem. Law Supp. Mot. *in Lim.* for Admission of Dep. Testimony of Vince Castelli ("Pl.'s Mot. in Lim."), ECF No. 257-2.  Second, ACI seeks partial summary judgment to recoup attorneys' fees that it paid Mac Naughton to press its appeal at the D.C. Circuit.  *See* Pl.'s Mem. Law Supp. Mot. for Partial Summ. J. in Amount of $28,703 ("Pl.'s Mot. Partial Summ. J."), ECF No. 261-2.  The Court addresses each request in turn.

### III.  ANALYSIS

#### A.  Motion *in Limine* to Admit Castelli's Deposition Testimony

ACI wants to introduce Castelli's deposition testimony to help show what a Class A license in Atlanta would have been worth.  *See* Pl.'s Mot. in Lim. at 2.  As mentioned, Castelli is a businessman in the television industry.  *See* Castelli Dep. at 4:20–21, ECF No. 258-1.  Over more than three decades in the industry, he has bought and sold numerous television stations.  *See id.* at 11:3–19.  His company now owns forty stations across the country, including eight in Atlanta.  *Id.* at 4:22–5:10.

In April 2019, Castelli emailed Colley proposing that the two of them go into business together.  *See id.*, Ex. 1.  He offered Colley a 50% interest in a construction permit for a new LPTV station at the price of $2.5 million.  *Id.*  A construction permit confers the right to build transmission facilities, and it is the first step to obtaining a license to broadcast on a designated frequency.  Sloan Decl. ¶¶ 5–6, ECF No. 260-2.  Castelli suggested that his company and ACI would split the remaining costs of building and maintaining the station.  Castelli Dep., Ex. 1.  At

his deposition, he testified that the $2.5 million figure was half of his estimate that "the value of the station would be at least $5 million as the time went on." *Id.* at 8:20–21. He valued the station based on a variety of factors, including the station's location at the center of a major market, upcoming changes in broadcasting standards, his view that displacement was unlikely, and the expectation that cable providers would carry the station. *Id.* at 8:15–21, 26:11–24, 29:15–24. Castelli also estimated that the station would be worth two-and-a-half times as much—or $12.5 million—if it had a Class A license. *Id.* at 9:20–24, 10:23–11:2.

ACI says that Castelli's testimony about the value of his proposed station is admissible as a lay opinion. *See* Pl.'s Mot. in Lim. at 3. A lay witness can offer an opinion only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge" that would make it expert testimony. Fed. R. Evid. 701. Solomon argues that Castelli's testimony flunks the third requirement. *See generally* Def.'s Opp'n Pl.'s Mot. *in Lim.* for Admission of Dep. Testimony of Vince Castelli ("Def.'s Opp'n Mot. in Lim."), ECF No. 258. Unlike lay opinion testimony, expert testimony must satisfy certain reliability and disclosure requirements. *See United States v. Williams*, 827 F.3d 1134, 1156 (D.C. Cir. 2016).

The line between the two kinds of testimony is a fine one. To discern one from the other, "a court must focus on the reasoning process by which a witness reached his proffered opinion." *Id.* at 1160 (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)). In general terms, "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Fed. R. Evid. 701 advisory committee's note to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)); *see also Williams*, 827 F.3d at 1155. Each kind of

reasoning involves comparing a generalization or baseline to the specific facts of a case to draw some conclusion.  *See* Edward J. Imwinkelried, *Distinguishing Lay from Expert Opinion: The Need to Focus on the Epistemological Differences Between the Reasoning Processes Used by Lay and Expert Witnesses*, 68 SMU L. Rev. 73, 85–86 (2015).  For example, both lay and expert testimony identifying handwriting as belonging to someone would involve comparing a generalization about the normal appearance of an author's handwriting to the appearance of the disputed handwriting.  *See id.*  But a lay opinion's defining characteristic is that it "arise[s] from the personal knowledge or firsthand perception of the witness."  *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017).  A witness offering a lay opinion grounds his baseline in personal experiences, then uses that baseline to evaluate an event that he personally observed.  *See* 1 *McCormick on Evidence* § 11 (8th ed. 2020).  To continue the handwriting example, a widow might rely on observations of her deceased husband's handwriting to opine that her husband was the author of a will she found in the days after his death.  By contrast, an expert can derive his baseline from specialized techniques or the research of others and then assess an event at issue in a case even if he did not witness it.  *See id.*  An expert testifying in the will dispute could draw on formal handwriting analysis techniques known only to professionals in that field to opine about the author of the will regardless of whether he had any personal connection to the case.  The two forms of reasoning thus differ in two ways: (1) how the witness establishes his baseline and (2) how the witness can learn about the facts of a case.  *See id.*

