**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| THE ATLANTA CHANNEL, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-1823 (RC) |
| | : | | |
| | : | | |
| v. | : | Re Document Nos.: | 269, 270, 292, 293 |
| | : | | 294, 295, 299, 301 |
| | : | | 302 |
| HENRY A. SOLOMON, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, GRANTING CERTAIN
MOTIONS *IN LIMINE* IN WHOLE, DENYING CERTAIN MOTIONS *IN LIMINE* IN WHOLE,
GRANTING CERTAIN MOTIONS *IN LIMINE* IN PART, AND DENYING CERTAIN MOTIONS *IN
LIMINE* IN PART**

## I. INTRODUCTION

Plaintiff Atlanta Channel, Inc. has filed two motions for partial summary judgment, and

both parties have filed several motions *in limine* in advance of trial. The Court addresses each

motion in turn below.

## II. BACKGROUND[1]

Plaintiff Atlanta Channel, Inc. ("ACI") brought this legal malpractice lawsuit after its

attorney, Defendant Henry Solomon, filed an incomplete license application on its behalf with

the Federal Communications Commission ("FCC"). *See* Second Am. Compl. ¶¶ 26–29, 73–79,

ECF No. 69. Solomon's mistake led to the FCC dismissing ACI's application, costing the

company Class A status for its low-power television ("LPTV") license, which bears the call-sign

---

[1] The Court repeats relevant background from a previous opinion in this case, *Atlanta
Channel, Inc. v. Solomon,* No. CV 15-1823, 2021 WL 4243383, at *1 (D.D.C. Sept. 17, 2021).

WTHC-LD.  Settlement Agreement, ECF No. 263-2.  A Class A license protects an LPTV station against displacement from its assigned broadcast frequency by full-power television stations.  *See* Second Am. Compl. ¶¶ 19–20.

Solomon helped ACI administratively appeal the dismissal.  *See* 1st Mac Naughton Decl., Exs. A–B, ECF No. 261-3.  But after waiting over a decade to decide the appeal, the FCC eventually denied it.  *Id.* Ex. E, at 13–18.  In the meantime, ACI had transferred its existing LPTV license to Beach TV Properties.  Second Am. Compl. ¶ 40.  ACI and Beach TV are both owned and operated by Jud Colley and Toni Davis.  *See* 2d Colley Decl. ¶ 2, ECF No. 261-4. Beach TV, describing itself as ACI's "successor," asked the FCC to reconsider the appeal denial. *See* 1st Mac Naughton Decl., Ex. C.  The FCC denied that request too.  *See id.* Ex. E, at 21–29.

In a last-ditch effort to obtain the Class A license, Beach TV (noting that it was "formerly known as" ACI) filed suit in the D.C. Circuit.  *See id.* Ex. D.  ACI's lawyer in the current proceedings, W. James Mac Naughton, prosecuted the appeal.  *See* 1st Mac Naughton Decl. ¶ 4. The D.C. Circuit affirmed the FCC's decisions in a short opinion.  *See Beach TV Props., Inc. v. FCC*, 617 F. App'x 10 (D.C. Cir. 2015) (per curiam).  It explained that it lacked jurisdiction to hear three of Beach TV's claims because Beach TV did not raise them "at any stage of the administrative adjudication." *Id.* at 10.  Two other claims were untimely because Beach TV first raised them in a motion for reconsideration.  *Id.*  And two claims were "not barred on appeal but lack[ed] merit" because the FCC did not abuse its discretion by rejecting ACI's license application based on a "material deficiency" or by refusing to extend the deadline to submit the application. *Id.* at 11.

According to ACI, the absence of Class A status for its LPTV license and subsequent regulatory developments ultimately forced it to relocate from its longtime channel, ultra high

frequency ("UHF") Channel 42, to a channel with inferior distribution capabilities.  Decl. Jud

Colley Supp. Pl.'s Mot. *In Lim.* Regarding Evidence of Pl.'s Expenses ¶¶ 14–15, ECF No. 269-1

("Colley Expenses Decl.").  ACI says that if it had held Class A status, it would have been

entitled to instead move to a channel with the same coverage as UCF Channel 42.  *Id.*

It is unnecessary to review the long and complicated procedural history of this case from

there.  As things currently stand, the parties agree that Solomon is liable for malpractice.  *See*

Settlement Agreement.  The question remaining for trial is what damages Solomon owes ACI,

*see* Settlement Agreement—which once again holds the existing LPTV license, *see* 2d Mac

Naughton Decl., Ex. C, at 93:22–95:19, ECF No. 267-2.  ACI has filed two motions for partial

summary judgment, and both parties have filed several motions *in limine* in advance of trial.

## III.  LEGAL STANDARDS

### A.  Summary Judgment

A party deserves summary judgment only if it "shows that there is no genuine dispute as

to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Material facts are those that could affect the outcome of the litigation, and genuine

disputes about material facts exist when the evidence would allow a reasonable jury to return a

verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court

assessing a summary judgment motion must avoid credibility determinations and draw all

inferences in the nonmovant's favor.  *Id.* at 255.  But conclusory assertions without any

evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d

671, 675 (D.C. Cir. 1999).

### B.  Motions *In Limine*

"While neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence

expressly provide for motions *in limine*, the Court may allow such motions 'pursuant to the

district court's inherent authority to manage the course of trials.'" *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). "Motions *in limine* are designed to narrow the evidentiary issues at trial." *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010). Importantly, a trial judge's discretion "extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial." *Barnes*, 924 F. Supp. 2d at 79 (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011)). "[A] motion *in limine* should not be used to resolve factual disputes or weigh evidence." *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008) (citation omitted).

"In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to Federal Rules of Evidence 401 and 402." *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 66 (D.D.C. 2014). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is admissible unless otherwise provided by the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed by the U.S. Supreme Court. *See* Fed. R. Evid. 402. "Irrelevant evidence is not admissible." *Id.* Further, Federal Rule of Evidence 403 provides that a court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"The burden is on the introducing party to establish relevancy as well as admissibility."
*Corrigan v. Glover*, 254 F. Supp. 3d 184, 191 (D.D.C. 2017) (cleaned up).

## IV.  ANALYSIS: MOTIONS FOR SUMMARY JUDGMENT

### A.  Locally Produced Programming

ACI moves for partial summary judgment in the form of an order declaring that the programming broadcast on its LPTV station in Atlanta, WTHC-LD, is "locally produced programming" within the meaning of the statutes and regulations governing Class A licenses. Pl.'s Mot. Partial Summ. J. for an Order Declaring WTHC Programming is "Locally Produced Programming," ECF No. 301.

To understand this request, it is first necessary to review the statutory and regulatory requirements that governed ACI's pursuit of Class A status , beginning in 1999.  Congress enacted the Consumer Broadcasters Protection Act of 1999 ("CBPA") "to ensure community access to locally-originated programming."  *Atlanta Channel, Inc. v. Solomon*, No. CV 15-1823, 2020 WL 1508587, at *2 (D.D.C. Mar. 30, 2020).  The CBPA directed the FCC to create a new category of television license, the Class A, that would provide to qualifying low power television ("LPTV") stations the same privileges full power stations enjoyed.  *See* 47 U.S.C. § 336(f).  An LPTV station qualified for Class A status if:

>(A)(i) during the 90 days preceding November 29, 1999—
>
>>(I) such station broadcast a minimum of 18 hours per day;
>>
>>(II) such station broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station, or the market area served by a group of commonly controlled low-power stations that carry common local programming produced within the market area served by such group; and
>>
>>(III) such station was in compliance with the Commission's requirements applicable to low-power television stations; and
>
>(ii) from and after the date of its application for a [C]lass A license, the station is in compliance with the [FCC's] operating rules for full-power television stations[.]

47 U.S.C. § 336(f)(2).  An LPTV station wishing to obtain Class A status had to first file a statement of eligibility certifying that it met these criteria; unless the statement was materially deficient, the FCC was to certify that the station could apply for a Class A designation within six months of the FCC's promulgation of Class A rules in June 2000.  *Atlanta Channel, Inc.*, 2020 WL 1508587, at *2–3.

The FCC's implementing regulations developed two principal requirements for Class A status.  First, as an implementation of the CBPA's mandate that Class A LPTV stations comply with the operating requirements for full-power stations, 47 U.S.C. § 336(f)(2)(A)(ii), the FCC announced the "main studio rule."  FCC, *Report and Order*, In the Matter of Establishment of a Class A Television Service, MM Docket No. 00-10, FCC 00-115, 15 FCC Rcd. 6365–66 (Apr. 4, 2000) ("2000 Report and Order").  This rule required each Class A station to maintain a main studio within its Grade B contour (a measure of its broadcast reach).  *Alternatively*, in a procedure known as "grandfathering," if a station had operated a main studio outside of its Grade B contour as of November 29, 1999, it could continue to maintain that studio in satisfaction of the main studio rule.  *Atlanta Channel, Inc.*, 2020 WL 1508587, at *3 (citations omitted).  To qualify as a "main studio," a facility had to hold equipment capable of originating programming and had to be staffed by both managerial and staff personnel—"the full-time or equivalent part-time presence of two individuals during normal business hours."  *Id.* (citations omitted).

Second was the local programming requirement, an interpretation of the CBPA's mandate that a Class A station "broadcast an average of at least 3 hours per week of programming that was produced within the market area served by such station."  47 U.S.C. § 336(f)(2)(A)(i)(II).  The FCC provided that locally produced programming was programming

produced within a station's Grade B contour.[2]  2000 Report and Order at 6364.  Notably, grandfathering also provided a means of compliance with the local programming requirement: programming produced at a grandfathered main studio would qualify as locally produced even though it was not actually produced within the Grade B contour.  *Id.* at 6365; *see also* 47 C.F.R. § 73.6000 (2001) (defining "locally produced programming" as "programming: (1) produced within the predicted Grade B contour of the station broadcasting the program . . . or (2) programming produced at the station's main studio.").

ACI and Solomon dispute whether the WTHC-LD station complied with the local programming rule and the main studio rule.  If it did not, says Solomon, it would not have received a Class A license even in the absence of Solomon's malpractice, and he therefore caused ACI zero damages.  *See, e.g.*, Joint Pretrial Statement at 2, 7, ECF No. 283.

More specifically, Solomon first contends that WTHC-LD did not comply with the main studio rule.  ACI says that its facility in Panama City, Florida was its main studio, which was grandfathered in as the main studio for its Atlanta broadcasts in satisfaction of the main studio rule.  Solomon says that Jud Colley undermined this assertion in a 2012 FCC filing in which he referred to ACI's Atlanta facility, rather than the Panama City facility, as its main studio.  Solomon claims that the Atlanta facility could not have been a main studio for Class A purposes because it did not have sufficient staff or equipment.  This Court previously held that there were genuine questions of material fact for trial on the issue of WTHC-LD's main studio compliance, including whether Colley's 2012 assertion actually meant that Atlanta, not Panama City, was WTHC-LD's main studio.  *See Atlanta Channel, Inc.*, 2020 WL 1508587, at *7–9.

---

[2] The regulations were somewhat different for groups of commonly controlled stations, but these differences are not relevant here.  *See Atlanta Channel, Inc.*, 2020 WL 1508587, at *3.

Solomon next claims that WTHC-LD did not comply with the locally produced programming requirement.  Solomon relies in significant part on Colley's deposition testimony as corporate representative for ACI, in which he said that all of ACI's programming, including its programming broadcast in Atlanta via WTHC-LD, is produced by Beach TV Cable Company at the Panama City facility.  *Id.* at *6.  If Panama City qualifies as WTHC-LD's grandfathered main studio, this is not a problem for WTHC-LD's local-programming-rule compliance—under FCC rules at the relevant times, programming produced at a grandfathered main studio counted as locally produced.  47 C.F.R. § 73.6000 (2001).  But ACI also presents, in the instant summary judgment motion, an alternative theory of local-programming-rule compliance that does not depend on the Panama City facility qualifying as a main studio.  It is undisputed that at least some of the programming WTHC-LD broadcast in Atlanta was filmed in Atlanta, concerns topics related to Atlanta, and was edited in Panama City.  Pl.'s Statement of Material Facts Not in Dispute ¶¶ 5, 7–10, 19, ECF No. 301-1 ("Pl.'s SMF"); Def.'s Statement of Genuine Issues of Material Facts in Opp'n to Pl.'s Mot. Partial Summ. J. for an Order Declaring WTHC Programming is "Locally Produced Programming" ¶¶ 5, 7–10, 19, ECF No. 309-2 ("Def.'s SMF").  ACI "contends that the filming in Atlanta of hyper-local Atlanta topics is the very essence of 'locally produced programming'" within the meaning of 47 C.F.R. § 73.6000 (2001), and that its Atlanta themed, Atlanta-filmed programming was produced in Atlanta even though it was edited in Panama City, Florida.  Pl.'s Mem. Supp. Mot. Partial Summ. J. for and Order Declaring WTHC Programming is "Locally Produced Programming" at 2, ECF No. 301-3 ("Pl.'s Locally Produced Programming Mem.").  ACI thus moves for partial summary judgment in the form of an order declaring that the WTHC-LD programming was locally produced programming for purposes of Class A eligibility because it was locally filmed and concerned local topics.

ACI suggests that the proper interpretive framework is one of deference to the FCC's interpretation of the term "locally produced programming" as used in 47 C.F.R. § 73.6000 (2001). ACI invokes *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, n. 9 (1984), but to the extent it argues for deference to an agency interpretation of a regulation ("produced" as used in 47 C.F.R. § 73.6000 (2001)), in addition to a statute ("produced" as used in 47 U.S.C. § 336(f)(2)(A)(i)(II)), the distinct framework of *Auer v. Robbins*, 519 U.S. 452 (1997) applies as well. Pl.'s Locally Produced Programming Mem. at 4. In any event, ACI is wrong to invoke any deference framework, for one basic reason: the FCC has not issued any interpretation of the word "produced" as used in either 47 U.S.C. § 336(f)(2)(A)(i)(II)  or 47 C.F.R. § 73.6000(2001).

ACI's argument to the contrary, that "the FCC interpreted 'locally produced programming' to mean 'locally originated programming' and 'locally oriented programming' for Class A Stations," Pl.'s Locally Produced Programming Mem. at 8 (cleaned up), first cites two passages of the 2000 Report and Order:

> The LPTV stations eligible for Class A status under the CBPA and our rules provide *locally-originated programming*, often to rural and certain urban communities that have either no or little access to such programming. The actions we take today will facilitate the acquisition of capital needed by these stations to allow them to continue to provide free, over-the-air programming, including *locally-originated programming*, to their communities. In addition, by improving the commercial viability of LPTV stations that provide valuable programming, our action today is consistent with our fundamental goals of ensuring diversity and localism in television broadcasting.
>
>  . . .
>
> With respect to the local market definition, a number of commenters urge us to expand our definition of the market area to include the predicted Grade B contour, contending that it is the only reasonable and realistic definition for defining where *locally originated programming would be produced*. Centex argues that broadening the market area definition, rather than limiting it to the protected service area, serves the Congressional intent of rewarding and protecting LPTV stations which provide communities *with locally oriented programming*. We agree. We

9

also believe that extending the market area to encompass the Grade B contour will give stations more flexibility to provide *locally oriented programming* to the community within their signal range, and provide them with a more stable economic base in which to improve their commercial viability.

2000 Report and Order at 6355, 6357 (emphases added).

These passages did not, as ACI says "equate[] 'locally produced programming' with 'locally originated programming' and 'locally oriented programming.'"  Pl.'s Locally Produced Programming Mem. at 8.  In the first passage and parts of the second, the FCC wrote that the legislative and regulatory goals of the Class A system were to facilitate locally originated and locally oriented programming, but did not purport to interpret one of the statutory and regulatory *means* of achieving those goals, the requirement that programming be produced locally.  Nothing in the passage suggested that the FCC meant to interpret "produced" to mean "originated."  Nor do the second passage's references to the Congressional intent of facilitating locally oriented programming suggest that where programming is "produced" turns on its content.  Indeed, the FCC later expressly rejected a suggestion to require locally produced programming to "address the interests" of the local community, on the ground that "the CBPA focuses on where the local programming was produced, rather than on its content or who may have produced it.  *In the Matter of Establishment of a Class A Television Service*, MM Docket No. 00-10, FCC 01-123, 16 FCC Rcd. 8244, 8253 (Apr. 13, 2001) ("2001 Reconsideration").

