## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| THE ATLANTA CHANNEL, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-1823 (RC) |
| | : | | |
| | : | | |
| v. | : | Re Document No.: | 361 |
| | : | | |
| HENRY A. SOLOMON, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL AND GRANTING PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT ON THE COURT'S PREVIOUS PARTIAL SUMMARY JUDGMENT ORDER

## I.  INTRODUCTION AND BACKGROUND

Plaintiff Atlanta Channel, Inc. ("ACI"), which owns a tourism-content television station in Atlanta, brought this legal malpractice lawsuit after its attorney, Defendant Henry Solomon, filed an incomplete license application (called a Statement of Eligibility) on its behalf with the Federal Communications Commission ("FCC").  *See* Second Am. Compl. ¶¶ 26–29, 73–79, ECF No. 69.  Solomon's mistake led to the FCC dismissing ACI's application, costing the company the opportunity to obtain Class A status for its low-power television ("LPTV") license, which bears the call-sign WTHC-LD.  Settlement Agreement, ECF No. 263-2.  Class A status provides an LPTV station with certain protections against displacement from its assigned broadcast frequency by full-power television stations or other spectrum users.  *See* Trial Ex. 201 ¶¶ 6, 18, ECF No. 326-7.  Solomon stipulated to the fact that he was liable to ACI for legal malpractice because of his deficient filing, but the parties disagreed as to whether he was responsible for any damages to ACI and if so, how much.  *See* Settlement Agreement.

The case proceeded to a jury trial on these issues.  There, the jury heard that in 2012 Congress passed a piece of legislation known as the Spectrum Act, which caused the FCC to reallocate a substantial amount of spectrum from television broadcast users to wireless broadband carriers.  *See* Trial Tr. at 89–90.  The FCC implemented this directive by designing a reverse auction process, in which full power Class A stations—but not those LPTV stations like WTHC that lacked Class A status—had several options, including selling their station at a price determined in the auction or moving from their ultra-high frequency ("UHF") channel to an alternative UHF channel with similar coverage.  *See id.*

During the 2017 auction process, the spectrum occupied by WTHC's longtime broadcast channel, UHF Channel 42, was repackaged and sold to a broadband carrier, T-Mobile.  *See* Trial Ex. 201 ¶ 72; Trial Tr. at 91–92.  As a non-Class A LPTV station, WTHC was not entitled to sell its license as part of the auction or to be guaranteed a replacement UHF Channel.  Instead, it was "permitted to remain on [its] existing channel[] until asked to move by the broadband wireless provider to whom the channel had been assigned."  Pl.'s Mem. Supp. Mot. Pursuant to Fed. R. Civ. P. 59 at 16 n.13 ("Mem."), ECF No. 361-1; Trial Tr. at 91–92.  T-Mobile asked ACI to move WTHC off of UFH Channel 42 in 2020, and ACI was forced to relocate to very high frequency ("VHF") Channel 3.  Mem. at 7–8; Trial Tr. at 91–92.  VHF Channel 3 could reach only 2 million viewers, a large reduction from WTHC's previous UHF Channel 42 reach of 5.5 million viewers.  Mem. at 27.

ACI claimed that Solomon's negligent failure to obtain Class A status for ACI caused this downgrade, and presented expert testimony in support of two different methods of establishing the value of the attendant diminution in value of the WTHC license.  Specifically, ACI sought to establish the value of "what ACI would have had" in the absence of Solomon's

malpractice, "a Class A license, serving five and a half million people in Atlanta, less what ACI has, a low-power TV channel serving two million people."  Trial Tr. at 843.  First, ACI's expert looked to the sale prices of comparable Class A stations in order to estimate that if WTHC had been a Class A station with a coverage of 5.5 million people, it would have been worth $6.5 million.  Subtracting WTHC's value on VHF Channel 3's reduced reach yielded a damages estimate of $6.2 million.  Trial Tr. at 178–79; Mem. at 8.  Second, in advance of the 2017 reverse auction, there was a market for options on the proceeds Class A stations would receive in the auction.  By looking at comparable option sales, the expert estimated WTHC's Class A value to be $6.2 million.  *Id.* at 172–73; Mem. at 6.  Solomon presented experts to criticize these evaluations.  In the course of criticizing the work of ACI's damages expert, one of Solomon's experts testified that $900,000 was "within a range of reasonableness" of the actual value WTHC would have had as Class A station.  Trial Tr. at 433.

Central to Solomon's trial theory was the argument that the Spectrum Act and the resulting reallocation of spectrum was an unforeseeable superseding cause of any damages ACI sustained when WTHC downgraded from UHF Channel 42 to VHF Channel 3, and that therefore, Solomon could not be liable for these damages.  *See* Jury Instructions at 17, ECF No. 350.  ACI countered that the Spectrum Act's reallocation of spectrum and displacement of LPTV stations was foreseeable at the time of Solomon's negligent filing in 1999; indeed, the very purpose of Congress's creation of a new Class A status in the Consumer Broadcasters Protection Act of 1999 ("CBPA") was to protect LPTV stations from displacement.  Mem. at 22–23.  Accordingly, Question 1 of the verdict form asked the jury to determine whether Solomon's malpractice had caused any harms "for which . . . each of the following [was] true:

(a) Defendant Henry A. Solomon's legal malpractice played a substantial and direct part in bringing about the harm, (b) the harm was a direct result or a reasonably

probable consequence of Defendant Henry A. Solomon's legal malpractice, and (c) if any acts or omissions by a third party caused the harm, a reasonably prudent person in Defendant Henry A. Solomon's circumstances would have anticipated the third party's acts or omissions and protected against them?