      A witness's "[p]erceptions based on industry experience [are] a sufficient foundation for lay opinion testimony."  *United States v. Oldrock*, 867 F.3d 934, 940 (8th Cir. 2017) (second alteration in original) (emphasis omitted) (quoting *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009)).  Accordingly, one court in this district permitted pharmacists to testify

that they did not fulfill a doctor's prescriptions because they were concerned that many of his patients "presented the exact same prescriptions and travelled a far distance to get those prescriptions." *United States v. Robinson*, No. 16-cr-98, 2017 WL 11496737, at *1 (D.D.C. July 13, 2017). The court reasoned that the testimony was "not an expert opinion" because the pharmacists' concerns were "based on their day-to-day business experience as pharmacists." *Id.* at *2. That said, the court would not allow the pharmacists to offer "expert-type testimony" as to whether the doctor "was acting outside the usual course of professional practice" or "what constitutes standard medical practice." *Id.* (internal quotation marks omitted).

Likewise, "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Id.* The Fourth Circuit, for instance, held that a company bookkeeper could provide lay opinion testimony about projected lease-related profits "on the basis of records kept by her personally." *See MCI Telecomm. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990). Similarly, the Fifth Circuit allowed a company's president to estimate the profits it lost as a result of the breach of a noncompetition agreement. *See Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 153 (5th Cir. 2017).

Courts have also permitted businesspeople to offer lay opinions estimating the value of their businesses' assets, costs, and outputs. In one case, the Eleventh Circuit admitted lay opinions from officers at a ship repair company regarding the reasonableness of the company's

charges for repairing a ship because they "testified based upon their particularized knowledge garnered from years of experience within the field." *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003). In another case, the Fourth Circuit permitted a department store executive to offer a lay opinion about what it would cost the store to accommodate a mall's redevelopment plan because he drew "on personal knowledge from . . . on-the-job experience[,] including 'relevant historical . . . facts' regarding the more than 50 redesign projects he ha[d] overseen." *See Lord & Taylor, LLC*, 849 F.3d at 575–76 (citation omitted). And in another case, the Fifth Circuit let a company's president testify as to the value of missing computer files because he had personal knowledge about what it would cost to pay employees to replace them. *See Merritt Hawkins & Assocs., L.L.C.*, 861 F.3d at 153; *see also id.* at 153–54 (permitting the president to testify about employee training expenses because "[t]raining expenses for employees [we]re the sort of routine matters" within his personal knowledge as the company's president).

      Castelli's testimony estimating the value of his construction permit is equally admissible. Lay reasoning underpinned his valuation. He relied on personal observations from more than thirty years in the television industry to come up with baselines about what certain station features were worth. Castelli then compared those baselines to his own station's characteristics to estimate the station's value. It does not appear from his testimony that he used a methodology or pricing model known only to television industry specialists. Because Castelli drew on his personal experiences to price his station, he is like the ship repair company officers who appraised the value of their company's services based on their "years of experience," the executive who estimated the cost of a store redesign based on the projects he had overseen, or the

company president who testified about the worth of his company's missing computer files based on how much he knew he would have to pay employees to replace them.

Solomon offers four arguments to exclude Castelli's testimony. The first three are unpersuasive. The last one warrants excluding Castelli's opinion that a station with a Class A license is worth two-and-a-half times the value of a station without one. First, Solomon asserts that, even if a businessperson can provide lay testimony about the value of his business, Castelli cannot testify as to the value of a permit that allowed him merely to build a business. *See* Def.'s Opp'n Mot. in Lim. at 9. But a construction permit is one of a television station's core assets—it is necessary to build transmission facilities and to obtain a license to broadcast from a designated frequency. *See* Sloan Decl. ¶¶ 5–6. And as the cases described above illustrate, a businessperson can supply lay testimony about the value of his business's assets for the same reason he can testify about the value of his business as a whole: he has personal knowledge of the business's workings. There is no logical difference between the two.