In the second passage, the FCC interpreted the locally produced programming statute's requirement that the programming be produced within a station's "market area," 47 U.S.C. § 336(f)(2)(A)(i)(II)—"market area" meant "Grade B contour"—but said nothing about what it meant for programming to be produced in a particular Grade B contour.  If anything, the passage makes clear that "produced" and "originated" do not necessarily carry the same meaning.  *See* 2000 Report and Order at 6357 ("[A] number of commenters urge us to expand our definition of

the market area to include the predicted Grade B contour, contending that it is the only

reasonable and realistic definition for defining where locally *originated* programming would be

*produced*." (emphases added)).

ACI next points to passages from the 2001 Reconsideration, in which the FCC clarified

the Class A rules.  Pl.'s Locally Produced Programming Mem. at 9–10.  With one possible

exception discussed below, these excerpts similarly do not use the terms "locally oriented" and

"locally originated" to interpret the term "produced," but rather to refer to the congressional goal

in legislating the Class A program or to describe the interpretation of "market area."  2001

Reconsideration at 8252–53, 8257.  At no point did the FCC expressly discuss the meaning of

"produced" or suggest that programming filmed at a location or that relates in content to the

location has necessarily been "produced" there.

The most that can be said for ACI's read of the FCC's orders is that the FCC arguably

seem to use the words "produced" and "originated" interchangeably at times.  *See* 2001

Reconsideration at 8253 ("We agree with KM that the CBPA focuses on where the local

programming was *produced*, rather than on its content or who may have produced it.  Moreover,

we find that locally *originated* programming is likely to serve local needs." (emphases added)).

But such passing references hardly "reflect [the] agency's authoritative, expertise-based, 'fair[,

or] considered judgment,'" and are therefore not the sort of interpretations entitled to deference.

*Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2414  (2019) (holding that an interpretation that does not so-

reflect is not entitled to *Auer* deference and noting that a "similar approach" applies in the

*Chevron* context under *United States v. Mead Corp.*, 533 U.S. 218, 229–31 (2001)).

And even if they did, establishing that "produced" means "originated" only gets ACI so

far; ACI still needs to establish that to originate programming in a location means merely to film

it there.  For this step, ACI relies on *In Re Pappas*, 104 F.C.C.2d 865 (1986), an adjudication involving a local origination requirement under 1980s-era FCC rules.  ACI represents this case as holding that "[v]ideo shot live at the studio 'originated' at the studio and video tapped [sic] in a nearby community 'originated' in that community."  Pl.'s Locally Produced Programming Mem. at 6.  The Court reads the case differently.  For one thing, the FCC made clear that "originate" in the context of the regulatory regime at issue meant "to be broadcast from."  *See Pappas*, 104 F.C.C.2d at 867–68 (describing allegation that the station at issue "produce[d] a one-half hour public affairs program each week in its Asheville studio, but that the broadcast of that program does not originate from there as the necessary equipment does not exist.").[3]  Then, the FCC held that it would not consider a station to be non-compliant with the rule that fifty percent of programming originate from its main studio in Asheville, NC, even though the station taped certain programming in Asheville but then shipped it to be broadcast from an auxiliary facility in Greenville, SC.  The FCC did not hold that the programming in question "originated" in Asheville because it was filmed there; rather the FCC granted the station a "waiver" such that the Greenville programming could be excluded from the denominator for the fifty- percent calculation.  *Id.* at 873.  *Pappas* cannot bear the weight ACI places upon it.  To the extent this application of a separate regulation sheds any light at all, it suggests that "originated in" means "broadcast from," not "filmed in."

ACI next asserts that during a 2012 FCC audit of some of Beach TV's regional stations other than WTHC-LD, the FCC interpreted "locally produced" to mean "locally originated" and "locally oriented."  During this audit, Beach TV certified that these stations complied with all

---

[3] For what it is worth, usages like this one suggest that the FCC understood "produce" and "originate" to mean different things, at least in the context of *Pappas*.

Class A requirements, and the FCC apparently accepted these assertions (though this acceptance does not appear to be in the record).  Pl.'s Locally Produced Programming Mem. at 10–12.  This acceptance came even though Beach TV's filings listed only one studio with editing equipment, Panama City.  *Id.* at 11.  ACI claims that this apparent FCC "conclu[sion] that Beach TV stations qualified for Class A licenses" represents "[i]mplicit . . . findings that "1) the hyper-local programming broadcast by the Beach TV Stations is 'locally produced programming;' and 2) the location where the programming is edited is irrelevant."  *Id.* at 12.

A look at the relevant documents makes clear that the FCC made no such finding, explicitly or implicitly.  The FCC's letter asking for information generally stated the requirement that a Class A station "broadcast an average of at least three hours per week of programming produced within the market area served by the station," but did not ask any specific questions about this requirement or the manner in which Beach TV's stations complied.  Pl.'s SMF Ex. A at 11, ECF No. 301-1.[4]  Separately, the letter specifically asked for "a copy of the station's quarterly issues/programs list with a statement giving the dates on which the lists were prepared and placed in the public inspection file."  *Id.* at 13.  It was in response to *this* question—not any question about the locally produced programming requirement—that Beach TV submitted descriptions of the locally-oriented content its stations broadcast.  Pl.'s SMF Ex. B  at 24–119.  ACI is therefore wrong to suggest that the FCC relied on these descriptions of content to conclude that the stations' programming was locally produced.  Pl.'s Locally Produced Programming Mem. at 11.

---

[4] The Court uses the page of the PDF file to identify the page numbers for this document together with its exhibits.

Beach TV also submitted certifications of continuing eligibility for Class A status for each station.  Pl.'s SMF Ex. B at 120–75.  A representative certification of locally produced programming compliance, for KNOV CD 41 in New Orleans, read as follows:

> I further certify that the station aired at least an average of three hours per week of locally produced programming, consisting of the following programs: KNOV CD 41, *New Orleans Television*, is the Official Visitor Information Television Station for the New Orleans Convention & Visitors Bureau; therefore, hyper-local.  On average, less than 5% of our content comes from outside sources.  *New Orleans Television* locally produces virtually 95% of its editorial and commercial content, therefore a complete list of locally produced content in any Quarter would require many, many pages.  Our ever changing hourly current Local News program, alone, satisfies the three hour per week local content requirement.

*Id.* at 123.  To be sure, the first sentence might be read to indicate that Beach TV understood itself to be complying with the locally produced programming requirement by producing programming with a local theme.  But the FCC could also have relied on the next sentence, in which Beach TV asserted that "*New Orleans Television* locally produces virtually 95% of its editorial and commercial content," to conclude that the station was actually creating ninety-five percent of its product entirely in New Orleans.  The FCC's apparent acceptance of this statement as evidence of the station's compliance with the local programming rule, even though Beach TV's filings obliquely suggested elsewhere that it was only capable of editing its content in Panama City, does not come close to a definitive interpretation holding that the locally produced programming requirement could be satisfied by programming that was locally shot and themed, but edited into a finished product elsewhere.

So, it turns out that the FCC has not interpreted "produced" to mean "oriented" or "originated"; nor has it interpreted "originated" to mean "filmed."  Without any administrative interpretation entitled to deference—and without any judicial interpretations of this provision to provide guidance—the Court must interpret the term itself in order to answer the question presented: Was programming that relates to Atlanta and was filmed in Atlanta, but was edited in

14

Panama City, "produced" within Atlanta within the meaning of 47 U.S.C. § 336(f)(2)(A)(i)(II) and  47 C.F.R. § 73.6000 (2001)?

The place to start is the text of the statute and the regulation.  *Jackson v. Modly*, 949 F.3d 763, 768 (D.C. Cir. 2020); *Otis Elevator Co. v. Sec'y of Lab.*, 762 F.3d 116, 124 (D.C. Cir. 2014).  Once again, the statute provides that a Class A station shall broadcast an average of at least three hours per week of "programming that was produced within the market area served by such station."  47 U.S.C. § 336(f)(2)(A)(i)(II).  The regulation, in relevant part defines "[l]ocally produced programming" as "programming . . . produced within the predicted Grade B contour of the station broadcasting the program."  47 C.F.R. § 73.6000 (2001).

To "produce" means [t]o bring (a performance) before the public; to administer the staging of (a play, opera, etc.) or the financial and managerial aspects of (a film, broadcast, etc.); to supervise the making of (a musical recording), esp. by determining the overall sound." *Produce*, Oxford English Dictionary, https://www.oed.com/view/Entry/151978 (last visited Feb. 15, 2022).  It can also mean "to give birth or rise to; yield," "to oversee the making of," or "to compose, create, or bring about by intellectual or physical effort."  *Produce*, Merriam-Webster's Collegiate Dictionary, https://unabridged.merriam-webster.com/collegiate/produce (last visited Feb. 15, 2022); *see also Produce*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/produce (last visited Feb. 15, 2022). Standing alone, the latter definition might apply to filming—one surely creates something when one records footage—but the Court must read the term in context.  *See Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015).  Here, the meaning of the term "produce" is informed by its object: programming.  47 U.S.C. § 336(f)(2)(A)(i)(II) ("programming that was produced within the market area served by such station"); 47 C.F.R. §

73.6000 (2001) ("programming . . . produced within the predicted Grade B contour of the station broadcasting the program").  "Programming " means "[t]he choosing, arrangement, or broadcasting of radio or television programmes; (also) such programmes collectively." *Programming, n.*, Oxford English Dictionary, https://www.oed.com/view/Entry/152232 (last visited Feb. 16, 2022).  A program is "[a] broadcast presentation treated as a single item for scheduling purposes and usually transmitted at a stated time and without interruption, other than for advertisements or news bulletins."  *Program, n.*, Oxford English Dictionary, https://www.oed.com/view/Entry/152225 (last visited Feb. 16, 2022).

From these definitions, it is clear that to produce programming requires editing, or at the very least, some action beyond  the mere filming of raw footage.  One would hardly say that raw footage is programming, or that the programming that a batch of raw footage ultimately becomes has been "produced" once it has been filmed (in Atlanta), but before it has been edited and turned into a finished, broadcast-ready presentation (in Panama City).  Nor do the definitions provide any reason to think programming can be produced locally merely because it relates to local themes.

This interpretation also matches common usage of terms like "produced," including in the television broadcast industry.  *See Fla. Pub. Telecomms. Ass'n, Inc. v. F.C.C.*, 54 F.3d 857, 860 (D.C. Cir. 1995) (endorsing an interpretation because it was "perfectly consistent with both the ordinary meaning of the words and industry usage").  The FCC has long used versions of the word to mean a process that includes more than filming.[5]  *See* FCC, *Report and Order, Declaratory Ruling, and Further Notice of Proposed Rulemaking*, In the Matter of Closed

---

[5] The Court considers these FCC usages not because they are considered agency interpretations entitled to deference, but rather because they are evidence of the common usage of the terms in the broadcast industry.

Captioning of Video Programming Telecommunications for the Deaf & Hard of Hearing, Inc. Petition for Rulemaking, 29 F.C.C. Rcd. 2221, 2238 (Feb. 24, 2014) ("Then, as now, the Commission intended for companies to take the measures necessary to ensure that the captions would be produced as an integral part of their video production process."); FCC, *Memorandum Opinion and Order*, In the Matter of Amend. of Part 90.69 of the Commission's Rules & Reguls. Concerning Eligibility in the Motion Picture Radio Serv., 8 F.C.C. Rcd. 3588 (May 19, 1993) ("On reconsideration, we agree that only entities providing technical services directly related to the production, videotaping *or* filming of on-location film and video-tape productions should be eligible to use the FVPRS, and we will modify Section 90.69(a)(2) of our rules accordingly." (emphasis added)); FCC, *Decision*, In Re Applications of Wpix, Inc. (Wpix), New York, New York for Renewal of License F. Commc'ns, Inc., New York, New York for Constr. Permit for New Television Broad. Station, 68 F.C.C.2d 381, 385 (June 21, 1978) ("The record also indicates that Engels subsequently became more closely involved in the production end of the news program, as opposed to his usual administrative functions . . . .  Thus, after meeting with the writers, he examined news scripts, checked the accuracy of news items, and assured that all writers exercised particular care in correctly identifying film and preparing accurately written news stories.  In this regard, several writers testified that, in the fall of 1968, they were instructed to be especially careful in identifying film that was more than one day old.").

Colley's own testimony as the Rule 30(b)(6) representative for ACI evidences an industry understanding that production involves more than the taping of raw footage.

> Q.  How long has Beach TV Cable Company, Inc. been the production company for your TV Stations?
>
> A.  Since 1987.
>
> Q.  And when you say production company, what do you mean?
>
> A.  We -- that is where the programming and the commercial spots are produced.

Q.  Where the programming and commercial spots are created?

A.  Yes, ma'am.

Q.  Where they are made?

A.  Right.

Q.  Where they are put into some form –

A.  Well, we have people that go into the field to the different markets, and they come back with the footage and edit it in Panama City in the Beach TV [Cable Company] facilities.

Colley 30(b)6) Dep. 20:14–21:10, Def.'s Opp'n Pl.'s Mot. Summ. J. for an Order Declaring WTHC Programming is "Locally Produced Programming" Ex. 1, ECF No. 309-3; *see also id.* at 86:2–6 (answering in the affirmative when asked whether "all the programming that's The Atlanta Channel, that comes from Panama City—is created by Beach TV Cable Company, Inc."). Colley later stated (again in his corporate representative capacity) that "the programming in Atlanta is produced by Beach TV Cable Company," *id.* 27:10–11, which is located in Panama City, *see id.* at 114:19–21. ACI's own subject-matter expert, telecommunications lawyer Tom Davidson, uses the term "production" this way. Suppl. Davidson Rep. ¶ 15.a, ECF No. 152-1 ("On December 29, 1999, the Panama City Studio was located at the site used by WTHC for the editing and final production of DN programming broadcast by WTHC as of November 29, 1999.").

In sum, the Court holds that locally producing programming within the meaning of the CBPA and the FCC's implementing regulations requires more than merely filming footage related to local topics. Producing involves the process of transforming raw footage into a finished, broadcast-ready program. The Court therefore denies ACI's motion for partial summary judgment and will not issue an order declaring that WTHC-LD's programming is "locally produced" merely because it was "filmed or taped within the Grade B Contour of the WTHC License about people, places and events within the Grade B Contour of the WTHC

license."  Pl.'s Mot. Partial Summ. J. for an Order Declaring WTHC Programming is "Locally Produced Programming."

## B.  Remedial Fees

ACI moves for partial summary judgment in the amount of $73,866.40, which it claims are fees paid to attorneys and lobbyists for the pursuit of remedies for the dismissal of the defective statement of Class A eligibility, including the filing of a petition for reconsideration with the FCC, the filing of an appeal of the denial of this petition in the D.C. Circuit, and lobbying of the FCC and Congress.  Pl.'s Statement of Material Facts Not in Dispute at 2, ECF No. 302-1 ("Pl.'s Remedy Expenses SMF").  Solomon has not filed any opposition to this motion, but even when a motion for summary judgment is unopposed, the Court "must determine for itself that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016).  A summary judgment "movant bears the initial burden of demonstrating that there is no genuine issue of material fact," *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), an assertion it "must support" by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A).

Previously, the Court granted partial summary judgment to ACI in the amount of $28,703, which represented the fees paid to Mac Naughton for his work on the D.C. Circuit appeal.  *Atlanta Channel, Inc.*, 2021 WL 4243383 at *9.  But on the record presented along with the instant partial summary judgment motion, ACI has not met its burden of demonstrating that it is entitled to judgment in the requested amount.  In support of the previous motion, ACI submitted a tax form showing a payment to Mac Naughton that matched the amount it declared it paid him for the appeal.  *Id.* at *7.  In support of the current motion, ACI submits only a declaration from Colley, who states that ACI's remedial fees consisted of a petition for

reconsideration prepared by the Garvey Firm in 2012, the D.C. Circuit appeal filed by Mac Naughton in 2014, and lobbying by Balch & Bingham and Ron Klink & Associates.  Decl. Jud Colley ¶¶ 3–6, ECF No. 302-2 ("Colley Fees Summary Judgment Decl.").  He sums up by stating generally that "ACI and its affiliate of Beach TV Cable Company, Inc. ("Beach TV") paid the Garvey Firm, Mr. Mac Naughton, Balch & Bingham and Ron Klink & Associates a total of $102,596.40 for these services."  *Id.* ¶ 7.  The Court already awarded $28,703 for Mac Naughton's D.C. Circuit Appeal, and the instant motion seeks a portion of the rest.[6]  *See* Pl.'s Mem. Law, ECF No. 302-3.  Importantly, Colley does not declare that Mac Naughton participated in or accrued fees for any of the remedial efforts other than the D.C. Circuit appeal.