Jury Verdict at 1, ECF No. 356. The jury answered "Yes." *Id.* Separately, Question 3 asked the jury whether the Spectrum Act was a superseding cause of any harms ACI had sustained. *Id.* at 2. The jury answered "Yes" to this question, as well. *Id.*

In other words, the jury concluded that ACI suffered at least some form of harm as a result of Solomon's malpractice that was not also the result of some unforeseeable, liability-severing superseding cause. The jury also apparently concluded that ACI suffered some form of harm that *was* caused by the Spectrum Act, which was an unforeseeable superseding cause. For the harms it identified in response to Question 1—those for which no superseding cause cut off Solomon's liability—the jury awarded $455,000 in compensatory damages for harm to the value of the WTHC license and $65,053.40 in compensatory damages for attorney and consultant fees incurred during ACI's attempts to remedy Solomon's malpractice. *Id.*

Believing the license damages award to be too low, ACI now moves pursuant to Fed. R. Civ. Pro. 59(a)(1)(A) "for a new trial on the amount of ACI's damages for the lost value of the WTHC License." Pl.'s Mot. New Trial Pursuant to Fed R. Civ. P. 59 at 1, ECF No. 361. Apart from its complaints about the jury verdict, ACI requests pursuant to Fed. R. Civ. P. 56(d) that the Court enter judgment in its favor on a separate form in the amount of $28,703. *Id.* Before trial, the Court granted partial summary judgment in favor of ACI in this amount, which represented attorney fees ACI paid to appeal the FCC's dismissal of the Statement of Eligibility. Order Granting in Part and Denying in Part Pl.'s Mot. *in Limine* and Granting Pl.'s Mot. Partial Summ. J., ECF No. 277; Mem. Op. Granting in Part and Denying in Part Pl.'s Mot. *in Limine* and Granting Pl.'s Mot. Partial Summ. J at 13–19, ECF No. 278. The Court denies the motion for a

new trial but grants the request for entry of judgment on the previous partial summary judgment
award.

## II.  LEGAL STANDARD

A district court "may . . . grant a new trial on all or some of the issues—and to any
party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in
an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  This rule commits the decision
whether to order a new trial to the court's discretion; it generally means that a court "should
grant a new trial if the verdict is against the weight of the evidence, damages are excessive, for
other reasons the trial was not fair, or substantial errors occurred in the admission or rejection of
evidence or the giving or refusal of instructions."  *Klayman v. Jud. Watch, Inc.*, No. CV 06-670,
2019 WL 1244079, at *5 (D.D.C. Mar. 18, 2019) (citation omitted), *aff'd*, 6 F.4th 1301 (D.C.
Cir. 2021).  The court should exercise its discretion to order a new trial "sparingly and
cautiously" because it "should be mindful of the jury's special function in our legal system and
hesitate to disturb its finding."  *Id.* (citations omitted).  Also guiding the court's discretion is the
"well-settled principle that Rule 59 is not a vehicle for relitigating old issues, presenting the case
under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the
apple."  *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and
citation omitted).  Thus, the court should grant a new trial "only where [it] is *convinced* the jury
verdict was a seriously erroneous result and where denial of the motion will result in a 'clear
miscarriage of justice.'"  *Klayman*, 2019 WL 1244079, at *5 (internal quotation marks and
citation omitted) (emphasis in original).  All of this means that "[t]he jury verdict stands 'unless
the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that

reasonable men and women could not disagree on the verdict.'" *Id.* (quoting *Czekalski v. LaHood*, 589 F.3d 449, 456 (D.C. Cir. 2009)).

### III.  ANALYSIS

In support of its motion for a new trial on damages related to harms to the WTHC license, ACI contends that the Spectrum Act could not have been "a superseding cause of any of ACI's injuries, either as a matter of fact or law."  Mem. at 2.  It further argues that the jury's $455,000 license-harm damages figure was "not supported by the evidence." *Id.* at 25 (cleaned up).  The Court disagrees with ACI's characterization of the law and facts regarding superseding cause, and finds that there is sufficient evidentiary support for the license-harm damages award. Accordingly, the Court denies the motion for a new trial.

To begin, the Court accepts for the purposes of this opinion two premises ACI advances in support of its new trial motion.  First, the Court accepts for the purposes of this opinion ACI's framing of its case and how it presented this case to the jury.  Specifically, ACI contends "that there were three (3) separate and distinct [harms to the value of the WTHC license, or "License Harms"] occurring over a span of twenty years."  Mem. at 3.  There was the "2000 License Harm": "the loss of the opportunity for Plaintiff to obtain a Class A license for the WTHC License pursuant to the" CBPA, which occurred when the FCC dismissed the defective Statement of Eligibility Solomon had negligently filed on ACI's behalf.  *Id.*  Then, there was the "2015 License Harm," which occurred when the D.C. Circuit affirmed the FCC's dismissal of ACI's Statement of Eligibility, "thereby making ACI's lost opportunity to get Class A status permanent."  *Id.* at 5.  Finally, the "2020 License Harm" took place "when the WTHC License was displaced from UHF Channel 42 by" T-Mobile and had to settle for the inferior distribution of VHF Channel 3.  *Id.* at 6.