Second, Solomon argues that Castelli relied on specialized knowledge in valuing his station. *See* Def.'s Opp'n Mot. in Lim. at 9–11. As evidence, Solomon cites Castelli attaching to his email to Colley a map of the proposed station's projected coverage and Castelli referring to advances in broadcasting standards as one basis for his valuation. *See id.* Neither Castelli's use of the coverage map nor his knowledge of broadcasting standards signified that his testimony depended on specialized expertise. Coverage maps are common in the television industry, and their meaning is largely apparent to even a lay viewer. *See* 1st Colley Decl. ¶¶ 6–9, ECF No. 260-1; *see also* Castelli Dep., Ex. 1. Perhaps expert testimony would be necessary to explain how to generate a coverage map, but Castelli only commissioned the map's creation and interpreted it to help value his station. How to interpret an already-generated coverage map is

8

the sort of skill that comes with experience in the industry; it does not require specialized training or expertise. The same goes for changes in broadcasting standards. One would expect a businessperson who operates forty television stations to be familiar with developments in industry standards. Castelli did not need to draw on specialized knowledge to account for those changes.

      Third, Solomon attacks Castelli's valuation for being a poor estimate of the proposed station's value. *See* Def.'s Opp'n Mot. in Lim. at 11–13. Solomon points out that Castelli's $2.5 million figure was not an actual purchase price but rather an opening offer that Castelli admitted was negotiable. *See id.* at 11–12; *see also* Castelli Dep. at 24:14–16. He also questions Castelli's assumption that cable providers would carry his proposed channel. *See* Def.'s Opp'n Mot. in Lim. at 12–13; *see also* Castelli Dep. at 29:15–24. These qualms are relevant to the weight of Castelli's testimony, not its admissibility. They pertain to the substance of Castelli's analysis rather than his reasoning process. *See* Def.'s Opp'n Mot. in Lim. at 11 ("The Castelli so-called offer to sell a half-interest in the unbuilt Channel 24 Construction Permit was merely an opening bid or invitation to negotiate[] and is not probative of market value." (underlining omitted)). The latter is what distinguishes expert testimony from lay testimony. A jury can decide the extent to which any logical shortcomings detract from Castelli's testimony. *Cf. Lord & Taylor, LLC*, 849 F.3d at 576 (rejecting arguments that a department store executive could not offer a lay opinion about the costs of a store renovation because he visited the store only once and had never estimated the costs of a renovation in Maryland, explaining that "those arguments [went] to the weight to be given [the executive's] testimony, not to its lay character or admissibility").

9

Lastly, Solomon asserts that Castelli cannot testify as to what his proposed channel would have been worth if it had a Class A license. *See* Def.'s Opp'n Mot. in Lim. at 13–14. Solomon says that answers to hypothetical questions or speculation about what a witness would have done had a situation been different cannot satisfy the requirement that a lay opinion be rationally based on the witness's perception. *Id.* at 13 (citing Fed. R. Evid. 701(a)). That is an oversimplification. To be sure, some courts have decried "speculative opinion testimony by lay witnesses[,] i.e., testimony not based upon the witness's perception." *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993); *see also United States v. Gibson*, 636 F.2d 761, 764 (D.C. Cir. 1980) ("[W]e know of no case holding that a trial judge must permit a lay witness to use one set of observations as the foundation for an opinion about what he might have seen under different circumstances."); *Athridge v. Iglesias*, No. 89-cv-1222, 2004 WL 7345458, at *2 (D.D.C. Dec. 21, 2004) ("Speculative testimony, based on what a witness would have done had the situation been otherwise, cannot possibly be based on a witness' perception."). Those courts excluded testimony about what a products liability plaintiff "would have done had he seen the warning label" at the heart of his case, *Washington*, 8 F.3d at 300 (emphasis omitted), what a witness who did not use binoculars "might have seen if he had used binoculars," *Gibson*, 636 F.2d at 764, and whether a couple would have refused to let their nephew borrow their car "had they been home on the day of the accident rather than on an extended vacation," *Athridge*, 2004 WL 7345458, at *2.