Elsewhere, Colley provides a more detailed breakdown: $20,523 to Balch & Bingham in 2012 for lobbying Congress and $28,030 to the Garvey Firm in 2012 and 2014 for work seeking reversal of the dismissal of the statement of eligibility.  Colley Expenses Decl. ¶¶ 11–12.  But these sum only to $48,553.  Even including much earlier expenses described in this declaration— that is, setting aside the fact that the Colley Fees Summary Judgment Declaration in support of the instant motion mentions fees only as far back as 2012—adds only $7,191 to the Garvey Firm in 2003 and 2004 for seeking to reverse the FCC's dismissal of the statement of eligibility and $1,006 to Klink & Associates in 2006 for lobbying, for a total of $56,750—far less than the $73,866.40 requested.  Colley Expenses Decl. ¶ 10.

Another source underscores the confusion.  ACI plans to introduce at trial an exhibit showing a summary of its expenses for attorneys and consultants in the amount of $102,569.40, a match for the total amount of remedial expenses Colley describes in support of the instant

---

[6] The motion seeks $73,866.40, even though the difference between the $102,596.40 total and the $28,703 already awarded is $73,893.40.  ACI does not explain this apparent discrepancy.

motion.  Colley Expenses Decl. Ex. A.  This lists several line amounts paid to Balch & Bingham, Klink & Associates, and the Garvey Firm, which sum to $56,750.57—a reasonable match for the sum of all expenses to these parties listed in the Colley Expenses Declaration just described.  But to get to the total of $102,569.40, the exhibit lists $45,818.83 in fees paid to Mac Naughton. Recall that Colley's declaration in support of the instant summary judgment motion does not state that Mac Naughton participated in any remedial efforts other than the D.C. Circuit appeal, and that the Court has already awarded his fees for that appeal, $28,703.  That leaves $17,715.83 in Mac Naughton work that is part of the $102,569.40 claimed to be the total amount, but not detailed at all in the evidence offered in support of the instant summary judgment motion.  ACI may well be entitled to recover these payments to Mac Naughton, but the record it has developed in support of the instant motion does not clearly so establish.[7]

To sum up, Colley identifies only two categories of work comprising the $73,866.40 in fees sought in the instant summary judgment motion: The Garvey Firm petition for reconsideration and the lobbying by Balch  & Bingham and Klink & Associates—fees for the other task mentioned, the D.C. Circuit appeal, have already been awarded.  Colley Fees Summary Judgment Decl. ¶¶ 2–7.  Record evidence supports, at most, $56,750.57 of these fees. ACI has not met its summary judgment burden of identifying record evidence that establishes its entitlement to judgment as a matter of law in the amount of $73,866.40.  ACI may present its case that it is entitled to this amount to the jury, but its unsupported assertion is insufficient to support summary judgment.  The Court denies the motion.

---

[7] It is also possible that the balance reflects additional fees for the D.C. Circuit appeal that ACI for some reason did not pursue in the previous summary judgment motion, or that Mac Naughton in fact helped with remedial efforts other than the appeal.  But Colley's declaration does not clearly say any of this, and the Court will not grant summary judgment based on speculation.

## V.  ANALYSIS: MOTIONS *IN LIMINE*

### A.  Solomon's Choice of Law Motion – ECF No. 294

The Court begins its evaluation of the myriad motions *in limine* with Solomon's Motion *in Limine* Concerning the Applicable Choice of Law on the Measure of Damages, which requests a ruling that "Georgia law should apply to the measure of damages in this case."  Def.'s Statement of Points and Authorities Supp. Mot. *In Lim.* Concerning Choice of Law on Damages at 3, ECF No. 294-2 ("Def.'s Choice of Law Statement").  The Court denies this motion, and holds that District of Columbia law governs the measure of ACI's alleged lost asset value damages.

The Court has previously explained the choice-of-law considerations applicable to this case:

> "A federal court sitting in diversity must apply the choice-of-law rules of the forum state—here, the District of Columbia."  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The District of Columbia "employ[s] 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.'"  *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (quoting *Moore v. Ronald Hsu Constr. Co.*, 576 A.2d 734, 737 (D.C. 1990) ).  Under this approach, a court must first "determine whether a true conflict exists between the laws of the two jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different."  *In re APA Assessment Fee Litig.*, 766 F.3d at 51–52 (internal quotation marks omitted) (quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992) ).  A  "false conflict" exists, on the other hand, "when either (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its law and the policies of the states whose laws are claimed to be in conflict would not be advanced by application of their law."  *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citing *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)). If "there is no 'true conflict'" among the purportedly interested jurisdictions, and where one of those jurisdictions is the District of Columbia, D.C. courts will "apply the law of the District of Columbia by default."  *GEICO*, 958 F.2d at 1141 (citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970); Restatement (Second) of Conflict of Laws § 186 cmt. c (Am. Law Inst. 1971)).

*Beach TV Properties, Inc. v. Solomon*, 306 F. Supp. 3d 70, 92 (D.D.C. 2018).

More than one jurisdiction might have an interest in applying its law to the matter of damages in this case—Solomon made the negligent filing in the District of Columbia while working for a Virginia law firm, while ACI allegedly felt resulting damages in Georgia—but the laws of Virginia, Georgia, and the District of Columbia are not in conflict on any relevant issue. Therefore, District of Columbia law applies by default.

Solomon focuses on an asserted conflict between Georgia and District of Columbia law on the evidentiary showing required "to recover lost profits." Def.'s Choice of Law Statement at 3. According to Solomon, District of Columbia allows proof of lost profits to rest on a "reasonable estimate," while Georgia law precludes lost profit damages unless the plaintiff can support them with "an actual track record of sales." *Id.* at 3–4. But any such conflict is irrelevant to this case, because ACI "is not seeking to recover its lost profits." Pl.'s Mem. of Law at 2, ECF No. 304 ("Pl.'s Choice of Law Opp'n"). Instead, ACI seeks to recover damages equal to the diminution in value of its LPTV license (the "WTHC license") that Solomon's malpractice allegedly caused. *See id.* Were it not for Solomon's malpractice, ACI says, the license would have benefited from Class A status and would have been protected from displacement to an inferior channel. According to ACI, the WTHC license—which it says met all the criteria for Class A status—declined in value due to Solomon's failure to obtain the Class A designation. *See id.*; Pl.'s Mem. Regarding the Timing of Diminished Value Damages at 3–6, ECF No. 333 ("Pl.'s Timing Mem.").

Lost profits and diminution in asset value are distinct measures of damages. *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) ("[C]ourts have universally recognized that [lost profits and lost asset damages] are separate and distinct categories of damages."); *Citibank (S.*

*Dakota), N.A. v. F.D.I.C.*, 827 F. Supp. 789, 792–93 (D.D.C. 1993) (recognizing the distinction), *opinion corrected on reconsideration in non-relevant part*, 857 F. Supp. 976 (D.D.C. 1994).  A lost profits measure seeks to recover the "lost operating profits" of a plaintiff's injured business. *See Schonfeld*, 218 F.3d at 176.  In contrast, "[w]hen the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach—not the lost profits that the asset could have produced in the future."  *Id.*  The latter measure—lost asset value—matches ACI's theory in this case.  It held an income-producing asset, the WTHC license, which it says lost market value due to Solomon's negligence.  Pl.'s Mem. Supp. Mot. *In Lim.* for the Admission Into Evidence of a Summary of the Reverse Auction Choices Made by Class A Licensees in Atlanta, GA at 2, ECF No. 270-2 ("Pl.'s Reverse Auction Mem.") ("ACI would have received a Class A license for the WTHC License if Defendant had not committed malpractice by filing a defective form.  Instead, ACI retained an LPTV license that is worth substantially less than the Class A license it would have received but for Defendant's malpractice.").  Thus, through its expert, ACI has sought not to prove the profits it would have earned from the license absent Solomon's malpractice, but rather "to prove the fair market value of the license if it had received Class A status."[8]  *Id.*  Specifically, ACI plans to introduce an expert to opine on the value of its license with Class A status assuming that such a license could be used to generate income by subleasing the associated spectrum.  Pl.'s Choice of Law Opp'n at 4; *see Schonfeld*, 218 F.3d at 176–77 ("In some instances, the asset lost is an *income-producing*

---

[8] The Court notes that although ACI's briefing discusses the lost value of the license itself, at least some of its purported proof seems to refer to the related, but distinct, lost value of ACI's business as a whole.  *See* Valuation of WTHC, Atlanta, GA as Class A LP Station at 8, ECF No. 137-5 ("Sloan Class A Valuation").

asset, the fair market value of which may be based, in whole or in part, on a buyer's projections of what income he could derive from the asset in the future. . . . The market value of an income-producing asset . . . represents what a buyer is willing to pay for *the chance* to earn the speculative profits." (emphases in original)).

Though the parties have not identified any directly apposite authority, general malpractice principles of the District of Columbia, Georgia, and Virginia law indicate that lost asset value is an appropriate measure of any damages attributable to Solomon's malpractice.  *See Dalo v. Kivitz*, 596 A.2d 35, 41–43 (D.C. 1991) (where an attorney's tortious conduct rendered the plaintiff unable to access assets in an escrow account, the appropriate measure of damages was "the actual value of the instruments in the escrow account"); *Ware v. Durham*, 268 S.E.2d 668, 669 (Ga. 1980) (a client injured by transactional legal malpractice may recover "actual damages" sustained); *Duvall, Blackburn, Hale & Downey v. Siddiqui*, 416 S.E.2d 448, 450 (Va. 1992) ("An attorney is liable only for actual injury to his client and damages will be calculated on the basis of the value of what is lost by the client."); *Restatement (Third) of the Law Governing Lawyers* § 53 (2000) ("Generally applicable principles of causation and damages apply in malpractice actions arising out of a nonlitigated matter."); *cf. Lockhart v. Cade*, 728 A.2d 65, 69 (D.C. 1999) ("[T]he amount the client would have recovered [on a claim] but for the attorney's negligence . . . is a proper element of the damages recoverable from the attorney."); *Withers v. Wilson*, 989 A.2d 1117, 1119–20 (D.C. 2010) ("The basic rule for measure of damages for partial destruction of or injury to a chattel is the difference in value of the chattel immediately before and after the injury." (cleaned up)).[9]  Persuasive authority confirms that a

---

[9] Solomon cites a case holding that "under Georgia law, if a retailer, wholesaler, or manufacturer, who has suffered a loss from the destruction of inventory, wants to recover the reasonable expected markup that is represented by the sale price of the lost inventory," it must

tort plaintiff may recover lost value damages for an injured intangible asset. *Netquote, Inc. v. Byrd*, No. CIV.A. 07-CV-00630, 2009 WL 902437, at *5 (D. Colo. Apr. 1, 2009) (explaining, in a tort case, that "[a]lthough diminution in value is generally used to measure damages to real property [under Colorado law] . . . . [i]f there is a market for an intangible asset, like there is for real property, there is no reason that a plaintiff should not be able to measure the damages from the loss of that asset by the calculation of the fair value."); *see Summers v. Fin. Freedom Acquisition LLC*, 807 F.3d 351, 357 (1st Cir. 2015) ("In predicting the path that a state court would probably follow, [a federal court sitting in diversity] start[s] with settled principles of state law and fill[s] the gaps by considering supplementary sources, such as persuasive authority from other jurisdictions and the teachings of learned treatises.").

The only potential conflict Solomon has identified—between Georgia and D.C. law on the evidentiary burden for lost-profit damages—is not relevant to ACI's diminution-in-value theory, and there does not appear to be any difference between Georgia, D.C., and Virginia law on the measure of lost asset value damages. Therefore, D.C. law applies to ACI's diminution-in-value claims by default.[10] *GEICO*, 958 F.2d at 1141. The Court denies Solomon's motion for an order declaring that Georgia law applies to the measure of damages in this case.

---

meet Georgia's heightened evidentiary burden for lost-profit damages. *325 Goodrich Ave., LLC v. Sw. Water Co.*, 891 F. Supp. 2d 1364, 1374 (M.D. Ga. 2012) (cleaned up). Not only does this lost-inventory rule not apply to the factual circumstances of this case, but the Court in *325 Goodrich Ave., LLC* also went on to hold that even in the absence of heightened lost-profit proof, the plaintiff could recover the "diminution of value" of the lost inventory itself (as opposed to recovering the sale-price markup). *Id.* at 1375.

[10] In briefing this motion, neither party mentions ACI's pursuit of an alternative species of damages, namely its claim that had it held Class A status, it allegedly could have received $6,200,000 in 2016 for an option on a portion of its proceeds in an upcoming FCC auction. Therefore, the Court has no occasion to, and does not, address the standards governing this theory at this time. *See* WTHC Auction Option Value Analysis at 7–8, ECF No. 137-7 ("Sloan Option Valuation").

**B.  Timing of Damages Measure – ECF Nos. 333, 334**

Closely related to the Court's conclusion that ACI seeks lost asset value damages is the

parties' dispute about when the value of ACI's license should be measured.  In its Minute Entry

of November 4, 2021, the Court ordered the partis to submit briefing on this issue.  In response,

ACI contends that the diminished value of its license should be measured "at the time the

permanent injury" became "complete," which it says was in February 2020—after it had been

displaced from its original channel, UHF Channel 42, and began broadcasting on a channel with

inferior distribution, very high frequency ("VHF") Channel 3, Pl.'s Timing Mem. at 5, 8.  For his

part, Solomon contends that the market value of the WTHC license with Class A status must be

measured "at the time of the breach in 2000," when Solomon's malpractice resulted in the FCC's

dismissal of ACI's Class A statement of eligibility.  Def.'s Mem. Concerning Timing of What

Damages Are Under a Diminution of Asset Value Theory at 2, ECF No. 334 ("Def.'s Timing

Mem.").  Both parties analogize to contract and real property cases from jurisdictions other than

D.C. to arrive at an uncontroversial proposition: the relevant diminished market value is the

value of the asset directly after the injury has been sustained.  Pl.'s Timing Mem. at 8 ("The

measure of damages for permanent injury to real property is the difference between the market

value of the property before and after the injury suffered or, in other words, the diminution in

market value which the property has sustained by the injury." (quoting *Millers Mut. Fire Ins. Co.*

*of Texas v. Wildish Constr. Co.*, 758 P.2d 836, 843 (Or. 1988)); Def.'s Timing Mem. at 6 ("In

conclusion, the caselaw following *Schonfeld* as well as commentators are in agreement that

under the lost asset value measure of damages, damages are measured as of the date of the

breach or injury.").

Thus, as the Court understands it, the real dispute between the parties does not concern

when after the injury the fair market value of the injured asset should be measured—directly

thereafter, all seem to agree—but rather what constitutes the relevant injury.  ACI claims that damages may not be measured until the injury is "complete," by which it means that all damages caused by Solomon's negligence have occurred.  Pl.'s Timing Mem. at 9–10.  Solomon suggests that the only relevant injury occurred when ACI's Class A statement of eligibility was dismissed in 2000.  Def.'s Timing Mem. at 6.

The Court sees things somewhat differently than either party.  It is true, as Solomon notes, that this Court previously held that ACI suffered *one* actionable injury when the FCC dismissed its Class A statement in 2000.  *Beach TV Props.*, *Inc.*, 306 F. Supp. 3d at 84.  But the Court did not hold that this was the *only* possible injury attributable to Solomon's negligence; indeed, it recognized that "the full extent of the damages caused by the dismissal of the Statement of Eligibility may not have been apparent in 2000."  *Id.*  Thus, the parties have stipulated that ACI suffered injury when its Class A application was dismissed and that "[t]he remaining issues for trial are first, *what other injuries to ACI, if any, were proximately caused by Mr. Solomon's breach of duty*; and second, the amount of damages, if any, that ACI is entitled to recover."  Settlement Agreement (emphasis added).

Though ACI characterizes itself in its timing brief as having suffered a single injury which did not become complete or permanent until 2022, ACI actually seems to allege a series of injuries to the value of its WTHC license, each of which may or may not have been proximately caused by Solomon's negligence.  In ACI's telling, it first suffered injury in 2000 when the FCC denied its statement of eligibility for Class A status.  With Class A status, ACI's license would have been protected from displacement from UFH Channel 42 in Atlanta, from which it could reach 5,500,000 people, to a channel with an inferior reach (a feature ACI calls "Displacement Protection").  Pl.'s Timing Mem. at 2.  The absence of Displacement Protection allegedly caused

the WTHC license to decrease in value.  *Id.*  Then, until 2016, ACI tried, through litigation and lobbying, to reverse the FCC's dismissal of its Class A statement of eligibility.  *Id.*at 2–3.  When the D.C. Circuit finally affirmed the FCC's dismissal in 2015, the value of the WTHC license may have decreased even further: it was now certain that the license would not obtain Displacement Protection.  *See id.* at 3.