The second ACI premise the Court accepts for this opinion is that when the jury found that the Spectrum Act of 2012 was a superseding cause of certain harm, it could not have been referring to either the 2000 License Harm or the 2015 License Harm, and must instead have been referring to the 2020 License Harm.  *See* Mem. at 9.  The 2000 License Harm could not have been caused by the Spectrum Act, which would not pass until 2012.  Nor could the Spectrum Act have caused the 2015 License Harm, because the FCC and D.C. Circuit decisions affirming the FCC's rejection of ACI's faulty statement of eligibility "were not predicated on the Spectrum Act," *see* Mem. at 5; rather, they turned on Solomon's failure to certify ACI's compliance with the eligibility requirements of the 1999 CBPA.  Trial Tr. at 4, 85.

Acceptance of these premises leaves two questions for resolution.  First, was the jury's conclusion that the Spectrum Act was a superseding cause of the 2020 License Harm so unreasonable that the verdict must be discarded and a new trial held?  *See* Mem. at 16–24.  Second, was the jury's award of $455,000 as compensation for the 2000 and/or 2015 License Harms so unreasonable that the verdict must be discarded and a new trial held?  The Court concludes that the answer to both questions is no, and that ACI's arguments to the contrary are not persuasive.  Accordingly, the Court denies ACI's motion for a new trial.

## A.  The Jury's Conclusion That the Spectrum Act Was a Superseding Cause of the 2020 License Harm Was Not Contrary to Law or Evidence

The argument that the jury reasonably concluded that the Spectrum Act was a superseding cause of the 2020 License Harm is straightforward.  Under District of Columbia law, "[a] superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."  *Butts v. United States*, 822 A.2d 407, 418 (D.C. 2003) (cleaned up) (emphasis and citation omitted).  Such a third-party act "breaks the chain of causation if it is not

reasonably foreseeable." *McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708, 716 (D.C. 1991).[1]  "Similarly, there is no proximate causation when the sequence of events leading to an injury is highly extraordinary in retrospect."  *Id.* (internal quotation marks and citation omitted).

There was plenty of record evidence to support the jury's conclusion that when Solomon filed the deficient form in 1999, it was not foreseeable that about twelve years later, Congress would pass the Spectrum Act, thereby setting off a massive reallocation of spectrum via a reverse auction.  For example, the jury heard expert testimony that the Spectrum Act was the result of "a spectrum crisis in the United States; that there was a desperate need for more spectrum for wireless and broadband purposes."  Trial Tr. at 580.  The Spectrum Act, according to Solomon's communications-law expert Jack Goodman, was "an effort to clear spectrum and to take spectrum that had been allocated to broadcast television and reallocate it to wireless broadband."  *Id.*  To do this, Congress "chose to create the first-ever incentive option [sic] where the FCC would offer to purchase spectrum from stations and then repack the remaining stations into a smaller band and then be able to sell the now-cleared spectrum to wireless and broadband

---

[1] In describing this rule, *McKethean* referred to intervening third-party acts that were themselves negligent or criminal, and many District of Columbia superseding cause cases involve negligent or criminal third-party actions.  Of course, the Spectrum Act and resulting spectrum market disruptions were not negligent or criminal.  ACI has not argued, either at trial or in support of the instant motion, that a liability-severing superseding act *must* be either negligent or criminal, and this does not appear to be the rule in the District of Columbia.  *McKethean* invoked the definition of superseding cause found in § 440 of the Second Restatement of Torts, 588 A.2d at 716 n.1, which does not include any limitation to negligent or criminal intervening acts, Restatement (Second) of Torts § 440 (1965) ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.").  *See also District of Columbia v. Cassidy*, 465 A.2d 395, 399 (D.C. 1983) (holding that a child's throwing of a stick during a game was a superseding cause without analyzing whether the child was negligent or criminal in throwing the stick).

companies." *Id.* at 580–81.  Goodman explained that the Spectrum Act "was of great significance" "[i]n the communications legal community" because it "was the first-ever reverse auction . . . anywhere in the world" and because "[i]t would have required a significant— potentially significant reductions in the number of television stations operating in the United States, because at that time no one knew how much spectrum the FCC would attempt to buy." *Id.* at 581–82.  The "first serious discussion" of the concept of holding a reverse auction in order to "deal with what [was] conceived to be a spectrum crisis" resulting from an increased need for broadband capacity did not occur until 2010.  *Id.* at 584, 590.  Goodman explained that "the reverse auction that was contemplated in the statute" was not "anything like the FCC had ever done before." *Id.* at 585.  Thus, Goodman opined that the idea of the Spectrum Act's reverse auction "was not contemplated" "in the period of 1999 to 2000." *Id.* at 586.  He did not believe that in 1999, anyone could have predicted all of the ways in which the FCC would implement a piece of legislation like the Spectrum Act.  *Id.* at 588.