But other courts have routinely permitted experienced professionals to offer lay opinion testimony about what would have happened had some disputed fact been different. For instance, several courts have allowed bank employees to offer lay opinions about what a bank would have done had it known about misrepresentations in loan applications. *See, e.g.*, *Kerley*, 784 F.3d at

10

339–40; *United States v. Hill*, 643 F.3d 807, 841–42 (11th Cir. 2011). Similarly, the Second Circuit permitted accountants to provide lay opinions on how they would have accounted for certain transactions had they known that the transactions were fraudulent. *See United States v. Cuti*, 720 F.3d 453, 459–60 (2d Cir. 2013). And in another case, the Fourth Circuit approved a lay opinion from a police officer who opined on the techniques and the degree of force he would have used had he been the one to subdue an arrestee. *See United States v. Perkins*, 470 F.3d 150, 153, 156 (4th Cir. 2006). So it cannot be that witnesses are categorically barred from offering lay opinion testimony about a counterfactual scenario. After all, hypothesizing about what could have been is "a process of reasoning familiar in everyday life." *See Cuti*, 720 F.3d at 460 (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment).

        The distinction between the two strains of caselaw appears to be a difference in the degree to which testimony is "rationally based on the witness's perception." *See* Fed. R. Evid. 701(a). Unadorned testimony about a hypothetical set of facts the witness did not observe is in no way "based on the witness's perception." Indeed, such speculative testimony is often self-serving and thus arguably unhelpful in "determining a fact in issue" too. *See* Fed. R. Evid. 701(b); *see also* Fed. R. Evid. 701 advisory committee's note to 1972 proposed rules ("If . . . attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule."); *Washington*, 8 F.3d at 300 & n.10. By contrast, a witness whose testimony is grounded in extensive experience with a business or industry can "rationally base[]" his prediction about a hypothetical scenario on that personal experience. *See Hill*, 643 F.3d at 841–42 (rejecting an argument to exclude bank employees' lay testimony about what the banks would have done on the ground that "the ability to answer hypothetical questions is the essential difference between expert and lay witnesses"

11

because the witnesses "based their testimony on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue" (citation omitted)); *see also United States v. Powers*, 578 F. App'x 763, 772 (10th Cir. 2014) (rejecting, on plain-error review, defendant's argument that lender witnesses who lacked personal involvement in transactions could not answer hypothetical questions relating to the transactions because their lay "testimony was based on their personal knowledge and experience with their respective firms' . . . policies and procedures").

Castelli's deposition testimony did not adequately establish that he had enough personal experience with Class A licenses to opine on their value. No doubt, Castelli has extensive industry experience. But with respect to Class A licenses specifically, he does not seem to have the "particularized knowledge" that comes only from working with something day in and day out. *See* Fed. R. Evid. 701 advisory committee's note to 2000 amendment; *cf. Lord & Taylor, LLC*, 849 F.3d at 575–76 (reasoning that a department store executive had "particularized knowledge" of renovation costs based on his "day-to-day work" that included overseeing "more than 50 redesign projects"); *Kerley*, 784 F.3d at 339–40 (permitting bank employees to opine on the hypothetical application of banks' "underwriting guidelines and policies" because they had "particularized knowledge . . . acquired through their employment"). Just one of the forty stations Castelli currently owns has a Class A license. Castelli Dep. at 5:18–6:2. And nothing in his testimony indicates that any of the stations he has previously sold were Class A stations either. In addition, ACI wants to admit Castelli's deposition testimony; they do not seek to preclear his live testimony. *See* Pl.'s Mot. in Lim. at 1. That restricts the Court's ability to take a generous view of admissibility on the ground that cross-examination could demonstrate the weakness of the foundation supporting Castelli's opinion. *Cf. United States v. Williams*, 212

F.3d 1305, 1309 n.6 (D.C. Cir. 2000) (explaining that a district court enjoys "broad discretion in admitting opinion testimony of lay witnesses . . . due in large part to the opportunity the trial judge ordinarily affords opposing counsel to expose a weak foundation through cross-examination of the witness"). Given Castelli's lack of experience with Class A licenses, his opinion regarding their value is not rationally based on his perception and is therefore inadmissible.