But it was still unclear what the lack of Displacement Protection would mean in practice, because "[t]he possibility of actual displacement remained uncertain in 2015 and the WTHC License continued to broadcast from UHF Channel 42 without any disruption or diminution in service."  *Id.*  So, the value of ACI's license in 2015, though allegedly diminished from where it would have been but for Solomon's Malpractice because the license lacked Displacement Protection, may have been bolstered by the fact that although the license lacked Displacement Protection, it had not actually been displaced and continued to benefit from the widespread coverage of UHF Channel 42.  *See id.* ("From 1993 until 2016, there was no imminent threat of displacement to the WTHC License by full power television stations or wireless broadband service providers.").

Then, the value of ACI's license allegedly took yet another hit: Congress's passage of the Spectrum Act of 2012, the FCC's issuance of regulations in 2014, and a 2016 D.C. Circuit decision combined to provide that LPTV licensees would be displaced from UHF channels in favor of wireless broadband providers and would not benefit from statutory provisions guaranteeing transfer to a station with coverage similar to their original one.  *Id.* at 4.  "Thus," ACI explains, "as of August 2016, it was certain – for the first time – that the WTHC License 1) had no Displacement Protection; and 2) would be displaced from UHF Channel 42; and 3) would not have Same Coverage Protection."  *Id.*  In other words, regulatory developments allegedly

conspired with Solomon's failure to obtain Class A status in order to diminish the value of the WTHC license even further. Still, some uncertainty which may have prevented the value of ACI's license from reaching rock bottom: "Whether and to what extent the WTHC License would be moved to a channel with coverage less than 5,500,000 people remained unknown." *Id.* at 4. But during a 2017 auction the FCC held to repurpose spectrum, another entity received the rights to UHF Channel 42 and informed ACI that it would have to relocate. ACI explored different options, but ultimately had to settle for Fayetteville, Georgia's VHF Channel 3 and its coverage population of 2,100,000 in May 2019. *Id.* at 5. Certainty about the WTHC license's decreased reach may have further diminished its value: "May 2019 is the earliest date the WTHC License unequivocally 1) had no Displacement Protection; and 2) would have to stop broadcasting on UHF Channel 42; and 3) could be certain it would be broadcasting on VHF Channel 3." *Id.* ACI began to broadcast from VHF Channel 3 using its LPTV license in February 2020. *Id.* at 6.

To summarize, ACI seems to contend that the value of the WTHC license suffered damage (at least) in 2000, and again in 2015, and again in 2019 or 2020. *None* of this apparently would have happened to ACI's license had it held Class A status. *See* Colley Expenses Decl. ¶ 14 ("If Defendant had filed a completed Statement of Eligibility with the FCC, Plaintiff would have had the right to be relocated to a UHF Channel between 14 and 36 that had the same coverage as UHF Channel 42."). Of course, other factors also contributed to the later damages, such as the passage of the Spectrum Act, another entity's purchase of the right to use UHF Channel 42 in the FCC's resulting auction, and ACI's inability to capitalize upon its conditional permission to move to UHF Channel 28 in Atlanta—which covered approximately 4,100,000 people—because the existing Channel 28 licensee refused to relocate. *See* Pl.'s Timing Mem. at

5; *see id. at* 4 ("The Spectrum Act increased the risk of Plaintiff's displacement from UHF Channel 42 but did not actually cause displacement.").

Thus, the question is not so much when to value the license in relation to each of these injuries—all agree that the answer is right after the injury occurred, *cf. Withers*, 989 A.2d at 1119–20 (D.C. 2010) ("The basic rule for measure of damages for partial destruction of or injury to a chattel is the difference in value of the chattel immediately before and after the injury." (cleaned up)) —but rather which, if any, of these successive injuries Solomon should have to pay damages for. This is not a question of valuation timing, but of proximate causation. *See Dalo*, 596 A.2d at 41–42 ("As with any tort action, legal malpractice liability is predicated on a finding that the injury was proximately caused by the breach of duty. Proximate cause exists when there is a substantial and direct causal link between the attorney's breach and the injury sustained by the client. A defendant will be held responsible for the damages which result despite the entry of another act in the chain of causation if that subsequent act reasonably could have been anticipated and protected against. By contrast, an intervening act not reasonably foreseeable (sometimes referred to as a superseding cause) breaks the chain of causation and relieves the wrongdoer of liability." (citations omitted and cleaned up)); *Haymon v. Wilkerson*, 535 A.2d 880, 885 (D.C. 1987) ("The primary purpose of tort law is to compensate plaintiffs for injuries they have sustained due to the wrongful conduct of others. The normal measure of tort damages is the amount which compensates the plaintiff for all of the damages proximately caused by the defendant's negligence."); Ronald E. Mallen, 3 *Legal Malpractice* § 21:8 (2021 ed.) ("The basic proposition is that an attorney is liable for all damages proximately caused by the wrongful act or omission. Deciding the issue of proximate causation usually resolves the issue of which damages are recoverable. The determination of proximate causation requires analysis of which

31

of the injuries sustained, if any, foreseeably would have been expected to flow from the wrongful conduct.").  The jury may conclude that Solomon proximately caused each of the alleged diminutions in value to the license discussed above (and/or others); or it may, for example, conclude that Solomon proximately caused some of them but not others; or it may conclude that he proximately caused none at all.  *See District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) ("Proximate cause is generally a factual issue to be resolved by the jury . . . ."); *Beach TV Props., Inc. v. Solomon*, 306 F. Supp. 3d at 96 ("Triers of fact determine not only whether a defendant's negligence proximately caused damage to the plaintiff, but also the extent of the plaintiff's damage that the defendant proximately caused."); *McAllister v. Sec'y of Health & Hum. Servs.*, 70 F.3d 1240, 1243 (Fed. Cir. 1995) ("It is well settled that, though damages accrue after the institution of the suit, they may be recovered, provided they are the natural and proximate consequences of the act complained of, and do not themselves constitute a new cause of action.  Actual damages in such a case are assessable up to the date of the verdict." (quoting *Cooper v. Sillers*, 30 App. D.C. 567, 572 (1908)).  For any injury the jury concludes Solomon proximately caused, the appropriate time to measure the diminution in value to the license for damages purposes will be directly after that injury.[11]

### C.  ACI's Reverse Auction Motion – ECF No. 270

Concluding that diminution-in-value damages should be assessed after each injury Solomon proximately caused does not necessarily answer the question of what evidence would

---

[11] Evidence of a later valuation might be relevant to determining the value of the license directly after an earlier injury, especially if there is little direct evidence of the value of the license immediately after the injury.  *See Lativafter Liquidating Tr. v. Clear Channel Commc'ns, Inc.*, 345 F. App'x 46, 48–51 (6th Cir. 2009) (affirming diminished value damages award based on post-breach value as established by the sale of a business's assets in May 2006, even though the breach had occurred back in November 2005).

be competent to prove such damages.  The best evidence of an intangible asset's market value is "a recent sale price for the subject asset, negotiated by the parties at arm's length."  *Schonfeld*, 218 F.3d at 178.  But such a sale may not exist; indeed, there may not be any active trading market for the type of asset at issue.  *See id.* at 178 ("Although it is easier to determine an asset's market value when it is actively traded on a standardized exchange or commodities market, an asset does not lose its value simply because no such market exists.").  Thus, "[i]f no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced."  *Id.* (applying New York law).  Such an expert opinion may "rest[], in part, on the asset's ability to produce profits in the future."  *Id.* at 180.

ACI's expert Stephan Sloan proposes to testify regarding the value of the WTHC license had it held Class A status based on "two different methods—the cash flow discount method and the comparable sales method."  Pl.'s Timing Mem. at 2.  ACI's Motion for an Order *In Limine* For The Admission Into Evidence of a Summary of The Reverse Auction Choices Made By Class A Licensees in Atlanta, GA, ECF No. 270, pertains to the comparable sales method.  In an accompanying declaration, Sloan explains that he relies primarily on comparable sales of Class A licenses in non-Atlanta markets, because there were no public sales of Class A licenses in Atlanta at the relevant time.  Decl. Stephan C. Sloan Supp. Pl.'s Mot. *In Lim.* For The Admission Into Evidence of a Summary of the Reverse Auction Choices Made By Class A Licensees in Atlanta, GA ¶ 2 & n.2, ECF No. 270-1 ("Sloan Reverse Auction Decl.").  In order to provide further support for his conclusion, Sloan also evaluated choices Atlanta Class A holders made in the FCC's reverse auction and prepared a summary thereof.  *Id.* ¶¶ 4–5.  ACI seeks an order declaring that this summary shall be admitted into evidence at trial.  As explained below, the

Court concludes that this summary is relevant and otherwise complies with the Federal Rules of Evidence.  Accordingly, the Court grants ACI's reverse-auction motion *in limine*.

Sloan declares that the Spectrum Act of 2012 and implementing regulations sought to replace television broadcasters with mobile phone companies as the users for certain UHF spectrum channels.  Sloan Reverse Auction Decl. ¶¶ 5–7.  The FCC implemented a two-part process to accomplish this goal.  It began by setting a target volume of spectrum to repurpose. *See id.* ¶ 11; *How it Works: The Incentive Auction Explained*, https://www.fcc.gov/about-fcc/fcc-initiatives/incentive-auctions/how-it-works (last updated Feb. 3, 2017) (hereinafter "*The Incentive Auction Explained*").  Then it held a Reverse Auction "to determine the total amount of incentive payments to broadcasters required to clear that amount of spectrum."  *The Incentive Auction Explained*, *supra*.  Next, the FCC held a "Forward Auction" to sell UHF spectrum to mobile phone companies.  Sloan Reverse Auction Decl. ¶¶ 9, 11.  If mobile phone companies purchased enough spectrum at a certain average price set by regulation, the auction would close, and the FCC would use the proceeds of the Forward Auction to pay the amounts that had been pledged to broadcasters during the Reverse Auction.  *Id.* ¶ 9, *The Incentive Auction Explained*, *supra*.

More specifically, each full power or Class A licensee subject to displacement had three Reverse-Auction options:

- The "Buy Out Choice": Surrender the license and go off air in exchange for a payment determined by competitive bidding for the spectrum.
- The "VHF Relocation Choice": Relocate to a VHF channel between 2 and 13 in exchange for a payment determined by competitive bidding.
- The "UHF Relocation Choice": Relocate to an available UHF channel with substantially the same coverage as the current channel and receive no payment.  *Id.* ¶ 8.

The FCC initially tried to repurpose a large amount of spectrum at a high total cost, but when mobile companies expressed unwillingness to pay, the FCC successively reduced the

amount of spectrum to be repurposed, and, accordingly, the compensation offered to television licensees in the Reverse Auction. *Id.* ¶¶ 11–13, 17. Thus, "[e]ach round in each stage" of the Reverse Auction "reduced the offering prices for the VHF Relocation Choice and Buy Out Choice until an equilibrium was reached between the amount of money the broadcast licensees would collectively accept for the VHF Relocation Choice and Buy Out Choice and the amount of money the mobile phone companies were willing to pay." *Id.* ¶ 13. "As the offering prices in the Reverse Auction declined in each round, each broadcast licensee had to decide for itself each time the offering price declined whether its best economic decision was to opt out of the Reverse Auction by taking the UHF Relocation Choice or accept the money offered to go off the air or move to a VHF Channel." *Id.* ¶ 14. In other words, at each round of the Reverse Auction process, each licensee had to ask itself whether it would it be better to take the offered price and cease operations or move to an inferior-coverage VHF channel (by taking the Buy-Out Choice or the VHF Relocation Choice) or to forego any auction money but continue operating on a new channel with UHF coverage (by taking the UHF relocation choice).

Sloan presents publicly-available FCC data about the choices of five Class A licenses in Atlanta. Each participated in the auction and indicated willingness to accept various figures for the Buy-Out Choice and/or the VHF Relocation Choice at each stage. These prices were not ultimately tendered (apparently due to mobile provider unwillingness to purchase the associated volume of spectrum). *See id.* ¶¶ 13, 17, 19–23. Eventually, each Class A holder opted out, meaning that they did not want to accept the lesser figure available in subsequent rounds and believed it preferable to relocate to another UHF channel and continue to broadcast. *See id.* ¶ 19 (Korean American TV Broadcasting Corporation "agreed to accept $17,097,986 for the VHF Relocation Choice "[i]n the 27th round of Stage 1 of the Reverse Auction" but then opted out at

the next round in favor of the UHF Relocation Choice); *id.* ¶ 20 (Prism Broadcasting Network, Inc. opted out at the 49th round of stage 1 when the offering price for the Buy Out Choice fell to $9,692,098 in favor of the UHF Relocation Choice); *id.* ¶ 21 (KM LPTV of Atlanta, LLC "agreed to accept $5,482,417 for the Buy Out Choice in the 49th round of Stage 2 and then opted out at the next round" in favor of the UHF Relocation Choice); *id.* ¶ 22 (Mako Communications, Inc. "agreed to accept $3,274,495 for the Buy Out Choice in the 49th round of Stage 2 and then opted out" in favor of the UFH Relocation Choice); *id.* ¶ 23 (D.T.V. LLC "agreed to accept $3,194,283 for the Buy Out Choice in the 49th round of Stage 2 and then opted out" in favor of the UHF relocation option).

According to Sloan, each of these decisions reflects the broadcaster's informed calculation that, by continuing to broadcast on a UHF frequency, its license was worth at least the price at which it opted out—they chose to keep broadcasting rather than being forced to accept a lesser figure in subsequent rounds of the auction. *See id. at* ¶¶ 19–23. Sloan then takes each of these figures and adjusts them for the population each broadcaster's station could reach, averages that figure, and removes the high and low figures to estimate that a Class A license in Atlanta at the time of the Reverse Auction—the asset ACI allegedly would have held but for Solomon's malpractice—was worth $1.72 in terms of price per population reached ("POP"). *Id.* at 14, ¶¶ 2, 24–25. ACI says that this number confirms that Sloan's estimate of the value of its license based on comparable sales outside Atlanta ($1.16 per POP) is reasonable, and indeed, conservative. Pl.'s Mem. Supp. Mot. *In Lim.* For The Admission Into Evidence of a Summary of The Reverse Auction Choices Made By Class A Licensees in Atlanta, GA at 1, ECF No. 270-2 ("Pl.'s Reverse Auction Mem.") at 1. Because the documents reflecting each station's choices

through numerous rounds are voluminous, Sloan offers the proposed exhibit, which summarizes the choices the stations made and Sloan's calculations.  Sloan Reverse Auction Decl. at 14.

At the outset, the Court agrees with ACI that Sloan's Reverse Auction choices exhibit is a permissible Rule 1006 summary because it is based on the content of voluminous documents and because the underlying documents—the FCC's public reports of Reverse Auction choices and Broadcast Investments Analysts' POP numbers, Sloan Reverse Auction Decl. ¶ 25 n.15—are subject to the hearsay exceptions of Rule 803(8) (public records) and Rule 803(17) (market reports).  Fed. R. Evid. 1006 (a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court").  Solomon does not dispute this.  Def.'s Opp'n Pl.'s Mot. *In Lim.* For The Admission into Evidence of a Summary of the Reverse Auction Choices Made by Class A Licensees in Atlanta, GA, ECF No. 273 ("Def.'s Reverse Auction Opp'n").

Instead, Solomon argues that the Reverse Auction choices are not competent evidence to establish the fair market value of the Atlanta Class A licenses, much less ACI's license.  First, Solomon argues that the Reverse Auction choices "represent asking prices from owners who were not really desiring to sell, and the prices were too high for the FCC to buy."  *Id.* at 2–3. This misunderstands Sloan's explanation of the Reverse Auction's operation.  The Class A participants *were* willing to accept—albeit in the context of the Spectrum Act's disruption of the market, which may have caused some forced choices—the offers made in the Reverse Auction before they opted out.  *See, e.g.*, Sloan Reverse Auction Decl. ¶ 21 (KM LPTV of Atlanta "agreed to accept $5,482,417 for the Buy Out Choice in the 49th round of Stage 2 and then opted out at the next round.").  That the FCC did not ultimately pay these prices says nothing about the value of the Class A participants' broadcast licenses, because the purpose of the FCC's auction

was not to use the relinquished spectrum for broadcasting, but rather to repurpose the spectrum for mobile phone company use.  Thus, the reverse auction data tells us both a price the Class A participants would have accepted to stop using their licenses and a price they rejected.