The jury also had access to the 2014 FCC order implementing the Spectrum Act's reverse auction, which described the auction as "a new tool authorized by Congress to help the Commission meet the Nation's accelerating spectrum needs" and as "a once-in-a-lifetime opportunity for broadcasters."  Trial Ex. 49D at 3–4.  Plus, the jury had the opportunity to review a 1999 House committee report on the CBPA, which noted that "at th[at] time," "[w]hether the FCC would auction frequencies used by LPTV stations [was] unclear."  Trial Ex. 211 at 10.  And it likely was not lost on the jury that the Spectrum Act, prompted by shifting technological market needs related to wireless broadband, took place some twelve years after Solomon's negligent filing.  *Cf. Nat'l Health Lab'ys, Inc. v. Ahmadi*, 596 A.2d 555, 560 n.15 (D.C. 1991) (noting "that passage of time, with other factors, could have justified, but did not compel, a

finding of superseding cause"). During the Spectrum Act reverse auction, the spectrum WTHC used to broadcast from UHF Channel 42 was sold to a wireless provider, who ultimately elected to displace WTHC from the channel. *See* Trial Ex. 201 ¶ 72, ECF No. 326-7 at 12; Trial Tr. at 91. It was reasonable for the jury to conclude that the Spectrum Act and the resulting displacement of WTHC was highly extraordinary in retrospect.

ACI's arguments to the contrary fail to persuade. First, ACI reviews evidence that tended to show that it was well known in 1999 that LPTV stations were subject to displacement; the entire point of Solomon's failed project of obtaining Class A status for WTHC was to protect it from displacement. Mem. at 22. In fact, the FCC had reallocated spectrum before 1999 and expressly foresaw the need to adjust spectrum management policies in light of the growth in wireless technology, including by exploring the use of two-sided auctions. *See id.* at 22–24. But the fact that there was evidence from which the jury might reasonably have concluded that the Spectrum Act *was* foreseeable in 1999 does not establish that it was unreasonable for them to weigh conflicting evidence and conclude that the Spectrum Act was *not* foreseeable. *See Martinez v. District of Columbia*, 503 F. Supp. 2d 353, 357 (D.D.C. 2007) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150–51 (2000)).

Indeed, the jury could have credited Goodman's explanation of why the Spectrum Act reverse auction was different in kind from previous FCC auction-style spectrum allocation efforts. *See* Trial Tr. at 585–87. Goodman also suggested that the reverse auction incentives facilitated the FCC's exercise of pre-existing reallocation authority by providing a new means of avoiding "political upheaval" that may have accompanied reallocation in the absence of these

incentives.  *See* Trial Tr. at 588.  Additionally, Solomon testified that the Spectrum Act process

was "revolutionary' because it "was not just a reallocation of spectrum.  This was something

unprecedented that -- the purpose was to actually clear the spectrum band, not just move

spectrum around, but get television stations, as many as possible, off the air, by hook or by

crook."  Trial Tr. at 289–90.  Reinforcing this testimony was an FCC slideshow that explained

that the Spectrum Act presented the FCC with "the *unique* ability to unlock value for

[b]roadcasters by reorganizing the 600 MHz spectrum band into contiguous blocks on a

nationwide basis and reallocating it for wireless use."  Trial Ex. 49E at 4 (emphasis added).  This

record is not an "exceptional" one that permits the Court to depart from the "ordinar[y]" course

of leaving the factual question of the foreseeability of an intervening cause to the jury; it is not

"clear that reasonable people could draw but one conclusion."  *See Nat'l Health Lab'ys, Inc.*, 596

A.2d at 560 (citation omitted and cleaned up).

 Second, ACI relies on § 442B of the Second Restatement of Torts and cases from outside

the District of Columbia to argue that because Solomon's negligent filing may have created the

risk of WTHC being displaced from its channel, and that the general harm of displacement may

have been foreseeable, the Spectrum Act (even if unforeseeable) cannot relieve Solomon of

liability for the 2020 License Harm.  Mem. at 18–20.  Section 442B states:

> Where the negligent conduct of the actor creates or increases the risk of a particular
> harm and is a substantial factor in causing that harm, the fact that the harm is
> brought about through the intervention of another force does not relieve the actor
> of liability, except where the harm is intentionally caused by a third person and is
> not within the scope of the risk created by the actor's conduct.

Restatement (Second) of Torts § 442B (1965).  A comment to this section explains that "[i]f the

actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur,

and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that

the harm is brought about in a manner which no one in his position could possibly have been

expected to foresee or anticipate." *Id.* cmt. (b).  In other words, the § 442B approach holds the tortfeasor liable for all harms stemming from his negligence so long as the type of harm was foreseeable, without regard for whether an intervening third-party act that contributed to the harm was itself foreseeable.  Thus, ACI argues that so long as a displacement harm was foreseeable, Solomon is liable whether or not the Spectrum Act was foreseeable.  Mem. at 20.