Because Castelli's opinion about the value of his proposed station is based on his experience as a businessperson in the television industry rather than technical or specialized expertise, it is admissible as lay opinion. Nevertheless, Castelli has no particularized knowledge of Class A licenses, so his opinion on the value of a Class A license will be excluded. ACI's motion *in limine* is thus granted in part and denied in part.

### B.  Motion for Partial Summary Judgment on Attorneys' Fees for Appeal

ACI also requests summary judgment with respect to fees it paid its attorney to appeal the FCC's dismissal of its application to the D.C. Circuit. *See* Pl.'s Mot. Partial Summ. J. A party deserves summary judgment only if it "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the litigation, and genuine disputes about material facts exist when the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court assessing a summary judgment motion must avoid credibility determinations and draw all inferences in the nonmovant's favor. *Id.* at 255. But conclusory assertions without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Damages in a malpractice suit include "attorney's fees and costs expended as a result of an attorney's . . . malpractice." *See Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989); *see also* Restatement (Third) of the Law Governing Lawyers § 53 cmt. f (Am. L. Inst. 2021) ("The rule barring recovery of fees does not prevent a successful legal-malpractice plaintiff from recovering as damages additional legal expenses reasonably incurred outside the malpractice action itself as a result of a lawyer's misconduct."). For ACI to recover the fees it paid to appeal the FCC's dismissal to the D.C. Circuit, it must show that Solomon's malpractice was a proximate cause of the appeal. *See Dalo v. Kivitz*, 596 A.2d 35, 41 (D.C. 1991); *see also Beach TV Props., Inc. v. Solomon*, 306 F. Supp. 3d 70, 96 (D.D.C. 2018) ("Triers of fact determine not only whether a defendant's negligence proximately caused damage to the plaintiff, but also the extent of the plaintiff's damage that the defendant proximately caused."). That means that there must be a "substantial and direct causal link" between Solomon's malpractice and the appeal. *See Dalo*, 596 A.2d at 42 (quoting *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C. 1984)). If there is such a link, an intervening act would supersede Solomon's malpractice and relieve him of liability only if that act was not reasonably foreseeable. *See id.*

According to ACI, there is no genuine dispute that Solomon's malpractice proximately caused it to pay its attorney to appeal the FCC decision. *See* Pl.'s Mot. Partial Summ. J. at 2–3. Solomon responds with three counterarguments. As an initial matter, he asserts that ACI cannot recover attorneys' fees for an appeal that Beach TV—not ACI—commissioned. Def.'s Opp'n Pl.'s Mot. Partial Summ. J. on Damages ("Def.'s Opp'n Mot. Partial Summ. J.") at 6, ECF No. 263. Solomon then argues that his misconduct was not a proximate cause of the appeal. He says that Beach TV chose to appeal only after the Spectrum Act's passage in 2012 raised the

14

possibility of receiving "a huge financial windfall." *Id.* at 5. Finally, Solomon concludes by off-handedly questioning whether the appeal to the D.C. Circuit was "worth the candle." *Id.* at 6.

No reasonable jury could side with Solomon. For starters, ACI can properly seek attorneys' fees for the failed appeal to the D.C. Circuit. ACI submitted two different tax forms from 2015 showing that it was the one that paid Mac Naughton to appeal the case. *See* 1st Mac Naughton Decl., Ex. H (miscellaneous income form for the appellate attorney listing the payer as ACI); 3d Colley Decl., Ex. B, ECF No. 267-1 (redacted excerpt from ACI's tax return listing a figure for legal and professional expenses that Colley states includes the amount paid to the appellate attorney, 3d Colley Decl. ¶ 9). In response, Solomon makes much of the fact that Beach TV pays some of ACI's expenses—including legal fees—and then accounts for those transactions with mere "journal entries" on both companies' books rather than writing checks between the companies. *See* Def.'s Opp'n Mot. Partial Summ. J. at 6; *see also, e.g.*, Colley Dep. at 105:1–8, 116:2–22, 161:11–162:16, ECF No. 263-3. He also points out that Mac Naughton addressed his invoice to Beach TV. *See* Def.'s Opp'n Mot. Partial Summ. J. at 6; *see also* 1st Mac Naughton Decl., Ex. G.