Solomon claims that "[it] has been black letter law that a mere offer to buy or sell property is incompetent to prove its market value," but this overstates the rule.  Def.'s Reverse Auction Opp'n at 2.  The District of Columbia Court of Appeals has "accept[ed] the contention" that "an owner's asking prices should be allowed in evidence . . . as probative of fair market value."  *District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052, 1054–55 (D.C. 1977) (holding that it was error to exclude such evidence but that the error was harmless in light of the other evidence adduced).[12]  It is true that courts, including in the District of Columbia, have observed that evidence of non-binding offers "is not highly probative," because an owner's "offering price is likely to be exaggerated, as a starting point for bargaining."  *Id.* at 1055 n.5; *see United States v. Easements & Rts.-Of-Way Over a Total of 15.66 Acres of Land, More or Less, in Gordon Cnty., Ga.*, 315 F. Supp. 3d 1353, 1358–59 (N.D. Ga. 2018) (admitting evidence of an oral, unaccepted offer to buy land, "[w]here there were discussions but no firm plans, speculation but no contracts . . . would be asking the jury to imagine the best possible use the landowner <u>dreamed of</u>, as opposed to one he was actually in a position to negotiate" at the relevant time (emphasis in original) (cleaned up)).  But "these problems go to [the] weight" of the evidence, "not [to its] admissibility."  *Burlington Apartment House Co.*, 375 A.2d at 1055

---

[12] Solomon's citations are not to the contrary. *See Wentworth v. Air Line Pilots Ass'n*, 336 A.2d 542, 543 (D.C. 1975) (noting "that appellant's asking price for the property *did not necessarily* bear any legally significant relationship to the fair market value of" of the property in question (emphasis added)); *Hannan v. United States*, 131 F.2d 441, 443 (D.C. Cir. 1942) (affirming exclusion of evidence of a prior sale *because market conditions had "changed markedly"* since the sale (emphasis added)) .

n.5.  Thus, additional evidence, standing alongside an owner's offer to sell or rejection of an offer to buy, may be necessary to prove market value.  *Johnston v. Hundley*, 987 A.2d 1123, 1130 n.11 (D.C. 2010) (holding that it was not error to permit an owner to testify that he initially thought his property could be sold for a high figure and listed the property at that figure, but that a damages award could not rest on this listing alone because "where a special expertise is required to estimate the value testimony respecting the owner's opinion, without more, does not provide an adequate basis for a reasonable estimate of value." (cleaned up)).

Critically, Sloan's opinion does not rest upon the Reverse Auction choices alone, or even primarily.  Rather, he estimated the value ACI's license would have carried with Class A status by analyzing sales of comparable stations in Austin, Texas and San Diego, California.  Sloan Class A Valuation at 47; *see Schonfeld*, 218 F.3d at 178 ("If no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced.").  The Reverse Auction Choices serve to confirm that this comparable sales estimate was reasonable.  Sloan Reverse Auction Decl. ¶ 5.  There were no publicly reported sales of similar assets in the Atlanta market, so the informed opinion of Atlanta Class A holders on the value of their licenses is a reasonable next-best option.  Moreover, some of the considerations motivating court skepticism of evidence of unaccepted offers to sell or buy do not apply here.  The Reverse Auction choices do not represent an owner's possibly inflated initial negotiated position; rather, the Class A holders effectively rejected forthcoming offers in future auction rounds.  And we know that the Class A holders were serious about accepting the amounts offered in the earlier rounds; had the auction process closed, they would have been on track to accept these amounts in exchange for either ceasing to broadcast or moving to a VHF

channel.  Accordingly, the Court holds that Sloan's summary exhibit regarding Atlanta Class A holders' Reverse Auction choices is admissible.

### D.  Solomon's Damages Evidence Motion – ECF No. 299

As the Court has explained, ACI's expert Stephan Sloan seeks to establish the value ACI's WTHC license would have had with Class A status by analyzing sales of comparable stations outside of Atlanta, and he confirms the resulting figures using data about the choices of Atlanta Class A holders in the FCC's Reverse Auction.  As an alternative method, Sloan seeks to establish the Class A fair market value by conducting a discounted cash-flow analysis premised on the theory that an informed buyer would value ACI's LPTV station based on the potential business strategy of "licens[ing] the Station's subchannels for a monthly fee."  Sloan Class A Valuation at 42, 45.  Sloan also presents yet another alternative method.  In 2016, before the Reverse Auction, some investors purchased from Class A holders an option to take a portion of any proceeds the station would receive in the forthcoming Reverse Auction.  Sloan looks to the option prices certain Class A holders received to estimate the value ACI's license would have presented on the 2016 option market had it held Class A status.  WTHC Auction Option Value Analysis at 7–9.  Solomon moves to exclude each of these opinions.  Def.'s Mot. *In Lim.* to Exclude Incompetent Damages Evidence, ECF No. 299.  The Court denies this motion.

The Court need not tarry long over Solomon's briefing on the Reverse Auction issue, which consists entirely of a reprisal of his points against ACI's Reverse Auction motion *in limine* in support of an argument that the Reverse Auction choices are misleading and a waste of time in violation of Rule 403.  Def.'s Statement of Points and Authorities Supp. Mot. *In Lim.* to Exclude Speculative or Incompetent Damages Evidence at 9–10, ECF No. 299-1 ("Def.'s Damages Evidence Statement").  For the reasons already discussed, the Court holds that evidence of

Atlanta Class A holders' Reverse Auction choices is probative of diminished value damages and therefore worth the jury's time.

Likewise, the Court's previous conclusion that ACI seeks diminution-in-asset-value damages, rather than lost profits, defeats Solomon's argument that Sloan's discounted cash-flow analysis is unduly speculative.  This argument relies on a single Georgia-law lost profits case to say that Sloan's model is speculative because it relies on a business model—leasing subchannels—that ACI has never used.  *Id.* at 7–9 (citing *325 Goodrich Ave., LLC*, 891 F. Supp. 2d at 1374).  But how an owner has used an asset in the past does not necessarily matter for a diminution-in-value theory.  When, as here, "the asset lost is an *income-producing asset*, the fair market value . . . may be based, in whole or in part, on a buyer's projections of what income he could derive from the asset in the future."  *Schonfeld*, 218 F.3d at 176; *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 860 (5th Cir. 2004) ("[T]he market value is determined by considering what a hypothetical buyer would pay for the chance to earn future profits.").  Sloan contends that the "best option" for ACI's LPTV station would be "to lease its subchannels," so a reasonable buyer might well value ACI's WTHC license with that use in mind.  Sloan Class A Valuation at 38.

Similar considerations govern Solomon's first point about Sloan's options valuation opinions, that these opinions "have no foundation in ACI's own business track record" because Colley testified that he never explored participating in the pre-auction options market even though his entities owned stations outside of Atlanta that held Class A status.  Def.'s Damages Evidence Statement at 4.  Thus, Solomon says that "[t]here is no basis in the evidence to assume that ACI would have even attempted to sell an option for [the WTHC license], if [that license] had had Class A status."  *Id.* at 4.  But there is at least some conflicting evidence on this score.

Colley testified that he would have accepted $6,200,000 (the option value estimated by Sloan) for "part" of the station before the Reverse Auction.  Decl. of W. James Mac Naughton Ex. B at 2, ECF No. 306-1.  Moreover, Solomon's objection goes to the jury issues of whether his malpractice actually and proximately caused ACI to lose the opportunity to make a $6,200,000 option sale, not to the foundation of Sloan's opinion that the market would have valued an option at $6,200,000.

More generally, Solomon argues that Sloan's option opinion is too speculative to pass muster under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).  Def.'s Damages Evidence Statement at 3–7; *see Daubert*, 509 U.S. at 590 (an expert opinion must rest on "more than subjective belief or unsupported speculation").  The Court disagrees.  Even "weak" "factual bases for an expert's opinion" do not render an expert opinion inadmissible; "a district court should only reject such testimony when it 'appears to be wholly speculative.'"  *Est. of Gaither ex rel. Gaither v. District of Columbia*, No. CV 03-01458, 2013 WL 12320079, at *3 (D.D.C. Sept. 11, 2013) (quoting *Bell Helicopter Textron, Inc. v. Turley*, 999 F.2d 549, 567, 569 (D.C. Cir. 1993)).  None of the purported "assumptions" Solomon identifies rises to this standard.  Solomon criticizes Sloan's reliance on the National Economic Research Association, Inc.'s ("NERA") FCC Incentive Model, which was a tool used in 2016 to predict Reverse Auction outcomes.  Def.'s Damages Evidence Statement at 3–4.  Necessarily, such a model geared toward predicting a novel process made certain assumptions.  *See* Sloan Option Rebuttal at 8, ECF No. 137-8 ("The NERA model combined data provided by the FCC with a structure to make assumptions about the participation of television station owners in the auction and assumptions about at what price station owners would logically participate or not participate in the auction." ).  But Solomon does not explain why any particular NERA

assumption was unduly speculative.  More to the point, Sloan does not use the NERA model to

project the outcome of the Reverse Auction, but rather to approximate how option market actors

were *themselves* projecting Reverse Auction outcomes in 2016 in order to inform their valuation

of options.  This reliance is based on "more than subjective belief or unsupported speculation,"

*Daubert*, 509 U.S. at 590, because "[m]any companies . . . made investment and other significant

business decisions based on the NERA model."  Sloan Option Rebuttal at 3.  Sloan's project is to

estimate the value ACI's license would have had as a Class A in 2016, so it makes sense to use a

model other market actors were using to value similar assets at the same time.

Solomon's other critique is that Sloan speculates too heavily when he assumes that the

options market would have assigned the same value to an Atlanta license that it did licenses

elsewhere; Solomon's own experts contend that there was no market interest in options on

Atlanta licenses in 2016.  Def.'s Damages Evidence Statement at 5–6.  In response, Sloan asserts

that these contentions are based in part on an industry report that was outdated by 2016, that

there may have been unreported option sales in Atlanta, and that if Solomon had not committed

malpractice and there had been an additional Class A license in Atlanta, the Atlanta spectrum

would have been scarcer and therefore more attractive to investors.  Sloan Option Valuation at 2;

Sloan Option Rebuttal at 4–5.  The Court expresses no opinion on which account the jury may

find more persuasive, but Sloan's response is not so speculative as to be inadmissible as a matter

of law.  At trial, Solomon may of course "challenge the weight accorded [Sloan's] testimony

through 'vigorous cross-examination[ and] presentation of contrary evidence.'"  *Estate of

Gaither*, 2013 WL 12320079, at *3 (quoting *Daubert*, 509 U.S. at 596).

### E.  ACI's Expenses Motion – ECF No. 269

In its Motion for an Order *In Limine* Regarding Evidence of Plaintiff's Expenses, ACI

asks the Court to declare that three summaries of expenses allegedly incurred as a result of

Solomon's Malpractice are admissible.  These include a list of legal expenses ACI and Beach TV Properties allegedly had to pay in order to remedy the FCC's dismissal of its faulty license application as well as summaries of two sets of expenses associated with ACI's and Beach TV Properties' efforts to continue their broadcast distribution without a Class A license.  Pl.'s Mot. *In Lim.* Regarding Evidence of Pl.'s Expenses ¶¶ 1–3, ECF No. 269.

First, as explained in the accompanying Declaration of Jud Colley, because it did not have a Class A license, ACI had to relocate in 2020 from UFH Channel 42—which could reach more than 100 hotels—to VHF Channel 3 in Fayetteville, Georgia.[13]  Colley Expenses Decl. ¶¶ 14–15.  Channel 3 cannot reach twenty-four of the hotels to which ACI had previously broadcasted.  *Id.* ¶ 15.  In order to continue reaching these twenty-four hotels, Beach TV Properties paid a contractor $76,142 to develop a proprietary internet streaming software; it also continues to pay an internet service provider for a dedicated high speed internet connection between its headquarters and the twenty-four hotels.  *Id.* ¶¶ 16–18.

Second, Colley explains that when ACI was displaced from UFH Channel 42, it and Beach TV Properties incurred expenses associated with building new transmission facilities for Channel 3.  *Id.* ¶ 22.  The FCC reimbursed approximately $260,000 worth of these expenses.  *Id.* ¶ 24.

In addition to requesting an order declaring that these expense summaries are admissible, ACI asks the Court to declare that "[e]vidence regarding reimbursement or payment of any Channel 3 Expenses by the Federal Communications Commission is not relevant and shall not be admitted into evidence at trial."  Pl.'s Mot. *In Lim.* Regarding Evidence of Pl.'s Expenses ¶ 4.

---

[13] Had it held a Class A license, ACI could have instead relocated to a UHF channel with a distribution similar to Channel 42.  Colley Expenses Decl. ¶ 14.

Subject to the qualifications discussed below, the Court declares that the expense summaries are admissible.  However, the Court defers until trial a ruling on ACI's request to exclude FCC reimbursement evidence.

### 1.  Expense Summaries

In opposition to ACI's motion *in limine* regarding its expenses, Solomon does not appear to contest the relevance, generally speaking, of expenses ACI incurred in order to mitigate damages caused by his malpractice.  For good reason: the issues for trial are what injuries to ACI beyond the denial of its license application, "if any, were proximately caused by . . . Solomon's breach of duty; and second, the amount of damages, if any, that ACI is entitled to recover." Settlement Agreement.  Costs allegedly incurred to mitigate the harm caused by the failure to obtain a Class A license are plainly relevant to ACI's damages claims.  *See Winter v. Brown*, 365 A.2d 381, 386 (D.C. 1976) (malpractice plaintiffs could recover attorney fees sustained while pursuing litigation to salvage original claim, which was dismissed due to defendant attorneys' failure to timely file pre-suit notice); *cf. Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (a court may award damages to recoup reasonable costs a plaintiff incurs in order to mitigate harm).  Instead, Defendants raise what the Court interprets as relevance objections to specific portions of ACI's exhibits summarizing its mitigation expenses, as well as arguments that the exhibits fail to comply with Federal Rule of Evidence 1006.

*Relevance.*  First, Solomon appears to argue that evidence of payments Beach TV Properties made while it held the existing broadcast license is irrelevant to ACI's damages claims because Beach TV Properties "is a separate legal entity from ACI."  Def.'s Opp'n Pl.'s Mot. *In Lim.* Regarding Evidence of Pl.'s Expenses at 5–7, ECF No. 274 ("Def.'s Expenses Opp'n").  For its part, ACI claims that it "has assumed responsibility for paying" all Beach TV Properties expenses through 2020 listed in the exhibits, because these have all  been booked as

inter-company loans from BTV Properties to Plaintiff and appear in the liabilities section of Plaintiff's 2020 balance sheet as an intercompany payable due to BTV Properties."  Colley Expenses Decl. ¶ 7.  Notably, this Court recently rejected a very similar argument from Solomon.  *See Atlanta Channel, Inc. v. Solomon,* No. CV 15-1823, 2021 WL 4243383, at *7 (D.D.C. Sept. 17, 2021) ("It is . . . unclear how a payment from Beach TV that is reimbursed with a transfer recorded in both ACI's and Beach TV's books is meaningfully different than ACI making that payment directly.").  Nevertheless, to avoid resolving a substantive issue of damages liability upon consideration of a motion *in limine* and to preserve Solomon's ability to make this argument at trial, the Court will defer ruling on this issue at this time.  The Court orders that the expense exhibits are admissible, subject to the condition that ACI revise them in order to clarify which entity made each individual payment.  *See, e.g.*, Colley Expenses Decl. Ex. A, ECF No. 269-1 at 11 (noting that certain expenses were paid by "US Bank Visa" and "American Express" without listing which entity was responsible for these payments).