The problem with ACI's argument is that no District of Columbia case has endorsed § 442B of the Second Restatement.  The District of Columbia-law cases ACI cites rely on *other* sections of the Second Restatement that discuss intervening and superseding causes and/or proximate cause generally.  *Rieser v. District of Columbia*, 563 F.2d 462, 479–80 & 480 n.93 (D.C. Cir. 1977) (citing § 441, § 452, and § 442's general list of "[f]actors for determining whether an intervening force is a superseding cause"), *opinion reinstated in part on reh'g*, 580 F.2d 647 (D.C. Cir. 1978); *Butts*, 822 A.2d at 418 (citing § 440 and citing § 441); *McKethean*, 588 A.2d at 716 n.9 (citing § 440); *District of Columbia v. Frick*, 291 A.2d 83, 84 (D.C. 1972) (citing §§ 430–32); *see also Beattie v. United States*, 756 F.2d 91, 136, 138 (D.C. Cir. 1984) (Wald, J., concurring) (citing § 442B for the uncontroversial proposition that "[a]s a general matter in tort law, the intervening intentional or criminal acts of third parties will break the chain of causation" and the non-applicable proposition that "[u]nder traditional proximate cause doctrine, any substantial factor in causing the harm is *a* proximate cause to which liability attaches, not just the last proximate act which could have prevented the harm" (emphasis in original) *abrogated on other grounds by Smith v. United States*, 507 U.S. 197 (1993).  What's more, District of Columbia law superseding cause cases routinely depart from the § 442B approach of focusing on the risk and foreseeability of the sort of *harm* the plaintiff suffered, and instead analyze whether the *intervening third-party action or force* that brought about the harm

was foreseeable.[2] *Romero v. National Rifle Ass'n of America, Inc.*, 749 F.2d 77, 79–81 (D.C. Cir. 1984) ("In the District of Columbia, a defendant can be held liable for damages resulting from intervening acts of third parties if the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against" (cleaned up)); *District of Columbia v. Carlson*, 793 A.2d 1285, 1290 n.5 (D.C. 2002) (plaintiff "was required to show" that a third party's "particular conduct" was foreseeable in order for the defendant to be held liable); *White v. United States*, 780 F.2d 97, 107 (D.C. Cir. 1986); *de Los Rios v. NationsBank, N.A.*, 911 F. Supp. 8, 11 (D.D.C. 1995); *McKethean*, 588 A.2d at 716; *Morgan v. District of Columbia*, 468 A.2d 1306, 1318 (D.C. 1983); *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980); *Convit v. Wilson*, 980 A.2d 1104, 1127 (D.C. 2009); *District of Columbia v. Doe*, 524 A.2d 30, 32–33 (D.C. 1987); *Marsh v. Barry*, 824 F.2d 1139, 1144 (D.C. Cir. 1987); *District of Columbia v. Cassidy*, 465 A.2d 395, 398–99 (D.C. 1983).

Thus, under District of Columbia law, the superseding cause question is not whether the type of harm, here displacement, was foreseeable. Instead, the question is whether something like the third-party act that caused the defendant's negligence to ripen into a particular

---

[2] Many of these cases involve criminal intervening third-party actions, and so apply a heightened foreseeability standard compared to non-criminal third-party actions: "When an intervening act is criminal, this court demands a more heightened showing of foreseeability than if it were merely negligent . . . . The defendant will be liable only if the criminal act is so foreseeable that a duty arises to guard against it." *District of Columbia v. Carlson*, 793 A.2d 1285, 1290 (D.C. 2002) (quoting *McKethean*, 588 A.2d at 716–717 (omission in original)). Though the Spectrum Act was not criminal and this heightened standard does not apply, these cases remain relevant to the extent they demonstrate that the object of the foreseeability inquiry is the third-party act, not the type of harm the plaintiff suffers. *See, e.g.*, *id.* ("We hold that even though [third party] Mr. Poe's actions violated a criminal statute, [the plaintiff] met his heightened burden of showing *that Mr. Poe's actions* were foreseeable in light of the District's negligence" (emphasis added)). The only difference between these cases and the instant case is the difference in the degree of foreseeability that must obtain for a defendant to be liable despite an intervening cause.

displacement harm, here Congress's passage of the Spectrum Act and the resulting mass reallocation of spectrum and 2020 License Harm, was foreseeable. *See Carlson*, 793 A.2d at 1290 n.5 (D.C. 2002). As the Court has explained, the trial record contained evidence from which the jury reasonably concluded that it was not.

Third, ACI argues that, "as a matter of law," the Spectrum Act could not have been unforeseeable because "[a]ny company doing business in a highly regulated industry is always subject to the foreseeable possibility the rules will change." Mem. at 21–22. But the cases ACI marshals in support do not address foreseeability in the context of tort liability; rather they involve constitutional and promissory estoppel arguments related to regulatory changes affecting various interests. *Id.* (citing *Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 91–92 (1958); *Multi-State Commc'ns, Inc. v. FCC*, 728 F.2d 1519, 1525–26 (D.C. Cir. 1984); *American Express Travel Related Servs., Inc. v. Sidamon–Eristoff*, 669 F.3d 359, 369 (3rd Cir. 2012); *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1275 (6th Cir. 1989); *Morris v. Runyon*, 870 F. Supp. 362, 375 (D.D.C. 1994); *McAndrews v. Fleet Bank of Massachusetts, N.A.*, 989 F.2d 13, 19 (1st Cir. 1993)). And in any event, Solomon's superseding cause theory does not argue that the Spectrum Act changed the regulatory status of WTHC as an LPTV license in an unpredictable way—as ACI goes to great lengths to point out, the Spectrum Act did not change WTHC's regulatory status. Mem. at 12–16. Rather, Solomon argued to the jury that the Spectrum Act created the incentive-auction conditions necessary to facilitate a large-scale reallocation of spectrum from broadcast to broadband use, which in turn caused WTHC to be displaced. *See, e.g.*, Trial Tr. at 588; Trial Ex. 49D at 3–4; Def.'s Opp'n Pl.'s Mot. New Trial at 12 ("Opp'n"), ECF No. 362.