But Solomon's argument is too clever by half. Earlier in this litigation, Solomon had Beach TV dismissed from the suit because ACI could not assign Beach TV the right to pursue the malpractice claim. *See Beach TV Props., Inc. v. Solomon*, No. 15-cv-1823, 2016 WL 6068806, at *15–17 (D.D.C. Oct. 14, 2016). He now wants to avoid paying appellate fees because ACI—not Beach TV—is asking for them. To make matters worse, he grounds his trap in an accounting technicality with little practical significance. Colley and Davis own both ACI and Beach TV. *See* 2d Colley Decl. ¶ 2. And even Solomon testified that, when Beach TV transferred the existing LPTV license back to ACI, there was essentially "no change in

15

ownership . . . and no change in control" because Colley and Davis owned and controlled both companies. 2d Mac Naughton Decl., Ex. C, at 93:22–95:19. It is thus unclear how a payment from Beach TV that is reimbursed with a transfer recorded in both ACI's and Beach TV's books is meaningfully different than ACI making that payment directly. Most importantly, even if Beach TV covers ACI's expenses from time to time, the evidence indicates that ACI paid Mac Naughton in this instance. Solomon does not grapple with that evidence by offering contrary evidence of his own. *See* Fed. R. Civ. P. 56(c)(1) (requiring a party asserting that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). Indeed, given Colley's oftentimes uncertain testimony regarding the relationship between ACI and Beach TV's finances, *see, e.g.*, Colley Dep. at 108:3–22, 116:16–18, it is striking that Solomon did not depose the bookkeeper whom Colley described as "the only person" who knew the details of transactions between the companies, *e.g.*, *id.* at 162:17–19. A jury could not reasonably determine that ACI did not fund the D.C. Circuit appeal.

Next, Solomon's misconduct was undisputedly a proximate cause of the appeal to the D.C. Circuit. His misfiling of ACI's license application certainly "play[ed] a central role" and was a "substantial factor" in ACI incurring the expense of the appeal. *See Dalo*, 596 A.2d at 41–42 (quoting *Freeman*, 477 A.2d at 715–16). Solomon nevertheless asserts that the Spectrum Act's passage in 2012 cut off the causal connection his malpractice had with the decision to appeal. *See* Def.'s Opp'n Mot. Partial Summ. J. at 5. As explained in a previous opinion, the Spectrum Act allows the federal government to relicense Class A television stations' broadcast frequencies to wireless communication companies by acquiring the Class A licenses in a reverse auction. *See Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823, 2020 WL 7013346, at *2 (D.D.C. Nov. 24, 2020). LPTV stations without a Class A license "cannot participate in the

16

reverse auction . . . and risk going off the air if the available spectrum is taken by wireless carriers or broadcast stations with priority." *Id.*  Solomon suggests that Beach TV decided to appeal the application dismissal because it wanted the "huge financial windfall" that could result from the reverse auction.  *See* Def.'s Opp'n Mot. Partial Summ. J. at 5.  He adds that this Court has already ruled that the foreseeability of the Spectrum Act's passage for purposes of damages calculations is a genuinely disputed issue of material fact.  *See id.*; *see also Beach TV Props., Inc.*, 306 F. Supp. 3d at 96–97.