Second, Solomon argues that it was not necessary for ACI to incur expenses associated with developing its internet streaming broadcast capabilities beginning in 2019, because it was already streaming its programming over the internet to a few hotels and on its website as far back as 2016, well before its channel displacement.  Def.'s Expenses Opp'n at 7–9.  But the fact that ACI had at least some internet streaming capacity in 2016 does not establish that it was unnecessary to expand that capacity to make up for the lost reach of UFH Channel 42 in 2020.  And it is not clear that website streaming could provide a sufficient substitute to streaming directly to hotels.  Similarly, Solomon's suggestion that ACI did not need to incur streaming expenses before December 2019 because it was not displaced until 2020, *id.* at 11, ignores the possibility that ACI may have had to develop its streaming capacity in advance of the

displacement to avoid a disruption in service, Pl.'s Reply Supp. Motion *In Lim.* Regarding Evidence of Pl.'s Expenses at 4, ECF No. 298 (noting that ACI knew in 2017 that it would be displaced and that it "had to plan for the contingency of going off the air altogether and find some alternative way of delivering its programming to the hotels."). In sum, Solomon argues that the expenses incurred were not necessary or reasonable. But the issue before the Court on this motion in *limine* is relevance, and evidence that ACI incurred streaming expenses to remedy its displacement plainly "tend[s] to make . . . more or less probable," Fed. R. Evid. 401, the consequential alleged fact that ACI spent money to mitigate the harm caused by Solomon's malpractice, and therefore clears the "low" "relevancy hurdle" of Federal Rule of Evidence 401, *Fitzgerald v. Expressway Sewerage Const., Inc.*, 177 F.3d 71, 75 (1st Cir. 1999). Solomon remains free to argue at trial that ACI did not actually need to incur its expenses.

*Federal Rule of Evidence 1006.* Solomon contends that certain exhibits fail to comply with Federal Rule of Evidence 1006, which provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "For a summary of documents to be admissible, the documents must be so voluminous as to make comprehension by the jury difficult and inconvenient; the documents themselves must be admissible; the documents must be made reasonably available for inspection and copying; the summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it. *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014).

Solomon contends that ACI has not established that its exhibit summaries are based on admissible evidence. Though Solomon does not explain in what way he believes the underlying documents to be non-admissible, he cites some authorities discussing the hearsay rule. Def.'s

Expenses Opp'n at 4–5 & 5 n.1.  The Court is satisfied, however, that the documents underlying the exhibit summaries fall within the business records exception to the hearsay rule.  This rule "provides for the admission of  [a] memorandum, report, record, or data compilation, in any form, of acts, events . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the information or method or circumstances of preparation indicate lack of trustworthiness."  *United States v. Gurr*, 471 F.3d 144, 151 (D.C. Cir. 2006) (quoting Fed. R. Evid. 803(6)).  ACI explains that its expenses exhibits summarize numerous invoices received from vendors in the course of its business.  Pl.'s Mem. Supp. Motion *In Lim.* Regarding Evidence of Pl.'s Expenses at 2–4, ECF No. 269-2 ("Pl.'s Expenses Mem.").  The Court is therefore satisfied that ACI's expenses exhibits summarize voluminous records that are subject to the business records exception to the hearsay rule.  It is true that some information about the underlying documents (such the number of documents supporting each exhibit) is found in ACI's brief, rather than in Colley's declaration; therefore, the Court's order admitting the expenses exhibits is subject to Colley (or another ACI custodian) providing testimony at trial to confirm that they are based on admissible business records.  Fed. R. Evid. 806(3)(D) (the conditions of the business records exception must be "shown by the testimony of the custodian or another qualified witness").

Although ACI represents that all documents underlying its expenses exhibits have been made available for Solomon's inspection as required by Rule 1006, Pl.'s Expenses Mem. at 3–4, Solomon asserts that this is not the case for certain video streaming invoices, Def.'s Expenses

Opp'n at 10.  The Court's order holding that the expenses exhibits are admissible is subject to the condition that ACI make all underlying documents available to Solomon, to the extent that  this has not already occurred.

Next, Solomon objects to a portion of the video streaming exhibit, which, in addition to listing video streaming expenses already incurred, projects the net present value of future costs for fifteen years at a discount rate of five percent.  Colley Expenses Decl. Ex. C, ECF No. 269-1 at 13.  Solomon argues that this projection is improper expert testimony that may not be included in a Rule 1006 summary.  Def.'s Expenses Opp'n at 10.  But the parties have stipulated "that for purposes of this action, five percent (5%) is the appropriate discount rate to determine the net present value of future expenses," so ACI need not rely upon any expert opinion to use this figure.  Stipulation of Discount Rate for Net Present Value, ECF No. 291.

Finally, Solomon objects to the list of hotels served by video streaming included after the list of video streaming expenses, which he characterizes as "a pedagogical device, rather than a summarizing device governed by Rule 1006."  Def.'s Expenses Opp'n at 11.  The Court agrees that, unlike the rest of the exhibit's summary of specific invoices, this list of hotels appears to be a demonstrative exhibit geared toward aiding the jury's examination of Colley's testimony that the UFH Channel 42 displacement blocked ACI from reaching twenty-four hotels.  Colley Expenses Decl. Ex. C, ECF No. 269-1 at 14; *see* Colley Expenses Decl. ¶ 15 &  ¶ 15 n.6.  *See United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998) (describing the differences between Rule 1006 summaries and "pedagogical devices, which are more properly considered under Rule 611(a) (internal quotation marks omitted)).  Therefore, the Court admits this portion of the streaming expenses exhibit subject to a limiting instruction which will "inform[] the jury of the summary's purpose and that it does not itself constitute evidence."  *Id.* (citation omitted).

2.   Reimbursement Evidence and the Collateral Source Rule

The remaining disputes pertaining to ACI's motion *in limine* regarding expenses relate to

the collateral source rule.   ACI argues that evidence of the FCC's reimbursement of expenses

associated with the move to Channel 3 must be excluded because the collateral source rule

provides that this evidence may not be used to discount Solomon's liability.   Pl.'s Expenses

Mem. at 4.   Solomon argues that evidence of ACI's expenses associated with the move to

Channel 3 is misleading precisely because it does not include evidence about FCC's

reimbursement program, which he contends is relevant to an issue in this case other than whether

ACI's damages should be reduced by the FCC reimbursement amount: the extent to which

Solomon's failure to obtain a Class A license for ACI in fact caused some of ACI's claimed

damages.   Def.'s Expenses Opp'n at 11–12.   As explained below, the Court orders that ACI's

exhibit showing its Channel 3 expenses shall be admitted, and defers until trial a ruling on

whether Solomon may introduce evidence about the FCC reimbursement.

*The collateral source rule applies to the FCC reimbursement as a matter of substantive*

*tort law, so the jury may not discount plaintiff's damages by the reimbursement amount.*   The

collateral source rule is a substantive rule of tort damages; it provides that "an injured person

may usually recover in full from a wrongdoer regardless of anything he may get from a collateral

source unconnected with the wrongdoer."   *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,

928 F.3d 42, 65 (D.C. Cir. 2019) (quoting *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir.

1976)); *see also Bushong v. Park*, 837 A.2d 49, 57 (D.C. 2003).   This substantive rule carries an

evidentiary corollary: it "prevents the admission of evidence showing that benefits were paid by

a collateral source" unless the evidence is probative on another issue.   *See Bushong*, 837 A.2 at

57; *see also Iacangelo v. Georgetown Univ.*, No. CV 05-2086, 2011 WL 13247933, at *3

(D.D.C. Jan. 13, 2011).   "[T]he receipt of payment from a collateral source may not be injected

into a trial to mitigate damages or in any manner which would mislead, improperly influence or prejudice the jury." *Jacobs v. H. L. Rust Co.*, 353 A.2d 6, 7 (D.C. 1976) (citing both D.C. and federal authority).  A federal court should apply the substantive (usually state) tort law that governs the case to determine the applicability of the collateral source rule "as a rule of damages." *Fitzgerald*, 177 F.3d at 74 (emphasis omitted).  But once a federal court determines that the collateral source rule applies to a particular payment to the plaintiff, "[t]he evidentiary implications flowing from that rule . . . are governed by the Federal Rules of Evidence." *Id.*

In D.C., "[t]he collateral source rule provides

> that when a tort plaintiff's items of damage are reimbursed by a third party who is independent of the wrongdoer, the plaintiff may still seek full compensation from the tortfeasor even though the effect may be a double recovery.  The rationale of this principle is that: (i)n general the law seeks to award compensation, and no more, for personal injuries negligently inflicted.  Yet an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer.  Usually the collateral contribution necessarily benefits either the injured person or the wrongdoer. Whether it is a gift or the product of a contract of employment or of insurance, the purposes of the parties to it are obviously better served and the interests of society are likely to be better served if the injured person is benefitted than if the wrongdoer is benefitted.  Legal 'compensation' for personal injuries does not actually compensate.  Not many people would sell an arm for the average or even the maximum amount that juries award for loss of an arm.  Moreover the injured person seldom gets the compensation he 'recovers', for a substantial attorney's fee usually comes out of it.  There is a limit to what a negligent wrongdoer can fairly, i.e., consistently with the balance of individual and social interests, be required to pay. But it is not necessarily reduced by the injured person's getting money or care from a collateral source.

*Jacobs*, 353 A.2d at 7 (quoting *Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C. Cir. 1954); additional citation omitted).  The rule seeks to avoid providing the defendant a "windfall" by permitting him, through no action of his own, to avoid paying the full extent of damages he caused.  Restatement (Second) of Torts § 920A cmt. b (Am. L. Inst. 1979). The case at bar seems to be a straightforward application of the rule: an independent third party, Congress through the

FCC, reimbursed ACI for some of the damages Solomon allegedly caused.  Solomon may not benefit from the unrelated grace of Congress, "even though the effect may be a double recovery" for ACI.  *Jacobs*, 353 A.2d at 7.

Solomon's argument against this conclusion does not persuade.  Solomon notes that "[t]he collateral source rule is available in two scenarios[,] 'either [1] when the payment in question came from a source wholly independent of the liable party or [2] when the plaintiff may be said to have contracted for the prospect of a 'double recovery.'"  Def.'s Expenses Opp'n at 14 (quoting *District of Columbia v. Jackson*, 451 A.2d 867, 873 (D.C. 1982)) (emphasis omitted).  Solomon is right that the second category does not apply to this case; ACI did not contract in advance to receive FCC benefits (in contrast to, say, a plaintiff who contracts to receive insurance or unemployment benefits, *see Neal v. Dir., D.C. Dep't of Corr.*, No. CIV. A. 93-2420, 1995 WL 517249, at *7–8 (D.D.C. Aug. 9, 1995)).  But the first category does.  Defendant Solomon had nothing to do with the FCC reimbursement, which came from a wholly independent federal program source.  This kind of public compensatory benefit is just the sort of gratuity unrelated to the defendant that the collateral source rule contemplates.  *See* Restatement (Second) of Torts § 920A cmt. b (Am. L. Inst. 1979) ("If the benefit was a gift to the plaintiff from a third party *or established for him by law*, he should not be deprived of the advantage that it confers." (emphasis added)); *cf. id.* cmt. c(4) ("Social security benefits, welfare payments, pensions under special retirement acts, all are subject to the collateral-source rule.").  Thus, the D.C. Circuit recently concluded, though arguably in *dicta*, that credit-monitoring services Congress provided to victims of a government database hack were subject to the collateral source

rule.  *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 65–66[14]; *see also*

*Navelski v. Int'l Paper Co.*, 771 F. App'x 949, 951–52 (11th Cir. 2019) (treating county's

application for a FEMA grant related to homes damaged by a flood that also harmed the

plaintiffs as subject to Florida's collateral source rule).  Solomon has not offered any basis for

distinguishing the FCC reimbursement program at issue in this case, which was a similar

congressional effort to assist parties that had suffered loss from circumstances beyond their

control.  Therefore, the collateral source rule applies to the FCC reimbursement, which may not

be discounted from the damages Solomon caused ACI.

   *The Court defers until trial a ruling on whether evidence related to the FCC

reimbursement program should be admitted for the purpose of establishing whether Solomon's

malpractice caused ACI's Channel 3 relocation damages.*  Now that the substantive collateral

source question has been answered, the Federal Rules of Evidence take over.  *Fitzgerald*, 177

F.3d at 74.  Given that the collateral source rule applies to the FCC reimbursements, it follows

that the fact that the FCC reimbursed ACI approximately $260,000 for expenses related to

relocating to Channel 3 is irrelevant to the issue of whether that sum should be subtracted from

any ultimate amount of damages Solomon is determined to have caused as a way of avoiding

gifting ACI a double recovery.  The collateral source rule makes clear that such double recovery

is appropriate, so the fact of the double recovery is not "of consequence in determining the

action."  Fed. R. Evid. 401(b).

   However, Solomon persuasively argues that evidence relating to the FCC reimbursement

is relevant to a distinct issue.  ACI appears to admit that it would have had to relocate channels

---

[14] The federal Privacy Act, rather than D.C. tort law, governed the substantive liability
issues in *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*  Still, the D.C. Circuit relied on
the Second Restatement, which D.C. law also follows.

even if it had procured the Class A license Solomon's malpractice allegedly prevented it from receiving; it just would have been able to relocate to a channel more desirable than the one it had to settle for as a non-Class A licensee, Channel 3.  *See* Colley Expenses Decl. ¶¶ 21–22.  ACI also appears to admit that the FCC would have reimbursed relocation expenses even for a move to one of the more desirable channels available to Class A license holders.  Pl.'s Reply Supp. Mot. *In Lim.* Regarding Evid. of Pl.'s Expenses at 6, ECF No. 298 ("If Plaintiff had received a Class A license, there would be no lawsuit.  Plaintiff would have been relocated to a UHF Channel between 14 and 36 that had the same coverage as UHF Channel 42 and the FCC would have paid Plaintiff's moving expenses.").  Solomon wishes to argue that the fact that ACI would have had to relocate and would have received at least some reimbursement from the FCC even if it had held a Class A license means that the Channel-3-moving-expenses damages attributable to Solomon's malpractice are either nonexistent or small.  Specifically, Solomon wishes to argue that many of the expenses that ACI did incur and that the FCC did reimburse are the same expenses and reimbursements that ACI would have incurred and received in a counterfactual, Class A-holding/no malpractice world.  Def.'s Expenses Opp'n at 13 ("Plaintiff already received only partial reimbursement from the FCC as an LPTV station, with the FCC applying the same or similar criteria in reviewing the identical expenses.  Thus, the FCC's review of these identical expenses is relevant to the issue of the FCC's application of its criteria for reimbursement of expenses, which criteria were applied to both Class A and LPTV stations.").

This is not an argument that the FCC reimbursement should be subtracted from whatever damages Solomon caused; rather, it is an argument about the quantity of damage Solomon's failure to procure a Class A license actually caused in the first place.  The collateral source rule does not apply to this sort of first-instance damages causation calculation.  *Cf. Crowther v.*

*Consol. Rail Corp.*, 680 F.3d 95, 98–100 (1st Cir. 2012) (Souter, J.) (upholding district court's admission of disability benefits as relevant to whether the plaintiff had been "malingering," i.e. purposely not working, because it was an issue "quite independent[] of collateral source evidence" and "was relevant to his claim of loss from continuing disability attributable to the negligence of the [defendant] railroads"); *Showan v. Pressdee*, 922 F.3d 1211, 1218 (11th Cir. 2019) (upholding over collateral source objection expert testimony on whether expenses the plaintiff had chosen to pay for a medical procedure were "reasonable and necessary" because the defendants did not offer the evidence in order to "try to get . . . 'credit' from the jury based on payments that [the plaintiff] had received"); *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1247 (5th Cir. 1994) ("Technically, the district court was probably incorrect in determining that the Forms literally had no relevance because they were evidence of a collateral source.  As the Plan was a collateral source, the Forms were clearly not relevant (and could not be admitted) with respect to the issue of mitigation (or set-off) of damages.  Yet, the forms may very well have been relevant with respect to the issue of medical causality."); *Barrera v. E. I. Du Pont De Nemours & Co.*, 653 F.2d 915, 920–21 (5th Cir. 1981) (holding that the district court should not have summarily excluded evidence that was inadmissible as direct evidence under the collateral source rule, but should instead have weighed the evidence under Fed. R. Evid. 403, because the evidence was relevant to the distinct issue of impeaching the plaintiff's testimony).

From here, the analysis becomes somewhat cloudy, because ACI does not clarify exactly what evidence about the FCC reimbursement it seeks to exclude, and Solomon does not clarify exactly what evidence about the FCC reimbursement he intends to introduce.  Still, it is at least clear that evidence of which expenses the FCC reimbursed ACI for and of how the FCC evaluated relocation reimbursement claims generally has a "tendency to make . . . more or less

probable" the consequential alleged fact that ACI incurred the same expenses it would have incurred as a Class A holder, Fed. R. Evid. 401, and therefore clears the "low" "relevancy hurdle," *Fitzgerald*, 177 F.3d at 75.