ACI's final set of arguments against the jury's superseding cause conclusion shifts the focus from the foreseeability question to a mistaken legal premise regarding the distinct requirement that a superseding cause be "independent."  ACI says that "[i]n the District of Columbia, an act that was highly extraordinary in retrospect excuses the original tortfeasor from liability only if that highly extraordinary act was, by itself and standing alone, an independent cause of the injury." Mem. at 11.  It is true that to be a superseding cause, a third-party act must be "independent" in the sense of being "disconnected from the negligence" of the original tortfeasor defendant.  *Smith v. Hope Vill., Inc.*, 481 F. Supp. 2d 172, 204 (D.D.C. 2007) (citation omitted).  Plainly, the Spectrum Act was independent in this sense: Solomon's negligent filing did not cause Congress to conceive of and pass the Spectrum Act to authorize the reverse auction.  But there is no support for ACI's leap to the conclusion that a superseding cause must be "independent" in the additional sense of being "the sole cause" of the injury "by itself and standing alone."  Mem. at 11; Pl.'s Reply Mem. Supp. Mot. Fed. R. Civ. P. 59 at 2, 10 n.14 ("Reply"), ECF No. 366.  Such a rule would make little sense; the very concept of superseding cause assumes that an injury can be caused both by a tortfeasor's negligence and by a subsequent third-party act.  *See, e.g.*, *Butts*, 822 A.2d at 418 ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about" (cleaned up) (emphasis and citation omitted)).

Thus, even if they are correct, ACI's assertions that the Spectrum Act did not grant the FCC any new displacement authority with respect to LPTV stations like WTHC are irrelevant to whether the Spectrum Act was a superseding cause of the 2020 License Harm.  Specifically, ACI says that non-Class A LPTV stations were not eligible to participate in the reverse auction, that

the FCC had the authority to remove LPTV stations from their channels and reassign these channels under 47 U.S.C. § 303(y) both before and after the Spectrum Act; that the Spectrum Act did not grant the FCC any new authority to displace FCC licenses or to auction channels occupied by LPTV stations to other users such as broadband providers; and that the Spectrum Act did not authorize the FCC to pay LPTV stations to voluntarily relinquish their channels. Mem. at 12–16.

These arguments miss the point: Whether or not the Spectrum Act granted the FCC new authority to reassign WTHC's spectrum, the Act at the very least prompted the FCC to do so. The parties stipulated, and shared with the jury, that "the FCC enacted rules directed by the Spectrum Act" that provided for the surrender of UHF Channels 38 to 51 by television broadcasters. Trial Ex. 201 ¶ 64, 72. The jury also reviewed the FCC's Spectrum Act implementation order, in which the FCC explained that the Spectrum Act required it to make spectrum available to sell to wireless providers in the auction and that it would use "its longstanding spectrum management authority . . . as well as the specific grant of authority in the Spectrum Act" to carry out this reallocation. Ex. 49D at 52. Thus, the Spectrum Act kicked off the mass reallocation of UHF spectrum that required WTHC's displacement. *See* Trial Tr. at 91–92 (ACI co-owner Jud Colley testifying that "during the course of the spectrum auction," WTHC's UHF Channel 42 spectrum was sold to T-Mobile, who eventually exercised its option to require WTHC to vacate the channel).[3] The FCC may have already had the authority to

---

[3]ACI seems to admit that the Spectrum Act "played a concurrent role in the creation and sale" to T-Mobile of the spectrum block that covered the spectrum WTHC had used when packaged as UHF Channel 42. Reply at 6. This sale meant WTHC had to move, which the FCC accomplished by means of an exercise of its pre-Spectrum Act 47 U.S.C. § 303(y) authority. Reply at 6–7. This account does not dispute the key point: that the Spectrum Act prompted the sale of the spectrum WTHC was using, which, in turn, prompted the displacement of WTHC from that spectrum. Or, in ACI's words, "pre-Spectrum Act law was applied *in conjunction with*

displace WTHC, but the jury could reasonably have concluded that the Spectrum Act caused the FCC to exercise this authority and/or to do so in a way it otherwise may not have.

To put all of this another way, ACI stresses that its communications-law expert "testified that long before the Spectrum Act was adopted, LPTV was a secondary user of spectrum and *could be* displaced by the FCC in the reallocation of spectrum from broadcast television to wireless broadband providers." Reply at 4. Fair enough. But the jury reasonably could have concluded that the Spectrum Act, by triggering a mass reallocation of spectrum and a resulting need for mass displacement, made it so that WTHC *would be* displaced. Thus, it was reasonable for the jury to conclude that the Spectrum Act was "independent" of Solomon's negligence and substantially contributed to WTHC's displacement injury. The jury was not required to go further and conclude that the Spectrum Act was the sole cause of this injury in order to decide that the Act was a superseding cause.