But the relevant question for the superseding cause analysis here is whether the D.C. Circuit appeal was foreseeable at the time of Solomon's malpractice, not whether the Spectrum Act's passage was.  That is because the damages ACI requests in its pending summary judgment motion consist only of the fees it paid to appeal the case rather than the economic damages potentially attributable to ACI's lack of a Class A license under the Spectrum Act's reverse auction scheme.  *See Dalo*, 596 A.2d at 42 ("A defendant 'will be held responsible for the damages which result despite the entry of another act in the chain of causation' if that subsequent act reasonably could have 'been anticipated and protected against.'" (citation omitted)).  And ACI's decision to take on the costs of an appeal to the D.C. Circuit was foreseeable when Solomon submitted the incomplete license application.  In the immediate aftermath of the application's dismissal, Solomon emailed Colley about how the appeals process would work. *See* Def.'s Opp'n Mot. Partial Summ. J., Ex. 4, ECF No. 263-5.  Solomon explained that the FCC would hear a first-round appeal and any unfavorable decision would be appealable to a U.S. Court of Appeals.  *Id.*  Colley responded that he wanted "to pursue *all avenues of relief*" because "protected frequency in Atlanta could be worth a substantial amount of money."  3d Colley Decl., Ex. A (emphasis added).  So notwithstanding the Spectrum Act later heightening the

stakes, it was always foreseeable that ACI would incur the cost of appealing the FCC decision to the D.C. Circuit. The Spectrum Act's passage was not a superseding cause of the appeal.

Solomon lastly asserts that there is a genuine dispute about whether the decision to appeal to the D.C. Circuit was "worth the candle." Def.'s Opp'n Mot. Partial Summ. J. at 1, 6. The "worth the candle" phrase refers to Solomon's assessment following the application's dismissal that the low chances of a successful appeal did not justify the costs. *See id.* Ex. 4. But he cites no authority for the proposition that a legal malpractice plaintiff cannot recover attorneys' fees incurred to pursue appeals that the defendant attorney judged to be financially unwise. On the contrary, a malpractice plaintiff can "recover the expenses of a proper effort to mitigate damages even though it proves unsuccessful." *See Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000) (brackets omitted) (quoting *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n*, 122 N.E. 463, 465 (N.Y. 1919)). Nowhere does Solomon argue that the D.C. Circuit appeal was somehow improper or frivolous. In fact, he told Colley after the application's dismissal that he would be "glad" to appeal if Colley thought it was worth the cost. *See* Def.'s Opp'n Mot. Partial Summ. J., Ex. 4. The D.C. Circuit did not describe the appeal as frivolous either. *See generally Beach TV Props., Inc.*, 617 F. App'x 10.

Solomon appears to argue that ACI had a duty to mitigate damages by not appealing the case. *See* Def.'s Opp'n Mot. Partial Summ. J. at 3. "The avoidable consequences doctrine is that 'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort . . . .'" *See Flowers v. District of Columbia*, 478 A.2d 1073, 1077 (D.C. 1984) (omission in original) (quoting Restatement (Second) of Torts § 918 (Am. L. Inst. 1979)); *see also* Restatement (Third) of the Law Governing Lawyers § 54 cmt. e ("To the extent that applicable law recognizes them in other negligence actions, the partial

defense of failure to mitigate damages and the defense of assumption of the risk apply to legal-malpractice claims."). Solomon seemingly thinks that the low likelihood of the appeal's success would have made it reasonable for ACI to abstain from appealing to minimize the costs he would have to repay it. Even if that is true, however, the decision to appeal was also reasonable. Colley believed that a Class A license "could be worth a substantial amount of money." 3d Colley Decl., Ex. A. Exhausting the right of appellate review was a reasonable way to mitigate the significant damages that could flow from failing to obtain that license. And because Solomon created the predicament, he does not get to second-guess the decision to appeal:

> Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.

*Dist. Concrete Co. v. Bernstein Concrete Corp.*, 418 A.2d 1030, 1037 (D.C. 1980) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)).

Accordingly, ACI can recover the fees it paid to appeal to the D.C. Circuit.

### IV.  CONCLUSION

For the foregoing reasons, ACI's motion *in limine* to admit Castelli's deposition testimony (ECF No. 257) is **GRANTED IN PART AND DENIED IN PART** and ACI's motion for partial summary judgment on the issue of the fees it paid to prosecute its D.C. Circuit appeal (ECF No. 261) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 17, 2021                                        RUDOLPH CONTRERAS
                                                                 United States District Judge