The next step is to determine whether such evidence, though relevant, should nevertheless be excluded because "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see Fitzgerald*, 177 F.3d at 75–76 (evaluating collateral source evidence first by determining Rule 401 relevance and then engaging in a Rule 403 prejudice weighing). On the one hand, the danger of prejudice is real: the very purpose of the collateral source rule is to make sure the jury does not fail to award damages because it feels the plaintiff has already received compensation for its injuries. *Fitzgerald*, 177 F.3d at 75 ("[I]ntroduction of collateral source evidence almost inevitably creates a risk that a jury, informed, say, that a plaintiff has recourse to first-party insurance proceeds, may be unduly inclined to return either a defendant's verdict or an artificially low damage award.").

On the other hand, evidence of which expenses the FCC saw fit to reimburse is highly probative of which expenses and reimbursements would and would not have occurred if, counterfactually, Solomon had not engaged in malpractice and ACI had held a Class A license. And the prejudice can be substantially limited by a "prophylactic instruction," *id.* at 75–76, that whatever damages the jury determines Solomon's malpractice actually caused—those that would not have been incurred if ACI had held a Class A license and had therefore been forced to move only to a channel more desirable than Channel 3—should not be reduced because of any payment ACI received from the FCC. *See ML Healthcare Servs., LLC v. Publix Super Markets,*

*Inc.*, 881 F.3d 1293, 1303–04 (11th Cir. 2018) (upholding admission of collateral source

evidence in part because district court had instructed the jury on the collateral source rule);

*Navelski*, 771 F. App'x at 951–52 (any error in admitting collateral source evidence was

harmless in part because of a limiting instruction); *cf. Wandel v. Kevin Dockett Sr. Trucking,*

*Inc.*, 797 F. Supp. 2d 137, 143–44 (D.D.C. 2011) (in response to jury question asking whether

plaintiff had already been paid by the defendant or its insurance, instructing that "[a]n injured

person may usually recover in full from a wrongdoer regardless of anything he or she may get

from a collateral source unconnected with the wrongdoer" even though there was no evidence of

collateral payments admitted in the case); *Iacangelo*, 2011 WL 13247933, at *4 (noting that the

court would instruct the jury "that whether there is or is not insurance or some other collateral

source by which [the plaintiff] is being compensated or will be compensated, in whole or in part,

is none of the jury's concern").

Thus, the Court will defer ruling on whether FCC reimbursement evidence will be

admitted until the context of the case presented at trial can further inform its Rule 403

discretionary weighing.  Relevant to this consideration will be exactly what evidence Solomon

wishes to submit on the topic[15] and whether Solomon might be able to argue his lack-of-

causation defense based on other evidence instead.  Perhaps, for example, Solomon could make

his case based on evidence of the expenses ACI incurred alone, without reference to the FCC

reimbursement program.  The Court will also evaluate the proposed evidence in light of the other

---

[15] The only evidence related to FCC reimbursement Solomon directly references in his
brief is a public website document explaining the FCC reimbursement program.  Def.'s Expenses
Opp'n. at 15 (apparently mistakenly referring to Exhibit 12 as Exhibit 13); *id.* Ex. 12, ECF No.
274-14.  By itself, this document is likely not especially probative, as it does not reveal which
expenses ACI incurred and which of those expenses might have been necessary even if ACI had
held a Class A license and had therefore been able to move to a channel preferable to Channel 3.

evidence submitted at trial.  *See Navelski*, 771 F. App'x at 951–52 (any error in admitting collateral source evidence was harmless in part because the document "was one piece of evidence admitted over the course of a five-day trial and it was redacted to eliminate much of the [prejudicial] information").

### F.  ACI's Exhibits and Experts Motion – ECF No. 295

Next, ACI moves to exclude several of Solomon's proposed trial exhibits and expert reports.  The Court evaluates each request below.

#### 1.  Sanders Report and Related Exhibits

ACI first moves to exclude the opinion of Solomon's expert John Sanders, who opines that because the Atlanta market is isolated from other large markets, it is dissimilar to the markets of the sales that form the basis of Sloan's comparable sales valuation opinion.  ACI moves to exclude this opinion only "to the extent it is based on Exhibits 51A and 51B."  Decl. W. James Mac Naughton at 6, ECF No. 296 ("Mac Naughton Exhibits and Experts Decl.").  ACI points out that Sanders's expert report does not reference these exhibits, and asks for their exclusion.  *Id.* at 4, 6 n.1.  Exhibit 51A presents two maps, one showing that Atlanta does not directly abut any other major television markets, the other showing that many markets in the Northeast and Mid-Atlantic regions (including Washington, D.C. and Philadelphia) are very close to other major markets.  *Id.* at 1; *see also* ECF No. 296-1.  Exhibit 51B lists geographic media markets and the number of homes they serve.  *See* ECF No. 296-2.

ACI seems to misunderstand the import of these exhibits in two ways.  First, Solomon offers them not to respond to Sloan's comparable sales analysis, but rather to respond to his alternative option market analysis: Sanders opines that Sloan's option sales in Philadelphia and Washington, D.C. do not tell us anything about the market for options in Atlanta, because the Southeast's "less congested" spectrum conditions were not attractive to investors.  Expert Report

of John S. Sanders at 19, ECF No. 116-1; *see* Def.'s Opp'n Pl.'s Mot. *In Lim.* For Exclusion

Def.'s Exs. and Ops. at 3–5, ECF No. 308 ("Def.'s Exhibits and Experts Opp'n").  Second,

Sanders's report does not rely on these exhibits as bases for his report; rather, Solomon offers

them at least in part as demonstrative exhibits to illustrate his testimony about the congestion

differences between the Northeast and Southeast regions.  Def.'s Exhibits and Experts Opp'n at

5.  Courts may admit demonstrative aids geared toward helping the jury evaluate a witness's

testimony.  *See U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46,

53 (D.D.C. 2006), *aff'd*, 530 F.3d 980 (D.C. Cir. 2008).  The Court holds that Exhibits 51A and

51B may be admitted as demonstrative of Sanders's expert testimony, and will admit them upon

introduction of his testimony subject to a limiting instruction which will "inform[] the jury of

[their] purpose and that [they do not themselves] constitute evidence."  *Bray*, 139 F.3d at 1111

(citation omitted).  Further, the Court denies ACI's motion to exclude Sanders's opinion because

of its relationship with Exhibits 51A and 51B.

     ACI makes a similar argument for the exclusion of Exhibits 83, 84, and 85, which are

copies of leases ACI entered into in connection with its operations on UHF Channel 42 and VHF

Channel 3.[16]  *See* Mac Naughton Exhibits and Experts Decl. Exs. N, O, P, ECF No. 297 at 342–

406.  ACI assumes that Sanders's expert report regarding streaming costs relies on these exhibits

without referencing them, and therefore says they should be excluded because they were

belatedly disclosed.  Mac Naughton Exhibits and Experts Decl. at 7 (stating that Exhibits 83, 84,

and 85 were "*apparently* relied on by Sanders to render Sander's [sic] Opinion on ACI's

Streaming Costs" (emphasis added)).  But it is not clear from the face of Sanders's report—

---

[16] These exhibits are the subject of a pending motion to seal, so the Court describes them
only generally.

which cites ACI's bank statements in support of its recitation of costs related to Channel 42—
that his costs analysis depends upon Exhibits 83, 84, and 85. Suppl. John Sanders Report at 2 &
n.4, ECF No. 136-1. Moreover, even apart from any relation to Sanders's reports, these
documents are relevant to the parties' dispute over the amount, if any, of costs ACI reasonably
incurred to move to Channel 3. *See* Def.'s Exhibits and Experts Opp'n at 7–8 ("Defense
Exhibits 83, 84 and 85 are relevant to the issue of the cost savings resulting to Plaintiff by
relocating to Channel 3 with a cheaper tower lease, and delivering about 25% of its programming
to hotels by internet video streaming."). The Court denies ACI's motion to exclude Exhibits 83,
84, and 85.

ACI also moves for the exclusion of Sanders's opinions regarding the comparability of
the markets Sloan relies on and regarding ACI's costs associated with streaming to twenty-four
hotels on the ground that "Defendant has never provided the written report for th[ese] opinions"
as required by Federal Rule of Civil Procedure 26(a)(2). Pl.'s Mem. of Law Supp. Pl.'s Mot. *In
Lim.* for the Exclusion of Def.'s Expert Ops. at 1, ECF No. 295-2 ("Pl.'s Expert Mem."). But
Solomon has disclosed Sanders's reports on both of these topics. Expert Report of John S.
Sanders at 18–20; Suppl. John Sanders Report. The Court denies ACI's motion to exclude
Sanders's expert opinions.

2. Solomon's Expert Opinions on ACI's Business History and Related Exhibits

Next, ACI moves to exclude documents that relate to ACI's business track record,
including its history of losses, and expert opinions from Sanders and Susan K. Patrick that these
losses would affect a market buyer's valuation of ACI's WTHC license as a Class A license.
Mac Naughton Exhibits and Experts Decl. at 7–10. ACI says that the fair market value of its
license must be determined according to its "highest and best use . . . , which may not necessarily
be its historical use." Pl.'s Expert Mem. at 2. As explained above, ACI seeks to establish that

the best use of its license as a Class A would have been to lease its subchannels.  Thus, it says that ACI's past use (and poor performance) is not relevant to how a market buyer would evaluate ACI's license as a Class A, and that evidence of its past performance can serve only to sneak in the "subtext" that "Plaintiff was a losing proposition notwithstanding Defendant's malpractice and therefore not entitled to full compensation for its losses."  Mac Naughton Exhibits and Experts Decl. at 10.  According to ACI, this means that past performance exhibits and opinions must be excluded under Rules 401 and 403.  *See id.*

ACI's citations to cases involving valuation of land do not persuade the Court at this stage that it must restrict the jury to consideration of a subchannel leasing model as the highest and best use of ACI's license as a Class A.  In this case about alleged injury to an intangible, income-producing asset, fair market value "may be based . . . on a buyer's projections of what income he could derive from the asset in the future."  *Schonfeld*, 218 F.3d at 176.  ACI offers expert testimony to suggest that a buyer would have projected future income based on a subchannel leasing model, but that does not preclude Solomon from offering competing expert testimony to suggest that a subchannel model would not have been a realistic use of ACI's license as a Class A or that even if it was, a buyer still may have considered ACI's weak performance using the license to broadcast travel programming to inform its valuation.  And this is exactly what Solomon has done.  *See, e.g.*, Expert Report of John S. Sanders at 13 (opining that the "abundant supply of subchannels" in the Atlanta market makes Sloan's "assumption [that ACI's license as a Class A could be used to] leas[e] 7 subchannels appear . . . implausible); *id.* at 22 ("The Atlanta Channel's history of losses would likely be perceived as a detriment to the potential value.").  Depending on which party's expert account the jury finds more credible,

evidence of ACI's financial history may well bring considerable probative value.  The Court denies ACI's motion to exclude documents and expert testimony showing its history of losses.[17]

### 3.  Superseded Interrogatories

ACI seeks to exclude Exhibits 52, 55, 58, 59, and 105, which are ACI responses to various sets of Solomon's interrogatories, because they are not the most up-to-date responses to Solomon's interrogatories.  ACI says that these responses are out of date, obsolete and "superseded" by more recent responses to the same sets of interrogatories.  Mac Naughton Exhibits and Experts Decl. at 10–12.  But Solomon explains that the different iterations of ACI's interrogatory responses contain different information relevant to his theory that moving to Channel 3 resulted in cost savings for which ACI's damages calculation does not account.  Def.'s Exhibits and Experts Opp'n at 10.  ACI does not cite any authority to support the proposition that older interrogatory responses are excludable merely because they have been "superseded" by a more recent response.  ACI may argue at trial that the older responses are out of date or otherwise misleading.  *Cf. Harris v. Kellogg, Brown & Root Servs., Inc.*, No. CV 08-563, 2016 WL 8201854, at *1 (W.D. Pa. Sept. 6, 2016) (noting that "superseded or withdrawn pleadings in the same proceeding [and] answers to interrogatories" may be controverted or explained by a party, but not suggesting that such statements are inadmissible (citation omitted)). The Court denies the motion to exclude Exhibits 52, 55, 58, 59, and 105.

---

[17] This includes the Expert Report of Richard K. Intner, which ACI says is no longer relevant because Intner's report rebuts that of ACI expert Michael Garibaldi, whom ACI no longer plans to call as a witness.  Mac Naughton Exhibits and Experts Decl. at 10.  But Intner's report also generally opines upon ACI's financial condition, which, as the Court has explained, may turn out to be probative of fair market value.  *See* Expert Report of Richard A. Intner at 4–5, ECF No. 136-2; Def.'s Exhibits and Experts Opp'n at 9–10.

#### 4.  Main Studio Emails

ACI next argues for the exclusion of two emails that relate to the parties' "main studio" dispute.  As the Court has explained, to qualify for Class A status under FCC regulations until 2016, a television station had to either maintain a fully staffed main studio at the same site it had used a main studio as of November 29, 1999, or maintain a fully staffed main studio locally within its coverage area.  *Atlanta Channel, Inc.*, 2020 WL 1508587, at *3–5.  Throughout this litigation, Solomon has contended that ACI did not comply with the main studio rule because its Panama City, Florida location (which it had maintained since the 1990s) was not its main studio, and because its other facility, in Atlanta, did not qualify as a "main studio" under FCC and statutory requirements.  *See id.* at *7–9 & *7 n.12.  Thus, Solomon argues that ACI would not have been eligible for a Class A license even if he had not engaged in malpractice, and ACI is therefore entitled to zero dollars in damages.  Joint Pretrial Statement at 2.  The Court previously held that there were material factual disputes on this issue, including the credibility of conflicting statements by Jud Colley, some of which suggest that Panama City was ACI's main studio, while others suggest that the Atlanta facility was.  *Atlanta Channel, Inc.*, 2020 WL 1508587, at *7–9.

ACI seeks to exclude two emails, Exhibits 98 and 99—in which ACI co-owner Toni Davis and bookkeeper Janet Singletary arguably suggest to attorney Melodie Virtue that ACI's main studio was in Atlanta—on the ground that they are not probative and "improperly bolster the argument Plaintiff's main studio was in Atlanta for purposes of Class A regulation."  Mac Naughton Exhibits and Experts Decl. at 12–13.  ACI argues about the relevance of these statements only insofar as they might relate to the evaluation and credibility of Colley's 2012 statement to the FCC that the Atlanta location was ACI's main studio.  *Id.* at 12 ("Ms. Virtue drafted Mr. Colley's 2012 statement to the FCC.  Whether and to what extent Ms. Virtue relied on Exhibits 98 and 99 in drafting the "main studio" statement is irrelevant.  Nor do Exhibits 98

and 99 shed any light on Jud Colley's own intent regarding the context of his 2012 statement to

the FCC.  Exhibits 98 and 99 are not probative of anything.").  But even apart from any relation

to Colley's 2012 statement, these emails from ACI officials are plainly quite probative of

whether ACI's main studio was in Atlanta or Panama City.  The Court denies ACI's motion to

exclude them.

### 5.   Incomplete Documents

ACI identifies several documents—Exhibits 54, 57, 58, and 95—which it says "are

incomplete and for that reason alone should not be admitted into evidence."  Mac Naughton

Exhibits and Experts Decl. at 14.  ACI says that Exhibits 57 and 58 are missing certain

attachments, but does not explain how the other exhibits are incomplete.  *Id.*  In any event, the

remedy for an incomplete document is not exclusion, but the right to demand admission of the

full document when the document is offered into evidence.  Fed. R. Evid. 106 ("If a party

introduces all or part of a writing or recorded statement, an adverse party may require the

introduction, at that time, of any other part — or any other writing or recorded statement — that

in fairness ought to be considered at the same time.").  Indeed, ACI acknowledges that the list of

proposed trial exhibits already includes full versions of Exhibits 54 and 95.  The Court denies

ACI's motion to exclude Exhibits 54, 57, 58, and 95 on the ground of incompleteness.

### 6.   Deferred Rulings

ACI next moves for exclusion of Exhibit 91, a copy of the D.C. Circuit opinion affirming

the FCC's order upholding the denial of ACI's Class A eligibility statement, as well as Exhibits

86, 87, 106, 107, and 108, various emails involving Solomon and Colley.  ACI contends, without

much explanation, that these exhibits are neither relevant nor probative and must be excluded

under Rules 402 and 403.  Mac Naughton Exhibits and Experts Decl. at 5, 12–13.  The Court

defers a ruling on the admissibility of these exhibits until the context of the case presented at trial can further inform its Rule 402 determination and its Rule 403 discretionary weighing.