### B. Trial Evidence Supports the Jury's License-Harm Damages Award

Accepting ACI's characterization of how the case was presented to the jury but rejecting ACI's arguments that the Spectrum Act could not have been a superseding cause of the 2020 License Harm leaves the Court to conclude that the jury's award of $455,000 in compensatory damages for "harm(s) to the value of the WTHC license," Jury Verdict at 2, sought to compensate ACI for the 2000 and/or 2015 License Harms (which could not have been caused by the Spectrum Act). ACI claims that the jury's award "is not supported by any evidence and must be vacated." Mem. at 26. To the contrary, a review of the record reveals that the jury's award finds support in the evidence, which means that the Court may not order a new trial on the

---

*the Spectrum Act* to effectuate the transfer of UHF Channel 42 in Atlanta from ACI to a wireless broadband provider." *Id.* at 7 n.9 (emphasis added).

ground of inadequate damages. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996) ("The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence. Thus, if the verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." (emphasis in original)); Mem. at 25 (ACI quoting this standard).

"The 2000 License Harm was the loss of the opportunity for Plaintiff to obtain a Class A license for the WTHC License." Mem. at 3. The purpose of Class A status would have been to protect WTHC from displacement. *See* Trial Ex. 201 ¶¶ 6, 18, 68, 71. The 2015 License harm occurred when the loss of opportunity to obtain Class A status became permanent because ACI had exhausted all avenues for review of the FCC's dismissal of its Statement of Eligibility; this solidified the risk of displacement. *See* Mem. at 5. Thus, in assessing damages for the 2000 and/or 2015 License Harms, the jury was tasked with determining the difference between "what ACI would have had if not for the harm Mr. Solomon caused"—a Class A license protected from displacement—and "what ACI had immediately after sustaining the harm"—an LPTV license that had permanently lost the chance to receive Class A status and therefore was subject to displacement risk. Jury Instructions at 22.[4]

There was evidence that the first figure, WTHC's value as a Class A, was $900,000. In the course of explaining his disagreement with ACI's expert Stephan Sloan's much higher valuation of WTHC as a Class A, Solomon's damages expert John Sanders related that he had made adjustments to Sloan's calculations that "brought the value down to the $900,000 range,"

---

[4] ACI does not argue that the Court incorrectly instructed the jury on this (or any other) point.

which he said was "within a range of reasonableness."  Trial Tr. at 432–33.  Sloan testified that

WTHC would have been worth as much as $6.5 million as a Class A, but it was up to the jury to

resolve this dispute between witnesses.  *Martinez*, 503 F. Supp. 2d at 357.

How, then, to determine the second figure, the value of WTHC as a non-Class A LPTV

license facing a risk of displacement?  ACI's counsel, co-owner, and communications-law expert

each told the jury that the difference between a Class A license and an LPTV license was the risk

of displacement inherent in LPTV status but absent with Class A status.  *See* Trial Tr. at 5, 16,

23, 36–37, 42–43, 228.  In other words, it was reasonable to conclude that all else being equal, an

LPTV license and a Class A license are equivalent in value but for the risk of displacement

associated with a non-Class A LPTV license's secondary status.  And the CBPA committee

report told the jury that the risk that an LPTV station would be displaced due to an FCC

reallocation auction was 50 percent.  Trial Ex. 211 at 10 (reporting the Congressional Budget

Office's estimate "that there is a 50 percent chance that the FCC will auction channels used by

secondary licensees under current law").  Further, though there was conflicting evidence on this

point, the jury heard testimony that an LPTV license that had been displaced was worth nothing.

*Compare* Mem. at 6 (ACI co-owner "Mr. Colley testified the value of the WTHC License in

2017 without a Class A License was zero." (citing Trial Tr. at 419)), *with* Trial Tr. at 178–89

(ACI's expert testifying that the value of WTHC as an LPTV license displaced to a VHF station

was about $200,000.  Thus, the jury reasonably could have determined that the value of WTHC

as an LPTV subject to a 50 percent risk of displacement was equivalent to the value of WTHC as

a Class A subject to a 50 percent chance of being displaced and therefore worth zero: ($900,000

times 50 percent) plus (zero times 50 percent), or $450,000.  The difference between what ACI

would have had absent the negligence (a $900,000 Class A) and what ACI had after the

negligence (an LPTV worth $450,000) was $450,000.  Or put another way, as a result of

Solomon's malpractice ACI had a license that was worth $900,000 when broadcasting on a UHF

channel but this value was discounted by the 50 percent chance that the license would be

displaced from this channel and worth zero dollars: $450,000.  Quite close to the jury's $455,000

award.  To be sure, this potential jury method did not result in exactly $455,000, and may not

have followed scientific accounting and valuation standards in accounting for the 50 percent

displacement risk.  The $5,000 discrepancy sought, perhaps, to account for the fact that WTHC

had by 2015 made it over fifteen years without being displaced; the jury may have thought that

the Congressional Budget Office had overestimated the risk of displacement when it published

the 50 percent figure in 1999.  In any event, the evidence demonstrates that the jury's $455,000

award was "within a reasonable range," which precludes the Court from disturbing it.  *Cf. Carter*