The Court similarly defers a ruling on the remaining set of documents addressed in ACI's motion, Exhibits 102 and 103.  These are FCC publications relating to reimbursement policies for stations that had to relocate.  *Id.* at 13–14.  As explained above, the Court defers until trial a ruling on whether and to what extent evidence about FCC reimbursement shall be admitted.

In sum, the Court defers until trial a ruling on the admissibility of Exhibits 86, 87, 91, 102, 103, 106, 107, and 108.  Otherwise, it denies ACI's motion to exclude the exhibits and expert opinions listed in Exhibit A to ACI's Motion *In Limine* for the Exclusion of Defendant's Exhibits and Opinions, ECF No. 295.

### G.  ACI's Trial Exhibits Motion – ECF No. 292

ACI next moves for an order declaring that seven of its trial exhibits—Exhibits 17, 20, 21, 29A, 29B, 30, and 31—are admitted into evidence.  The Court grants the motion.

As the Court has explained above and in a previous opinion, the parties dispute whether ACI complied with two regulatory requirements for Class A licenses, the requirement that a Class A station must maintain a "main studio" in its area of broadcast and the requirement that a Class A station must broadcast an average of three hours of programming that was locally produced within its area of broadcast.  *See Atlanta Channel, Inc.*, 2020 WL 1508587, at *6.  According to Solomon, ACI's WTHC-LD station failed to comply with these requirements, and so would not have received Class A status even in the absence of his malpractice and did not sustain any injury attributable to his malpractice.  *Id.*

Exhibits 17 and 20 are emails between Solomon and Melodie Virtue regarding ACI's Petition for Reconsideration of the FCC's denial of its Class A statement of eligibility.  In Exhibit 17, Solomon writes to Virtue that ACI made the showing required for Class A status.

Decl. W. James Mac Naughton Ex. A, ECF No. 292-1 at 11.  In Exhibit 20, Solomon writes that "Jud's Declaration"—a reference to a 2012 filing in which Jud Colley referred to the Atlanta facility as ACI's "main studio"—was "excellent."  Decl. W. James Mac Naughton Ex. B, ECF No. 292-1 at 13; *see* Decl. W. James Mac Naughton at 3–5, ECF No. 292-1 ("Mac Naughton Plaintiff's Exhibits Decl.").

Both are admissible.  Exhibit 17 reveals Solomon's opinion that WTHC-LD complied with all the Class A requirements, including the local programming and main studio requirements, when he filed the statement of eligibility.  Solomon's opinion is relevant to the issue of whether WTHC-LD in fact met those requirements.  Exhibit 21 is a copy of 47 C.F.R. § 1.52, the regulation requiring attorneys who prepare FCC filings to sign the document to certify that "there is good ground to support it."  This could support a jury inference that Solomon's Exhibit 17 expression of the opinion that WTHC-LD met all Class A requirements was well-informed.

Similarly, Exhibit 20 is relevant to the parties' dispute over what exactly Colley meant when he referred to the Atlanta facility as a "main studio" in the 2012 filing.  The Court has held that there is a genuine dispute of material fact regarding whether Colley meant to say Atlanta was the "main studio" as that term is used in the Class A regulations, or whether he used the term in the distinct context of discussing regulations applicable to full-power television stations. *Atlanta Channel, Inc.*, 2020 WL 1508587, at *8.  Solomon's email statement that he thought the Colley filing was "excellent" tends to show that Solomon did not understand the Colley filing to disavow Panama City as WTHC-LD's "main studio" for Class A purposes, thereby lending some support to the argument that Colley meant something different when he used the term.  That Solomon no longer worked for the law firm representing ACI when he sent these emails does not

diminish their relevance, Def.'s Opp'n Pl.'s Mot. *In Lim.* For the Admission of Pl.'s Exs. at 3, ECF No. 310 ("Def.'s Exhibits Opp'n"); it is plain from the face of the emails that Solomon was providing advice to ACI's then-attorney Virtue regarding ACI's FCC efforts.

As for the remaining exhibits, ACI co-owner Toni Davis plans to testify at trial "about the process for creating the WTHC Programming, from concept, to scripts, to filming and editing." Decl. W. James Mac Naughton Ex. E, ECF No. 292-1 at 24. She plans to use Exhibits 29A and 29B, videos of WTHC-LD programming, and Exhibits 30 and 31, videos of programming from another station Colley and Davis own in New Orleans that were "created in the same manner as the WTHC [p]rogramming," to illustrate her testimony. *Id.* at 24–25. Specifically, Davis will testify that the programming for WTHC-LD and her other stations is "shot on site and edited at Panama City, FL." *Id.* at 25. Thus, the videos are relevant to the disputes over whether WTHC-LD qualified for Class A status because its programming was locally produced and because it maintained a qualifying main studio. The videos will further illustrate Davis's testimony about her "unique business model for the distribution of niche, hyper-local programming." *Id.* Solomon has not explained his Rule 402 and 403 objections to these exhibits beyond short statements that playing the videos would be a "[w]aste of time" and that his objections "are self evident." Def.'s Exhibits Opp'n at 3; Pretrial Statement Ex. A at 2. But each video is, at most, one minute long. Tr. Mot. Hearing at 13, ECF No. 342.

Exhibits 17, 20, 21, 29A, 29B, 30, and 31 shall be admitted into evidence.

### H.  Solomon's Legal Conclusions Motion – ECF No. 293

Solomon moves for an order striking certain portions of the reports of ACI's legal experts, Tom A. Davidson and Peter Tannenwald, which he says encroach upon the province of the jury by offering legal conclusions. Def.'s Mot. *In Lim.* to Exclude the Ops. of Pl.'s Legal Experts that Encroach on the Province of the Court or the Jury at 1, ECF No. 293. Davidson and

Tannenwald are telecommunications lawyers who opine on the regulatory environment

surrounding Class A licenses, which bears on the trial issues of whether ACI's injuries were a

foreseeable consequence of Solomon's malpractice and whether WTHC-LD complied with the

local programming and main studio requirements for Class A eligibility.[18]  *See* Davidson Rep.,

ECF No. 137-4; Suppl. Davidson Rep., ECF No. 152-1; Tannenwald Rep., ECF No. 152-2.

The Court previously addressed similar objections to the opinions of Solomon's expert

Jack N. Goodman, and explained the relevant legal standard:

> Generally, "[e]xpert testimony that consists of legal conclusions cannot properly
> assist the trier of fact" in either "'understand[ing] the evidence' or . . .
> 'determin[ing] a fact in issue.'"  *Burkhart v. Wash. Metro. Area Transit Auth.*, 112
> F.3d 1207, 1212 (D.C. Cir. 1997) (quoting Fed. R. Evid. 702).  This is because
> "[l]egal conclusions . . . 'intrude upon the duties of, and effectively substitute for
> the judgment of, the trier of fact and the responsibility of the Court to instruct the
> trier of fact on the law.'"  *Convertino v. U.S. Dep't of Justice*, 772 F. Supp. 2d 10,
> 12 (D.D.C. 2010) (quoting *United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F.
> Supp. 2d 94, 98 (D.D.C. 2002)).  "[T]he line between an inadmissible legal
> conclusion and admissible assistance to the trier of fact in understanding the
> evidence . . . .is not always bright." *Burkhart*, 112 F.3d at 1212. Generally, though,
> "an expert may offer [an] opinion as to facts that, if found, would support a
> conclusion that the legal standard at issue was satisfied, but [the expert] may not
> testify as to whether the legal standard has been satisfied."  *Id.* at 1212–13.

*Atlanta Channel, Inc. v. Solomon*, No. CV 15-1823, 2020 WL 7013346, at *3 (D.D.C. Nov. 24,

2020).  The Court found that "much of" Goodman's report, which consisted of "background

information about the FCC, broadcast television spectrum, and the Spectrum Act," "would assist

the trier of fact in understanding a complicated field and aid the jury in reaching its own

conclusion with respect to what was foreseeable" in terms of the harms ACI allegedly suffered

---

[18] ACI says that parts of Tannenwald's opinion are "moot" because they respond to an
opinion of Solomon's expert Jack N. Goodman that the Court previously struck.  Pl.'s Mem.
Opposing Def.'s Mot. to Strike the Test. of Messrs. Davidson and Tannenwald at 2, ECF No.
305.  Out of an abundance of caution, the Court strikes the improper portions of Tannenwald's
report anyway.

because it lacked a Class A license.  *Id.* at *7–8.  However, the Court struck portions of

Goodman's report in which he opined on what was "reasonably foreseeable" at the time of the

malpractice, because that was an issue "for the jury to decide."  *Id.* at *8.  Similarly, the Court

permitted Goodman to report on "the laws and FCC regulations concerning" WTHC-LD's

eligibility for Class A status, and "the legal framework at issue and how given facts might fit into

that framework," but struck his legal conclusions on whether WTHC-LD in fact met those

requirements.  *Id.* at *9.

Applying the same considerations, the Court partially agrees with Solomon and strikes

the following[19]:

- "As set forth in more detail herein, it is my opinion that Mr. Solomon . . . ."  Davidson Rep. ¶ 3.

- "(B) should reasonably have anticipated that the failure to submit a completed Class A Certification Form for WTHC could result in LPTV Station WTHC's eventual displacement by existing and future primary services."  Davidson Rep. ¶ 3.

- "Based upon the foregoing, it is my opinion that Mr. Solomon should reasonably have known that the failure to submit a complete Class A Certification for WTHC would likely result in its displacement by a future primary service, such that WTHC would be required to cease operations:"  Davidson Rep. ¶ 48.

- "b. Mr. Solomon should reasonably have known that LPTV stations were subject to displacement by primary users of the television stations, as evidenced by statements in FCC pleadings prepared by Mr. Solomon in this Case as well as FCC decisions and publications announcing the filing of LPTV displacement applications. c. Mr. Solomon should reasonably have known that, as a result of the digital television transition, LPTV stations not afforded Class A status were at high risk of displacement and that, due to strained spectrum capacity, it may not be possible to relocate to an alternative channel for operations. d. Mr. Solomon should reasonably have known that the FCC planned to reallocate television spectrum to new services in order to meet increasing demand for spectrum for wireless communications services. e. Mr. Solomon should reasonably have known that spectrum in an urban market such as Atlanta was highly congested, thereby increasing both the value of this spectrum and the likelihood that displaced LPTV stations would be able to locate alternative channels on which to operate in the event of displacement."  Davidson Rep. ¶ 48.

---

[19] The Court takes no position on whether the legal conclusions offered by Davidson and Tannenwald are correct.

- "As set forth in more detail herein, it is my opinion that (A) the programming aired by WTHC at all times qualified as locally produced programming under the FCC's rules and (B) ACI maintained a main studio for WTHC as required by Section 73.1125 until such time as the rule was eliminated by the FCC."  Suppl. Davidson Rep. ¶ 3.

- "Based upon the foregoing, it is my opinion that programming produced by WTHC was 'locally produced programming' under Section 73.6000 of FCC's rules when WTHC's Class A Certification Form was submitted to the Commission on December 29, 1999 because:" Suppl. Davidson Rep. ¶ 15.

- "d. Because final production of DN programming aired on WTHC at the time it sought Class A status was done at the Panama City Studio location, the studio site used by WTHC as of November 29, 1999, such programming qualified as locally produced programming under Section 73.6000 of the FCC's rules."  Suppl. Davidson Rep. ¶ 15.

- "Based upon the foregoing, it is my opinion that programming produced by WTHC continues to qualify as 'locally produced programming' under Section 73.6000 of FCC's rules because there has been no change in the FCC's policy of treating programming produced at a studio location in existence as of November 29, 1999 as a locally produced programming for purposes of meeting the Local Program Requirement.  This policy was first articulated in the *Class A R&O*, confirmed in the *Class A Reconsideration Order*, and reiterated as recently as two years ago in the *2017 Main Studio Order*."  Suppl. Davidson Rep. ¶ 16.

- "Based upon the foregoing, it is my opinion that WTHC maintained a main studio in conformance with Section 73.1125 of the FCC's rules when WTHC's Class A Certification Form was submitted to the Commission on December 29, 1999 because, at this time,: a. The Panama City Studio met the FCC's requirements governing the location of a Class A station's main studio."  Suppl. Davidson Rep. ¶ 20.

- "On December 29, 1999, the Panama City Studio location was used by WTHC as of November 29, 1999 and thus qualified as a grandfathered main studio under FCC policies.  b. The Panama City Studio met the FCC's minimum staffing requirements under the Main Studio Rule because it was staffed with at least one management-level person and one staff person. *See Colley Decl.* at ¶ 4.  c. The Panama City Studio met the FCC's program origination requirement because it was capable of producing live programming, and had the requisite equipment to do so.  *See Colley Decl.* at ¶ 5."  Suppl. Davidson Rep. ¶ 20.

- "Based upon the foregoing, it is my opinion that WTHC complied with the Main Studio Rule when the incentive auction occurred in 2016, and continued to comply with the Main Studio Rule thereafter to the extent required by the FCC, because:"  Suppl. Davidson Rep. ¶ 21.

- "The Panama City Studio, which was used by WTHC for its program production at the time of the incentive auction, is at the same location as was in existence and used by WTHC as of November 29, 1999 and thus is grandfathered."  Suppl. Davidson Rep. ¶ 21.

- "d. Since November 29, 1999, the Panama City Studio has complied with the minimum staffing and program origination requirements of the Main Studio Rule. *See Colley Decl.* at ¶¶ 4–5." Suppl. Davidson Rep. ¶ 21.

- The entirety of paragraph 7 of the Tannenwald Report.

- The entirety of paragraph 10 of the Tannenwald Report.

As reflected in this list, the Court does not strike certain passages identified in Solomon's motion, such as Davidson's statements that "[t]he FCC expressly stated in the *Class A R&O* that LPTV stations seeking Class A status would not be required to change the location of an existing studio, or build a new studio, to comply with the Class A rules," Suppl. Davidson Rep. ¶ 15(b), and "[u]nder the rules and policies adopted by the FCC in the *Class A R&O*, a LPTV station's main studio location as of November 29, 1999 was grandfathered for purpose of compliance with the Main Studio Rule," *id.* ¶ 20(a).  That is because these statements explain to the jury the complex regulatory background surrounding Class A licenses, but do not express an opinion regarding how that background applies to the legal questions for the jury in this case, namely whether WTHC-LD actually met the requirements for Class A status and whether WTHC-LD's displacement and other injuries were foreseeable.  Thus, for example, in its previous opinion the Court struck the Goodman statement "[i]n my opinion, therefore, WTHC-LD did not in 1999, did not in 2016, and does not now meet the requirements for Class A Television status," *Atlanta Channel, Inc.*, 2020 WL 7013346, at *9 n.11, but left undisturbed Goodman's very next sentence: "The FCC's rule clearly requires that a station to be Class-A eligible [sic], it must broadcast an average of three hours of locally produced programming each week," Suppl. Goodman Rep. ¶ 11, ECF No. 141.

## VI.  CONCLUSION

For the foregoing reasons, and subject to the conditions and qualifications heretofore discussed: ACI's Motions for Partial Summary Judgment (ECF Nos. 301 and 302) are **DENIED**;

Solomon's Motion *In Limine* Concerning Choice of Law on Damages (ECF No. 294) is **DENIED**; ACI's Motion for an Order *In Limine* For The Admission Into Evidence of a Summary of The Reverse Auction Choices Made By Class A Licensees in Atlanta, GA (ECF No. 270) is **GRANTED**; Solomon's Motion *In Limine* to Exclude Incompetent Damages Evidence (ECF No. 299) is **DENIED**; ACI's Motion *In Limine* Regarding Evidence of Plaintiff's Expenses (ECF No. 269) is **GRANTED IN PART**, and the Court defers until trial a ruling on the remainder; ACI's Motion *In Limine* for the Exclusion of Defendant's Exhibits and Opinions (ECF No. 295) is **DENIED IN PART**, and the Court defers until trial a ruling on the remainder; ACI's Motion *In Limine* for the Admission of Plaintiff's Exhibits (ECF No. 292) is **GRANTED**; and Solomon's Motion *In Limine* to Exclude the Opinions of Plaintiff's Legal Experts that Encroach on the Province of the Court or the Jury (ECF No. 293) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  01/29/2022                                         RUDOLPH CONTRERAS
                                                           United States District Judge