*v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1238–39 (D.C. Cir. 1984) ("In reviewing the actual

amount of a jury's award, our task is limited and a reluctance to interfere is our touchstone.  This

limited role reflects the obvious fact that we are not privy to the jury's deliberations.  In

reviewing the amount of the jury's award, we thus need not—and indeed cannot—reconstruct the

precise mathematical formula that the jury adopted.  Nor need we explore every possible

quantitative analysis or compute the basis of each penny and dollar in the award.  Our inquiry

ends once we are satisfied that the award is within a reasonable range and that the jury did not

engage in speculation or other improper activity.").[5]

---

[5] ACI also collects evidence from which the jury might have reached $455,000 in
damages by gleaning the difference between the value of an LPTV station serving the 5.5 million
population reach of UHF Channel 42 and an LPTV station serving the 2 million population reach
of VHF Channel 3—in other words, the loss associated with the 2020 License Harm
displacement.  Mem. at 27.  ACI takes issue with this approach because it did not "attribute[] any
value to a Class A license" or "to its lost class A status."  *Id.*; Reply at 12 n.15.  But as the Court
has explained, the difference between a Class A and an LPTV is displacement protection—the

In its reply brief, for the first time, ACI argues that Solomon's expert's $900,000 estimate "was admitted in error."  Reply at 12.  ACI's complaint is that Sanders reached the $900,000 not after conducting a valuation of his own, but rather in the course of critiquing Sloan's discounted cash-flow valuation method, a method Sloan did not present at trial (Sloan relied on other valuation methods at trial).  *Id.* at 13.  ACI raised the same objection at trial, but the Court overruled it after confirming that Sanders had presented the $900,000 estimate in his pre-trial report.  Trial Tr. at 433.  Even though Sanders was tasked with critiquing Sloan's valuations rather than conducting an "official appraisal" or valuation opinion of his own, in the course of this task he effectively conducted his own valuation based on his own calculations explained in his pre-trial report, and presented the results to the jury.  *See id.* at 434, 437, 532.

ACI now argues that the Court's ruling was inconsistent with a later ruling that barred Sanders from testifying about the feasibility of WTHC generating income from a subchannel leasing model on the ground that this information was relevant only to Sloan's discounted cash-flow method, which was "no longer in the case."  Trial Tr. at 443–44; Reply at 13.  But these rulings were not in conflict: the value of WTHC as a Class A was a central issue in the case, so Sanders's estimate of that value had relevance and probative value far beyond its utility in

---

consequence of "lost Class A status" *was* displacement—so the jury could have concluded that for all other purposes, a non-displaced LPTV and a Class A reaching 5.5 million people would be equivalent in value.  Of course, for the jury to have calculated damages in this way, it would have to have concluded that the Spectrum Act was a superseding cause not of the 2020 displacement but of something else.  Perhaps, for example, the jury concluded that the Spectrum Act as a superseding cause of the speculative increase in the option-market value of Class A stations in the run-up to the reverse auction, which may have impacted some of Sloan's Class A valuations.  *See* Mem. at 25.  Because ACI does not frame its motion to suggest that the jury could have found the Spectrum Act to be a superseding cause of anything other than the 2000 License Harm, the 2015 License Harm, or the 2020 License Harm, and because there is ample evidence to support a jury conclusion that the Spectrum Act was a superseding cause of the 2020 License Harm, the Court does not ground its denial of ACI's motion on this potential avenue of jury calculation.

critiquing the obsolete discounted cash-flow method.  *See* Fed. R. Evid. 401, 402, 403.  The

subchannel characteristics of the Atlanta market did not.  Therefore, Sanders's $900,000 estimate

was properly admitted and was a permissible basis for the jury's damages award.

### C.  The Court Grants ACI's Uncontested Request for Entry of Judgment to Effect the Court's Previous Partial Summary Judgment Order

In addition to requesting a new trial on license harm damages, ACI moves under Fed. R.

Civ. P. 56(d) for the entry of judgment via a separate document in the amount of $28,703, which

represents damages in the form of attorney fees ACI paid to appeal the FCC's dismissal of the

Statement of Eligibility.  Pl.'s Mot. New Trial Pursuant to Fed R. Civ. P. 59.  The Court

previously granted partial summary judgment in favor of ACI in this amount (the jury

subsequently awarded ACI $65,053.40 in additional attorney and lobbying fees incurred in the

effort to reverse the FCC's dismissal of the statement of eligibility).  Order Granting in Part and

Denying in Part Pl.'s Mot. *in Limine* and Granting Pl.'s Mot. Partial Summ. J., Mem. Op.

Granting in Part and Denying in Part Pl.'s Mot. *in Limine* and Granting Pl.'s Mot. Partial Summ.

J., ECF No. 277; ECF No. 278 at 13–19; Jury Verdict at 2.  Solomon does not object to the entry

of such a judgment.  *See* Opp'n at 14 n.3.  Accordingly, the Court grants this motion.

## IV.  CONCLUSION

For the foregoing reasons, ACI's Motion for a New Trial Pursuant to Fed. R. Civ. P. 59

(ECF No. 361) is **DENIED**.  ACI's Motion for the Entry of Judgment by a Separate Document

in the amount of $28,703 is **GRANTED**.  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.

Dated:  09/01/2022                           RUDOLPH CONTRERAS
                                                  United States District Judge